IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| ANGELA PRICE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NUMBER: |
| | ) | 3:06-cv-742-MEF |
| ROANOKE CITY BOARD OF | ) | |
| EDUCATION, | ) | |
| | ) | |
| Defendant. | | |

**ROANOKE CITY BOARD OF EDUCATION'S BRIEF IN
SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

<u>STATEMENT OF UNDISPUTED FACTS</u>

1.    Plaintiff Angela Price accuses a co-worker Jerrell Cottle at Handley Middle School of sexual harassment. (Ex. 1 Amended Complaint.)

2.    Price never reported her complaint to a supervisor prior to filing an EEOC complaint:  not to her principal; not to her female assistant principal; not to the superintendent.  (Ex. 2, Price Depo. 28, 62-63; Ex. 3, Marcum Depo. 13; Ex. 4, Foster Depo. 6-7; Ex. 5, Benefield Depo. 6.)

3.     Price represented in her complaint to the EEOC that she had reported her problem with Cottle to the assistant principal.  Price admitted this was not true.

Q.    You never went to the assistant principal with a direct complaint, did you?

A.    No.

(Ex. 2, Price Depo. 107.)

4.    Price knew to report sexual harassment to her supervisor.  (Ex. 2, Price Depo. 51, 120, 52-53.)

5.    Price attended a sexual harassment seminar given by the District on February 16, 1998.  (Ex. 2, Price Depo. 23-25, 49.)

6.    After the seminar she reported a problem to her supervisor in accordance with the policy.  (Ex. 2, Price Depo. 30, 51.)

7.    Price admitted knowing to go to her supervisor concerning the prior incident.  (Ex. 2, Price Depo. 52-53.)

8.    As soon as Price reported the prior incident to her supervisor, it stopped.  (Ex. 2, Price Depo. 51.)

9.    As soon as Price's complaint against Cottle came to the attention of her supervisors, it stopped.  (Ex. 2, Price Depo. 62, 108.)

10.    Q.   You indicate that you complained to the assistant principal. Who was the assistant principal that you complained to?

A.   That was Robbie Benefield.  That was the comments being made in front of the office.  I assumed she heard.

Q.   All right.  Here you're telling the EEO that you went to the assistant principal and complained, that wouldn't be true, would it?

A.   Not a direct complaint.

Q.    You never went to the assistant principal with a direct complaint, did you?

A.   No.

Q.   She may have been in the vicinity when you were talking with other people, but that's the closest you came to sharing with the assistant principal your concern about Cottle; would that be right?

A.   Yes.

Q.   And you say, but nothing has been done.  Did you expect or ever ask the teachers to do something about Cottle?

A.   Not them personally, no.

Q.   Did you ever ask the school secretary to do something about Cottle?

A.   Not a direct -- no.

Q.   Did you ever ask the counselor in '03 to do something about Cottle?

A.   No.

Q.   Did you ever ask the assistant principal to do something about Cottle?

A.   No.

Q.   So you never asked them to do anything about Cottle?

A.   No.

Q.   But as soon as this was brought to the attention of the superintendent, principal, and assistant principal, they did something about it?

A.   Yes.

(Ex. 2, Price Depo. 106-108.)

11.   Rosemarie Marshall, school secretary and bookkeeper, talked with Price almost daily.  (Ex. 6, Marshall Depo. 7.)

12.     Price mentioned to Marshall that Cottle had asked her to go to Florida.

(Ex. 6, Marshall Depo. 7.)

13.     Price did not seem upset when she mentioned this to Marshall.  (Ex. 6,

Marshall Depo. 8.)

14.     Marshall thought nothing of this information because Cottle had made

the same comment to Marshall in a joking manner. (Ex. 6, Marshall Depo. 8.)

15.     Q.     Okay.  And what did you say, did you say anything to
Price when she made the comment about him asking her to go to
Florida?

A     No, I did not.

Q     And did you believe that he had asked her to go to
Florida?

A     There was a possibility because he's a very friendly guy
like that and he had also said something to me to that effect one time,
I knew it was a family vacation, we had talked about it when he was
picking up his check, and so when I went outside that afternoon, I
said, "I'm so jealous because you're going to Florida."

He said, "Well, just hop in and let's go," but it was a
family vacation.  I took, you know, I didn't think anything about it.

(Ex. 6, Marshall Depo. 8.)

16.     Marshall does not believe Cottle was sexually harassing Price.  (Ex. 6,

Marshall Depo. 9.)

17.     A.     She never made any remarks, you know, that was, that would

make me think she was upset and she was smiling about it when she would tell us.

(Ex. 6, Marshall Depo. 20.)

18.    Both Price and Cottle are part-time crossing guards at Handley Middle School in the Roanoke School System.  (Ex. 2, Price Depo. 12.)

19.    Cottle is a 68-year old retired CSX Railroad manager, who supervised some one hundred CSX dispatchers.  (Ex. 7, Cottle Aff. 1.)

20.    Cottle has never been accused of employee misconduct or sexual harassment in his entire career.  (Ex. 7, Cottle Aff. 1.)

21.    The EEOC complaint was filed in September of 2005.  (Ex. 8, EEOC Charge of Discrimination.)

22.    Cottle had knee surgery in January of 2005; and again in June of 2007.  Cottle uses a walker. (Ex. 7, Cottle Aff. 2; Ex. 9, Cottle Depo. 25.)

23.    Roanoke has a no tolerance sexual harassment policy.  (Ex. 10, Sexual Harassment Policy.)

24.    The policy appears in the District's policy manual and in the Student Handbook.  (Ex. 3, Marcum Depo. 66, 76.)

25.    The District conducts classes at the beginning of each school year on sexual harassment.  Employees are told to report harassment to their supervisor. (Ex. 9, Cottle Depo. 12; Ex. 5, Benefield Depo. 8; Ex. 4, Foster Depo. 10.)

26.    Greg Foster was the principal of Handley Middle School during the 2004-2005 school year.  ((Ex. 11, Foster Aff. 1; Ex. 4, Foster Depo. Ex. 1.)

27.    Robbie Benefield was the assistant principal of Handley Middle School during the 2004-2005 school year.  (Ex. 2, Price Depo. 16; Ex. 5, Benefield Depo. Ex. 1.)

28.    Chuck Marcum was the superintendent of the Roanoke City School System during the 2004-2005 school year.  (Ex. 2, Price Depo. 17; Ex. 3, Marcum Depo. Ex. 1.)

<u>Allegations of Sexual Harassment</u>

29.    Price alleged in her EEOC complaint that she suffered sexual harassment by Cottle during the 2003-2004 school year.  According to Price the harassment persisted throughout the 2004-2005 school year and ultimately through October 2005.  (Ex. 2, Price Depo. 108-109, 110-111.)

30.    Price would on occasion approach Cottle at his crossing guard post in the mornings but ceased doing so as of December 2004.  (Ex. 2, Price Depo. 55-56.)

31.    Price recorded the dates of Cottle's alleged sexual harassment in a pocket calendar she kept in her purse.  After six months of logging incidents of harassment in this calendar, Price transferred the dates to a document stored on her computer and threw away the calendar.  The first computer entry dates back to the fall of 2002/Winter of 2003.  (Ex. 2, Price Depo. 20-22.)

32.    Price characterized Cottle's inappropriate interactions with her during the 2002-2003 school year as sporadic and admitted she did not feel threatened or upset by them.  (Ex. 2, Price Depo. 26-27.)

33.    Price became worried about Cottle's behavior in the fall of 2003.  (Ex. 2, Price Depo.  27.)

34.    In the fall of 2003, Cottle asked Price to accompany him to Florida where he planned to travel for a doctor's appointment.  Price thought it was a joke. She told Rosemarie Marshall, the school secretary, about Cottle's invitation.  (Ex. 2, Price Depo. 95-96.)

35.    In December 2003, Cottle told Price that she was pretty and asked to see her green eyes.  Again, Price shared these conversations with Marshall.  (Ex. 2, Price Depo. 98-99.)

36.    Other than the above remarks, Price does not recall any other incidents during the 2003-2004 school year that would constitute sexual harassment.  (Ex. 2, Price Depo. 108-110.)

37.    Price believes  Cottle made the following remarks between August 2005 and October 2005:

•    Cottle told her she "looks good enough to eat this morning." Price was shocked by this comment.  (Ex. 2, Price Depo.  71.)

- Cottle told her she looked good and asked her to remove her glasses in order to see her pretty green eyes.  (Ex. 2, Price Depo. 71, 73.)

- Cottle proposed that he and Price take a trip together or "go driving."  He suggested they tell people they had a school board meeting and instead go to LaGrange.  (Ex. 2, Price Depo. 71-72.)

- Cottle indicated that he would like to kiss Price on her cheek, on her shoulder and on the back of her hand.  During this incident, Price said Cottle touched her on the cheek, shoulder and hand.   Price rebuffed his advances and told him to stop. Cottle explained that in France they kiss on the hands, and Price told him that he was not going to kiss her anywhere. (Ex. 2, Price Depo. 72-73, 102-103.)

- Cottle told Price that he wished he had found her before her husband.  Price said it would have done him no good.  (Ex. 2, Price Depo.  73.)

38.   Price recalled other incidents that occurred during the 2004-2005 school year and the Fall of 2005 that were not documented.  Those incidents include:

- During the winter months, Cottle would touch Price with his hands to indicate the cold. Price would tell him to stop and push his hand away. (Ex. 2, Price Depo. 114.)

- Cottle commented on her Auburn shirt and offered to buy her an Alabama shirt. (Ex. 2, Price Depo. 112.)

- Cottle said she had pretty legs. (Ex. 2, Price Depo. 113.)

39. Price said the last inappropriate incident involving Cottle occurred in October 2005, and since that date, Cottle has done nothing to offend her. (Ex. 2, Price Depo. 59, 64.)

40. Price filed her Equal Employment Opportunity complaint (hereinafter "EEO complaint") on September 23, 2005. (Ex. 2, Price Depo. 59.)

41. In early October 2005, Price met with Marcum, Foster and Benefield to discuss the EEO complaint, and at that meeting, they indicated that they had no knowledge of the sexual harassment prior to receiving the complaint. (Ex. 2, Price Depo. 62-63.)

42. Following this meeting, Cottle ceased to engage in inappropriate conduct or make offensive comments. (Ex. 2, Price Depo. 64, 123-124.)

<u>Prior Sexual Harassment Experience</u>

43.    The Roanoke City School Board has a written policy on sexual harassment that outlines the procedures an employee must follow in order to report such misconduct.   (Ex. 3, Marcum Depo. 76.)

44.    Prior to accepting the crossing guard position, Price worked full-time as a custodian from 1996 though 2002. (Ex. 2, Price Depo. 13-14.)

45.    In February of 1998, the Roanoke City School system sponsored a sexual harassment and special education question and answer workshop led by attorney Donald B. Sweeney, Jr.  This seminar was intended to supplement and clarify the Board's policy on sexual harassment.  (Ex. 2, Price Depo. 23)

46.    Price does not recall attending the sexual harassment workshop sponsored by the school system in February of 1998.  (Ex. 2, Price Depo. 24-25.)

47.    Price nevertheless identified her signature on a document verifying that she had attended the sexual harassment and special education workshop sponsored by the Roanoke City School System on February 16, 1998.  (Ex. 2, Price Depo. 130-131.)

48.    In approximately 1998 or 1999, Price experienced problems with a fellow custodian, Elton Overton.  When in her presence, Overton allegedly made inappropriate and offensive sounds.  (Ex. 2, Price Depo. 50-52.)

49.    Price complained to Marshall, the school secretary, but the misconduct continued.  Price then notified the maintenance supervisor, Jamie Taylor, who spoke with Overton, and the misconduct stopped.  (Ex. 2, Price Depo. 50-52.)

## Failure to Report the Sexual Harassment

50.    Although she saw him on a daily basis, Price never complained to the school principal,  Foster, about the alleged sexual harassment prior to filing her EEO complaint.  (Ex. 2, Price Depo. 28, 32.)

51.    Price admitted that she had a friendly relationship with Marcum, the current school superintendent and former principal at the school.  However, Price never complained to him about the alleged harassment during his tenure as principal or as superintendent.  (Ex. 2, Price Depo. 41-42.)

52.    Robbie Benefield is the female assistant principal  Although she saw her on a regular basis and felt comfortable speaking with her about the incidents involving Cottle, Price never directly lodged a complaint with the assistant principal, Benefield, prior to filing her EEO complaint.  (Ex. 2, Price Depo. 28, 33, 107.)

53.    In her EEO complaint, Price indicated that she notified Benefield of the sexual harassment.  However, Price based this statement on the assumption that

the assistant principal overheard complaints Price made to other office workers. (Ex. 2, Price Depo. 106-107.)

54.     Price said it was safe to assume that neither the principal nor the assistant principal knew of her problems with Cottle. (Ex. 2, Price Depo. 29.)

55.     Price did speak with Rosemarie Marshall, the school secretary, about her worrisome interactions with Cottle but never asked Marshall to tell the principal nor did Marshall suggest she notify the principal. (Ex. 2, Price Depo. 30-31.)

56.     Price also told Sherry Yarbrough, the school receptionist, about certain comments made by Cottle.   However, Price never sought advice or guidance from Yarbrough about how she should handle the situation or with whom she should speak regarding these matters. (Ex. 2, Price Depo. 42-44.)

57.     Price admitted that her past experience with sexual harassment indicated that complaints to the school secretary failed to remedy situation. However, her complaints to a person in a supervisory capacity did effectively stop the harassment. (Ex. 2, Price Depo. 52.)

58.     In her EEO complaint, Price indicated that she had complained to teachers about Cottle's conduct.   However, Price did not specifically describe her concerns nor did she say that they upset her.   She merely told them that she was

going to wait inside the building for Cottle to leave because she felt uncomfortable around him.  (Ex. 2, Price Depo.  104.)

59.    Although she felt comfortable speaking with Hunter about her problem with Cottle, Price did not ask her for advice or guidance as to how to remedy the situation.  (Ex. 2, Price Depo. 36-37.)

60.    Price believes Clarke, a fifth grade teacher, observed her in the school office avoiding Cottle, but again although she felt comfortable speaking with her, Price did not directly voice her concerns to Clarke.  (Ex. 2, Price Depo. 37-39.)

61.    Price cannot identify her direct supervisor for the crossing guard position.  She typically notified Marshall, the school secretary, or Benefield, the assistant principal, when she had a work conflict.  (Ex. 2, Price Depo. 15.)

62.    Price asserted that she suffered emotional distress and mental anguish as a result of the sexual harassment.  However, Price did not seek treatment from a counselor, psychologist or psychiatrist nor did she share her distress with any treating physician.  (Ex. 2, Price Depo. 121-122.)

Rosemarie Marshall
Secretary/Bookkeeper

63.    Marshall talked with Prior daily.  (Ex. 12, Marshall Aff. 1; Ex. 6, Marshall Depo. 7.)

64.    Price never asked Marshall for a copy of the policy manual and never asked about the sexual harassment policy. (Ex. 12, Marshall Aff. 1.)

65.    The policy manual was in Principal Foster's office and in the library. (Ex. 12, Marshall Aff. 1; Ex. 6, Marshall Depo. 7.)

66.    Price never asked Marshall how to report a problem with Cottle.  (Ex. 12, Marshall Aff. 2; Ex. 6.)

67.    Marshall does not believe the allegations. She has never heard Cottle say anything inappropriate.  (Ex. 12, Marshall Aff. 2; Ex. 6, Marshall Depo. 9.)

68.    Marshall believes Price is fabricating the allegations for money.  (Ex. 6, Marshall Depo. 20.)

69.    Price never complained as if she was being sexually harassed and would smile when she talked about Cottle flirting with her.  (Ex. 6, Marshall Depo. 15.)

### Greg Foster, Principal

70.    Price never complained to Foster about Cottle or about being sexually harassed.  (Ex. 11, Foster Aff. 1; Ex. 4, Foster Depo. 7.)

71.    Price never asked to see a copy of the Board policy manual.  (Ex. 11, Foster Aff. 1-2.)

72.    Foster kept two or three copies of the policy manual in his office. There were copies available if Price had asked.  (Ex. 11, Foster Aff. 3; Ex. 4, Foster Depo. 11.)

73.    Foster maintains an open door policy for employees to share any problem or complaint with him.  (Ex. 4, Foster Depo. 8; Ex. 11, Foster Aff. 2.)

74.    Foster tells all employees at the start of each school year about the sexual harassment policy.  (Ex. 11, Foster Aff. 2; Ex. 4, Foster Depo. 10.)

75.    Foster does not tolerate sexual harassment and as soon as Price's complaint came to his attention he addressed the problem immediately.  (Ex. 11, Foster Aff. 3.)

76.    No one else has ever complained about Cottle. He is very friendly and well liked.  (Ex. 11, Foster Aff. 3-4.)

77.    Cottle is married and devoted to his wife.  (Ex. 11, Foster Aff. 4.)

78.    Price never complained to Foster or to his female assistant principal prior to filing her EEOC complaint.  (Ex. 11, Foster Aff. 4.)

79.    Price never complained to Benefield about Cottle doing anything inappropriate.  (Ex. 5, Benefield Depo. 7.)

80.    The first time Benefield learned of a problem was when they received the EEOC complaint.  (Ex. 13, Benefield Aff. 1; Ex. 5, Benefield Depo. 6.)

81.    Benefield has an open friendly relationship with Price.  (Ex. 13, Benefield Aff. 1.)

82.    At no time prior to the filing of the complaint did Price complain about Cottle.  (Ex. 13, Benefield Aff. 2.)

83.     Price came to the school office regularly (Ex. 13, Benefield Aff. 2.)

84.     Price would call Benefield as her supervisor when she is sick or needs to miss work.  (Ex. 13, Benefield Aff. 2.)

85.     Benefield can think of no reason why Price did not come to her about the policy manual or any complaint about Cottle.  (Ex. 13, Benefield Aff. 3.)

86.     As a female administrator, Benefield takes the sexual harassment policy very seriously.  (Ex. 13, Benefield Aff. 2.)

87.     If Price had complained, Benefield would have investigated immediately as they did after receiving the EEOC complaint.  (Ex. 13, Benefield Aff. 2.)

88.     Price never Benefield asked to see the policy manual or ask how to report a sexual harassment complaint.  (Ex. 13, Benefield Aff. 2.)

89.     As soon as they received the EEOC complaint, Benefield, Foster and Marcum met with Price.  They each told her they had no prior knowledge of a problem or complaint.  (Ex. 13, Benefield Aff. 2.)

90.     Benefield had no knowledge of a problem and no reason to suspect a problem.  Benefield had never heard any other complaint about Cottle.  (Ex. 13, Benefield Aff. 3.)

91.     Cottle has never said anything inappropriate to Benefield or to any other female employee to her knowledge.  (Ex. 13, Benefield Aff. 4.)

92.    The problem stopped as soon as it was brought to the attention of the school supervisor. (Ex. 13, Benefield Aff. 4-5.)

## Chuck Marcum, Superintendent

93.    The first knowledge Marcum had of Price's complaint about Cottle was when he received the EEOC complaint.  (Ex. 3, Marcum Depo. 12-13; Ex. 14, Marcum Aff. 2.)

94.    Price gave no supervisor any notice that she was being sexually harassed.  (Ex. 3, Marcum Depo. 13; Ex. 14, Marcum Aff. 2.)

95.    Marcum immediately set up interviews with Price, Cottle and other employees at the school.  (Ex. 3, Marcum Depo. 15; Ex. 14, Marcum Aff. 2.)

96.    Marcum made notes of all interviews.  (Ex. 3, Marcum Depo. 15, Ex. 3 and 4.)

97.    Marcum was unable to substantiate Price's claim.  (Ex. 14, Marcum Aff. 5; Ex. 3, Marcum Depo. 48.)

98.    Marcum advised Cottle not to have anything to do with Price.  If he did, it would be insubordination.  (Ex. 3, Marcum Depo. 58.)

99.    Marcum believes the action that they took was appropriate and addressed the problem effectively; and Price has had no further complaint.  (Ex. 3, Marcum Depo. 58, 92.)

100.   Roanoke has a sexual harassment policy and conducts mandatory seminars for all employees.  (Ex. 14, Marcum Aff. 3.)

101.   Price attended the sexual harassment seminar in 1998. (Ex. 3, Marcum Depo. 94.)

102.   At the seminar in 1998, employees were told how to report a sexual harassment complaint. (Ex. 3, Marcum Depo. 94.)

103.   Price knew to report a complaint to her supervisor and did so in 1998 or 1999.  (Ex. 3, Marcum Depo. 84; Ex. 14, Marcum Aff. 3, 4.)

104.   Price has given no explanation why she did not mention her complaint to her female supervisor assistant principal Robbie Benefield.  (Ex. 3, Marcum Depo. 18; Ex. 14, Marcum Aff. 5.)

105.   Price wants money damages from the school district but she never gave the District a fair chance to address the problem.  (Ex. 14, Marcum Aff. 6.)

<u>Jerrell Cottle, Crossing Guard</u>

106.   Cottle has received training at the first of every school year on sexual harassment. (Ex. 9, Cottle Depo. 12.)

107.   Complaints of harassment should be reported to Principal Foster or Superintendent Marcum.  (Ex. 9, Cottle Depo. 12.)

108.   Cottle retired after a 30-year career with CSX Railroad. The last 15 years he was in management.  (Ex. 7, Cottle Aff. 1.)

109.   If anything he has said to Price was offensive, he apologizes.  He did not mean to.  (Ex. 7, Cottle Aff. 2.)

110.   Cottle said that his comment to Price about going to Florida was said in a joking manner as he said it to other people. (Ex. 7, Cottle Aff. 1-2.)

111.   After meeting with Superintendent and Principal Foster about the allegations, he has never talked to Price again.  (Ex. 9, Cottle Depo. 1_??)

112.   Cottle is 68, married, and uses a walker after having knee surgery. (Ex. 7, Cottle Aff. 1-2; Ex. 9, Cottle Depo. 25.)

113.   Cottle is saddened by the complaint and denies that he has sexually harassed Price.  (Ex. 7, Cottle Aff. 1-2.)

<u>Chris Martin, Secretary to Superintendent</u>

114.   Martin is the secretary to the Superintendent.  (Ex. 15, Martin Aff. 1.)

115.   Price asked Martin for a copy of the Roanoke School District Policy Manual during the summer of 2005.  (Ex. 15, Martin Aff. 1.)

116.   Martin explained that the central office copy was not intact because they were revising the policy manual.  (Ex. 15, Martin Aff. 1.)

117.   Martin advised Price to go to her school where they had several copies.  (Ex. 15, Martin Aff. 1.)

118.   Martin invited Price to come back if she had any problem.  (Ex. 15, Martin Aff. 1.)

119.   Price never called or came back.  (Ex. 15, Martin Aff. 1.)

120.   Price did not ask for the sexual harassment policy; she wanted the entire manual.  (Ex. 15, Martin Aff. 2.)

121.   Price never mentioned why she wanted the policy.  (Ex. 15, Martin Aff. 2.)

122.   Price never mentioned any problem that she was having with Cottle. (Ex. 15, Martin Aff. 2.)

123.   All District employees attend seminars about sexual harassment. (Ex. 15, Martin Aff. 2.)

<u>Angela Price, Plaintiff</u>

124.   Price admits she never complained to her principal even though she is on friendly terms with him.  (Ex. 2, Price Depo. 26, 28.)

125.   Price admitted she never complained to her female assistant principal. (Ex. 2, Price Depo. 28.)

126.   When a prior complaint occurred in 1998 or 1999 she reported it to her supervisor and it was handled.  (Ex. 2, Price Depo. 30, 50, 51.)

127.   At that time Price knew to report problems to her supervisor.  (Ex. 2, Price Depo. 52-53.)

128.   Price was comfortable talking with her female assistant principal. (Ex. 2, Price Depo. 33.)

129.   Price never asked the school secretary for advice or to whom she should complain.  (Ex. 2, Price Depo. 41.)

130.   Price never asked the school receptionist about what to do.  (Ex. 2, Price Depo. 43.)

131.   Price wants money damages from the school.  (Ex. 2, Price Depo. 60).

132.   Superintendent Marcum met with her, along with Principal Foster and Assistant Principal Benefield after she filed the EEOC complaint.  (Ex. 2, Price Depo. 62.)

133.   Superintendent Marcum, Principal Foster, Assistant Principal Benefield told her they knew nothing about the complaint until they received the EEOC complaint.  (Ex. 2, Price Depo. 63.)

134.   After meeting with Superintendent Marcum, Cottle has done nothing to bother her since.  (Ex. 2, Price Depo. 64.)

135.   Cottle asked her to go to Florida in 2003 when he was going for a doctor's visit.  (Ex. 2, Price Depo. 95.)

136.   The EEOC complaint was filed two years later in September 2005.  (Ex. 2, Price Depo. 28.)

137.   Price thought it was a joke.  (Ex. 2, Price Depo. 96.)

138.   Price never specifically asked for a copy of the District's sexual harassment policy.  (Ex. 2, Price Depo. 119.)

139.   The harassment stopped after she met with Superintendent Marcum. (Ex. 2, Price Depo. 124.)

140.   Price never complained to any Board member of the Roanoke Board of Education.  (Ex. 2, Price Depo. 124.)

141.   Price has not seen a psychiatrist or psychologist because of her problem with Cottle.  (Ex. 2, Price Depo. 114.)

142.   The only medical problem Price has had since 2003 was a back problem from a herniated disc.  (Ex. 2, Price Depo. 115.)

143.   Price represented to the EEOC she had complained to her assistant principal Benefield.  Price admitted this was not true.  (Ex. 2, Price Depo. 106-107.)

> Q.   Did you ever ask the assistant principal to do something about Cottle?
>
> A.  No.
>
> Q.  So you never asked them to do anything about Cottle?
>
> A.  No.
>
> Q.   But as soon as this was brought to the attention of the superintendent, principal, and assistant principal, they did something about it?
>
> A.  Yes.

(Ex. 2, Price Depo. 107-108.)

<u>Kristine Clarke</u>
<u>Fifth Grade Teacher</u>

144.   Clarke never heard Cottle say anything inappropriate.  (Ex. 16, Clarke Depo. 9.)

145.   Clarke never heard anyone complain about Cottle.  (Ex. 16, Clarke Depo. 9.)

146.   Clarke never heard Price say she wanted to get away from Cottle. (Ex. 16, Clarke Depo. 14.)

147.   The Board has a sexual harassment policy.  (Ex. 16, Clarke Depo. 10.)

148.   If you are harassed you report it to your supervisor.  (Ex. 16, Clarke Depo. 10.)

149.   The Board has sexual harassment seminars where you are told to report problems to your supervisor.  (Ex. 16, Clarke Depo. 10.)

150.   Policy manuals are kept in Principal Foster's office.  (Ex. 16, Clarke Depo. 10.)

151.   Clarke saw Price talking to Cottle many times.  (Ex. 16, Clarke Depo. 13.)

<u>Theresa Hunter</u>
<u>Teacher</u>

152.   Price never complained that Cottle had made any inappropriate remarks.  (Ex. 17, Hunter Depo. 7, 10, 17.)

153.   Roanoke's sexual harassment policy tells you to report to your supervisor.  (Ex. 17, Hunter Depo. 24.)

<u>Delia Harmon</u>
<u>Teacher</u>

154.   Price never complained about Cottle or said that Cottle had done anything inappropriate.  (Ex. 18, Harmon Depo. 7.)

155.   If Harmon had any sexual harassment problem, she would have reported it to her supervisor, Ms. Benefield.  (Ex. 18, Harmon Depo. 9.)

<u>Marilyn Pollard</u>
<u>Special Ed Aide</u>

156.   Price mentioned to her that Cottle asked her to drive him to Florida because of a health issue.  (Ex. 19, Pollard Depo. 7.)

157.   Pollard observed Price talking to Cottle either at her car or his truck. (Ex. 19, Pollard Depo. 10.)

158.   Pollard is familiar with the Board's sexual harassment policy.  If she had a problem, she would report it to her teacher, then the assistant principal, then the principal, then to Donna Hodges, then to the Superintendent.  (Ex. 19, Pollard Depo. 12.)

<u>Sherry Yarbrough</u>
<u>Front Officer Secretary</u>
<u>Handley Middle School</u>

159.   Price mentioned that Cottle had asked her to go to Florida. She did not seem upset or concerned.  Just reporting information.  (Ex. 20, Yarbrough Depo. 8-10.)

160.   Price never complained that Cottle said anything offensive.  (Ex. 20, Yarbrough Depo. 10.)

161.   Yarbrough would see Price walk over to Cottle's truck to talk almost every day. This seemed contradictory.  (Ex. 20, Yarbrough Depo. 12, 13.)

162.   The policy manuals are kept both in Principal Foster's office and in the library.  (Ex. 20, Yarbrough Depo. 10.)

163.   If you are harassed, you report it to your supervisor.   (Ex. 20, Yarbrough Depo. 14.)

164.   No one else has ever said that Cottle made inappropriate comments. (Ex. 20, Yarbrough Depo. 14)

<u>ARGUMENT</u>

Summary judgment not only is proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(c). The movant bears the initial burden of showing the court, by reference to materials on file, that no genuine issues of material fact exist to be decided at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991). The moving party discharges this burden by "showing" or "pointing out" to the court that there is an absence of evidence to support the non-moving party's case. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995). If the moving party has discharged its burden, the non-movant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial. *Id.*

In deciding whether the moving party has met its burden, the court is obligated to draw all inferences from the evidence presented in the light most favorable to the non-movant and, also, to resolve all reasonable doubts in that party's favor. *Spence v. Zimmerman*, 873 F.2d 256, 257 (11th Cir. 1989). However, inferences in favor of the non-movant are not unqualified. "Mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment." *Resolution Trust Corp. v. Dunmar Corp.,* 43 F.3d 587, 592 (11th Cir. 1995) (citation omitted). Moreover, evidence that is merely colorable, *see Brown v. City of Clewiston*, 848 F.2d 1534, 1537 (11th Cir. 1988), conclusory, *see Peppers v. Coates*, 887 F.2d 1493, 1498 (11th Cir. 1989), or conjectural, does not create a genuine issue of material fact.

The Defendant respectfully submits that the Board of Education is entitled to summary judgment for the following reasons:

    A.    The Plaintiff failed to show that the alleged misconduct was sufficiently severe or pervasive to create a hostile work environment; and

    B.    The Plaintiff cannot establish a basis for employer liability.

**A.    Roanoke is due summary judgment as to Price's claims of sexually hostile environment because Price cannot establish that Cottle's alleged conduct was severe or pervasive.**

In *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 65 (1986), the Supreme Court recognized that the Title VII prohibition against sexual harassment in the workplace includes both conduct that has a tangible, adverse effect on the terms or conditions of employment and conduct that creates a hostile or threatening work environment.  To prove a *prima facie* case of hostile work environment, Plaintiff must establish that (1) she belongs to a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based on her sex; (4) the harassment was sufficiently severe or pervasive to affect a term, condition, or privilege of employment; and (5) a basis for holding Roanoke liable.  *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999).

Plaintiff's hostile work environment claim fails because she cannot establish that Cottle's alleged conduct rises to the severe or pervasive level necessary to

affect a term, condition or privilege of her employment.  To satisfy this element of the *prima facie* case, she must prove that "the work place [was] permeated with discriminatory intimidation, ridicule, and insults that [was] sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment.  *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367 (1993).

In order to determine whether allegations of sexual harassment are sufficiently severe or pervasive to alter the terms and conditions of employment, a court must decide that the resultant work environment is "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998).  To perform this objective analysis, the Supreme Court instructed lower courts to examine the totality of the circumstances, including "the frequency of the discriminatory conduct, its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Id.* at 787-88. The Court cautioned that Title VII should not be used as "general civility code" and emphasized that misconduct "must be extreme to amount to a change in the terms and conditions of employment, . . . ."  *Id.* at 788.

Assuming that Plaintiff subjectively viewed the conduct as offensive, she cannot show that that conduct was objectively severe and pervasive. Plaintiff claims that the sexual harassment began in the Fall of 2003, persisted throughout the 2003-2004 and 2004-2005 school years and ended in October 2005. Plaintiff alleges that during this time period, Cottle frequently complimented her general appearance and at times remarked specifically upon her "pretty" eyes or "pretty" legs. Cottle also on more than one occasion asked the Plaintiff to accompany him on trips or invited her out. Plaintiff alleged that Cottle at one point told her he wished he had found her before her husband. In an isolated incident, Cottle touched the Plaintiff when indicating he would like to kiss her on the shoulder, cheek and hand. Another isolated incident involved Cottle telling the Plaintiff that she looked good enough to eat.

Typically, before a court even reaches the severe and pervasive determination, it must find that "the statements and conduct [are] of a sexual or gender related nature – 'sexual advances, request for sexual favors, [or] conduct of a sexual nature.'" *Gupta v. Florida Board of Regents*, 212 F.3d 571, 583 (11th Cir. 2000). (Citations omitted.) Cottle never sought sexual favors nor made explicit sexual remarks toward the Plaintiff. Even construing the above-referenced isolated incidents as sexual in nature, the Supreme Court has nevertheless observed "the ordinary tribulations of the work place, such as sporadic use of abusive language

. . . and occasional teasing" or infrequent or "isolated incidents (unless extremely serious)" are not enough to constitute a Title VII violation. *Faragher*, 524 U.S. at 788.

Although tactless, bothersome and inappropriate in a work environment, the behavior engaged in by Cottle is true as alleged nevertheless falls short of the severe and pervasive standard contemplated under Title VII. The Plaintiff never alleged that Cottle's conduct interfered with her ability to perform her crossing guard duties nor did she indicate that she felt physically threatened or humiliated by his behavior. In fact up until December 2004, the Plaintiff voluntarily interacted with Cottle by walking over to his crossing guard post to speak with him. Other than two somewhat egregious incidents over an approximately two-year period, the alleged sexual harassment consisted predominantly of Cottle commenting on the Plaintiff's appearance and occasionally asking her out. Although she consistently discouraged his advances, the Plaintiff never explicitly told Cottle to stop speaking to her and only on one occasion did she ask him to refrain from making such comments. In short, the conduct alleged by Plaintiff simply does not rise to the level of severity or pervasiveness to create an objectively abusive work environment.

Moreover, courts have entered summary judgment in favor of the employer in cases involving conduct sufficiently more egregious than that Plaintiff has

alleged.  *See, e.g., Gupta*, 212 F.3d at 578-79 (finding no harassment in a case in which plaintiff alleged that over a six-month period, her superior repeatedly called her at home several times a week asking personal questions; stared at her legs; touched the inside of her thigh; unbuckled his pants and pulled down his zipper to tuck in his shirt in front of her; lifted the hem of her dress; and suggested that he should spend the night with her); *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1247 (11th Cir. 1999) (rejecting a claim of hostile work environment sexual harassment in a case which plaintiff claimed the alleged harasser rubbed his hip against her hip, repeatedly made sniffing noises while looking at her groin, and constantly followed and stared at her).

Because Plaintiff cannot meet her *prima facie* case on the element of severe and pervasive sexual harassment, Roanoke City Board of Education's motion for summary judgment is due to be granted.

**B.    Roanoke is not liable for Price's alleged sexual harassment because Price failed to provide Roanoke with adequate notice.**

Assuming that Plaintiff satisfies the *prima facie* severe and pervasive requirements, Plaintiff's claim of sexual harassment still fails because she cannot establish that Roanoke is liable for Cottle's alleged conduct.  In order to hold an employer legally responsible for sexual harassment inflicted by a co-worker, an employee must prove that the employer "knew or should have known of the

harassing conduct but failed to take prompt remedial action." *Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1302 (11th Cir. 2007).

In the instant case, the Plaintiff made essentially no efforts to notify the school of the sexual harassment that allegedly persisted for a two-year period. Although she encountered both the principal and vice principal at school on a regular basis, the Plaintiff never directly complained to either administrator about Cottle's behavior. Plaintiff further admitted that neither the principal nor the vice principal had reason to know of the harassment. The Plaintiff shared her concerns about Cottle's conduct only in the most casual manner, if at all, with the school secretary, school receptionist, a guidance counselor and various teachers. However, Plaintiff typically complained only of isolated incidents or told these individuals in passing that she felt uncomfortable around Cottle and that she tried to avoid him. The informal context and tone of the Plaintiff's complaints would hardly raise an inference of pervasive sexual harassment nor would it compel these individuals to take action or recount the Plaintiff's concerns to a superior. The Plaintiff never approached a supervisor, superior or fellow employee with the specific purpose to report the alleged harassment and to seek advice as to how to address the situation.

Plaintiff maintains that she consistently informed the school secretary, Rosemarie Marshall, about particular incidents of harassment though Marshall

never offered feedback nor suggested a course of action.  Plaintiff also relied on

Marshall as a confidant when she previously suffered workplace harassment in her

janitorial position.  Despite her complaints to Marshall, the harassment continued,

but when the Plaintiff complained to the maintenance supervisor, the harassment

promptly stopped.  Given her past experience, Plaintiff should have known that

complaints to a superior or supervisor effectively corrected a hostile or

uncomfortable work environment whereas complaints to the school secretary

proved futile.

     As demonstrated above, the Plaintiff failed to put the Roanoke City School

System on notice of the harassing behavior, and thus, the school system never

enjoyed the opportunity to take swift and effective remedial measures.  The effort

to curtail sexual harassment in the workplace depends on an individual's

willingness to promptly and candidly report occurrences of inappropriate conduct.

As the Eleventh Circuit noted,

> federal law has now attempted to correct the problem of
> workplace discrimination, but it cannot be done without the
> cooperation of the victims, notwithstanding that it may be difficult for
> them to make such efforts.
>      When an employer has taken steps, such as promulgating a
> considered sexual harassment policy, to prevent sexual harassment in
> the workplace, an employee must provide adequate notice that the
> employer's directives have been breached so that the employer has the
> opportunity to correct the problem.

*Coates v. Sundor Brands, Inc.*, 164 F.3d 1361, 1366 (11th Cir. 1999).

The attempts the Plaintiff did make to voice her concerns and inform the school of the harassment simply do not, as a matter of law, constitute sufficient notice. *See Coates,* 164 at 1365 (finding inadequate notice of sexual harassment when employee presented supervisor with an inappropriate note from a co-worker but failed to explain that "the note represented a problem about which she was concerned or that required . . . immediate attention," or "that the note was only the latest in an on-going pattern of sexually harassing behavior,' or that "the primary purpose for seeking out [the supervisor] was to discuss . . . the harassment."); *Madray v. Publix Supermarkets, Inc.*, 208 F.3d 1290, 1300-1301 (11th Cir. 2000) (telling a supervisor about an isolated incident of harassment does not provide employer with ample notice to take action).

The Roanoke City School System has adopted a policy against workplace sexual harassment and in 1998 sponsored a workshop intended to supplement this policy and explain its grievance procedures. Although the Plaintiff claims she does not recall attending this seminar, her signature appears on a document verifying that she participated in the sexual harassment question and answer workshop. The sexual harassment policy and explanatory workshop demonstrate that the school board "exercised reasonable care to prevent and correct promptly any sexually harassing behavior." *Faragher*, 524 U.S. at 807-808. Moreover, once administrators at Hadley Middle School received Plaintiff's EEO complaint and

consequently learned of the harassment, the principal, vice principal and superintendent confronted Cottle to ensure that no such future incidents would occur. (Ex. 3, Marcum Depo. 14.) These administrators also met with Plaintiff to discuss the allegations within the complaint. Plaintiff admits that following this meeting the harassment stopped.

The Plaintiff, however, failed to adequately avail herself of the grievance procedures communicated to her by the school and consequently failed to mitigate the harassment. Plaintiff maintains that she did not report the harassment because she did not know the proper chain of command and felt uncomfortable speaking with male superiors about her situation. However, Plaintiff admitted that she felt comfortable speaking with a number of school officials, including the vice-principal. Nevertheless, Plaintiff allowed the alleged harassment to persist for approximately two years as she unsuccessfully sought a copy the school board policy. Had the Plaintiff promptly and openly informed *any* superior at the first instance of what she felt constituted sexual harassment, she could have prevented many future offensive encounters with Cottle. *See Nurse BE v. Columbia Palms W. Hosp. Ltd. P'ship*, No. 06-12159, 2007 WL 1953580, at *7 (11th Cir. 2007) (noting that "had the plaintiff reported the harassing incidents immediately after they occurred, most of the harassment would have been avoided" and that "the

victim of the alleged harassment has an obligation to use reasonable care to avoid harm where possible") (citations omitted).

As demonstrated above, the Plaintiff never adequately notified the Roanoke School system of the sexual harassment she suffered. Instead of reporting Cottle's misconduct after it first emerged, Plaintiff allowed it to continue and even began recording certain incidents as if in contemplation of a lawsuit. Because Plaintiff failed to exercise reasonable care to avoid harm and because she failed to take full advantage of the preventative measures offered by the school, the Roanoke School Board is entitled to summary judgment as a matter of law.

## CONCLUSION

Roanoke City Board of Education, one of the state's smallest school systems, utilized its administrative resources in good faith to address Plaintiff's complaint. Although she has not specified an amount, Price is seeking monetary damages from the Roanoke School System for the pain and mental distress she experienced as a result of the alleged harassment. (Ex. 2, Price Depo. 61.)

Roanoke Board respectfully asks the Court to find that (1) the complaint does not amount to severe and pervasive sexual harassment; (2) that Plaintiff failed to adequately notify the Defendant of the alleged harassment; and (3) that Defendant acted in reasonable fashion once the allegations were brought to their attention.

s/Donald B. Sweeney, Jr.
DONALD B. SWEENEY, JR.
(SWE002)

OF COUNSEL

Bradley Arant Rose & White LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2119
Telephone: (205) 521-8000
Facsimile: (205) 521-8800

CERTIFICATE OF SERVICE

I hereby certify that on August 6, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Adam M. Porter, Esq.
2301 Morris Avenue, Suite 102
Birmingham, AL  35203

and I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants:

NONE

Respectfully submitted,

s/ Donald B. Sweeney, Jr.
Donald B. Sweeney, Jr. (ASB-3803-W77D)