IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

ANGELA PRICE,                              )
                                           )
    Plaintiff,                         )
                                           )
v.                                         )     CIVIL ACTION NUMBER:
                                           )     3:06-cv-742-MEF
ROANOKE CITY BOARD OF                      )
EDUCATION,                                 )
                                           )
    Defendant.                         )

**MOVANT'S EVIDENTIARY SUBMITTAL
IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

Comes now Defendant to submit this evidentiary submittal in support of Defendant's Motion for Summary Judgment filed concurrently herewith. As additional support of the motion, Defendant submits the following evidence attached hereto:

No.        Item

Exhibit 1    Amended Complaint

Exhibit 2    Deposition of Angela Price

Exhibit 3    Deposition of Chuck Marcum

Exhibit 4    Deposition of Greg Foster

Exhibit 5    Deposition  of Robbie Benefield

Exhibit 6      Deposition  of Rosemarie Marshall

Exhibit 7      Affidavit of Jerrell Cottle

Exhibit 8      EEOC Charge of Discrimination

Exhibit 9      Deposition of Jerrell Cottle

Exhibit 10    Roanoke City Board of Education's Sexual Harassment Policy

Exhibit 11    Affidavit of Greg Foster

Exhibit 12    Affidavit of Rosemarie Marshall

Exhibit 13    Affidavit of Robbie Benefield

Exhibit 14    Affidavit of Chuck Marcum

Exhibit 15    Affidavit of Chris Martin

Exhibit 16    Deposition of Kristine Clarke

Exhibit 17    Deposition of Theresa Hunter

Exhibit 18    Deposition of Delia Harmon

Exhibit 19    Deposition of Marilyn Pollard

Exhibit 20    Deposition of Sherry Yarbrough


s/Donald B. Sweeney, Jr.
_____
DONALD B. SWEENEY, JR.
(SWE002)

OF COUNSEL

Bradley Arant Rose & White LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2119
Telephone: (205) 521-8000
Facsimile: (205) 521-8800

## CERTIFICATE OF RETENTION OF ORIGINAL

      As attorney for the filer of this document, I hereby certify that the filer or the filer's attorney currently holds the original signature document with any required formalities, will make the same available upon request of the Court or of a party, and will retain the hard copy of the same for one year after the expiration of all time periods for appeals, or resolution of appeals, whichever is later.

<div align="right">

s/ Donald B. Sweeney, Jr.
Attorney for Defendant

</div>

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 6, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Adam M. Porter, Esq.
2301 Morris Avenue, Suite 102
Birmingham, AL  35203

and I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants:

NONE

Respectfully submitted,

s/ Donald B. Sweeney, Jr.
Donald B. Sweeney, Jr. (ASB-3803-W77D)

EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

| | | |
|---|---|---|
| ANGELA PRICE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. |
| vs. | ) | |
| | ) | 3:06-cv-742-MEF |
| ROANOKE CITY BOARD OF EDUCATION, | ) | |
| | | |
| Defendant. | | |

---

### FIRST AMENDED COMPLAINT

#### I. JURISDICTION

1.  This is a suit for relief from gender discrimination instituted pursuant to Title VII of the

Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e *et seq.* The jurisdiction of this Court is

based on 28 U.S.C. §§1331 and 1343(4).

2.  Plaintiff Angela Price ("Plaintiff") timely filed her sex discrimination charge with the

Equal Opportunity Commission within 180 days after the last discriminatory treatment.  Plaintiff

further filed this suit within 90 days after receipt of her right-to-sue letter issued from the E.E.O.C.

#### II. PARTIES

3.  Plaintiff is a female citizen of the United States over the age of nineteen and a resident

of Five Points, Chambers County, Alabama.

4.  Defendant Roanoke City Board of Education ("Defendant") is governmental entity

located in Roanoke, Randolph County, Alabama and is an employer as that term is contemplated

under Title VII.

## III. BACKGROUND

5.  Paragraphs 1-4 above are incorporated by reference.

6.  Plaintiff is female.

7.  Plaintiff became employed by Defendant in 1996.

8.  Plaintiff is a crossing guard at Handley Middle School in Roanoke, which is operated by Defendant.

9.  Jerrell Cottle is a crossing guard at Handley Middle School and an employee of Defendant.

10. Cottle is male.

11. Beginning with the start of the school year of 2003-2004, Plaintiff was subjected to sexual harassment by Cottle.

12. The harassment occurred through that school year, the school year of 2004-2005, and the fall semester of 2005 until October, approximately one month after Plaintiff filed her EEOC charge.

13. Cottle frequently remarked on Plaintiff's appearance, such as telling her she is pretty and saying "You look good enough to eat this morning."

14. Cottle further frequently asked Plaintiff to go out with him and to "go with" him.

15. Cottle further touched Plaintiff on the cheek, shoulder and hand.

16. Cottle's harassment of Plaintiff occurred on a daily basis.

17. The harassment was very upsetting and distracting to Plaintiff.

18. The harassment further caused Plaintiff to lose satisfaction and enjoyment in her job and made her not want to come to work.

2

19. Further, whereas Plaintiff had been coming to work about fifteen minutes before her scheduled work time started, after the harassment began she started coming in just before her scheduled start time to try to avoid Cottle.

20. Plaintiff's coming to work closer to her start time caused her to be in a rush to get to her post.

21. Plaintiff complained to teachers at the school, the secretary, the counselor, and the assistant principal about the harassment.

22. However, nothing was done about it until Plaintiff filed her EEOC charge.

23. Plaintiff further made efforts to obtain an employee handbook because she had no information as to any policy or reporting procedure of defendant regarding sexual harassment.

24. Plaintiff called the high school for a copy.

25. However, she was not able to get one as the copy there was reportedly packed up in an unknown location.

26. Plaintiff also called Defendant's central office and asked for a copy.

27. However, she was not able to get one as the copy there was reportedly taken apart at the time due to pending revisions.

## IV. CAUSES OF ACTION

### COUNT I

### TITLE VII

28. Paragraphs 1-27 above are incorporated by reference.

29. Defendant violated Plaintiff's rights under Title VII by subjecting her to sexual harassment.

3

30. As a result of the harassment, Plaintiff has been made to suffer emotional distress and mental anguish.

**WHEREFORE, these premises considered,** Plaintiff respectfully requests the following:

(i) That the Court issue an Order declaring that Defendant's acts as described herein violated Title VII;

(ii) That the Court grant Plaintiff a permanent injunction enjoining Defendant, and its agents, employees, successors, and those acting in concert with Defendant from continuing to violate Title VII;

(iii) That the Court enter an Order requiring Defendant to pay Plaintiff compensatory damages as a jury may assess;

(iv) That the Court award such other legal and equitable relief as justice requires, including, but not limited to, an award of costs, attorney's fees, expert witness fees, and expenses.

## COUNT II

### 42 U.S.C. §1983 SEXUAL HARASSMENT

31. Paragraphs 1-30 are incorporated by reference.

32. Defendant violated Plaintiff's equal protection rights under the Fifth and Fourteenth Amendments to the United States Constitution by subjecting her to sexual harassment, which constituted a hostile work environment.

33. Defendant is responsible for the sexual harassment because (a) the harassment was so permanent and well settled as to constitute a custom or usage, and/or (b) Defendant tacitly authorized the harassment and/or displayed deliberate indifference towards it.

4

34. As a result of the above described discriminatory act, Plaintiff has been made to suffer mental anguish and emotional distress.

**WHEREFORE, these premises considered,** Plaintiff respectfully requests the following:

(i) That the Court issue an Order declaring that Defendant's actions as described herein violate §1983;

(ii) That the Court grant Plaintiff a permanent injunction enjoining Defendant, and its agents, employees, successors, and those acting in concert with Defendant from continuing to violate §1983;

(iii) That the Court enter an Order requiring Defendant to make Plaintiff whole by ordering Defendant to pay compensatory damages as a jury may assess;

(iv) That the Court award such other legal and equitable relief as justice requires, including, but not limited to, an award of costs, attorney's fees and expenses.

> Respectfully submitted,
> s/ Adam M. Porter
> Adam M. Porter
> Attorney for Plaintiff
> 2301 Morris Avenue, Suite 102
> Birmingham, Alabama 35203
> Phone: (205) 322-8999
> Facsimile: (205) 322-8915
> Email: adamporter@earthlink.net

Plaintiff requests trial by struck jury.

> s/ Adam M. Porter
> Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on March 27, 2007 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to Donald B. Sweeney, Jr., Esq Bradley Arant Rose & White LLP One Federal Place 1819 Fifth Avenue North Birmingham, AL 35203-2104 and that there are no non-CM/ECF participants in this case.

s/ Adam M. Porter
Attorney for Plaintiff

# EXHIBIT 2

# FREEDOM COURT REPORTING

Page 5

1          I N D E X

2

3           PAGE

4 EXAMINATION BY MR. SWEENEY:...............7

5

6        E X H I B I T S

7 DEFENDANT'S NO.           PAGE

8 Exhibit 1..............................18

9 Exhibit 2..............................20

10 Exhibit 3.............................101

11 Exhibit 4.............................108

12 Exhibit 5.............................130

13

14

15

16

17

18

19

20

21

22

23

Page 6

1      I, Maya Rose, a Court Reporter of

2 Birmingham, Alabama, and a Notary Public

3 for the State of Alabama at Large, acting

4 as Commissioner, certify that on this

5 date, pursuant to the Federal Rules of

6 Civil Procedure and the foregoing

7 stipulation of counsel, there came before

8 me at 1819 Fifth Avenue North, Birmingham,

9 Alabama, on the 21st day of March, 2007,

10 commencing at 10:10 a.m., ANGELA PRICE,

11 witness in the above cause, for oral

12 examination, whereupon the following

13 proceedings were had and done:

14

15       ANGELA PRICE,

16 being first duly sworn, was examined and

17 testified as follows:

18

19      THE REPORTER: Usual

20 stipulations?

21      MR. PORTER: Sure.

22

23

Page 7

1 EXAMINATION BY MR. SWEENEY:

2      Q. Are you Angela Price?

3      A. I am.

4      Q. Where do you live, Ms. Price?

5      A. I live at 4220 County Road 278,

6 Five Points, Alabama.

7      Q. Have you been deposed before?

8      A. In a deposition?

9      Q. Yes.

10      A. No, sir.

11      Q. And during the course of the

12 morning, I'll be asking you questions. If

13 my questions aren't clear, would you ask

14 me to rephrase them or repeat the

15 question?

16      A. Yes, sir.

17      Q. I will assume that if you

18 answer my question, that you understand

19 the question and that you've given me

20 complete answers to the question.

21      A. Yes, sir.

22      Q. If at any time during the

23 deposition you remember anything that you

Page 8

1 think relates to a previous answer you've

2 given me and you would like to supplement

3 what you've shared with me, would you do

4 so?

5      A. Yes, sir.

6      Q. Because at the end of the

7 deposition, I will assume that you have

8 shared with me in good faith all of the

9 relevant information about the matters

10 that I've asked you.

11      A. Yes, sir.

12      Q. And at the end of the

13 deposition, I will say, is there anything

14 else that you want to add or say about the

15 questions I've asked.

16      A. Okay.

17      Q. Okay. When were you born?

18      A. November 2nd, 1965.

19      Q. And you're married?

20      A. I am.

21      Q. What is your husband's name?

22      A. James E. Price.

23      Q. For how long have you been

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660**

# FREEDOM COURT REPORTING

Page 9

1  married?
2      A.  Twenty-five years.
3      Q.  Do you have children?
4      A.  I do.
5      Q.  Are they in school?
6      A.  No, sir.
7      Q.  What are their ages?
8      A.  Twenty-three and eighteen.
9      Q.  Do they live in Chambers
10  County?
11      A.  My son still lives at home
12  while attending UAH in Huntsville.
13      Q.  Okay.  Do you have family
14  members that live in the Middle District
15  of Alabama?
16      A.  Middle District meaning?
17      Q.  That is the area around --
18  between Montgomery and Opelika --
19      A.  Huh-uh.
20      Q.  -- Anniston to Troy.
21      MR. PORTER:  Dothan.
22      A.  No, sir.
23      Q.  All right.  No family, close

Page 10

1  family on either side of yours or your
2  husband's?
3      A.  Not that I'm aware of.
4      Q.  Where were you born?
5      A.  Randolph County.
6      Q.  Okay.  Prior to becoming
7  employed with the Roanoke City Board of
8  Education, did you have previous
9  employment?
10      A.  I did.
11      Q.  Would you share with us your
12  previous employment for the last, say,
13  fifteen years?
14      A.  Before being employed, I worked
15  at Town and Country Beauty Salon for about
16  a year and a half.  And then I worked at
17  Terry Manufacturing for about nine months.
18      Q.  And have you ever been
19  terminated from a job?
20      A.  No, sir.
21      Q.  Have you ever previously filed
22  a complaint or grievance against an
23  employer --

Page 11

1      A.  No, sir.
2      Q.  -- or a fellow employee?
3      A.  No, sir.
4      Q.  Have you ever filed a lawsuit
5  against anyone before?
6      A.  No, sir.
7      Q.  Have you ever been involved in
8  a lawsuit?
9      A.  No, sir.
10      Q.  Have you ever been arrested?
11      A.  No, sir.
12      Q.  Your position of employment
13  with the Roanoke City Board of Education
14  is as a crossing guard?
15      A.  Yes, sir.
16      Q.  Tell me what your duties and
17  responsibilities are in that position.
18      A.  At this time that's what I'm
19  doing.  I report to work at seven o'clock.
20  My duty is to direct traffic in front of
21  the school building and make sure the kids
22  are able to get in and out of their
23  vehicles safely, and the same in the

Page 12

1  afternoon.  I work an hour in the morning
2  and an hour in the afternoon.
3      Q.  So your morning duty hours
4  would be from seven o'clock to what?
5      A.  Eight o'clock.
6      Q.  And the afternoon hours?
7      A.  2:30 to 3:30.
8      Q.  Is that considered a part-time
9  position?
10      A.  Yes, sir.
11      Q.  And you're paid on an hourly
12  basis?
13      A.  Yes, sir.
14      Q.  What school is it that you do
15  this?
16      A.  Handley Middle School.
17      Q.  When you're at the front of the
18  school, where is Jessie Cottle?
19      A.  Mr. Cottle?  He's out on the
20  Gilham Road entrance or exit now.
21      Q.  Is that within visual sighting?
22  Can you see him every day and he can see
23  you every day?

3  (Pages 9 to 12)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660**

# FREEDOM COURT REPORTING

Page 13

1　　A.　Yes, sir.
2　　Q.　Okay.  You began this position
3　when?
4　　A.　The fall of '02.  The '02-'03
5　year.
6　　Q.　Had you previously been
7　employed --
8　　A.　I have.
9　　Q.　-- by the Roanoke City?
10　　A.　Yes.
11　　Q.　In what position?
12　　A.　I was the custodian inside the
13　middle school.
14　　Q.　When were you hired as a
15　custodian?
16　　A.　I believe it was in '96.
17　　Q.　And you remained in that
18　position for how long?
19　　A.　Until I took over as crossing
20　guard.
21　　Q.　Was the custodial position a
22　full-time position?
23　　A.　It was.

Page 14

1　　Q.　So you elected to go from a
2　full-time position to a part-time
3　position?
4　　A.　Yes, sir.
5　　Q.　For how long have you known Mr.
6　Cottle?
7　　A.　Just from the time I started
8　the custodial -- I mean, the crossing
9　guard position.
10　　Q.　Had he been previously employed
11　in that position prior to you assuming
12　your crossing guard --
13　　A.　Yes, sir, I believe he was.
14　　Q.　When you were hired as a
15　custodian, who was the person that
16　interviewed you for that position?
17　　A.　Jessie Lancaster.
18　　Q.　She was the principal?
19　　A.　Yes, sir.
20　　Q.　When you were hired as a
21　crossing guard, who interviewed you for
22　that position?
23　　A.　Dr. Krauss.  Dr. Krauss.

Page 15

1　　Q.　Who do you report to as your
2　supervisor in your present position?
3　　A.　That's questionable.  I'm not
4　real sure who I'm supposed to report to.
5　If I have to be out, I either tell Ms.
6　Marshall, which is the school secretary,
7　or Ms. Benefield, which is the assistant
8　principal.  Other than that, I don't know
9　who I would report to.
10　　Q.　Well, who is the chief
11　executive officer of the school?
12　　A.　I'm assuming the principal, Mr.
13　Foster.
14　　Q.　Do you assume that or do you
15　know that?
16　　A.　Well --
17　　　MR. PORTER:  That he's the
18　principal?
19　　A.　He's the principal, that I
20　know.
21　　Q.　And when matters relating to
22　the faculty or staff are discussed, is it
23　the principal that generally does that?

Page 16

1　　A.　I'm not sure.  I've not had any
2　contact as far as meetings with him.
3　　Q.　Okay.  When you were custodian,
4　who did you report to?
5　　A.　Jamie Taylor.
6　　Q.　And what was his position?
7　　A.　He's the maintenance
8　supervisor.
9　　Q.　All right.  Well, let me get
10　you to educate me about the chain of
11　command at the -- at your school.  There's
12　a principal; correct?
13　　A.　Correct.
14　　Q.　And in 2004, 2005, who was the
15　principal?
16　　A.　I believe Mr. Foster was at
17　that time.
18　　Q.　And there's an assistant
19　principal?
20　　A.　That's correct.
21　　Q.　In 2004, 2005, who was the
22　assistant principal?
23　　A.　I believe that was Robbie

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660**

# FREEDOM COURT REPORTING

Page 17

1 Benefield at that time.
2     Q.  Is there any other supervisor
3 at the school other than those two?
4     A.  Not that I know of.
5     Q.  Who is the superintendent of
6 the Roanoke City School System?
7     A.  Now?
8     Q.  Yes.
9     A.  Chuck Marcum.
10     Q.  And was he the superintendent
11 during the 2004-2005 school year?
12     A.  Yes, sir.
13     Q.  Do you know Mr. Marcum?
14     A.  I do.
15     Q.  Do you know him just
16 professionally or professionally and
17 socially?
18     A.  Professionally.
19     Q.  Have you had any interfacing
20 with -- or any interchange with Mr. Marcum
21 prior to your filing of the EEO complaint?
22     A.  A couple of times when my
23 children were students at the high school

Page 18

1 and he was principal there.
2     Q.  Were you on friendly terms with
3 him?
4     A.  Pretty much, yes, sir.
5     Q.  I mean, Roanoke is a fairly
6 small school system, isn't it?
7     A.  It is.
8     Q.  So even though you live if
9 Chambers County, your children went to
10 Handley High School?
11     A.  Yes, sir.
12     Q.  On what basis were they able to
13 do that?
14     A.  Because I was employed there.
15     Q.  Okay.  Let me show you what I
16 will mark as Defendant's Exhibit 1, the
17 deposition notice.
18          (Whereupon, Defendant's
19          Exhibit 1 was marked
20          for identification.)
21     Q.  And on page two, I asked you to
22 bring all records, notes, memorandum,
23 correspondence, audio or video recordings

Page 19

1 relating to this lawsuit.  Mr. Porter has
2 just given me a packet of information.  To
3 the best of your knowledge, does this
4 packet of documents comply with the
5 request for production that's set forth in
6 Defendant's Exhibit 1?
7     A.  Everything except --
8          MR. PORTER:  Let me --
9     A.  -- the recording.
10          MR. PORTER:  Let me make sure,
11 you are not asking me for my notes or
12 correspondence --
13          MR. SWEENEY:  Oh, of course
14 not.  Not privileged.
15          MR. PORTER:  I just wanted
16 to -- yes, that's everything that she had.
17          MR. SWEENEY:  All right.
18          MR. PORTER:  Do you have the
19 EEOC file?
20          MR. SWEENEY:  Yes.
21          MR. PORTER:  Okay.  That's the
22 only other document I can think of.
23     Q.  Let me mark the packet of

Page 20

1 information that you've given me as
2 Defendant's Exhibit 2.
3          (Whereupon, Defendant's
4          Exhibit 2 was marked
5          for identification.)
6     Q.  The first two pages of
7 Defendant's Exhibit 2 would be what?
8     A.  Just notes I've kept through
9 the years.
10     Q.  All right.  Did you do that on
11 advice of counsel?
12     A.  No, sir.  I just kept up with
13 this on my own.
14     Q.  Okay.  Where are the original
15 documents from which those were typed?
16     A.  This was just typed from memory
17 of things that have taken place.
18     Q.  When would you have typed that?
19     A.  Different times.  I've just
20 added it to a file on my computer and then
21 printed it off last night.  There was
22 things that has been added.  After
23 reviewing some of the information last

5 (Pages 17 to 20)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660**

# FREEDOM COURT REPORTING

Page 21

1  night, I added in some notes.
2      **Q. Is this a running commentary**
3  **that you did at the time when things were**
4  **happening?**
5      A. Yes, sir.
6      **Q. In other words, the first entry**
7  **relates to the fall of 2002, the winter of**
8  **2003, did you type what's there at that**
9  **time?**
10      A. Probably six to eight months
11  after that. I had marked it in, like, a
12  little pocket calendar.
13      **Q. I'm sorry. What?**
14      A. I had marked the dates in a
15  pocket calendar that I keep in my purse.
16  And about six months after that, I started
17  just typing the notes on a file on the
18  computer that --
19      **Q. Where is that pocket calendar?**
20      A. I've done away with that. I'm
21  sorry. That's way before any of this in
22  '05 came up. Because it was, like, a
23  two-year --

Page 22

1      **Q. Well, you were keeping --**
2      A. -- pocket calendar, so I just
3  chunked it.
4      **Q. You were keeping detailed notes**
5  **for some purpose.**
6      A. Just dates. The dates were
7  marked as to, you know, to give me a
8  general idea.
9      **Q. Well, why were you keeping**
10  **systematic notes concerning what was**
11  **happening between you and Mr. Cottle?**
12      MR. PORTER: Object to the
13  form.
14      A. I kept the notes because it was
15  being done on a continual basis and I
16  wanted to have documentation if something
17  ever came up. I wanted it to be fresh in
18  my mind. I didn't want to have to just
19  try to remember three or four years back
20  through everything that's happened in that
21  time frame. So I made notes where I would
22  be sure as to what happened, what dates it
23  happened on.

Page 23

1      **Q. Did you do that because**
2  **somebody had advised you to do that?**
3      A. No, sir. I had not spoken with
4  anyone legally about this until last --
5  until the fall of '05.
6      **Q. Have you ever read literature**
7  **about sexual harassment?**
8      A. No, sir.
9      **Q. Have you ever attended**
10  **workshops or seminars on sexual**
11  **harassment?**
12      A. Not that I can remember. But I
13  was made aware of one that the school had
14  in February of '98. And at that time,
15  that was a time when -- my mother-in-law
16  passed away the 28th of February. So she
17  had been in the hospital sick, I had been
18  going back and forth to doctors myself
19  sick. My father had been going to and
20  from Birmingham with sclerosis of the
21  liver. He was in the final stages. So
22  anything that -- at that time, I did not
23  remember the meeting until Mr. Porter

Page 24

1  showed me documentation that I had signed
2  in for that meeting. But that was a time
3  when anything that happened is not real
4  familiar in my frame of mind.
5      **Q. Well, were you tending your**
6  **duty station on a daily basis at that**
7  **time?**
8      A. Yes, sir --
9      **Q. Were you --**
10      A. -- as much as possible.
11      **Q. -- discharging your**
12  **responsibilities in a competent manner?**
13      A. I was having to take a lot of
14  days off to be at the hospital with my
15  father and mother-in-law as well as
16  doctor's appointments on my own.
17      **Q. Well, if the school system**
18  **sponsored a workshop, would that have been**
19  **something that you would have gone to to**
20  **learn about sexual harassment?**
21      A. If it was required of
22  custodians. A lot of times they have
23  workshops custodians and crossing guards

6 (Pages 21 to 24)

# FREEDOM COURT REPORTING

Page 25

1  are not required to attend, but --
2  **Q. But as I understood what you**
3  **told me, you attended a sexual harassment**
4  **workshop put on by the Roanoke City School**
5  **System?**
6  A. That's what the paper stated.
7  I don't recall it being a sexual
8  harassment workshop. I don't even
9  remember attending a workshop at that
10  time.
11  **Q. So that wouldn't have been the**
12  **basis of why you started keeping notes?**
13  A. No, sir.
14  **Q. And the basis of you keeping**
15  **notes was to do what?**
16  A. Was to keep it fresh in my mind
17  so I would know the actual dates of when
18  things were happening.
19  **Q. All right. So you knew to keep**
20  **notes, but you didn't know to go to your**
21  **principal at that time in 2004?**
22  A. No, sir. I had spoken with the
23  school secretary and --

Page 26

1  **Q. Okay. But my question is about**
2  **the school principal.**
3  A. Huh-uh, no, sir.
4  **Q. Do you know Mr. Foster?**
5  A. I do.
6  **Q. All right. Are you on friendly**
7  **terms with him?**
8  A. I would say so.
9  **Q. Do you have -- you know where**
10  **his office is?**
11  A. I do.
12  **Q. And every day when you come to**
13  **your duty station, you're not far from his**
14  **office, are you?**
15  A. Well, he's in the building.
16  I'm outside.
17  **Q. All right. So if while you**
18  **were keeping these notes in 2003 and 2004,**
19  **was there anything to prevent you from**
20  **going to the principal to share these**
21  **matters with him?**
22  A. At that time, I was -- it was
23  not to the point that I felt threatened or

Page 27

1  upset over it. It was just sporadic
2  comments. But also during that time, Mr.
3  Foster was not the president -- principal,
4  I don't believe, in '02, '03.
5  **Q. Okay. But in --**
6  A. We went through several
7  principals there in a stretch of time.
8  **Q. Okay. When did the comments**
9  **from Mr. Cottle become worrisome to you?**
10  A. In the fall of '03-'04 school
11  year.
12  **Q. Was Mr. Foster the principal at**
13  **that time?**
14  A. I'm not sure if he was or if
15  Mr. -- I don't even remember his name, the
16  one before him. I don't even remember who
17  he was now.
18  **Q. Well, when your children were**
19  **at the high school, you had occasion to**
20  **talk to Mr. Marcum as principal, didn't**
21  **you?**
22  A. A couple of occasions, yes.
23  **Q. All right. So when you were**

Page 28

1  working at the middle school as a cross
2  guard, there wouldn't have been anything
3  that would have prevented you from going
4  to the principal if you had wanted to?
5  A. No, sir.
6  **Q. Did you ever -- prior to filing**
7  **the EEO complaint in this case, and I**
8  **think it was what, September 2005, did you**
9  **ever go to the principal of your school to**
10  **complain about Mr. Cottle?**
11  A. Not the principal, no.
12  **Q. Did you ever go to the**
13  **assistant principal to complain?**
14  A. Not go to her office, but she
15  was standing in the general central area
16  of the office and overheard comments. She
17  says she does not remember them, that she
18  was standing there and heard them.
19  **Q. Well, do you have any reason to**
20  **believe that she would not tell the truth?**
21  A. No, sir.
22  **Q. So if she says she didn't hear**
23  **you make a complaint, would you accept**

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660**

# FREEDOM COURT REPORTING

Page 29

1  that as true?
2      A.  I will accept that.  She may
3  not have heard it and I'm not saying she
4  did.
5      Q.  So would it be true then prior
6  to you filing the complaint, as far as you
7  know, neither the principal of your
8  school, nor the assistant principal had
9  any knowledge of your problems with Mr.
10  Cottle?
11      A.  That's safe to assume.
12      Q.  And is there anything, any
13  reason you can share with me why you would
14  not have gone to the principal or
15  assistant principal to complain about
16  Cottle prior to filing an EEO complaint?
17      A.  Some of the comments he made I
18  was not comfortable speaking with a male
19  about.
20      Q.  Well, were there things,
21  though, that you could have shared with
22  him about what was going on?
23      A.  Yes.

Page 30

1      Q.  But you didn't elect to do
2  that?
3      A.  Well, prior to this particular
4  incident, there was another one and I
5  reported it to the maintenance supervisor.
6  He handled it.  I assumed when I told the
7  school secretary that she would have
8  passed the information on and it would
9  have been handled.
10      Q.  Did you ever go back to her to
11  ask her if she had passed it on?
12      A.  Not to straight out ask her,
13  no.
14      Q.  Who was the school secretary?
15      A.  Rosemarie Marshall.
16      Q.  Did you ever go to her and
17  complain and say, I want you to tell the
18  principal and/or assistant principal about
19  this?
20      A.  No.  But I did tell her that it
21  was getting worse and I didn't know how
22  much of it I could handle.
23      Q.  Did she suggest that you talk

Page 31

1  with the assistant principal or principal?
2      A.  No.
3      Q.  But you knew in some prior
4  matter to go to your supervisor to
5  complain?
6          MR. PORTER:  Object to the
7  form.
8      Q.  Is that right?
9      A.  I went to Jamie Taylor because
10  he worked on a personal basis with us as
11  custodians.
12      Q.  Well, he was your supervisor,
13  wasn't he?
14      A.  As far as I knew, yes.
15      Q.  Well, didn't you just tell me
16  that?
17      A.  Yes.
18      Q.  That you went to your
19  supervisor to complain when something
20  happened prior to this?
21      A.  Yes.
22      Q.  So, on that basis, you knew to
23  complain to your supervisor based on your

Page 32

1  prior experience?
2      A.  Well, I wasn't real sure who
3  the supervisor was in the crossing guard
4  position even though the principal is in
5  charge of the building.  That's when I
6  attempted to get copies of the board
7  policy and was not able to get them from
8  three different sources.
9      Q.  Well, not having the board
10  policy wouldn't have prevented you -- with
11  what frequency would you see the
12  principal?
13      A.  On a daily basis.
14      Q.  So, on a daily basis, you had
15  an opportunity to talk with the principal
16  if you had wanted to bring these matters
17  to his attention?
18      A.  Yes, sir.  But I did not feel
19  comfortable speaking with him.
20      Q.  All right.  With what frequency
21  did you see the assistant principal at the
22  school?
23      A.  It depends on if I subbed or

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

| Page 33 | Page 35 |
|---|---|
| 1  not. If I subbed, I saw her on a daily | 1  that? |
| 2  basis. If I did not, I may not see her | 2  A.  You asked me if I knew if he |
| 3  but once or twice a week. | 3  was married. I said as far as I know. |
| 4  **Q.  And the assistant principal is** | 4  I've not seen a marriage license. I don't |
| 5  **a female?** | 5  know for sure. |
| 6  A.  Yes. | 6  **Q.  During any of this time, 2003** |
| 7  **Q.  All right. Are you comfortable** | 7  **to when you made your report to the EEO** |
| 8  **talking to the assistant principal about** | 8  **complaint, did you ever discuss your** |
| 9  **the matters that were happening between** | 9  **problems with Cottle with your husband?** |
| 10  **you and Mr. Cottle?** | 10  A.  No. |
| 11  A.  Yes. | 11  **Q.  You never mentioned it to your** |
| 12  **Q.  All right. And you would see** | 12  **husband?** |
| 13  **this person with -- the assistant** | 13  A.  No. |
| 14  **principal with considerable regularity?** | 14  **Q.  Is there some reason you didn't** |
| 15  A.  Yes. | 15  **mention it to your husband?** |
| 16  **Q.  But you never mentioned these** | 16  A.  Yes, sir. Because I figured my |
| 17  **matters to the principal in 2003, 2004,** | 17  husband would punch him in the face. |
| 18  **2005; is that correct?** | 18  **Q.  So your husband never advised** |
| 19  A.  Well, a couple of the years | 19  **you to go to your supervisor?** |
| 20  before that, it was not a female -- | 20  A.  No, sir. |
| 21  **Q.  Right. But during the time the** | 21  **Q.  Because he didn't know about it** |
| 22  **female was there, you never mentioned** | 22  **either?** |
| 23  **these matters to her, did you?** | 23  A.  That's correct. |

| Page 34 | Page 36 |
|---|---|
| 1  A.  Not directly. I just assumed | 1  **Q.  Where does your husband work?** |
| 2  she had heard it when she was in the other | 2  A.  He works in Palmetto, Georgia. |
| 3  office. | 3  **Q.  What does he do?** |
| 4  **Q.  All right. You assumed, but** | 4  A.  He trims trees. |
| 5  **you never asked her about it?** | 5  **Q.  Pardon?** |
| 6  A.  No. | 6  A.  Trims trees. |
| 7  **Q.  And you never asked the** | 7  **Q.  Is he a supervisor?** |
| 8  **secretary if she had reported it to the** | 8  A.  No, sir. |
| 9  **principal or assistant principal?** | 9  **Q.  All right. In the first two** |
| 10  A.  No, I did not ask her that. | 10  **pages of Board Exhibit 2, you have an** |
| 11  **Q.  How old is Mr. Cottle?** | 11  **entry, Ms. Hunter witnessed on several** |
| 12  A.  I have no idea. | 12  **occasions my ignoring Mr. Cottle as well** |
| 13  **Q.  Is he married?** | 13  **as my going inside to get away from him.** |
| 14  A.  As far as I know. | 14  **What's the basis of that statement?** |
| 15  **Q.  You don't know anything about** | 15  A.  That we had talked on several |
| 16  **his personal life?** | 16  mornings. I would be sitting in my car. |
| 17  A.  I know nothing about him | 17  Mr. Cottle would be standing at my car or |
| 18  personally. | 18  he would pull his truck up to my car and |
| 19  **Q.  So you've worked with this** | 19  he would be talking and I would be sitting |
| 20  **person for over two years and you don't** | 20  in there either doing a crossword puzzle, |
| 21  **know if he's married?** | 21  reading a newspaper or something, ignoring |
| 22  A.  He's married. | 22  him and -- |
| 23  **Q.  Well, didn't I just ask you** | 23  **Q.  Did you ever ask Ms. Hunter** |

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660**

# FREEDOM COURT REPORTING

Page 37

1  what she witnessed?
2      A.  I spoke with her on the --
3  going into the office one morning and I
4  told her, I said, I've got to go in.  And
5  she's like, why?  I said, well, so I can
6  get away from him.  She said, yeah, I saw
7  you reading, ignoring him, but he didn't
8  look like he was paying you any attention.
9      Q.  Okay.  Ms. Hunter is who?
10     A.  She is a special ed teacher.
11     Q.  Did you ask her for advice
12  about what you should do with these
13  concerns?
14     A.  No, sir.
15     Q.  You were comfortable talking to
16  her about this problem, though; correct?
17     A.  Yes, sir.
18     Q.  Is there some reason you didn't
19  ask Ms. Hunter what she would do given the
20  problems that you were having?
21     A.  No, sir.
22     Q.  You have an entry, Ms. Clarke
23  was in the office when it was being

Page 38

1  discussed about Cottle's comments.  Ms.
2  Clarke is?
3      A.  A fifth grade English teacher
4  or history teacher.
5      Q.  Have you had discussions with
6  Ms. Clarke specifically where you've
7  complained about Mr. Cottle?
8      A.  Not with her specifically.  She
9  would be in the office when I would come
10  back in from my afternoon duty at 3:30
11  when my time was up, I'd go back in the
12  building and stand there and look out the
13  window and wait for him to leave so I can
14  go out and leave without having to be
15  confronted by him again.
16     Q.  All right.  Now, I would assume
17  that if Mr. Cottle was really bothering
18  you, you would want to bring closure to
19  that.
20     A.  Yes.
21     Q.  Wouldn't that be a fair
22  assumption?
23     A.  Yes.

Page 39

1      Q.  And would that have been the
2  truth?
3      A.  Yes.
4      Q.  I mean, you wanted to bring a
5  stop to whatever he was doing that was
6  bothering you?
7      A.  Correct.
8      Q.  And you were comfortable
9  talking with Ms. Hunter about it and you
10  were comfortable talking with Ms. Clarke
11  about it, weren't you?
12     A.  Yes.
13     Q.  But for whatever reason, you
14  did not go to the assistant principal and
15  you did not go to the principal about it?
16     A.  Yes.
17     Q.  And is there some reason if you
18  really were being bothered by Mr. Cottle
19  why you didn't go to the supervisor,
20  assistant principal, or principal to share
21  it with them?
22         MR. PORTER:  Object to the
23  form.

Page 40

1      A.  Mainly because I was not sure
2  on who I was to report this to.
3      Q.  Well, what would have been the
4  downside if you went to the assistant
5  principal, a female, and said, I've got a
6  concern, are you the right person for me
7  to report it to?  What would have been the
8  downside of doing that?
9      A.  I'm not sure.
10     Q.  There wouldn't be any that
11  comes to my mind.  Do any come to your
12  mind?
13     A.  No.
14     Q.  I mean, hasn't the assistant
15  principal always been courteous to you?
16     A.  Yes.
17     Q.  So you don't have any reason to
18  have feared discussing something that was
19  important with that assistant principal,
20  do you?
21     A.  No.
22     Q.  Rosemarie Marshall was aware of
23  most everything mentioned.  Who's

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

Page 41

1  Rosemarie Marshall?
2     A.  She's the school secretary.
3     Q.  So you had repeated
4  conversations with her?
5     A.  Yes.
6     Q.  Did you ever ask her advice on
7  what she thought you should do?
8     A.  No.
9     Q.  Did you ever ask her if this is
10 something you should bring to the
11 attention of the assistant principal or
12 principal?
13    A.  No.
14    Q.  Now, you already knew Mr.
15 Marcum; correct?
16    A.  Yes.
17    Q.  Is there any reason why you --
18 or did you have a friendly relationship
19 with Mr. Marcum when he was principal at
20 the high school?
21    A.  For the most part, yes, sir.
22    Q.  And you knew he was the
23 superintendent?

Page 42

1     A.  He was in the end, yes.
2     Q.  And he was in and out of the
3  school from time to time, wasn't he?
4     A.  He probably was, but I wasn't
5  always there, so --
6     Q.  Well, if you --
7     A.  I might see him, I might not.
8     Q.  If you had a friendly
9  relationship with Mr. Marcum based on your
10 experience when he was principal at the
11 high school, is there any reason why you
12 didn't take your complaint to him?
13    A.  No, sir.
14    Q.  Has he always been respectful
15 of you?
16    A.  Yes, sir.
17    Q.  Who is Sherry Yarbrough?
18    A.  She's the secretary --
19 receptionist at the middle school.
20    Q.  Since you filed the lawsuit,
21 have you talked to Ms. Hunter about your
22 complaints?
23    A.  No, sir.

Page 43

1     Q.  Or Ms. Clarke?
2     A.  No, sir.
3     Q.  Or Ms. Marshall?
4     A.  No, sir.
5     Q.  Or Ms. Yarbrough?
6     A.  No, sir.
7     Q.  Now, you say Ms. Yarbrough was
8  aware of your coming into the office in
9  mornings and afternoons to wait so Cottle
10 would leave.  Did you discuss that's why
11 you were in the office with her?
12    A.  It was said on several
13 occasions that I was standing there
14 waiting on him to leave or I'd come in and
15 go to the restroom to wait on him to
16 leave.
17    Q.  Did you ever ask Ms. Yarbrough
18 what she thought you should do because you
19 were concerned about Cottle?
20    A.  No, sir.
21    Q.  Well, you apparently had a
22 trusting relationship with Ms. Yarbrough
23 because you were telling her about why you

Page 44

1  were in the office; correct?
2     MR. PORTER:  Object to the
3  form.
4     Q.  Did you have a trusting,
5  respectful relationship with her?
6     A.  Yes, sir.  But she asked me one
7  afternoon when I was standing there
8  looking out the window, she said, what are
9  you doing?  I said, I'm waiting on Mr.
10 Cottle to leave.
11    Q.  Okay.  And did you tell her
12 why?
13    A.  Not at that particular time,
14 no.  But she did -- she was aware that he
15 had made comments.
16    Q.  How do you know she was aware?
17    A.  Because I had told her.
18    Q.  And when you told her that, is
19 there any reason why you wouldn't have
20 asked her who you should talk to about the
21 matters?
22    A.  No, sir.
23    Q.  In the fall of 2005, the entry

11 (Pages 41 to 44)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

Page 45

1 says you attempted to get a school board
2 policy book. What did you do to get a
3 copy of the school board policy book?
4      A.  I went to the middle school
5 library and spoke with Ms. Henson and the
6 middle school was doing renovations on
7 their library, so theirs was packed up.
8 She told me, she said, contact the high
9 school to see if they've got theirs.  I
10 called Donna Evans at the high school.
11 They couldn't find theirs because they had
12 been renovating the high school and theirs
13 had been packed up.
14      Q.  Did you tell either of those
15 people why you wanted the handbook?
16      A.  I just told them I needed to
17 review some stuff in the handbook.
18      Q.  But did you tell them it had --
19 because you were concerned about sexual
20 harassment?
21      A.  No, sir.
22      Q.  Did you know that there was a
23 policy in the handbook about sexual

Page 46

1 harassment?
2      MR. PORTER:  Object to the
3 form.
4      A.  No, sir, I was not sure of what
5 was in the handbook.  I was looking for a
6 policy, trying to find out what chain of
7 command I needed to pursue with this.
8      Q.  Without telling me the
9 substance of any conversation you had with
10 an attorney, when was the first time you
11 talked to an attorney about your problems
12 with Cottle?
13      A.  It would probably be in an
14 e-mail in August.
15      Q.  Huh?
16      A.  August '05.
17      Q.  Okay.  Are you a member of AEA?
18      A.  No, sir.
19      Q.  Eventually you went to the --
20 let's see.  You went to the library and
21 asked for a copy of the policy, you called
22 the high school.  Did you do that on one
23 occasion or more than one occasion?

Page 47

1      A.  On one occasion and then I
2 called central office.
3      Q.  And --
4      A.  Talked with Ms. McKenny and she
5 said Ms. Martin was not there.  So I
6 called back to central office and spoke
7 with Ms. Martin.  And she said their
8 policy was torn apart, that they were
9 revising it, that there was no way for me
10 to get it at that time because it was all
11 apart and they had to get it put back
12 together.
13      Q.  When you talked with Chris
14 Martin, did you tell her what aspect of
15 the policy that you wanted?
16      A.  No, sir, I just told her I
17 needed to see it.
18      Q.  Was there some reason you
19 didn't tell her why you were inquiring?
20      A.  I was trying not to let
21 everyone in the school system know what
22 was going on until I knew what chain of
23 command I needed to follow.

Page 48

1      Q.  Do you know Ms. Martin?
2      A.  Just in and out of the office,
3 at central office.
4      Q.  Do you know Ms. McKenny?
5      A.  In and out of the central
6 office.
7      Q.  Well, in and out of the central
8 office, did that constitute a sufficient
9 basis for you to share an important matter
10 like this with them?
11      A.  No, sir.
12      MR. PORTER:  Object to the
13 form.
14      Q.  Did you ever go to the central
15 office to talk to either of them about the
16 whereabouts of the sexual harassment
17 policy?
18      A.  No, sir.  It was a phone
19 conversation only and it wasn't about a
20 particular section.  It was about the
21 handbook in general.
22      Q.  Who led the 1998 workshop on
23 sexual harassment, to your knowledge?

12  (Pages 45 to 48)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

Page 49

1    A.  I have no idea.
2    Q.  If I told you that I led that
3  workshop, would you have any reason not to
4  believe that?
5    A.  No, sir, I don't have any
6  reason not to believe that.
7    Q.  Do you recognize me as we're
8  talking today?
9    A.  Yes, sir.
10    Q.  So does that refresh your
11  recollection that I actually conducted
12  that workshop?
13    A.  No, sir.  I remember you from
14  another matter.
15    Q.  Does it refresh your
16  recollection that at that workshop I went
17  over the steps and protocols and the
18  procedures set forth in your policy?
19    A.  I don't recall.
20    Q.  Did you -- whoever the
21  presenter was, whether me as I represent
22  to you or someone else, would you have
23  shown that person the respect of

Page 50

1  listening?
2    A.  I would have.
3    Q.  When did the prior incident
4  happen that you made reference to?
5    A.  Which prior reference are you
6  speaking of?
7    Q.  You said that prior to your
8  problems with Cottle, you had a prior
9  incident that you brought to the attention
10  of your supervisor.  Who was that -- who
11  did that involve?
12    A.  Elton Overton.
13    Q.  Huh?
14    A.  Elton Overton.
15    Q.  Was that a male?
16    A.  Yes.
17    Q.  And what did he do?
18    A.  He was a custodian.
19    Q.  What did he do to you that
20  caused a concern?
21    A.  He would make sounds when I'd
22  walk by, hmm, hmm, hmm, like that, you
23  know.  I felt offended by it.  And so

Page 51

1  after several different occasions of that,
2  I spoke with Ms. Marshall and nothing was
3  ever done.  It continued.  So then I spoke
4  with Jamie Taylor, the maintenance
5  supervisor.
6    Q.  And what did he do?
7    A.  He spoke with Mr. Overton and
8  it stopped.  I never had another problem.
9    Q.  So he followed -- the
10  supervisor, when it was brought to his
11  attention, put a stop to it?
12    A.  Yes, sir.
13    Q.  And that occurred when?
14    A.  I'm not real sure about the
15  dates.  It was in --
16    Q.  What's your best judgment?
17    A.  -- '98 or '99.
18    Q.  What?
19    A.  '98 or '99.
20    Q.  Would it have occurred before
21  you attended this workshop in February of
22  1998?
23    A.  I'm not real sure about those

Page 52

1  dates.
2    Q.  But somehow you knew to go to
3  your supervisor at that time?
4    A.  Well, I assumed when Ms.
5  Marshall, after telling her and there was
6  nothing done about it, that I needed to
7  pursue and go further.
8    Q.  Who was Ms. Marshall?
9    A.  The school secretary.
10    Q.  Well, the school secretary is
11  not in a supervisory position or capacity.
12    A.  No, sir, I saw that.
13    Q.  So you had experience knowing
14  that dialoguing with the secretary might
15  not bring a stop to sexual harassment, but
16  going to a supervisor would?
17    MR. PORTER:  Object to the
18  form.
19    Q.  Correct?
20    A.  Yes.
21    Q.  So you knew from a prior
22  experience that when you took a matter of
23  sexual harassment, a complaint to a

13 (Pages 49 to 52)

# FREEDOM COURT REPORTING

Page 53

1  supervisor, action was taken to bring that
2  to a stop?
3      A.  Yes.
4      Q.  When you had talked to your
5  supervisor about this prior incident, the
6  supervisor was a male; is that right?
7      A.  He was.
8      Q.  And you --
9      A.  Someone I had known for years.
10      Q.  -- didn't have -- you weren't
11  inhibited about going to him about these
12  matters?
13      A.  No, sir, because I've known him
14  for years. He's a personal friend as
15  well.
16      Q.  When you went to him to discuss
17  that, your previous supervisor, what did
18  he tell you he would do?
19      A.  He told me he would speak with
20  him.
21      Q.  Did you have a joint meeting
22  with him and the co-employee or did he
23  just handle it?

Page 54

1      A.  He just handled it.
2      Q.  Did the other employee ever
3  apologize to you?
4      A.  No.
5      Q.  But it stopped?
6      A.  Yes.
7      Q.  And if it had not stopped, did
8  you know that you could go back to the
9  supervisor because he would not tolerate
10  that?
11      A.  I would --
12          MR. PORTER:  Object to the
13  form.
14      A.  I would hope I could go back to
15  him.
16      Q.  Well, let me explore that with
17  you. You went and told him about these
18  sounds that were being made and it was
19  making you uncomfortable.
20      A.  Yes.
21      Q.  And that's all he was doing, he
22  was making sounds that you thought were
23  inappropriate.

Page 55

1      A.  Correct.
2      Q.  And so you went to the
3  supervisor and what did he tell you he
4  would do?
5      A.  He told me he would speak with
6  him.
7      Q.  Did he tell you he didn't think
8  that was appropriate?
9      A.  No. He just said he would
10  speak with him.
11      Q.  And put a stop to it?
12      A.  He didn't say he'd put a stop.
13  He said he'd speak with him.
14      Q.  Okay. There's a reference
15  here, Ms. Price, that you would go to the
16  post. What is that? Let me read
17  this. Many of the people in earlier
18  interviews said I went to his post. What
19  is that?
20      A.  Where he parks in the mornings,
21  his truck.
22      Q.  Did you, in fact, go to his --
23  where he was parking on occasions as these

Page 56

1  people indicated?
2      A.  Prior to the harassment, yes, I
3  did.
4      Q.  But not in 2003 or 2004 or
5  2005?
6      A.  From December of '04, if I'm
7  correct, that is when I no longer went in
8  anywhere near his post except passing by
9  when I would be leaving the school.
10      Q.  And if people at the school
11  were to say that you continued to go to
12  his post even after that date, they would
13  be mistaken as far as you're concerned?
14      A.  As far as my walking to his
15  post, they would be mistaken.
16      Q.  Now, you said you were doing a
17  running dialogue of these notes and so
18  forth, but this entry indicates that you
19  were aware of interviews. What
20  interviews?
21      A.  Those are the interviews Mr.
22  Marcum conducted.
23      Q.  So those took place and were

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660**

## FREEDOM COURT REPORTING

Page 57

1   brought to your attention after you field
2   the EEO complaint?
3       A.  Correct.
4       Q.  But your testimony to me is all
5   of the previous notations on this document
6   were done at or about the time that the
7   incidents took place?
8       A.  Some were added in.  That's
9   what I stated earlier.  I added some in
10  after reading over everything.
11      Q.  You list a number of people
12  here.  Have you talked to Harriet Jones
13  about your issues with Cottle?
14      A.  No, sir.
15      Q.  So you don't know what Harriet
16  Jones knows or observed?
17      A.  All she is aware of is that
18  where I park, she parks directly beside
19  me.  And many mornings she would have to
20  wait for Mr. Cottle to move so she could
21  pull into her parking place.
22      Q.  But in terms of discussing any
23  specifics about this complaint, you didn't

Page 58

1   have a conversation with her?
2       A.  No, sir.
3       Q.  Donna Stephens, have you talked
4   to Donna Stephens at any time about your
5   problems with Mr. Cottle?
6       A.  No, sir.  She's aware of the
7   same as Ms. Jones.
8       Q.  Delia Harmon, have you ever
9   talked to Ms. Harmon about any of the
10  issues you have with Mr. Cottle?
11      A.  No, sir.
12      Q.  Marilyn Pollard?
13      A.  No, sir.
14      Q.  Never talked to her about
15  anything?
16      A.  They're just aware that he
17  approached my vehicle.
18      Q.  Theresa Hunter, is that the
19  same Ms. Hunter that --
20      A.  That's the same.
21      Q.  -- you referenced earlier?
22      A.  -- Ms. Hunter.
23      Q.  And Mr. Foster, what does Mr.

Page 59

1   Foster know?
2       A.  Mr. Foster parks on this side
3   of where I parked and there were many
4   mornings that he would pull into his
5   parking lot and he knows as well Mr.
6   Cottle was standing at my vehicle.
7       Q.  You indicate in this note that
8   the last comment was sometime around the
9   1st to the 14th of October 2005.  I don't
10  understand that entry.  Was that the last
11  time Mr. Cottle said anything or did
12  anything of an offensive nature to you?
13      A.  Yes.
14      Q.  You filed the EEO complaint,
15  let's see, in September, September 23,
16  '05.  Prior to that, had you consulted
17  with an attorney?
18      A.  Prior to the filing?
19      Q.  Yes.
20      A.  Yes, I spoke with Mr. Porter.
21      Q.  Did an attorney assist you in
22  filing the EEO complaint?
23      A.  He did.

Page 60

1       Q.  Prior to filing the EEO
2   complaint, had anybody -- I'm not asking
3   about your attorney conversation -- had
4   anybody ever suggested that you go and
5   report your concerns to a supervisor?
6       A.  No, sir.
7       Q.  You knew that that had worked
8   in the past?
9       A.  Yes, sir.
10      Q.  And you had been keeping notes
11  all along about these matters?
12      A.  Yes, sir.
13      Q.  Were you just hoping to file a
14  lawsuit to get money from the school
15  system?
16      A.  No, sir.
17      Q.  Well, then why would you file
18  an EEO complaint prior to going to the
19  supervisors that had indicated in a
20  previous incident that they could bring a
21  stop to this and were willing to do that?
22      MR. PORTER:  Object to the
23  form.

15  (Pages 57 to 60)

# FREEDOM COURT REPORTING

Page 61

1      A.  I spoke with that supervisor
2  because as I said before, he is a friend.
3  I have known him on a personal basis for
4  many years.  I was not comfortable with
5  speaking with Mr. Foster and I attempted
6  to get board policies so I would know
7  which route I needed to take as far as the
8  steps I needed to take in order to handle
9  this matter, could not get ahold of it.
10  And due to all of the harassment, I just
11  felt that I needed to take it somewhere,
12  so I contacted an attorney.
13      Q.  Well, are you seeking monetary
14  damages from the school system?
15      A.  At this time due to all the
16  stress I have had to deal with this and
17  continually working and Mr. Cottle still
18  at his position, yes.
19      Q.  So how much money do you want
20  from the Roanoke School System?
21      A.  I would have to speak with my
22  attorney on that.
23      Q.  Well, do you have any idea of

Page 62

1  what you would ask a jury for in terms of
2  compensatory damages?
3      A.  I would have to speak with my
4  attorney.
5      Q.  Would it be more than a hundred
6  thousand or less than a hundred thousand?
7      A.  I would have to speak with my
8  attorney.
9      Q.  But you indicate in this
10  document that there has been no further
11  incident with Mr. Cottle since October of
12  2005.
13      A.  That is correct.
14      Q.  After the EEO complaint was
15  filed, who was the first person in the
16  school system that contacted you about the
17  matter?
18      A.  Mr. Marcum.
19      Q.  And tell me about your
20  conversation with Mr. Marcum.
21      A.  I was in a classroom subbing
22  and Ms. Benefield come to get me.  And
23  when I got in the office, Mr. Marcum, Mr.

Page 63

1  Foster, and Ms. Benefield were in the
2  conference room and he read over the EEOC
3  charges and proceeded to ask me questions
4  about the charges.
5      Q.  Did those three people indicate
6  to you they had no knowledge of any
7  problem prior to receiving the EEO
8  complaint?
9      A.  They did.
10      Q.  They told you that they had no
11  prior knowledge?
12      A.  They told me they had no prior
13  knowledge.
14      Q.  And what did Mr. Marcum tell
15  you he would do concerning the matters
16  that you were alleging?
17      A.  He didn't say.
18      Q.  Well, did Mr. Foster or any of
19  them indicate what they would do?
20      A.  No, sir.
21      Q.  What do you recall being
22  discussed at that meeting?
23      A.  Just the charges that are in

Page 64

1  the EEOC file.
2      Q.  They were asking you about
3  those?
4      A.  They were asking me questions
5  about those.
6      Q.  Did they tell you that they
7  would go to Mr. Cottle immediately?
8      A.  No, sir.
9      Q.  Are you aware that they went to
10  Mr. Cottle immediately to make sure that
11  nothing of the nature of the complaints
12  that you had put in the EEO complaint
13  would happen in the future?
14      MR. PORTER:  Object to the
15  form.
16      A.  I was not aware that he was
17  contacted.  I was just aware that the
18  comments and his approaching my vehicle
19  had stopped after that time.
20      Q.  Since October of 2005, has Mr.
21  Cottle done a single thing by way of
22  conduct or comment to offend you?
23      A.  No.

16  (Pages 61 to 64)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

Page 65

1    Q.  In this commentary, you say
2  that you wanted Mr. Marcum to hear a
3  recording that you have. Did you bring
4  that recording with you?
5    A.  I did.
6    Q.  Where is that?
7    A.  It's in my bag.
8    Q.  Would you mind playing that for
9  us?
10    A.  Is there a plug-in that I can
11  plug the speakers?
12    Q.  Huh?
13    A.  A plug-in that I can plug the
14  speakers in so you can hear?
15    Q.  You just have one tape; is that
16  correct?
17    A.  That's correct.
18    Q.  I'm sorry?
19    A.  That's correct.
20    Q.  Have you ever told anybody that
21  you had more than fifty tapes?
22    A.  No.  There's thirty-something
23  recordings on that tape.  I didn't say I

Page 66

1  had no fifty tapes.
2    Q.  Do you know how long these
3  tapes are?
4    A.  Each recording I figured up the
5  time is approximately forty-five minutes
6  or so.
7    Q.  So what I'm asking you to play
8  will take several hours?
9    A.  If we have to stop and you ask
10  questions during, yes, because it's
11  forty-five minutes' worth of recorded
12  stuff.
13    Q.  All right.  Before we take the
14  time to do that -- and you know we've
15  requested those before, don't you?
16    A.  Yes.
17    Q.  And they haven't been provided,
18  have they?
19    A.  I took the recording to Mr.
20  Marcum's office and attempted for him to
21  hear them, but he said he couldn't hear or
22  understand it.  And he didn't have any
23  speakers that we could hook it to.

Page 67

1    Q.  Put the apparatus that you have
2  on the table, if you will, so I can look
3  at it and see what it is.
4    A.  It's just computer speakers.
5  That's all this is.  And this is the
6  little digital recorder.
7    Q.  Is there a tape in that
8  recorder?
9    A.  No, sir.  It's recorded onto
10  that.  It's just a digital recorder.
11  There is no tape.
12    MR. SWEENEY:  Adam, let's go
13  off the record just a minute.
14    (Off-the-record discussion.)
15    Q.  Ms. Price, before we start
16  playing these, would you tell me what it
17  is that you've recorded on this machine?
18    A.  It's conversations that Mr.
19  Cottle and I had at different times from
20  August '05 until October '05.
21    Q.  So this will cover
22  conversations with Mr. Cottle from August
23  of '05 until you filed an EEO complaint?

Page 68

1    A.  That's correct, and some even
2  after that.
3    Q.  All right.  And you had already
4  talked with an attorney prior to starting
5  these recordings?
6    A.  No, sir.
7    Q.  When do you say you first
8  contacted an attorney?
9    A.  In the latter part of August.
10    Q.  And these conversations
11  continue into September?
12    A.  Yes, sir.
13    Q.  Did you ever tell Mr. Cottle
14  that you were recording conversations with
15  him?
16    A.  No, sir.
17    Q.  So these were conversations
18  that took place at school?
19    A.  Yes, sir.
20    Q.  So when you would see him at
21  your duty station, you would turn on your
22  recorder?
23    A.  Yes, sir, it would be in my

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660**

# FREEDOM COURT REPORTING

Page 69

1    pocket on.
2        Q.  Okay.  Let's play the
3    recording.  At this time and place, we're
4    beginning the recordings that you made of
5    conversations between you and Mr. Cottle.
6    And these are conversations that you think
7    reflect the sexual harassment that you
8    were being subjected to?
9        A.  That's correct.
10       Q.  Are these representative --
11   typical of the kinds of comments?
12       A.  They are.
13       Q.  Okay.
14           (Inaudible tape being played.)
15       MR. SWEENEY:  I can't
16   understand any of that.  Can you?
17       THE REPORTER:  I cannot
18   understand it either.
19       MR. PORTER:  I'll tell you what
20   let's do.  Let's not --
21       A.  Yeah.  It's difficult to hear
22   it on this tape.  The best way to do it is
23   if you have headphones to stick in and put

Page 70

1    it on.  That way you hear each word and
2    it's filtered through the little things on
3    the headphones.  These speakers, I mean,
4    they're not that good either.  I know what
5    he's saying because I was there.  I know
6    what he's saying.  I mean --
7        Q.  Okay.  Let's not play it.
8        A.  Okay.
9        Q.  We can't pick up on that.
10       MR. SWEENEY:  Adam, will you
11   get that transcribed but keep the original
12   so that we can track that?
13       MR. PORTER:  Sure.
14       MR. SWEENEY:  Okay.  And I'll
15   want to continue this deposition reserving
16   the right to re-call Ms. Price after we
17   get the transcript.
18       Q.  So I'll just state that it may
19   be necessary for you to come back.  You've
20   listened to these recordings several
21   times, I assume?
22       A.  Yeah.
23       Q.  All right.  What are the type

Page 71

1    of comments that are on this that indicate
2    a basis for your claim of sexual
3    harassment?
4        A.  The first one after I give the
5    date, you can hardly hear him, but he told
6    me I look good enough to eat this morning.
7        Q.  All right.
8        A.  Well, I was floored.
9        Q.  And what did you say to him in
10   response to that?
11       A.  I didn't say anything.  My
12   mouth just flew open.
13       Q.  So that had never happened
14   before?
15       A.  Nothing like that, no.
16       Q.  Okay.
17       A.  Before that, it was just like,
18   you look good to me, show me your pretty
19   green eyes, you know.
20       Q.  All right.
21       A.  And then he said, tell you what
22   let's do, let's me and you tell everybody
23   we've got a school board meeting tonight

Page 72

1    and we'll go to LaGrange.  Let's me and
2    you get in your car and go driving.
3        Q.  And when he would say that to
4    you, what would you say in response?
5        A.  I would say no, or I don't
6    think so.
7        Q.  Okay.  What else does he say?
8        A.  He told me on one occasion, he
9    says, I'm going to plant one here
10   (pointing), here (pointing), and here
11   (pointing).  I said, I don't think so.
12       Q.  Now, let's see.  You just
13   pointed to your check --
14       A.  My shoulder.
15       Q.  -- to your upper -- your
16   shoulder, your forearm or your wrist?
17       A.  My -- the back of my hand.
18       Q.  Okay.  And how did you --
19       A.  And I said, I don't think so.
20   He said, in France they kiss on the hands.
21   I told him, I said, you're not kissing me
22   nowhere.
23       Q.  Okay.  And he never did kiss

18  (Pages 69 to 72)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

Page 73

1  you.
2      A.  No.
3      Q.  Okay.
4      A.  He made comments like, I wish I
5  had found you before your husband.
6      Q.  And what would you say in
7  response to that?
8      A.  And I said, you know, it
9  wouldn't have done you no good.  I mean,
10  you know --
11     Q.  You say that on the tape?
12     A.  I'm not sure exactly what I say
13  on the tape.
14     Q.  Well, I'm asking you what you
15  recall the tape says.
16     A.  I don't recall exactly my
17  answer to that on the tape.
18     Q.  All right.  What other comments
19  would he make?
20     A.  He'd demand for me, take your
21  glasses off, let me see your pretty green
22  eyes.
23     Q.  And how would you respond?

Page 74

1      A.  I'd say, no, I'm not.
2      Q.  All right.
3      A.  And I mean, it was just those
4  type things over --
5      Q.  Any other comment that was
6  different from those?
7      A.  No.  After that, it was
8  basically the same stuff.
9      Q.  All right.  And this
10  illustrates the type of comments that form
11  the basis of your EEO complaint and your
12  lawsuit?
13     A.  Yes.
14     Q.  At any point in this
15  conversation with Mr. Cottle that you've
16  recorded, did you ever say, stop making
17  those comments to me, I don't appreciate
18  them, I don't want them and don't do that
19  ever again?
20     A.  Not in those words.  He would
21  say, you don't like me saying that, do
22  you?  And I would say no, no, I don't.
23     Q.  Did you ever tell him to stop?

Page 75

1      A.  I did in one part say, I wish
2  you would stop.
3      Q.  Well, you're not afraid of Mr.
4  Cottle, are you?
5      A.  No.
6      Q.  Now, where did these
7  conversations take place?
8      A.  At my vehicle.
9      Q.  So you would be sitting in your
10  vehicle?
11     A.  Either sitting in it.  Or on
12  one occasion, he walks up to my vehicle
13  and it's recorded, he's like, get out.
14     Q.  All right.  But these would
15  take place when you would be sitting in
16  your vehicle and he'd come up to your
17  vehicle?
18     A.  Yes.
19     Q.  And you'd turn on your tape
20  recorder?
21     A.  Yes.
22     Q.  And you would listen to
23  whatever he had to say?

Page 76

1      A.  Until Mr. Foster or someone got
2  there and opened the door to the building
3  and then I would use the excuse, I had to
4  go in to go to the bathroom to get away
5  from him.
6      Q.  All right.  You indicated that
7  the first entry says, you look good enough
8  to eat?
9      A.  Yes.
10     Q.  All right.  And you were
11  floored?
12     A.  (Witness nodding head
13  affirmatively.)
14     Q.  And you had that on your
15  machine; correct?
16     A.  Correct.
17     Q.  And you could have taken that
18  recording at that moment to one of your
19  supervisors, couldn't you?
20     A.  Well, because it's not real
21  clear and people can't understand it, I
22  didn't see where it was going to do me
23  much good.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660**

# FREEDOM COURT REPORTING

Page 77

1    Q.  But you didn't give them an
2  opportunity to help you, did you?
3        MR. PORTER:  Object to the
4  form.
5    Q.  You made the decision that you
6  didn't think it would do much good, but
7  you never approached your female assistant
8  principal or your principal or your
9  superintendent to see if they would help?
10    A.  At that time, the comment was
11  not clear to me and so I did not -- I
12  assumed no one else could understand it --
13    Q.  All right.  It wasn't --
14    A.  -- even though --
15    Q.  -- clear to you?
16    A.  -- I knew what he said.
17        MR. PORTER:  Let her finish.
18    Q.  Excuse me.  I'm sorry.  Excuse
19  me.
20    A.  You can't hear it clearly.
21    Q.  Okay.
22    A.  And so I assumed other people
23  couldn't hear it clearly.  I knew what he

Page 78

1  said.  But without clear proof, I didn't
2  know that anybody else would believe me so
3  I continued to record conversations.  And
4  later on I discovered with headphones,
5  it's a lot clearer if you listen to it
6  with headphones on.
7    Q.  But what you were doing was
8  collecting evidence so you could file a
9  lawsuit; right?
10    A.  No, sir.
11    Q.  But you weren't collecting
12  evidence to take to a supervisor to put a
13  stop to it, were you?
14    A.  If I had gotten the board
15  policies so I could have seen the chain of
16  command I needed to follow, then I would
17  have carried it to that person.
18    Q.  Well, what if the board policy
19  said, if you have a complaint, you should
20  go to your supervisor?  What if the policy
21  said that?  You would have already known
22  you could do that, wouldn't you?
23        MR. PORTER:  Object to the

Page 79

1  form.
2    A.  Yes, sir.
3    Q.  Because you had already done
4  that before.
5    A.  But there again, as a crossing
6  guard, I was not clear on who my
7  supervisor was.  I know the principal is
8  in charge of the building.  But most of --
9  anything I had to complain about had been
10  complained to the secretaries.
11    Q.  Okay.  After you met with Mr.
12  Marcum, Mr. Cottle's wife called you?
13    A.  That was in the summer of '06.
14    Q.  The summer of '06?
15    A.  (Witness nodding head
16  affirmatively.)
17    Q.  All right.  And did you know
18  Mr. Cottle's wife?
19    A.  No, sir.
20    Q.  But you certainly knew he was
21  married since you talked to the wife and
22  you indicated here.
23    A.  After that comment, yes, sir.

Page 80

1    Q.  All right.
2    A.  Prior to that, no, sir.
3    Q.  Let's revisit what you told me
4  at the start of this deposition.  Didn't
5  you tell me you assumed he was married,
6  but you didn't know?
7        MR. PORTER:  Object to the
8  form.
9    A.  Yes, sir.
10    Q.  And now this document indicates
11  you knew that he was married because you
12  talked to his wife.
13    A.  She addressed herself as his
14  wife when she called me.
15    Q.  And you don't have any reason
16  to disbelieve that, do you?
17    A.  No, sir.
18    Q.  All right.  So when you told me
19  at the start of this deposition you just
20  assumed but didn't know that he was
21  married, you weren't being completely
22  forthright with me, were you?
23        MR. PORTER:  Object to the

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660**

# FREEDOM COURT REPORTING

Page 81

1  form. That's not what she said. She said
2  as far as I know.
3      A.  As far as I know.  I mean, I've
4  never seen a marriage certificate.  I
5  don't know that he's married.
6      **Q.  Well, what did Mrs. Cottle say**
7  **to you?**
8      A.  She said, I heard you've got a
9  tape you want me to hear.  I didn't
10  realize who she was.  I said, I don't know
11  what you're talking about.
12      **Q.  What else did she say?**
13      A.  And she's like, well, she was
14  like that's what I was told.  I said, I then
15  don't know who this is she.  And then she
16  told me, she said, this is Janell Cottle.
17  This is Jerrell's wife.  And she proceeded
18  to tell me that Mr. Marcum had told her
19  that I said I had a tape that she wanted
20  to hear.  I said, that's not what was
21  said.
22      **Q.  All right.  What else took**
23  **place?**

Page 82

1      A.  And she as much as told me I
2  was trailer trash and --
3      **Q.  Wait.  Let me go back just a**
4  **minute, Ms. Price.  Instead of you**
5  **paraphrasing, what did she say?**
6      MR. PORTER:  Object to the
7  form.  Did she say she was paraphrasing?
8      MR. SWEENEY:  Yeah.  She said
9  in as much as said that you were trailer
10  trash.
11      A.  She said --
12      **Q.  All right.  That suggests to me**
13  **you're paraphrasing.  What do you recall**
14  **her exact words, to the best of your**
15  **recollection?**
16      A.  She said, I know you live in a
17  trailer there in that rundown little
18  Standing Rock.
19      **Q.  Okay.  What else did she say?**
20      A.  And she's like, there's no way
21  my husband would have said anything to
22  you.  Your husband can't be much of a
23  husband or he would have put a stop to

Page 83

1  this.
2      **Q.  Anything else?**
3      A.  I really don't recall.  I was
4  so upset at the time of that phone
5  conversation, I just -- it went on for
6  several minutes and she was just really
7  rude.  And I just could not understand why
8  my conversation with Mr. Marcum was told
9  to her.
10      **Q.  All right.  After Mr. Cottle's**
11  **wife called you, did you ever go to your**
12  **principal to share with the principal that**
13  **that had happened?**
14      A.  No, sir.
15      **Q.  Or to the assistant principal?**
16      A.  No, sir.
17      **Q.  Or to Mr. Marcum?**
18      A.  No, I don't believe I ever told
19  Mr. Marcum she called, or maybe I did call
20  him back.
21      **Q.  Well, whatever is the truth,**
22  **what do you recall?**
23      A.  I did call him back.  I

Page 84

1  remember calling him back.
2      **Q.  Did you tell him that Mrs.**
3  **Cottle --**
4      A.  Had called --
5      **Q.  -- had called?**
6      A.  -- me, yes, sir, I did.
7      **Q.  What do you think you told Mr.**
8  **Marcum?**
9      A.  I just asked him if he had told
10  her and he told me he had had an interview
11  with Mr. Cottle about the tape.
12      **Q.  All right.  Did you tell Mr.**
13  **Marcum that she had been abusive to you on**
14  **the phone?**
15      A.  I told him that she had called
16  me and was extremely rude.
17      **Q.  Okay.  But is that as much as**
18  **you told him about --**
19      A.  Yes.
20      **Q.  -- the conversation?  Did you**
21  **ask him to do anything about that?**
22      A.  Well, I didn't figure he had
23  any control over her.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660**

# FREEDOM COURT REPORTING

Page 85

1    Q. All right. There's an entry
2  here, Marcum and the school attorney
3  threatened to fire me for job abandonment.
4  Who was the school attorney that you're
5  talking to?
6    A. I'm not sure that -- I received
7  an e-mail in August. I had --
8      MR. PORTER: Don't discuss any
9  conversations of e-mails with you and I.
10    A. Oh, okay. I had back surgery
11  in June and my doctor had not released me
12  to go back to work yet. And there was a
13  threat of terminating my position because
14  of job abandonment. But I had not gotten
15  a release from my doctor to provide to
16  central office.
17    Q. But this says that Marcum and
18  the school attorney threatened you. All
19  right. First, what did Marcum say that
20  was threatening to you?
21    A. It did not come directly to me.
22  It was sent to my attorney.
23    Q. Mr. Porter?

Page 86

1    A. Yes.
2    Q. Well, what was sent to Mr.
3  Porter?
4    A. I don't know. He just e-mailed
5  me and asked me if I was aware that the
6  school board and Mr. Marcum was going to
7  terminate my position for job abandonment.
8  And he asked me what was the deal and I
9  told him that I had been out of work
10  due --
11      MR. PORTER: All right.
12    A. -- to back surgery.
13      MR. PORTER: That's enough of
14  that.
15    Q. All right. And who is the
16  school attorney that you have in mind?
17    A. I have no idea.
18      MR. SWEENEY: Adam, would that
19  be me?
20      MR. PORTER: Yeah. You may not
21  remember that.
22      MR. SWEENEY: Well, I don't
23  remember threatening anybody.

Page 87

1      MR. PORTER: No. I think the
2  conversation was, I don't remember if it
3  was on the phone or e-mail, that they
4  didn't know where she was or something
5  like that. She didn't show up for the
6  back-to-school meeting or something like
7  that.
8    Q. Okay. After your attorney
9  contacted you, did you provide Mr. Marcum
10  with information about your medical
11  condition?
12    A. Yes, sir.
13    Q. And that satisfied Mr. Marcum
14  that you had not abandoned your job?
15    A. Yes, sir.
16    Q. But prior to giving him that
17  information, would it be true that Mr.
18  Marcum had no idea of your whereabouts?
19    A. Central office was aware that I
20  had not been released from my doctor. I
21  told them when I went back for my
22  one-month checkup and would give them the
23  paperwork. And at that time, I had not

Page 88

1  gone back.
2    Q. Who at the central office did
3  you have that conversation with?
4    A. Tracy Smith.
5    Q. You have an e-mail as page
6  three of this package from Chuck Marcum.
7  I was wondering if we have made our
8  response in the Angela Price matter. What
9  is this e-mail about?
10    A. I'm assuming it was sent to me
11  by mistake.
12    Q. Does it have any significance
13  as far as you're concerned?
14    A. Other than contact without my
15  lawyer.
16    Q. Well, did you share this with
17  your lawyer?
18    A. I did.
19    Q. Do you know what your lawyer
20  did with it?
21    A. I have no idea. He handled it.
22      MR. SWEENEY: Well, is there
23  some issue about this? Apparently a

22  (Pages 85 to 88)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

Page 89

1    mistake was made?
2        MR. PORTER:  Well, I don't know
3    if there was a mistake made or not.  I
4    guess Mr. Marcum can tell us that at some
5    point.  You asked for any, I think,
6    communications or something like that,
7    so --
8        Q.  But there's no threat or
9    anything improper about the matters that
10   you set forth there, is there, as far as
11   you're concerned?
12       A.  No.
13       Q.  Is there anything in the
14   message of that e-mail that indicates an
15   insensitivity or indifference to your
16   complaint?
17       A.  No, sir.
18       Q.  Or anything that would suggest
19   retaliation or anything that would violate
20   any right or law that would entitle you to
21   relief?
22       A.  No, I'm not sure about that.
23       Q.  The next page of this packet is

Page 90

1    a handwritten chart of some type.  What is
2    that?
3        A.  That's the days that I subbed
4    from my '05 check stubs.  And the purpose
5    of that was to demonstrate how many days
6    that I subbed, showing that I would finish
7    my post outside as a crossing guard and go
8    directly into the building.
9        Q.  Okay.  How does this
10   information relate to the lawsuit?
11       A.  It just shows that there was no
12   way I could stop at his post and be
13   standing out there talking with him, that
14   I was inside the building.
15       Q.  Okay.  Let me hand you a
16   two-page document that appears to be a
17   printout of some sort.  What is that?
18       A.  Those are days missed in the --
19   '04 to '06, I believe.
20       Q.  And the subsequent printouts
21   are what?
22       A.  Those are showing days subbed
23   as well.  They had to print it from

Page 91

1    paychecks --
2        Q.  Okay.  And what is --
3        A.  -- and just calculated the days
4    subbed.
5        Q.  What is the significance of
6    this information?
7        A.  There again, just showing that
8    I would leave my post as a crossing guard
9    and go directly in the building.
10       Q.  So the information we've just
11   gone over as part of Board Exhibit 2
12   constitutes the documentary evidence that
13   you have that's not privileged together
14   with the tape that we'll get transcribed?
15       A.  Yes.
16       MR. PORTER:  Responsive to what
17   you've requested.
18       MR. SWEENEY:  Huh?
19       MR. PORTER:  Responsive to what
20   you've requested.
21       Q.  Are there any documents that
22   you have that relate in any form or
23   fashion to the issues raised in your

Page 92

1    lawsuit?
2        A.  No, sir.
3        Q.  You have disclosed through your
4    attorney a list of people that may have
5    information about your contentions.  Let
6    me go over those.  There may be some of
7    them that we have just asked about -- I've
8    just asked about.  But let me make sure
9    I'm systematic.  Robbie Benefield, what do
10   you think Robbie Benefield knows?
11       A.  She was in the upper office
12   when a conversation was being discussed
13   about Mr. Cottle's comments toward me.
14       Q.  And that conversation would
15   have taken place when?
16       A.  Sometime in the fall of '05,
17   early August, right after school started.
18       Q.  Prior or after the filing of
19   the EEO complaint?
20       A.  Prior.
21       Q.  But immediately before, say,
22   August before you filed --
23       A.  Yes.

23  (Pages 89 to 92)

## FREEDOM COURT REPORTING

Page 93

1    Q.  -- the complaint in September?
2    A.  Yes.
3    Q.  All right.  Would she know
4    anything else?
5    A.  No.
6    Q.  Would she have had any prior
7    knowledge about any issue you had with Mr.
8    Cottle before that conversation?
9    A.  No.
10   Q.  Tina Clarke?
11   A.  She was in the upper part of
12   the office as well when a conversation was
13   being discussed as well as me coming in
14   and watching out the window waiting for
15   him to leave.
16   Q.  Okay.  But in terms of whether
17   she heard the conversation, you don't
18   know?
19   A.  No, sir.  She heard the
20   conversation.  She may not recall it, but
21   she heard it.
22   Q.  All right.  But if she said she
23   didn't hear it, didn't know about it,

Page 94

1    you're not challenging her veracity, are
2    you?
3    A.  No.
4    Q.  Do you believe her to be a
5    truthful person?
6    A.  Yes.
7    Q.  Greg Foster, what would Mr.
8    Foster know?
9    A.  Just that mornings he would
10   pull up to his parking place, that Mr.
11   Cottle would be at my place, not the
12   reverse, not me at his.
13   Q.  Did you ever say to Mr. Foster
14   that you'd like for Cottle to park where
15   he's supposed to?
16   A.  Oh, he was parked where he was
17   supposed to.  He would walk to my vehicle
18   as well.
19   Q.  Okay.  Delia Harmon, what does
20   she know?
21   A.  She also -- she arrives to work
22   early, so she would know that he would be
23   at my car standing.

Page 95

1    Q.  But as far as you know, that's
2    the full extent of her information?
3    A.  As far as I know, yes.
4    Q.  Theresa Hunter, you previously
5    discussed her.  Is there anything else
6    that she would have known in support of
7    your contentions of sexual harassment?
8    A.  No, nothing more than what --
9    Q.  Harriet Jones?
10   A.  -- I've already said.  Just
11   aware of where I parked and that he would
12   be there.
13   Q.  Rosemarie Marshall?
14   A.  She's aware of most of the
15   harassment.
16   Q.  Beginning when?  When did you
17   first disclose to her your issues about
18   Mr. Cottle?
19   A.  In the fall of '03 when he
20   asked me to go to Florida when he was
21   going for a doctor's visit.
22   Q.  When he was going for what?
23   A.  A doctor's visit.

Page 96

1    Q.  And what did you tell Ms.
2    Marshall?
3    A.  I just told her that he had
4    asked me to go to Florida with him.
5    Q.  Did you tell her you thought
6    that was inappropriate?
7    A.  I told her I thought it was a
8    joke.  He was crazy.
9    Q.  Did you ask her to do anything
10   about it?
11   A.  No.
12   Q.  Did you tell her you were
13   concerned or worried or threatened?
14   A.  No, not at that time.
15   Q.  When was the next conversation
16   you had with Ms. Marshall about Cottle?
17   A.  It would probably be in
18   December of '03.
19   Q.  What do you recall telling her
20   in December of '03?
21   A.  I just remember saying that he
22   was still making comments about how pretty
23   I was or let me see your green eyes and it

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660**

# FREEDOM COURT REPORTING

Page 97

1  was just continuing.
2    Q.  Okay.  What was her response?
3    A.  No response at all.
4    Q.  She didn't say anything?
5    A.  Huh-uh.
6    Q.  Did you tell her that he was
7  making those comments and that you were
8  really upset?
9    A.  No, not at that time.
10   Q.  You just shared with them the
11 information?
12   A.  (Witness nodding head
13 affirmatively.)
14   Q.  When was your next conversation
15 with her?
16   A.  I'm not sure.
17   Q.  Okay.  At any time prior to
18 filing the EEO complaint, did you tell Ms.
19 Marshall that you were really upset with
20 Cottle?
21   A.  I told her that it was getting
22 worse and I didn't know how much more of
23 it I could take.

Page 98

1    Q.  And when did you tell her that?
2    A.  In August of '05.
3    Q.  What did she say in response to
4  that?
5    A.  She didn't say anything.
6    Q.  Absolutely nothing?
7    A.  She was working on her
8  computer.
9    Q.  I'm sorry?
10   A.  She was working on her
11 computer.  I was standing in her office
12 door.
13   Q.  All right.  Marilyn Pollard?
14   A.  Pollard.
15   Q.  Pollard.  What would Ms.
16 Pollard know?
17   A.  She would also know that he
18 would be standing at my car in the
19 mornings.
20   Q.  Donna Stephens?
21   A.  The same.
22   Q.  Sherry Yarbrough?
23   A.  She's aware of some of the

Page 99

1  comments and she's --
2    Q.  How would she become aware?
3    A.  Because she would be in the
4  office when I would either be telling her
5  or Ms. Marshall.
6    Q.  Have you ever asked Ms.
7  Yarbrough if she recalls the comments that
8  you shared in the office about Cottle?
9    A.  No, sir, I've not discussed
10 anything with anybody at the school.
11   Q.  After you conferenced with Mr.
12 Marcum after the filing of the EEO
13 complaint, if Cottle had said or done
14 anything after that conference, what would
15 you have done?  Who would you have
16 reported it to?
17     MR. PORTER:  Object to the
18 form.
19   A.  At that point, I would have
20 probably told my husband.
21   Q.  Well, wouldn't you have gone to
22 Mr. Marcum?
23   A.  Yes, sir.

Page 100

1    Q.  You knew that he was concerned
2  about your complaint?
3     MR. PORTER:  Object to the
4  form.
5    A.  I knew he was aware of my
6  complaint.
7    Q.  Would you have gone to Mr.
8  Foster?
9    A.  I would have probably went to
10 Mr. Foster or whoever was at the school at
11 that particular day.
12   Q.  Okay.  Have you recently
13 reviewed your EEO complaint?
14   A.  I looked over it this morning.
15   Q.  Huh?
16   A.  I looked over it this morning.
17   Q.  What else did you review in
18 preparation for your deposition other than
19 reviewing the EEO complaint?
20   A.  I just looked back over it to
21 make sure everything was accurate.
22   Q.  What?
23   A.  I just looked back over it to

25  (Pages 97 to 100)

# FREEDOM COURT REPORTING

Page 101

1  make sure it was accurate this morning.
2  **Q. Was it accurate?**
3  A. Yes, to the best of my
4  knowledge.
5  (Whereupon, Defendant's
6  Exhibit 3 was marked
7  for identification.)
8  **Q. This is what you reviewed this**
9  **morning?**
10  A. Yes, sir, I just looked back
11  over this.
12  **Q. This is what you filed with the**
13  **EEO complaint?**
14  A. (Witness nodding head
15  affirmatively.)
16  **Q. Did you share with the EEO all**
17  **of the relevant matters that you thought**
18  **should be brought to their attention in**
19  **support of your complaint?**
20  MR. PORTER: Object to the
21  form.
22  A. I'm not sure.
23  **Q. Were you interviewed by a**

Page 102

1  representative of the EEO?
2  A. No, sir.
3  **Q. Did you have any conversations**
4  **with anybody at the EEO after filing this?**
5  A. I have not.
6  **Q. You indicate in this that he**
7  **touched you on the cheek, shoulder, and**
8  **hand --**
9  A. Uh-huh.
10  **Q. -- is that true?**
11  A. That's correct.
12  **Q. When did that take place?**
13  A. On the morning he told me, I'm
14  going to plant one here (pointing), here
15  (pointing), and here (pointing).
16  **Q. Did he touch your cheek?**
17  A. He touched my cheek.
18  **Q. And what did you do?**
19  A. I just did like that
20  (indicating).
21  **Q. You just kind --**
22  A. I was sitting --
23  **Q. -- of dodged it?**

Page 103

1  A. -- inside my car.
2  **Q. I'm sorry?**
3  A. I was sitting in my car, so I
4  did just like that (indicating).
5  **Q. And then he touched your**
6  **shoulder?**
7  A. Uh-huh.
8  **Q. And touched your hand?**
9  A. Uh-huh.
10  MR. PORTER: Try not to say
11  uh-huh.
12  A. Yes.
13  **Q. Did you slap him or push him**
14  **away or say anything at that point?**
15  A. I just told him to stop.
16  **Q. And he did?**
17  A. Well, that's when he said, in
18  France they kiss on the hands, and I told
19  him he wasn't kissing me nowhere.
20  **Q. All right. And the next to the**
21  **last line, you say I have complained to**
22  **teachers at the school.**
23  A. Uh-huh.

Page 104

1  **Q. All right. What teachers again**
2  **have you complained -- that you complained**
3  **about prior to filing this?**
4  A. The two that were aware of it
5  were Theresa Hunter and Tina Clarke.
6  **Q. And you're saying you went to**
7  **them and told them what Mr. Cottle was**
8  **doing and how upset you were?**
9  A. Not in a direct purpose, no.
10  **Q. Well, what --**
11  A. In conversation.
12  **Q. -- did you do? And your**
13  **conversations with them would have been**
14  **what?**
15  A. That I was going in the school
16  building to get away from him because I
17  felt uncomfortable around him, that I was
18  going in the school building to wait on
19  him to leave, and that I would just be
20  sitting there trying to ignore him in
21  hopes that he would just stop.
22  **Q. All right. You indicated that**
23  **you shared the complaints with the**

26 (Pages 101 to 104)

# FREEDOM COURT REPORTING

Page 105

1 secretary. What secretary was that?
2    A.  Rosemarie Marshall.
3    Q.  Have we gone over the matters
4 that you discussed with her?
5    A.  Yes.
6    Q.  You indicate that you shared
7 the complaints with the school counselor.
8 Who was that?
9    A.  That would have been Susan
10 Hare.  She also overheard a conversation
11 about me coming in the building to get
12 away from him because I felt uncomfortable
13 around him.
14    Q.  All right.  You told the EEO
15 that you complained to the counselor.
16 What did you complain to the counselor
17 other than that you were coming in to get
18 away from him?
19    A.  That I felt uncomfortable
20 around him.
21    Q.  And when would you have told
22 her -- the counselor that?
23    A.  It was in a conversation in the

Page 106

1 central part of the office.
2    Q.  When?
3    A.  It would have probably been in
4 the '03-'04 school year.
5    Q.  Did you come to the -- who was
6 the counselor?
7    A.  It was Susan Hare.
8    Q.  Is she still employed there?
9    A.  No.
10    Q.  During 2004, did you share any
11 information with the school counselor?
12    A.  No.
13    Q.  Or 2005?
14    A.  No.
15    Q.  You indicate that you
16 complained to the assistant principal.
17 Who was the assistant principal that you
18 complained to?
19    A.  That was Robbie Benefield.
20 That the comments being made in front
21 of the office.  I assumed she heard.
22    Q.  All right.  Here you're telling
23 the EEO that you went to the assistant

Page 107

1 principal and complained, that wouldn't be
2 true, would it?
3    A.  Not a direct complaint.
4    Q.  You never went to the assistant
5 principal with a direct complaint, did
6 you?
7    A.  No.
8    Q.  She may have been in the
9 vicinity when you were talking with other
10 people, but that's the closest you came to
11 sharing with the assistant principal your
12 concern about Cottle; would that be right?
13    A.  Yes.
14    Q.  And you say, but nothing has
15 been done.  Did you expect or ever ask the
16 teachers to do something about Cottle?
17    A.  Not them personally, no.
18    Q.  Did you ever ask the school
19 secretary to do something about Cottle?
20    A.  Not a direct -- no.
21    Q.  Did you ever ask the counselor
22 in '03 to do something about Cottle?
23    A.  No.

Page 108

1    Q.  Did you ever ask the assistant
2 principal to do something about Cottle?
3    A.  No.
4    Q.  So you never asked them to do
5 anything about Cottle?
6    A.  No.
7    Q.  But as soon as this was brought
8 to the attention of the superintendent,
9 principal, and assistant principal, they
10 did something about it?
11    A.  Yes.
12       (Whereupon, Defendant's
13       Exhibit 4 was marked
14       for identification.)
15    Q.  Have you recently reviewed the
16 matters that are contained in the
17 complaint?
18    A.  No, sir.  I've not looked over
19 it in a while.
20    Q.  If you will, look at paragraph
21 11.  Beginning with the start of the
22 school year 2003, 2004, plaintiff was
23 subjected to sexual harassment by Cottle.

27 (Pages 105 to 108)

# FREEDOM COURT REPORTING

Page 109

1  During that period of time, 2003, 2004,
2  what took place?
3      A.  That was when he wanted me to
4  go to Florida with him.  He asked me to go
5  to Florida with him.  And he made comments
6  about, you sure do look good today, let me
7  see your pretty green eyes, that type of
8  stuff there.
9      Q.  All right.  Anything else that
10 you recall that he said in 2003, 2004?
11     A.  No.  It was just general
12 comments of that nature.
13     Q.  Well, can you think of any
14 other comment that he would have made that
15 you believe constituted sexual harassment
16 during the 2003, 2004 period?
17     A.  No, just the constant --
18     Q.  Well, I'm asking are there any
19 other comments that you can recall?
20     A.  Not that I can recall.
21     Q.  Do you have any notes that
22 would refresh your recollection about
23 comments that he made during 2003, 2004,

Page 110

1  other than those you've just shared with
2  me?
3      A.  No.
4      Q.  So as far as we can determine
5  today, the comments you just made that you
6  recall are all that you remember?
7      A.  That I can remember, yes.
8      Q.  All right.  Paragraph 12, the
9  harassment occurred throughout the school
10 year.  In 2003, 2004, you never reported
11 these problems to any supervisor, did you?
12         MR. PORTER:  Object to the
13 form.
14     A.  Not that I can recall.
15     Q.  Okay.  Do you have anything --
16 notes or calendar or anything else that
17 would refresh your recollection where you
18 might have gone to a supervisor?
19     A.  No.
20     Q.  All right.  2004, 2005 and the
21 fall semester of 2005 until October, have
22 you shared with me the types of comments
23 and conduct that constituted sexual

Page 111

1  harassment by Cottle?
2      A.  Yes, that and what's on the
3  tape.
4      Q.  All right.  And we haven't
5  listened to the tape.  But is there
6  anything else, any other comments that he
7  made that made you uncomfortable that are
8  not on the tape and you haven't shared
9  with me?
10     A.  Just his presence near me made
11 me uncomfortable.
12     Q.  All right.  But any other
13 comment?
14     A.  Nothing other than what's on
15 the tape.
16     Q.  13, Cottle frequently commented
17 on your appearance, that you were pretty
18 and you looked good enough to eat this
19 morning.  Now, that comment appears on the
20 tape; right?
21     A.  Yes.
22     Q.  And you said you were
23 flabbergasted?

Page 112

1      A.  Yes.
2      Q.  And that suggests to me that he
3  had never made that statement before.
4      A.  Yes.
5      Q.  That's correct, he --
6      A.  That's correct.
7      Q.  -- never made the statement
8  before?
9      A.  He never made it before.
10     Q.  And that you were flabbergasted
11 when you heard that?
12     A.  Yes.
13     Q.  And he would indicate that he
14 thought you were pretty.  What would he
15 say?
16     A.  He'd just say, you sure do look
17 nice today.  You look good.  Let me see
18 your pretty green eyes.  Pull your glasses
19 off.  He'd make comments about an Auburn
20 shirt I'd wear or something.  He'd say,
21 I'm going to buy you an Alabama shirt.
22     Q.  Anything else about appearance?
23     A.  Huh-uh, just things on that

28  (Pages 109 to 112)

# FREEDOM COURT REPORTING

|  | Page 113 |
|---|---|
| 1 | line. |
| 2 | **Q.  Well, can you think about any** |
| 3 | **other comment that he made?** |
| 4 | A.  Pretty legs. |
| 5 | **Q.  I'm sorry.  What?** |
| 6 | A.  He said something about your |
| 7 | pretty legs. |
| 8 | **Q.  Anything else?** |
| 9 | A.  Not that I can recall. |
| 10 | **Q.  14, frequently asked plaintiff** |
| 11 | **to go out with him and to go with him.** |
| 12 | **Other than the Florida trip, what did he** |
| 13 | **say along those lines?** |
| 14 | A.  He said, let's tell everybody |
| 15 | we've got a school board meeting tonight |
| 16 | and me and you go to LaGrange.  Are you |
| 17 | going to the football game with me |
| 18 | tonight?  Let's get in your car and just |
| 19 | ride.  Let's go to Cheaha.  And other than |
| 20 | that, I can't think of anything else. |
| 21 | **Q.  Okay.  And 15, he touched you** |
| 22 | **on the cheek, shoulder, and hand?** |
| 23 | A.  Yes. |

|  | Page 114 |
|---|---|
| 1 | **Q.  And we've talked about that?** |
| 2 | A.  Yes. |
| 3 | **Q.  And that was the only time he** |
| 4 | **physically touched you?** |
| 5 | A.  No.  There were other times. |
| 6 | During the winter months, his hands would |
| 7 | be cold and he would reach over and touch |
| 8 | me on the cheek and say, it's cold this |
| 9 | morning. |
| 10 | **Q.  And what would you say when he** |
| 11 | **would do that?** |
| 12 | A.  I'd just say stop. |
| 13 | **Q.  Okay.** |
| 14 | A.  And I'd take my hand and just |
| 15 | kind of push away. |
| 16 | **Q.  All right.  Any other physical** |
| 17 | **contact that you recall?** |
| 18 | A.  No. |
| 19 | **Q.  All right.  17, harassment was** |
| 20 | **very upsetting and distracting to** |
| 21 | **plaintiff.  During any of this period of** |
| 22 | **time, have you gone to a psychologist or** |
| 23 | **psychiatrist because of the trauma and** |

|  | Page 115 |
|---|---|
| 1 | **emotional disturbance that you allege in** |
| 2 | **your complaint?** |
| 3 | A.  No. |
| 4 | **Q.  Do you have a medical doctor?** |
| 5 | A.  Yes. |
| 6 | **Q.  Since 2003, have you been on** |
| 7 | **any medication?** |
| 8 | A.  Just medication for back -- |
| 9 | **Q.  For anything.** |
| 10 | A.  -- problems, yes. |
| 11 | **Q.  For what?** |
| 12 | A.  For back problems.  I've had |
| 13 | back surgery. |
| 14 | **Q.  Okay.  Was that a slipped disc** |
| 15 | **or something?** |
| 16 | A.  It was a herniated disc. |
| 17 | **Q.  But that's the only medical** |
| 18 | **problem you've had since 2003?** |
| 19 | A.  Yes. |
| 20 | **Q.  And the only doctor you've gone** |
| 21 | **to would have been the physicians** |
| 22 | **attending to your back?** |
| 23 | A.  In '04 I was seeing another |

|  | Page 116 |
|---|---|
| 1 | physician for acid reflux due to stress. |
| 2 | **Q.  Now, what doctor was that?** |
| 3 | A.  Dr. Yahmi in Roanoke, Alabama. |
| 4 | **Q.  I'm sorry?** |
| 5 | A.  Dr. Yahmi. |
| 6 | **Q.  And his office is where?** |
| 7 | A.  He's in Roanoke, Alabama. |
| 8 | **Q.  And how often do you go to him?** |
| 9 | A.  I was seeing him probably once |
| 10 | or twice a month. |
| 11 | **Q.  How long have you had this** |
| 12 | **problem?** |
| 13 | A.  It had just -- it had gotten |
| 14 | worse due to stress. |
| 15 | **Q.  When did the problem first** |
| 16 | **arise with -- at any time in your life?** |
| 17 | A.  Probably in '99. |
| 18 | **Q.  And who did you go to then?** |
| 19 | A.  It was Dr. Yahmi. |
| 20 | **Q.  Has he been your family** |
| 21 | **physician since you were a child?** |
| 22 | A.  No, sir. |
| 23 | **Q.  But for many years?** |

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660**

# FREEDOM COURT REPORTING

Page 117

1    A.  For three or four years.
2    Q.  And what was the medication or
3  the treatment that was prescribed to
4  address that?
5    A.  I was on Nexium and Prilosec.
6    Q.  Have you ever been separated
7  from your husband?
8    A.  No.
9    Q.  Have you ever had domestic
10  problems with your husband?
11    A.  Not --
12    MR. PORTER:  Object to the
13  form.
14    A.  Not before this issue.
15    Q.  You said that you became a
16  cross guard when?
17    A.  In the fall of '02, I think.
18    Q.  All right.  Since the fall of
19  '02, have you applied for any other
20  position of employment, whether with
21  Roanoke or anybody else?
22    A.  Yes.
23    Q.  Where?

Page 118

1    A.  At the Randolph County School
2  Systems, other jobs within the Roanoke
3  City School System, and at West Georgia
4  Tech.
5    Q.  What position did you apply for
6  with the Randolph County Board?
7    A.  An aides position.
8    Q.  Were you interviewed?
9    A.  No.
10    Q.  And when did you have that --
11  when did you make that application?
12    A.  I'm not sure.  There's been two
13  to three over the last several years.
14    Q.  And what other positions within
15  the Roanoke City have you applied for?
16    A.  Aides positions.
17    Q.  When was the last aides
18  position you applied for?
19    A.  Probably in the summer of '05.
20    Q.  Just before you filed the EEO
21  complaint?
22    A.  Yes, sir.
23    Q.  Item 21 is the same statement

Page 119

1  that you make in the EEO complaint.  Have
2  you shared with me the teachers,
3  secretary, counselor and assistant
4  principal information already or is there
5  something new you had in mind when you put
6  down what you have in paragraph 21?
7    A.  It's the information I've
8  already provided.
9    Q.  Now, you said that you were
10  asking for an employee handbook.  Did you
11  ever ask anybody for a copy of the Roanoke
12  City policy relating to sexual harassment?
13    A.  That was the copy not -- I
14  didn't specifically state sexual
15  harassment, but that was the policy that I
16  was attempting to get from the middle
17  school library, the high school library,
18  and central office.
19    Q.  Did you say you wanted a copy
20  of the Roanoke City Policy Manual?
21    A.  Yes, sir.
22    Q.  And when they couldn't give
23  that to you for reasons you've explained,

Page 120

1  did you ask for an employee handbook?
2    A.  No, sir.  I asked for a
3  handbook and the only one I had was a
4  student handbook.
5    Q.  Did the student handbook
6  pertain to a particular year?  How current
7  was the student handbook that you had?
8    A.  It was when my daughter was in
9  middle school.  It was a '98 -- '97-'98
10  handbook.
11    Q.  But you had a '97-'98 student
12  handbook?
13    A.  Uh-huh.
14    Q.  And in that, there was a
15  reference to sexual harassment?
16    A.  I think there was.
17    Q.  And what do you recall that
18  said students should do if they were
19  sexually harassed?
20    A.  They'd report it to a teacher.
21    Q.  So you were aware of that
22  process?
23    A.  Yes.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660**

# FREEDOM COURT REPORTING

Page 121

1   **Q.   Or aware of whatever the**
2   **student handbook said about sexual**
3   **harassment?**
4       A.   Yes.
5   **Q.   So you knew the school had a**
6   **policy against sexual harassment?**
7       MR. PORTER:  Object to the
8   form.
9       A.   Yes, sir.  That's why I was
10  attempting to get the policy manual.
11  **Q.   All right.  Item 30 you**
12  **indicate that you suffered emotional**
13  **distress.  Did you ever go to a counselor**
14  **about the emotional distress and mental**
15  **anguish that you referenced in this**
16  **paragraph?**
17      A.   No, sir.
18  **Q.   Did you ever go to a**
19  **psychologist or psychiatrist?**
20      A.   No, sir.
21  **Q.   Did you ever share any**
22  **information about emotional distress or**
23  **mental anguish with any physician?**

Page 123

1   feel threatened, then you need to do
2   whatever you can to make it to where you
3   feel safe to go to school.  Because I had
4   to have the job because my child was in
5   that school.  And I could not keep him
6   there and live in Chambers County.
7   **Q.   Did he tell you to report this**
8   **matter to a supervisor to give the school**
9   **system a chance to address it before you**
10  **went to the EEO?**
11      A.   No, sir.
12  **Q.   What is his position with the**
13  **company in Georgia he works with?**
14      A.   He's a bucket operator.
15  **Q.   Huh?**
16      A.   A bucket operator.
17  **Q.   And for what company?**
18      A.   J & R Tree Service.
19  **Q.   Is that a large tree service?**
20      A.   No, sir, it's private owned.
21  **Q.   As I understand what you've**
22  **told me, after October after you met with**
23  **Mr. Marcum and Mr. Foster, the sexual**

Page 122

1       A.   No.
2   **Q.   Did you mention emotional**
3   **distress and mental anguish with your**
4   **doctors when they were treating you for**
5   **your back problem?**
6       A.   No.
7   **Q.   And you didn't share this**
8   **emotional distress and mental anguish with**
9   **your husband, did you?**
10      A.   Not until '05, the fall of '05.
11  **Q.   After the filing of the EEO**
12  **complaint?**
13      A.   That's correct.
14  **Q.   Did you tell your husband that**
15  **you were going to file an EEO complaint**
16  **before you filed it?**
17      A.   Yes, I did.
18  **Q.   Did he agree that that's**
19  **something you should do?**
20      A.   He told me that I needed to do
21  what I felt like was right.  He said,
22  that's your job.  He said, if you feel
23  uncomfortable going to your job and you

Page 124

1   harassment comments and conduct of Cottle
2   came it a stop.
3       A.   Yes.
4   **Q.   And had not been repeated in**
5   **any form or fashion since then.**
6       A.   No.
7   **Q.   All right.  In this lawsuit**
8   **you're asking the Court to enjoin the**
9   **school system.  What are you asking the**
10  **school system to enjoin if there's no**
11  **sexual harassment going on at the present**
12  **time?**
13      A.   I don't understand.
14  **Q.   All right.  In your complaint**
15  **you're asking the Court to issue an**
16  **injunction to stop the sexual harassment**
17  **that you're complaining about in this**
18  **complaint.  But can we agree that there is**
19  **no sexual harassment presently going on?**
20      A.   We can agree on that.
21  **Q.   So there's nothing for the**
22  **Court to enjoin that is currently**
23  **happening?**

31 (Pages 121 to 124)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

# FREEDOM COURT REPORTING

Page 125

1    A.  That would be correct.
2    Q.  And there's been nothing that's
3  happened since this matter came to Mr.
4  Marcum and Ms. Foster's attention?
5    A.  Other than the contact from Mr.
6  Cottle's wife after meeting Mr. Marcum.
7    Q.  All right.  And you agree they
8  didn't have anything to do with that?
9    MR. PORTER:  Object to the
10  form.
11    A.  I don't know about that.
12    Q.  Well, didn't you tell me that
13  you didn't report that to them because you
14  didn't think they could control her?
15    A.  I spoke with Mr. Marcum about
16  it.  Did I think he could control her?
17  No.  But I did speak with him about her
18  contacting me after our meeting.
19    Q.  You don't believe Mr. Marcum
20  put her up to it, do you?
21    MR. PORTER:  Object to the
22  form.
23    A.  I have no idea.

Page 126

1    Q.  Do you have any information
2  that Mr. Marcum would have suggested to
3  Ms. Cottle that she call you?
4    A.  No, sir.
5    Q.  Do you have any belief that Mr.
6  Marcum would have done that based on your
7  meetings with him?
8    A.  I don't know.
9    Q.  You have no opinion about that?
10    A.  I'm not sure what Mr. Marcum
11  might have done after our conversation.
12    Q.  Well, didn't he treat you with
13  respect in that meeting?
14    A.  He did.
15    Q.  All right.  Page four you say
16  that agents, employees, successors, and
17  those acting in concert with the
18  defendant.  Wouldn't it be true, Ms.
19  Price, that your complaint is about what
20  Mr. Cottle was doing?
21    A.  That, and the school not doing
22  anything about it.
23    Q.  Well, but the conduct that was

Page 127

1  offensive to you was conduct by Mr.
2  Cottle?
3    A.  That is correct.
4    Q.  And no other employee of the
5  school system, just Mr. Cottle?
6    A.  That is correct.
7    Q.  So, in that regard, was anyone
8  else working with Mr. Cottle to sexually
9  harass you that you know of?
10    A.  Not that I know of.
11    Q.  You indicate that you're
12  seeking compensatory damages but you don't
13  have any idea what you want?
14    A.  No, sir.
15    Q.  Is the Roanoke School System a
16  wealthy school system?
17    A.  I have no idea.
18    Q.  But you want money damages from
19  them?
20    A.  I would like to be compensated
21  for the stress and just for not even
22  wanting to go to work, that I've had to
23  deal with mental anguish of not wanting to

Page 128

1  attend my job.
2    Q.  Do you know any member of the
3  Board of Education?
4    A.  Not on a personal basis.
5    Q.  Do you know any of them on any
6  basis?
7    A.  Just that they're board
8  members.
9    Q.  All right.  Did you ever go to
10  any member of the board at any time to
11  share with them your problems with Cottle?
12    A.  No, sir.
13    Q.  So would it be true, Ms. Price,
14  that as far as you know, prior to the
15  filing of the EEO complaint in September
16  of 2005, no member of the board knew
17  anything about your issues with Cottle?
18    A.  That would be safe to assume.
19    Q.  And Mr. Marcum indicated to you
20  he had no knowledge of any problem prior
21  to meeting with you after the EEO
22  complaint?
23    A.  That's correct.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660**

# FREEDOM COURT REPORTING

Page 129

1    Q.  And Mr. Foster indicated he had
2  no knowledge?
3    A.  That's correct.
4    Q.  And the assistant principal
5  indicated she had no knowledge?
6    A.  That is correct.
7    Q.  So none of the supervisors or
8  board members had any knowledge of this
9  until you filed the EEO complaint as far
10  as you know?
11    A.  As far as I know.
12    Q.  You asked for an award of cost.
13  What cost have you absorbed to date
14  because of what Mr. Cottle did?
15    A.  I'm not sure.  You'd have to
16  speak with my attorney.
17    Q.  Well, do you know of any money
18  you've expended?
19    A.  Not at this time, no.
20    Q.  You're asking for attorney
21  fees.  Have you paid any attorney fees to
22  date regarding this complaint?
23    A.  Not at this time.

Page 130

1    Q.  Have you paid any expert
2  witness fees --
3    A.  No, sir.
4    Q.  -- or expenses?
5    A.  Not at this time.
6    (Whereupon, Defendant's
7    Exhibit 5 was marked
8    for identification.)
9    Q.  Let me show you what's been
10  marked as Defendant's Exhibit 5.  Do you
11  see in the middle column an asterisk by
12  the name Angela Price?
13    A.  I do.
14    Q.  Is that your signature?
15    A.  It is.
16    Q.  Do you remember signing this
17  piece of paper?
18    A.  I don't remember the exact
19  date, no, sir.
20    Q.  Okay.  At the top do you see
21  the caption, I attended the sexual
22  harassment and special education question
23  and answer workshop sponsored by the

Page 131

1  Roanoke City School System and facilitated
2  by Donald L. Sweeney held February 16,
3  1998; do you see that?
4    A.  I see that.
5    Q.  I was given the opportunity to
6  ask questions and have my questions
7  answered.
8    A.  Yes, sir.
9    Q.  Now, having seen your signature
10  and read that statement at the top, does
11  that refresh your recollection that you
12  were put on notice of the policy and
13  practice of the school system if anyone
14  had a sexual harassment complaint?
15    MR. PORTER:  Object to the
16  form.
17    A.  No, sir.  At that time I was
18  under stress of a mother-in-law in the
19  hospital dying from cancer, a father with
20  sclerosis of the liver and final stages as
21  well as health problems of my own.  I do
22  not recall that meeting.
23    MR. SWEENEY:  Let's take a

Page 132

1  minute.  I may be through.
2    (Whereupon, a short break was
3    taken.)
4    Q.  (BY SWEENEY:)  Ms. Price, at
5  the start of the deposition I indicated
6  that I'd give you an opportunity at the
7  end of the deposition to supplement any
8  answer to -- that you've given me to any
9  previous question.  Is there anything you
10  want to supplement, modify, add, change?
11    A.  No, sir.
12    Q.  All right.
13    MR. SWEENEY:  Adam, this
14  concludes, I hope, the deposition, but I
15  reserve the right after we get the
16  transcript to re-call her.
17    MR. PORTER:  Right.
18    MR. SWEENEY:  Okay.
19
20  FURTHER THE DEPONENT SAITH NOT
21
22
23

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660**

# FREEDOM COURT REPORTING

Page 133

1        DEPONENT'S CERTIFICATE
2
3        I, ANGELA PRICE, the witness herein,
4    have read the transcript of my testimony
5    and the same is true and correct, to the
6    best of my knowledge.  Any corrections
7    and/or additions, if any, are listed
8    separately.
9
10
11
12            ANGELA PRICE
13
14
15        Sworn to and subscribed before me,
16    this the    day of    , 2007, to
17    certify which witness my hand and seal of
18    office.
19
20
21
22        NOTARY PUBLIC IN AND FOR
23           THE STATE OF ALABAMA

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660**

**A**

abandoned 87:14
abandonment 85:3,14 86:7
able 11:22 18:12 32:7
Absolutely 98:6
absorbed 129:13
abusive 84:13
accept 28:23 29:2
accurate 100:21 101:1,2
acid 116:1
acting 6:3 126:17
action 1:7 53:1
actual 25:17
Adam 4:4 67:12 70:10 86:16 132:13
add 8:14 132:10
added 20:20,22 21:1 57:8,9
additions 133:7
address 117:4 123:9
addressed 80:13
advice 20:11 37:11 41:6
advised 1:21 23:2 35:18
AEA 46:17
affirmatively 76:13 79:16 97:13 101:15
afraid 75:3
afternoon 12:1,2 12:6 38:10 44:7
afternoons 43:9
agents 126:16
ages 9:7

agree 122:18 124:18,20 125:7
AGREED 2:2,9 2:17 3:3
ahold 61:9
aides 118:7,16 118:17
Alabama 1:2 4:7 4:15 6:2,3,9 7:6 9:15 112:21 116:3,7 133:23
allege 115:1
alleging 63:16
Amended 1:15
and/or 30:18 133:7
Angela 1:5,12 2:5 6:10,15 7:2 88:8 130:12 133:3,12
anguish 121:15 121:23 122:3,8 127:23
Anniston 9:20
answer 7:18 8:1 73:17 130:23 132:8
answered 131:7
answers 7:20
anybody 60:2,4 65:20 78:2 86:23 99:10 102:4 117:21 119:11
apart 47:8,11
apologize 54:3
apparatus 67:1
apparently 43:21 88:23
appearance 111:17 112:22
appears 90:16

111:19
application 118:11
applied 117:19 118:15,18
apply 118:5
appointments 24:16
appreciate 74:17
approached 58:17 77:7
approaching 64:18
appropriate 55:8
approximately 66:5
Arant 4:12
area 9:17 28:15
arrested 11:10
arrives 94:21
asked 8:10,15 18:21 34:5,7 35:2 44:6,20 46:21 84:9 86:5,8 89:5 92:7,8 95:20 96:4 99:6 108:4 109:4 113:10 120:2 129:12
asking 7:12 19:11 60:2 64:2,4 66:7 73:14 109:18 119:10 124:8,9 124:15 129:20
aspect 47:14
assign 2:21
assist 59:21
assistant 15:7 16:18,22 28:13 29:8,15 30:18

31:1 32:21 33:4,8,13 34:9 39:14,20 40:4 40:14,19 41:11 77:7 83:15 106:16,17,23 107:4,11 108:1 108:9 119:3 129:4
assume 7:17 8:7 15:14 29:11 38:16 70:21 128:18
assumed 30:6 34:1,4 52:4 77:12,22 80:5 80:20 106:21
assuming 14:11 15:12 88:10
assumption 38:22
asterisk 130:11
attempted 32:6 45:1 61:5 66:20
attempting 119:16 121:10
attend 25:1 128:1
attended 23:9 25:3 51:21 130:21
attending 9:12 25:9 115:22
attention 32:17 37:8 41:11 50:9 51:11 57:1 101:18 108:8 125:4
attorney 4:5,11 46:10,11 59:17 59:21 60:3 61:12,22 62:4 62:8 68:4,8

85:2,4,18,22 86:16 87:8 92:4 129:16,20 129:21
Auburn 112:19
audio 18:23
August 46:14,16 67:20,22 68:9 85:7 92:17,22 98:2
Avenue 4:6,14 6:8
award 129:12
aware 10:3 23:13 40:22 43:8 44:14,16 56:19 57:17 58:6,16 64:9 64:16,17 86:5 87:19 95:11,14 98:23 99:2 100:5 104:4 120:21 121:1
a.m 6:10

**B**

B 4:10 5:6
back 22:19 23:18 30:10 38:10,11 47:6 47:11 54:8,14 70:19 72:17 82:3 83:20,23 84:1 85:10,12 86:12 87:21 88:1 100:20,23 101:10 115:8 115:12,13,22 122:5
back-to-school 87:6
bag 65:7
based 31:23 42:9 126:6

# FREEDOM COURT REPORTING

basically 74:8
basis 12:12
  18:12 22:15
  24:6 25:12,14
  31:10,22 32:13
  32:14 33:2
  36:14 48:9
  61:3 71:2
  74:11 128:4,6
bathroom 76:4
Beauty 10:15
becoming 10:6
began 13:2
beginning 69:4
  95:16 108:21
belief 126:5
believe 13:16
  14:13 16:16,23
  27:4 28:20
  49:4,6 78:2
  83:18 90:19
  94:4 109:15
  125:19
Benefield 15:7
  17:1 62:22
  63:1 92:9,10
  106:19
best 19:3 51:16
  69:22 82:14
  101:3 133:6
Birmingham 4:7
  4:15 6:2,8
  23:20
board 1:8 10:7
  11:13 32:6,9
  36:10 45:1,3
  61:6 71:23
  78:14,18 86:6
  91:11 113:15
  118:6 128:3,7
  128:10,16
  129:8
book 45:2,3
born 8:17 10:4

bothered 39:18
bothering 38:17
  39:6
Bradley 4:12
break 132:2
bring 18:22
  32:16 38:18
  39:4 41:10
  52:15 53:1
  60:20 65:3
brought 50:9
  51:10 57:1
  101:18 108:7
bucket 123:14
  123:16
building 11:21
  26:15 32:5
  38:12 76:2
  79:8 90:8,14
  91:9 104:16,18
  105:11
buy 112:21

_____
C
_____
C 4:1
calculated 91:3
calendar 21:12
  21:15,19 22:2
  110:16
call 83:19,23
  126:3
called 45:10
  46:21 47:2,6
  79:12 80:14
  83:11,19 84:4
  84:5,15
calling 84:1
cancer 131:19
capacity 52:11
caption 130:21
car 36:16,17,18
  72:2 94:23
  98:18 103:1,3
  113:18

carried 78:17
case 28:7
cause 6:11
caused 50:20
central 28:15
  47:2,6 48:3,5,7
  48:14 85:16
  87:19 88:2
  106:1 119:18
certainly 79:20
certificate 81:4
  133:1
certify 6:4
  133:17
chain 16:10 46:6
  47:22 78:15
challenging 94:1
Chambers 9:9
  18:9 123:6
chance 123:9
change 132:10
charge 32:5 79:8
charges 63:3,4
  63:23
chart 90:1
Cheaha 113:19
check 72:13
  90:4
checkup 87:22
cheek 102:7,16
  102:17 113:22
  114:8
chief 15:10
child 116:21
  123:4
children 9:3
  17:23 18:9
  27:18
Chris 47:13
Chuck 4:18 17:9
  88:6
chunked 22:3
City 1:8 10:7
  11:13 13:9

17:6 25:4
  118:3,15
  119:12,20
  131:1
Civil 1:7,15 6:6
claim 71:2
Clarke 37:22
  38:2,6 39:10
  43:1 93:10
  104:5
classroom 62:21
clear 7:13 76:21
  77:11,15 78:1
  79:6
clearer 78:5
clearly 77:20,23
close 9:23
closest 107:10
closure 38:18
cold 114:7,8
collecting 78:8
  78:11
column 130:11
come 26:12 38:9
  40:11 43:14
  62:22 70:19
  75:16 85:21
  106:5
comes 40:11
comfortable
  29:18 32:19
  33:7 37:15
  39:8,10 61:4
coming 43:8
  93:13 105:11
  105:17
command 16:11
  46:7 47:23
  78:16
commencing
  6:10
comment 59:8
  64:22 74:5
  77:10 79:23

109:14 111:13
  111:19 113:3
commentary
  21:2 65:1
commented
  111:16
comments 27:2
  27:8 28:16
  29:17 38:1
  44:15 64:18
  69:11 71:1
  73:4,18 74:10
  74:17 92:13
  96:22 97:7
  99:1,7 106:20
  109:5,12,19,23
  110:5,22 111:6
  112:19 124:1
Commissioner
  2:6 3:4 6:4
communicatio...
  89:6
company 123:13
  123:17
compensated
  127:20
compensatory
  62:2 127:12
competent 24:12
complain 28:10
  28:13 29:15
  30:17 31:5,19
  31:23 79:9
  105:16
complained 38:7
  79:10 103:21
  104:2,2 105:15
  106:16,18
  107:1
complaining
  124:17
complaint 10:22
  17:21 28:7,23
  29:6,16 35:8

42:12 52:23
57:2,23 59:14
59:22 60:2,18
62:14 63:8
64:12 67:23
74:11 78:19
89:16 92:19
93:1 97:18
99:13 100:2,6
100:13,19
101:13,19
107:3,5 108:17
115:2 118:21
119:1 122:12
122:15 124:14
124:18 126:19
128:15,22
129:9,22
131:14
**complaints**
42:22 64:11
104:23 105:7
**complete** 7:20
**completely**
80:21
**compliance** 2:13
**comply** 19:4
**computer** 20:20
21:18 67:4
98:8,11
**concern** 40:6
50:20 107:12
**concerned** 43:19
45:19 56:13
88:13 89:11
96:13 100:1
**concerning**
22:10 63:15
**concerns** 37:13
60:5
**concert** 126:17
**concludes**
132:14
**condition** 87:11

**conduct** 64:22
110:23 124:1
126:23 127:1
**conducted** 49:11
56:22
**conference** 63:2
99:14
**conferenced**
99:11
**confronted**
38:15
**considerable**
33:14
**considered** 12:8
**constant** 109:17
**constitute** 48:8
**constituted**
109:15 110:23
**constitutes**
91:12
**consulted** 59:16
**contact** 16:2
45:8 88:14
114:17 125:5
**contacted** 61:12
62:16 64:17
68:8 87:9
**contacting**
125:18
**contained**
108:16
**contentions** 92:5
95:7
**continual** 22:15
**continually**
61:17
**continue** 68:11
70:15
**continued** 51:3
56:11 78:3
**continuing** 97:1
**control** 84:23
125:14,16
**conversation**

46:9 48:19
58:1 60:3
62:20 74:15
83:5,8 84:20
87:2 88:3
92:12,14 93:8
93:12,17,20
96:15 97:14
104:11 105:10
105:23 126:11
**conversations**
41:4 67:18,22
68:10,14,17
69:5,6 75:7
78:3 85:9
102:3 104:13
**copies** 32:6
**copy** 45:3 46:21
119:11,13,19
**correct** 16:12,13
16:20 33:18
35:23 37:16
39:7 41:15
44:1 52:19
55:1 56:7 57:3
62:13 65:16,17
65:19 68:1
69:9 76:15,16
102:11 112:5,6
122:13 125:1
127:3,6 128:23
129:3,6 133:5
**corrections**
133:6
**correspondence**
18:23 19:12
**cost** 129:12,13
**Cottle** 12:18,19
14:6 22:11
27:9 28:10
29:10,16 33:10
34:11 35:9
36:12,17 38:7
38:17 39:18

43:9,19 44:10
46:12 50:8
57:13,20 58:5
58:10 59:6,11
61:17 62:11
64:7,10,21
67:19,22 68:13
69:5 74:15
75:4 81:6,16
84:3,11 93:8
94:11,14 95:18
96:16 97:20
99:8,13 104:7
107:12,16,19
107:22 108:2,5
108:23 111:1
111:16 124:1
126:3,20 127:2
127:5,8 128:11
128:17 129:14
**Cottle's** 38:1
79:12,18 83:10
92:13 125:6
**counsel** 2:4,18
2:20 6:7 20:11
**counselor** 105:7
105:15,16,22
106:6,11
107:21 119:3
121:13
**Country** 10:15
**County** 7:5 9:10
10:5 18:9
118:1,6 123:6
**couple** 17:22
27:22 33:19
**course** 7:11
19:13
**Court** 1:1,22,23
2:6,14 6:1
124:8,15,22
**courteous** 40:15
**cover** 67:21
**co-employee**

53:22
**crazy** 96:8
**cross** 28:1
117:16
**crossing** 11:14
13:19 14:8,12
14:21 24:23
32:3 79:5 90:7
91:8
**crossword** 36:20
**current** 120:6
**currently**
124:22
**custodial** 13:21
14:8
**custodian** 13:12
13:15 14:15
16:3 50:18
**custodians**
24:22,23 31:11

**D**

**D** 5:1
**daily** 24:6 32:13
32:14 33:1
**damages** 61:14
62:2 127:12,18
**date** 6:5 56:12
71:5 129:13,22
130:19
**dates** 21:14 22:6
22:6,22 25:17
51:15 52:1
**daughter** 120:8
**day** 1:19 6:9
12:22,23 26:12
100:11 133:16
**days** 24:14 90:3
90:5,18,22
91:3
**deal** 61:16 86:8
127:23
**December** 56:6
96:18,20

decision 77:5
defendant 1:10
  4:9 126:18
Defendant's 5:7
  18:16,18 19:6
  20:2,3,7 101:5
  108:12 130:6
  130:10
Delia 58:8 94:19
delivering 1:17
demand 73:20
demonstrate
  90:5
depends 32:23
DEPONENT
  132:20
DEPONENT'S
  133:1
deposed 7:7
deposition 1:12
  2:4,10,11,23
  3:4 7:8,23 8:7
  8:13 18:17
  70:15 80:4,19
  100:18 132:5,7
  132:14
depositions 2:15
detailed 22:4
determine 110:4
dialogue 56:17
dialoguing
  52:14
different 20:19
  32:8 51:1
  67:19 74:6
difficult 69:21
digital 67:6,10
direct 11:20
  104:9 107:3,5
  107:20
directly 34:1
  57:18 85:21
  90:8 91:9
disbelieve 80:16

disc 115:14,16
discharging
  24:11
disclose 95:17
disclosed 92:3
discovered 78:4
discuss 35:8
  43:10 53:16
  85:8
discussed 15:22
  38:1 63:22
  92:12 93:13
  95:5 99:9
  105:4
discussing 40:18
  57:22
discussion 67:14
discussions 38:5
distracting
  114:20
distress 121:13
  121:14,22
  122:3,8
District 1:1,2
  9:14,16
disturbance
  115:1
DIVISION 1:3
doctor 85:11,15
  87:20 115:4,20
  116:2
doctors 23:18
  122:4
doctor's 24:16
  95:21,23
document 19:22
  57:5 62:10
  80:10 90:16
documentary
  91:12
documentation
  22:16 24:1
documents 19:4
  20:15 91:21

dodged 102:23
doing 11:19
  36:20 39:5
  40:8 44:9 45:6
  54:21 56:16
  78:7 104:8
  126:20,21
domestic 117:9
Donald 1:17
  4:10 131:2
Donna 45:10
  58:3,4 98:20
door 76:2 98:12
Dothan 9:21
downside 40:4,8
Dr 14:23,23
  116:3,5,19
driving 72:2
due 61:10,15
  86:10 116:1,14
duly 6:16
duties 11:16
duty 11:20 12:3
  24:6 26:13
  38:10 68:21
dying 131:19

**E**

E 4:1,1 5:1,6
  8:22
earlier 55:17
  57:9 58:21
early 92:17
  94:22
EASTERN 1:3
eat 71:6 76:8
  111:18
ed 37:10
educate 16:10
education 1:9
  10:8 11:13
  128:3 130:22
EEO 17:21 28:7
  29:16 35:7

57:2 59:14,22
  60:1,18 62:14
  63:7 64:12
  67:23 74:11
  92:19 97:18
  99:12 100:13
  100:19 101:13
  101:16 102:1,4
  105:14 106:23
  118:20 119:1
  122:11,15
  123:10 128:15
  128:21 129:9
EEOC 19:19
  63:2 64:1
effect 2:12
effective 1:16
eight 12:5 21:10
eighteen 9:8
either 10:1 15:5
  35:22 36:20
  45:14 48:15
  69:18 70:4
  75:11 99:4
elect 30:1
elected 14:1
Elton 50:12,14
emotional 115:1
  121:12,14,22
  122:2,8
employed 10:7
  10:14 13:7
  14:10 18:14
  106:8
employee 11:2
  54:2 119:10
  120:1 127:4
employees
  126:16
employer 10:23
employment
  10:9,12 11:12
  117:20
English 38:3

enjoin 124:8,10
  124:22
entitle 89:20
entrance 12:20
entry 21:6 36:11
  37:22 44:23
  56:18 59:10
  76:7 85:1
Evans 45:10
Eventually
  46:19
everybody 71:22
  113:14
evidence 3:1
  78:8,12 91:12
exact 82:14
  130:18
exactly 73:12,16
examination 5:4
  6:12 7:1
examined 6:16
excuse 76:3
  77:18,18
executive 15:11
Exhibit 5:8,9,10
  5:11,12 18:16
  18:19 19:6
  20:2,4,7 36:10
  91:11 101:6
  108:13 130:7
  130:10
exhibits 1:20
exit 12:20
expect 107:15
expended
  129:18
expenses 130:4
experience 32:1
  42:10 52:13,22
expert 130:1
explained
  119:23
explore 54:16
extent 95:2

# FREEDOM COURT REPORTING

| | | | | |
|---|---|---|---|---|
| **extremely** 84:16 | 4:13 6:5 | **first** 6:16 20:6 | **Foster** 15:13 | 118:3 123:13 |
| **eyes** 71:19 73:22 | **feel** 32:18 | 21:6 36:9 | 16:16 26:4 | **getting** 30:21 |
| 96:23 109:7 | 122:22 123:1,3 | 46:10 62:15 | 27:3,12 58:23 | 97:21 |
| 112:18 | **fees** 129:21,21 | 68:7 71:4 76:7 | 59:1,2 61:5 | **Gilham** 12:20 |
| **e-mail** 46:14 | 130:2 | 85:19 95:17 | 63:1,18 76:1 | **give** 22:7 71:4 |
| 85:7 87:3 88:5 | **fellow** 11:2 | 116:15 | 94:7,8,13 | 77:1 87:22 |
| 88:9 89:14 | **felt** 26:23 50:23 | **Five** 7:6 | 100:8,10 | 119:22 123:8 |
| **e-mailed** 86:4 | 61:11 104:17 | **flabbergasted** | 123:23 129:1 | 132:6 |
| **e-mails** 85:9 | 105:12,19 | 111:23 112:10 | **Foster's** 125:4 | **given** 7:19 8:2 |
| | 122:21 | **flew** 71:12 | **found** 73:5 | 19:2 20:1 |
| **F** | **female** 33:5,20 | **floored** 71:8 | **four** 22:19 117:1 | 37:19 131:5 |
| **face** 35:17 | 33:22 40:5 | 76:11 | 126:15 | 132:8 |
| **facilitated** 131:1 | 77:7 | **Florida** 95:20 | **frame** 22:21 | **giving** 87:16 |
| **fact** 55:22 | **field** 57:1 | 96:4 109:4,5 | 24:4 | **glasses** 73:21 |
| **faculty** 15:22 | **fifteen** 10:13 | 113:12 | **France** 72:20 | 112:18 |
| **fair** 38:21 | **fifth** 4:14 6:8 | **follow** 47:23 | 103:18 | **go** 14:1 25:20 |
| **fairly** 18:5 | 38:3 | 78:16 | **frequency** 32:11 | 28:9,12,14 |
| **faith** 8:8 | **fifty** 65:21 66:1 | **followed** 51:9 | 32:20 | 30:10,16 31:4 |
| **fall** 13:4 21:7 | **figure** 84:22 | **following** 6:12 | **frequently** | 35:19 37:4 |
| 23:5 27:10 | **figured** 35:16 | **follows** 6:17 | 111:16 113:10 | 38:11,14 39:14 |
| 44:23 92:16 | 66:4 | **football** 113:17 | **fresh** 22:17 | 39:15,19 43:15 |
| 95:19 110:21 | **file** 19:19 20:20 | **force** 2:12 | 25:16 | 48:14 52:2,7 |
| 117:17,18 | 21:17 60:13,17 | **forearm** 72:16 | **friend** 53:14 | 54:8,14 55:15 |
| 122:10 | 64:1 78:8 | **foregoing** 6:6 | 61:2 | 55:22 56:11 |
| **familiar** 24:4 | 122:15 | **form** 2:19 22:13 | **friendly** 18:2 | 60:4 64:7 |
| **family** 9:13,23 | **filed** 1:23 10:21 | 31:7 39:23 | 26:6 41:18 | 67:12 72:1,2 |
| 10:1 116:20 | 11:4 42:20 | 44:3 46:3 | 42:8 | 76:4,4 78:20 |
| **far** 16:2 26:13 | 59:14 62:15 | 48:13 52:18 | **front** 11:20 | 82:3 83:11 |
| 29:6 31:14 | 67:23 92:22 | 54:13 60:23 | 12:17 106:20 | 85:12 90:7 |
| 34:14 35:3 | 101:12 118:20 | 64:15 74:10 | **full** 2:12 95:2 | 91:9 92:6 |
| 56:13,14 61:7 | 122:16 129:9 | 77:4 79:1 80:8 | **full-time** 13:22 | 95:20 96:4 |
| 81:2,3 88:13 | **filing** 3:3 17:21 | 81:1 82:7 | 14:2 | 109:4,4 113:11 |
| 89:10 95:1,3 | 28:6 29:6,16 | 91:22 99:18 | **further** 2:8,16 | 113:11,16,19 |
| 110:4 128:14 | 59:18,22 60:1 | 100:4 101:21 | 3:2 52:7 62:10 | 116:8,18 |
| 129:9,11 | 92:18 97:18 | 110:13 117:13 | 132:20 | 121:13,18 |
| **fashion** 91:23 | 99:12 102:4 | 121:8 124:5 | **future** 64:13 | 123:3 127:22 |
| 124:5 | 104:3 122:11 | 125:10,22 | | 128:9 |
| **father** 23:19 | 128:15 | 131:16 | **G** | **going** 23:18,19 |
| 24:15 131:19 | **filtered** 70:2 | **forth** 19:5 23:18 | **game** 113:17 | 26:20 28:3 |
| **feared** 40:18 | **final** 23:21 | 49:18 56:18 | **general** 22:8 | 29:22 36:13 |
| **February** 23:14 | 131:20 | 89:10 | 28:15 48:21 | 37:3 47:22 |
| 23:16 51:21 | **find** 45:11 46:6 | **forthright** 80:22 | 109:11 | 52:16 53:11 |
| 131:2 | **finish** 77:17 90:6 | **forty-five** 66:5 | **generally** 15:23 | 60:18 72:9 |
| **Federal** 1:14 | **fire** 85:3 | 66:11 | **Georgia** 36:2 | 76:22 86:6 |

# FREEDOM COURT REPORTING

95:21,22
102:14 104:15
104:18 112:21
113:17 122:15
122:23 124:11
124:19
good 8:8 70:4
71:6,18 73:9
76:7,23 77:6
109:6 111:18
112:17
gotten 78:14
85:14 116:13
grade 38:3
green 71:19
73:21 96:23
109:7 112:18
Greg 94:7
grievance 10:22
grounds 2:22
guard 11:14
13:20 14:9,12
14:21 28:2
32:3 79:6 90:7
91:8 117:16
guards 24:23
guess 89:4

**H**

H 5:6
half 10:16
hand 72:17
90:15 102:8
103:8 113:22
114:14 133:17
handbook 45:15
45:17,23 46:5
48:21 119:10
120:1,3,4,5,7
120:10,12
121:2
handle 30:22
53:23 61:8
handled 30:6,9

54:1 88:21
**Handley** 12:16
18:10
**hands** 72:20
103:18 114:6
**handwritten**
90:1
**happen** 50:4
64:13
**happened** 22:20
22:22,23 24:3
31:20 71:13
83:13 125:3
**happening** 21:4
22:11 25:18
33:9 124:23
**harass** 127:9
**harassed** 120:19
**harassment** 23:7
23:11 24:20
25:3,8 45:20
46:1 48:16,23
52:15,23 56:2
61:10 69:7
71:3 95:7,15
108:23 109:15
110:9 111:1
114:19 119:12
119:15 120:15
121:3,6 124:1
124:11,16,19
130:22 131:14
**Hare** 105:10
106:7
**Harmon** 58:8,9
94:19
**Harriet** 57:12
57:15 95:9
**head** 76:12
79:15 97:12
101:14
**headphones**
69:23 70:3
78:4,6

**health** 131:21
**hear** 28:22 65:2
65:14 66:21,21
69:21 70:1
71:5 77:20,23
81:9,20 93:23
**heard** 28:18
29:3 34:2 81:8
93:17,19,21
106:21 112:11
**held** 131:2
**help** 77:2,9
**Henson** 45:5
**herniated**
115:16
**high** 17:23 18:10
27:19 41:20
42:11 45:8,10
45:12 46:22
119:17
**hired** 13:14
14:14,20
**history** 38:4
**hmm** 50:22,22
50:22
**home** 9:11
**hook** 66:23
**hope** 54:14
132:14
**hopes** 104:21
**hoping** 60:13
**hospital** 23:17
24:14 131:19
**hour** 12:1,2
**hourly** 12:11
**hours** 12:3,6
66:8
**Huh** 46:15 50:13
65:12 91:18
100:15 123:15
**Huh-uh** 9:19
26:3 97:5
112:23
**hundred** 62:5,6

**Hunter** 36:11,23
37:9,19 39:9
42:21 58:18,19
58:22 95:4
104:5
**Huntsville** 9:12
**husband** 35:9,12
35:15,17,18
36:1 73:5
82:21,22,23
99:20 117:7,10
122:9,14
**husband's** 8:21
10:2

**I**

**idea** 22:8 34:12
49:1 61:23
86:17 87:18
88:21 125:23
127:13,17
**identification**
18:20 20:5
101:7 108:14
130:8
**ignore** 104:20
**ignoring** 36:12
36:21 37:7
**illustrates** 74:10
**immediately**
64:7,10 92:21
**important** 40:19
48:9
**improper** 89:9
**inappropriate**
54:23 96:6
**Inaudible** 69:14
**incident** 30:4
50:3,9 53:5
60:20 62:11
**incidents** 57:7
**indicate** 59:7
62:9 63:5,19
71:1 102:6

105:6 106:15
112:13 121:12
127:11
**indicated** 56:1
60:19 76:6
79:22 104:22
128:19 129:1,5
132:5
**indicates** 56:18
80:10 89:14
**indicating**
102:20 103:4
**indifference**
89:15
**information** 8:9
19:2 20:1,23
30:8 87:10,17
90:10 91:6,10
92:5 95:2
97:11 106:11
119:4,7 121:22
126:1
**inhibited** 53:11
**injunction**
124:16
**inquiring** 47:19
**insensitivity**
89:15
**inside** 13:12
36:13 90:14
103:1
**interchange**
17:20
**interfacing**
17:19
**interview** 84:10
**interviewed**
14:16,21
101:23 118:8
**interviews** 55:18
56:19,20,21
**involve** 50:11
**involved** 11:7
**issue** 88:23 93:7

# FREEDOM COURT REPORTING

117:14 124:15
**issues** 57:13
  58:10 91:23
  95:17 128:17
**Item** 118:23
  121:11

_____
**J**
_____
**J** 123:18
**James** 8:22
**Jamie** 16:5 31:9
  51:4
**Janell** 81:16
**Jerrell's** 81:17
**Jessie** 12:18
  14:17
**job** 10:19 85:3
  85:14 86:7
  87:14 122:22
  122:23 123:4
  128:1
**jobs** 118:2
**joint** 53:21
**joke** 96:8
**Jones** 57:12,16
  58:7 95:9
**Jr** 1:17 4:10
**judgment** 51:16
**June** 85:11
**jury** 62:1

_____
**K**
_____
**keep** 21:15
  25:16,19 70:11
  123:5
**keeping** 22:1,4,9
  25:12,14 26:18
  60:10
**kept** 20:8,12
  22:14
**kids** 11:21
**kind** 102:21
  114:15
**kinds** 69:11
**kiss** 72:20,23

103:18
**kissing** 72:21
  103:19
**knew** 25:19 31:3
  31:14,22 35:2
  41:14,22 47:22
  52:2,21 60:7
  77:16,23 79:20
  80:11 100:1,5
  121:5 128:16
**know** 15:8,15,20
  17:4,13,15
  22:7 25:17,20
  26:4,9 29:7
  30:21 34:14,15
  34:17,21 35:3
  35:5,21 44:16
  45:22 47:21
  48:1,4 50:23
  54:8 57:15
  59:1 61:6 66:2
  66:14 70:4,5
  71:19 73:8,10
  78:2 79:7,17
  80:6,20 81:2,3
  81:5,10,15
  82:16 86:4
  87:4 88:19
  89:2 93:3,18
  93:23 94:8,20
  94:22 95:1,3
  97:22 98:16,17
  125:11 126:8
  127:9,10 128:2
  128:5,14
  129:10,11,17
**knowing** 52:13
**knowledge** 19:3
  29:9 48:23
  63:6,11,13
  93:7 101:4
  128:20 129:2,5
  129:8 133:6
**known** 14:5 53:9

53:13 61:3
  78:21 95:6
**knows** 57:16
  59:5 92:10
**Krauss** 14:23,23

_____
**L**
_____
**L** 2:1 131:2
**LaGrange** 72:1
  113:16
**Lancaster** 14:17
**large** 2:7 6:3
  123:19
**law** 4:5,11 89:20
**laws** 2:13
**lawsuit** 11:4,8
  19:1 42:20
  60:14 74:12
  78:9 90:10
  92:1 124:7
**lawyer** 88:15,17
  88:19
**leading** 2:20
**learn** 24:20
**leave** 38:13,14
  43:10,14,16
  44:10 91:8
  93:15 104:19
**leaving** 56:9
**led** 48:22 49:2
**legally** 23:4
**legs** 113:4,7
**let's** 46:20 59:15
  67:12 69:2,20
  69:20 70:7
  71:22,22 72:1
  72:12 80:3
  113:14,18,19
  131:23
**library** 45:5,7
  46:20 119:17
  119:17
**license** 35:4
**life** 34:16 116:16

**line** 103:21
  113:1
**lines** 113:13
**list** 57:11 92:4
**listed** 133:7
**listen** 75:22 78:5
**listened** 70:20
  111:5
**listening** 50:1
**literature** 23:6
**little** 21:12 67:6
  70:2 82:17
**live** 7:4,5 9:9,14
  18:8 82:16
  123:6
**liver** 23:21
  131:20
**lives** 9:11
**LLP** 4:12
**long** 8:23 13:18
  14:5 66:2
  116:11
**longer** 56:7
**look** 37:8 38:12
  67:2 71:6,18
  76:7 108:20
  109:6 112:16
  112:17
**looked** 100:14
  100:16,20,23
  101:10 108:18
  111:18
**looking** 44:8
  46:5
**lot** 24:13,22 59:5
  78:5

_____
**M**
_____
**M** 4:4
**machine** 67:17
  76:15
**maintenance**
  16:7 30:5 51:4
**making** 54:19

54:22 74:16
  96:22 97:7
**male** 29:18
  50:15 53:6
**manner** 24:12
**manual** 119:20
  121:10
**Manufacturing**
  10:17
**March** 1:19 6:9
**Marcum** 4:18
  17:9,13,20
  27:20 41:15,19
  42:9 56:22
  62:18,20,23
  63:14 65:2
  79:12 81:18
  83:8,17,19
  84:8,13 85:2
  85:17,19 86:6
  87:9,13,18
  88:6 89:4
  99:12,22
  123:23 125:4,6
  125:15,19
  126:2,6,10
  128:19
**Marcum's** 66:20
**Marilyn** 58:12
  98:13
**mark** 18:16
  19:23
**marked** 18:19
  20:4 21:11,14
  22:7 101:6
  108:13 130:7
  130:10
**marriage** 35:4
  81:4
**married** 8:19
  9:1 34:13,21
  34:22 35:3
  79:21 80:5,11
  80:21 81:5

# FREEDOM COURT REPORTING

**Marshall** 15:6
30:15 40:22
41:1 43:3 51:2
52:5,8 95:13
96:2,16 97:19
99:5 105:2
**Martin** 47:5,7
47:14 48:1
**matter** 31:4 48:9
49:14 52:22
61:9 62:17
88:8 123:8
125:3
**matters** 8:9
15:21 26:21
32:16 33:9,17
33:23 44:21
53:12 60:11
63:15 89:9
101:17 105:3
108:16
**Maya** 1:16 2:5
6:1
**McKenny** 47:4
48:4
**mean** 14:8 18:5
39:4 40:14
70:3,6 73:9
74:3 81:3
**meaning** 9:16
**medical** 87:10
115:4,17
**medication**
115:7,8 117:2
**meeting** 23:23
24:2 53:21
63:22 71:23
87:6 113:15
125:6,18
126:13 128:21
131:22
**meetings** 16:2
126:7
**member** 46:17

128:2,10,16
**members** 9:14
128:8 129:8
**memorandum**
18:22
**memory** 20:16
**mental** 121:14
121:23 122:3,8
127:23
**mention** 35:15
122:2
**mentioned**
33:16,22 35:11
40:23
**message** 89:14
**met** 79:11
123:22
**middle** 1:2 9:14
9:16 12:16
13:13 28:1
42:19 45:4,6
119:16 120:9
130:11
**mind** 22:18 24:4
25:16 40:11,12
65:8 86:16
119:5
**minute** 67:13
82:4 132:1
**minutes** 66:5,11
83:6
**missed** 90:18
**mistake** 88:11
89:1,3
**mistaken** 56:13
56:15
**modify** 132:10
**moment** 76:18
**monetary** 61:13
**money** 60:14
61:19 127:18
129:17
**Montgomery**
9:18

**month** 116:10
**months** 10:17
21:10,16 114:6
**morning** 7:12
12:1,3 37:3
71:6 100:14,16
101:1,9 102:13
111:19 114:9
**mornings** 36:16
43:9 55:20
57:19 59:4
94:9 98:19
**Morris** 4:6
**mother-in-law**
23:15 24:15
131:18
**mouth** 71:12
**move** 57:20

## N

**N** 2:1 4:1 5:1
**name** 8:21 27:15
130:12
**nature** 59:12
64:11 109:12
**near** 56:8
111:10
**necessary** 2:17
70:19
**need** 123:1
**needed** 45:16
46:7 47:17,23
52:6 61:7,8,11
78:16 122:20
**neither** 29:7
**never** 33:16,22
34:5,7 35:11
35:18 51:8
58:14 71:13
72:23 77:7
81:4 107:4
108:4 110:10
112:3,7,9
**new** 119:5

**newspaper**
36:21
**Nexium** 117:5
**nice** 112:17
**night** 20:21 21:1
**nine** 10:17
**nodding** 76:12
79:15 97:12
101:14
**North** 4:14 6:8
**Notary** 2:7 6:2
133:22
**notations** 57:5
**note** 59:7
**notes** 18:22
19:11 20:8
21:1,17 22:4
22:10,14,21
25:12,15,20
26:18 56:17
60:10 109:21
110:16
**notice** 3:3 18:17
131:12
**November** 8:18
**number** 57:11

## O

**O** 2:1
**Object** 22:12
31:6 39:22
44:2 46:2
48:12 52:17
54:12 60:22
64:14 77:3
78:23 80:7,23
82:6 99:17
100:3 101:20
110:12 117:12
121:7 125:9,21
131:15
**objections** 2:18
2:21
**observed** 57:16

**occasion** 27:19
46:23,23 47:1
72:8 75:12
**occasions** 27:22
36:12 43:13
51:1 55:23
**occurred** 51:13
51:20 110:9
**October** 59:9
62:11 64:20
67:20 110:21
123:22
**offend** 64:22
**offended** 50:23
**offensive** 59:12
127:1
**offered** 2:23
**office** 26:10,14
28:14,16 34:3
37:3,23 38:9
43:8,11 44:1
47:2,6 48:2,3,6
48:8,15 62:23
66:20 85:16
87:19 88:2
92:11 93:12
98:11 99:4,8
106:1,21 116:6
119:18 133:18
**officer** 15:11
**Off-the-record**
67:14
**Oh** 19:13 85:10
94:16
**okay** 8:16,17
9:13 10:6 13:2
16:3 18:15
19:21 20:14
26:1 27:5,8
37:9 44:11
46:17 55:14
69:2,13 70:7,8
70:14 71:16
72:7,18,23

FREEDOM COURT REPORTING

73:3 77:21
79:11 82:19
84:17 85:10
87:8 90:9,15
91:2 93:16
94:19 97:2,17
100:12 110:15
113:21 114:13
115:14 130:20
132:18
**old** 34:11
**once** 33:3 116:9
**one-month**
87:22
**Opelika** 9:18
**open** 71:12
**opened** 76:2
**operator** 123:14
123:16
**opinion** 126:9
**opportunity**
32:15 77:2
131:5 132:6
**oral** 1:18 6:11
**order** 61:8
**original** 1:18
20:14 70:11
**outside** 26:16
90:7
**overheard** 28:16
105:10
**Overton** 50:12
50:14 51:7
**owned** 123:20
**o'clock** 11:19
12:4,5

**P**

**P** 2:1 4:1,1
**package** 88:6
**packed** 45:7,13
**packet** 19:2,4,23
89:23
**page** 5:3,7 18:21

88:5 89:23
126:15
**pages** 20:6 36:10
**paid** 12:11
129:21 130:1
**Palmetto** 36:2
**paper** 25:6
130:17
**paperwork**
87:23
**paragraph**
108:20 110:8
119:6 121:16
**paraphrasing**
82:5,7,13
**Pardon** 36:5
**park** 57:18
94:14
**parked** 59:3
94:16 95:11
**parking** 55:23
57:21 59:5
94:10
**parks** 55:20
57:18 59:2
**part** 41:21 68:9
75:1 91:11
93:11 106:1
**particular** 30:3
44:13 48:20
100:11 120:6
**parties** 2:3,21
**part-time** 12:8
14:2
**passed** 23:16
30:8,11
**passing** 56:8
**paychecks** 91:1
**paying** 37:8
**people** 45:15
55:17 56:1,10
57:11 63:5
76:21 77:22
92:4 107:10

**period** 109:1,16
114:21
**person** 14:15
33:13 34:20
40:6 49:23
62:15 78:17
94:5
**personal** 31:10
34:16 53:14
61:3 128:4
**personally** 34:18
107:17
**pertain** 120:6
**phone** 48:18
83:4 84:14
87:3
**physical** 114:16
**physically** 114:4
**physician** 116:1
116:21 121:23
**physicians**
115:21
**pick** 70:9
**piece** 130:17
**place** 4:13 20:17
56:23 57:7,21
68:18 69:3
75:7,15 81:23
92:15 94:10
102:12 109:2
**plaintiff** 1:6 4:3
108:22 113:10
114:21
**plant** 72:9
102:14
**play** 66:7 69:2
70:7
**played** 69:14
**playing** 65:8
67:16
**Please** 1:21
**plug** 65:11,13
**plug-in** 65:10,13
**pocket** 21:12,15

21:19 22:2
69:1
**point** 26:23
74:14 89:5
99:19 103:14
**pointed** 72:13
**pointing** 72:10
72:10,11
102:14,15,15
**Points** 7:6
**policies** 61:6
78:15
**policy** 32:7,10
45:2,3,23 46:6
46:21 47:8,15
48:17 49:18
78:18,20
119:12,15,20
121:6,10
131:12
**Pollard** 58:12
98:13,14,15,16
**Porter** 4:4 6:21
9:21 15:17
19:1,8,10,15
19:18,21 22:12
23:23 31:6
39:22 44:2
46:2 48:12
52:17 54:12
59:20 60:22
64:14 69:19
70:13 77:3,17
78:23 80:7,23
82:6 85:8,23
86:3,11,13,20
87:1 89:2
91:16,19 99:17
100:3 101:20
103:10 110:12
117:12 121:7
125:9,21
131:15 132:17
**position** 11:12

11:17 12:9
13:2,11,18,21
13:22 14:2,3,9
14:11,16,22
15:2 16:6 32:4
52:11 61:18
85:13 86:7
117:20 118:5,7
118:18 123:12
**positions** 118:14
118:16
**possible** 24:10
**post** 55:16,16,18
56:8,12,15
90:7,12 91:8
94:11
**practice** 131:13
**preparation**
100:18
**prescribed**
117:3
**presence** 111:10
**present** 4:17
15:2 124:11
**presenter** 49:21
**presently** 124:19
**president** 27:3
**pretty** 18:4
71:18 73:21
96:22 109:7
111:17 112:14
112:18 113:4,7
**prevent** 26:19
**prevented** 28:3
32:10
**previous** 8:1
10:8,12 53:17
57:5 60:20
132:9
**previously** 10:21
13:6 14:10
95:4
**Price** 1:5,12 2:5
6:10,15 7:2,4

# FREEDOM COURT REPORTING

| | | | | |
|---|---|---|---|---|
| 8:22 55:15 | 80:2 87:16 | 114:23 121:19 | **reading** 2:10 | **recording** 19:9 |
| 67:15 70:16 | 92:18,20 93:6 | **psychologist** | 36:21 37:7 | 65:3,4 66:4,19 |
| 82:4 88:8 | 97:17 104:3 | 114:22 121:19 | 57:10 | 68:14 69:3 |
| 126:19 128:13 | 128:14,20 | **Public** 2:7 6:2 | **real** 15:4 24:3 | 76:18 |
| 130:12 132:4 | **private** 123:20 | 133:22 | 32:2 51:14,23 | **recordings** |
| 133:3,12 | **privileged** 19:14 | **pull** 36:18 57:21 | 76:20 | 18:23 65:23 |
| **Prilosec** 117:5 | 91:13 | 59:4 94:10 | **realize** 81:10 | 68:5 69:4 |
| **principal** 14:18 | **probably** 21:10 | 112:18 | **really** 38:17 | 70:20 |
| 15:8,12,18,19 | 42:4 46:13 | **punch** 35:17 | 39:18 83:3,6 | **records** 18:22 |
| 15:23 16:12,15 | 96:17 99:20 | **purpose** 22:5 | 97:8,19 | **reference** 50:4,5 |
| 16:19,22 18:1 | 100:9 106:3 | 90:4 104:9 | **reason** 28:19 | 55:14 120:15 |
| 25:21 26:2,20 | 116:9,17 | **purse** 21:15 | 29:13 35:14 | **referenced** |
| 27:3,12,20 | 118:19 | **pursuant** 6:5 | 37:18 39:13,17 | 58:21 121:15 |
| 28:4,9,11,13 | **problem** 37:16 | **pursue** 46:7 | 40:17 41:17 | **reflect** 69:7 |
| 29:7,8,14,15 | 51:8 63:7 | 52:7 | 42:11 44:19 | **reflux** 116:1 |
| 30:18,18 31:1 | 115:18 116:12 | **push** 103:13 | 47:18 49:3,6 | **refresh** 49:10,15 |
| 31:1 32:4,12 | 116:15 122:5 | 114:15 | 80:15 | 109:22 110:17 |
| 32:15,21 33:4 | 128:20 | **put** 25:4 47:11 | **reasons** 119:23 | 131:11 |
| 33:8,14,17 | **problems** 29:9 | 51:11 55:11,12 | **recall** 25:7 49:19 | **regard** 127:7 |
| 34:9,9 39:14 | 35:9 37:20 | 64:12 67:1 | 63:21 73:15,16 | **regarding** |
| 39:15,20,20 | 46:11 50:8 | 69:23 78:12 | 82:13 83:3,22 | 129:22 |
| 40:5,15,19 | 58:5 110:11 | 82:23 119:5 | 93:20 96:19 | **regularity** 33:14 |
| 41:11,12,19 | 115:10,12 | 125:20 131:12 | 109:10,19,20 | **relate** 90:10 |
| 42:10 77:8,8 | 117:10 128:11 | **puzzle** 36:20 | 110:6,14 113:9 | 91:22 |
| 79:7 83:12,12 | 131:21 | | 114:17 120:17 | **relates** 8:1 21:7 |
| 83:15 106:16 | **Procedure** 1:15 | **Q** | 131:22 | **relating** 2:14 |
| 106:17 107:1,5 | 6:6 | **question** 7:15,18 | **recalls** 99:7 | 15:21 19:1 |
| 107:11 108:2,9 | **procedures** | 7:19,20 26:1 | **received** 85:6 | 119:12 |
| 108:9 119:4 | 49:18 | 130:22 132:9 | **receiving** 63:7 | **relationship** |
| 129:4 | **proceeded** 63:3 | **questionable** | **receptionist** | 41:18 42:9 |
| **principals** 27:7 | 81:17 | 15:3 | 42:19 | 43:22 44:5 |
| **print** 90:23 | **proceedings** | **questions** 2:19 | **recognize** 49:7 | **release** 85:15 |
| **printed** 20:21 | 6:13 | 2:20 7:12,13 | **recollection** | **released** 85:11 |
| **printout** 90:17 | **process** 120:22 | 8:15 63:3 64:4 | 49:11,16 82:15 | 87:20 |
| **printouts** 90:20 | **production** 19:5 | 66:10 131:6,6 | 109:22 110:17 | **relevant** 8:9 |
| **prior** 3:1 10:6 | **professionally** | | 131:11 | 101:17 |
| 14:11 17:21 | 17:16,16,18 | **R** | **record** 67:13 | **relief** 89:21 |
| 28:6 29:5,16 | **proof** 78:1 | **R** 4:1 123:18 | 78:3 | **remained** 13:17 |
| 30:3 31:3,20 | **protocols** 49:17 | **raised** 91:23 | **recorded** 66:11 | **remember** 7:23 |
| 32:1 50:3,5,7,8 | **provide** 85:15 | **Randolph** 10:5 | 67:9,17 74:16 | 22:19 23:12,23 |
| 52:21 53:5 | 87:9 | 118:1,6 | 75:13 | 25:9 27:15,16 |
| 56:2 59:16,18 | **provided** 66:17 | **reach** 114:7 | **recorder** 67:6,8 | 28:17 49:13 |
| 60:1,18 63:7 | 119:8 | **read** 23:6 55:16 | 67:10 68:22 | 84:1 86:21,23 |
| 63:11,12 68:4 | **psychiatrist** | 63:2 131:10 | 75:20 | 87:2 96:21 |
| | | 133:4 | | |

# FREEDOM COURT REPORTING

| | | | | |
|---|---|---|---|---|
| 110:6,7 130:16 130:18<br>**renovating** 45:12<br>**renovations** 45:6<br>**repeat** 7:14<br>**repeated** 41:3 124:4<br>**rephrase** 7:14<br>**report** 11:19 15:1,4,9 16:4 35:7 40:2,7 60:5 120:20 123:7 125:13<br>**reported** 30:5 34:8 99:16 110:10<br>**Reporter** 1:23 2:6 6:1,19 69:17<br>**represent** 49:21<br>**representative** 69:10 102:1<br>**request** 19:5<br>**requested** 66:15 91:17,20<br>**required** 24:21 25:1<br>**reserve** 132:15<br>**reserving** 70:15<br>**respect** 49:23 126:13<br>**respectful** 42:14 44:5<br>**respective** 2:4<br>**respond** 73:23<br>**response** 71:10 72:4 73:7 88:8 97:2,3 98:3<br>**responsibilities** 11:17 24:12<br>**Responsive** 91:16,19 | **restroom** 43:15<br>**retained** 1:22<br>**retaliation** 89:19<br>**reverse** 94:12<br>**review** 45:17 100:17<br>**reviewed** 100:13 101:8 108:15<br>**reviewing** 20:23 100:19<br>**revising** 47:9<br>**revisit** 80:3<br>**re-call** 70:16 132:16<br>**ride** 113:19<br>**right** 9:23 16:9 19:17 20:10 25:19 26:6,17 27:23 31:8 32:20 33:7,12 33:21 34:4 36:9 38:16 40:6 53:6 66:13 68:3 70:16,23 71:7 71:20 73:18 74:2,9 75:14 76:6,10 77:13 78:9 79:17 80:1,18 81:22 82:12 83:10 84:12 85:1,17 86:11,15 89:20 92:17 93:3,22 98:13 103:20 104:1,22 105:14 106:22 107:12 109:9 110:8,20 111:4 111:12,20 114:16,19 117:18 121:11 122:21 124:7 124:14 125:7 | 126:15 128:9 132:12,15,17<br>**Road** 7:5 12:20<br>**Roanoke** 1:8 10:7 11:13 13:9 17:6 18:5 25:4 61:20 116:3,7 117:21 118:2,15 119:11,20 127:15 131:1<br>**Robbie** 16:23 92:9,10 106:19<br>**Rock** 82:18<br>**room** 63:2<br>**Rose** 1:16 2:6 4:12 6:1<br>**Rosemarie** 30:15 40:22 41:1 95:13 105:2<br>**route** 61:7<br>**rude** 83:7 84:16<br>**rules** 1:15 2:14 6:5<br>**rundown** 82:17<br>**running** 21:2 56:17<br>_____<br>**S**<br>**S** 2:1,1 4:1 5:6<br>**safe** 29:11 123:3 128:18<br>**safely** 11:23<br>**SAITH** 132:20<br>**Salon** 10:15<br>**satisfied** 87:13<br>**saw** 33:1 37:6 52:12<br>**saying** 29:3 70:5 70:6 74:21 96:21 104:6<br>**says** 28:17,22 45:1 72:9 | 73:15 76:7 85:17<br>**school** 9:5 11:21 12:14,16,18 13:13 15:6,11 16:11 17:3,6 17:11,23 18:6 18:10 23:13 24:17 25:4,23 26:2 27:10,19 28:1,9 29:8 30:7,14 32:22 41:2,20 42:3 42:11,19 45:1 45:3,4,6,9,10 45:12 46:22 47:21 52:9,10 56:9,10 60:14 61:14,20 62:16 68:18 71:23 85:2,4,18 86:6 86:16 92:17 99:10 100:10 103:22 104:15 104:18 105:7 106:4,11 107:18 108:22 110:9 113:15 118:1,3 119:17 119:17 120:9 121:5 123:3,5 123:8 124:9,10 126:21 127:5 127:15,16 131:1,13<br>**sclerosis** 23:20 131:20<br>**seal** 133:17<br>**secretaries** 79:10<br>**secretary** 15:6 25:23 30:7,14 34:8 41:2 42:18 52:9,10 | 52:14 105:1,1 107:19 119:3<br>**section** 48:20<br>**see** 12:22,22 32:11,21 33:2 33:12 42:7 45:9 46:20 47:17 59:15 67:3 68:20 72:12 73:21 76:22 77:9 96:23 109:7 112:17 130:11 130:20 131:3,4<br>**seeing** 115:23 116:9<br>**seeking** 61:13 127:12<br>**seen** 35:4 78:15 81:4 131:9<br>**semester** 110:21<br>**seminars** 23:10<br>**sent** 85:22 86:2 88:10<br>**separated** 117:6<br>**separately** 133:8<br>**September** 28:8 59:15,15 68:11 93:1 128:15<br>**service** 123:18 123:19<br>**set** 19:5 49:18 89:10<br>**seven** 11:19 12:4<br>**sexual** 23:7,10 24:20 25:3,7 45:19,23 48:16 48:23 52:15,23 69:7 71:2 95:7 108:23 109:15 110:23 119:12 119:14 120:15 121:2,6 123:23 124:11,16,19 |

# FREEDOM COURT REPORTING

Page 145

130:21 131:14
**sexually** 120:19
127:8
**share** 10:11
26:20 29:13
39:20 48:9
83:12 88:16
101:16 106:10
121:21 122:7
128:11
**shared** 8:3,8
29:21 97:10
99:8 104:23
105:6 110:1,22
111:8 119:2
**sharing** 107:11
**Sherry** 42:17
98:22
**shirt** 112:20,21
**short** 132:2
**shoulder** 72:14
72:16 102:7
103:6 113:22
**show** 18:15
71:18 87:5
130:9
**showed** 24:1
**showing** 90:6,22
91:7
**shown** 49:23
**shows** 90:11
**sick** 23:17,19
**side** 10:1 59:2
**sighting** 12:21
**signature** 2:9
130:14 131:9
**signed** 24:1
**significance**
88:12 91:5
**signing** 130:16
**single** 64:21
**sir** 7:10,16,21
8:5,11 9:6,22
10:20 11:1,3,6

11:9,11,15
12:10,13 13:1
14:4,13,19
17:12 18:4,11
20:12 21:5
23:3,8 24:8
25:13,22 26:3
28:5,21 32:18
35:16,20 36:8
37:14,17,21
41:21 42:13,16
42:23 43:2,4,6
43:20 44:6,22
45:21 46:4,18
47:16 48:11,18
49:5,9,13
51:12 52:12
53:13 57:14
58:2,6,11,13
60:6,9,12,16
63:20 64:8
67:9 68:6,12
68:16,19,23
78:10 79:2,19
79:23 80:2,9
80:17 83:14,16
84:6 87:12,15
89:17 92:2
93:19 99:9,23
101:10 102:2
108:18 116:22
118:22 119:21
120:2 121:9,17
121:20 123:11
123:20 126:4
127:14 128:12
130:3,19 131:8
131:17 132:11
**sitting** 36:16,19
75:9,11,15
102:22 103:3
104:20
**six** 21:10,16
**slap** 103:13

**slipped** 115:14
**small** 18:6
**Smith** 88:4
**socially** 17:17
**somebody** 23:2
**son** 9:11
**soon** 108:7
**sorry** 21:13,21
65:18 77:18
98:9 103:2
113:5 116:4
**sort** 90:17
**sounds** 50:21
54:18,22
**sources** 32:8
**speak** 53:19
55:5,10,13
61:21 62:3,7
125:17 129:16
**speakers** 65:11
65:14 66:23
67:4 70:3
**speaking** 29:18
32:19 50:6
61:5
**special** 37:10
130:22
**specifically** 38:6
38:8 119:14
**specifics** 57:23
**spoke** 37:2 45:5
47:6 51:2,3,7
59:20 61:1
125:15
**spoken** 23:3
25:22
**sponsored** 24:18
130:23
**sporadic** 27:1
**staff** 15:22
**stages** 23:21
131:20
**stand** 38:12
**standing** 28:15

28:18 36:17
43:13 44:7
59:6 82:18
90:13 94:23
98:11,18
**start** 67:15 80:4
80:19 108:21
132:5
**started** 14:7
21:16 25:12
92:17
**starting** 68:4
**state** 2:7 6:3
70:18 119:14
133:23
**stated** 25:6 57:9
**statement** 36:14
112:3,7 118:23
131:10
**STATES** 1:1
**station** 24:6
26:13 68:21
**Stephens** 58:3,4
98:20
**steps** 49:17 61:8
**stick** 69:23
**STIPULATED**
2:2,8,16 3:2
**stipulation** 6:7
**stipulations**
6:20
**stop** 39:5 51:11
52:15 53:2
55:11,12 60:21
66:9 74:16,23
75:2 78:13
82:23 90:12
103:15 104:21
114:12 124:2
124:16
**stopped** 51:8
54:5,7 64:19
**straight** 30:12
**stress** 61:16

116:1,14
127:21 131:18
**stretch** 27:7
**stubs** 90:4
**student** 120:4,5
120:7,11 121:2
**students** 17:23
120:18
**stuff** 45:17
66:12 74:8
109:8
**subbed** 32:23
33:1 90:3,6,22
91:4
**subbing** 62:21
**subjected** 69:8
108:23
**subscribed**
133:15
**subsequent**
90:20
**substance** 46:9
**successors**
126:16
**suffered** 121:12
**sufficient** 48:8
**suggest** 30:23
89:18
**suggested** 60:4
126:2
**suggests** 82:12
112:2
**Suite** 4:6
**summer** 79:13
79:14 118:19
**superintendent**
17:5,10 41:23
77:9 108:8
**supervisor** 15:2
16:8 17:2 30:5
31:4,12,19,23
32:3 35:19
36:7 39:19
50:10 51:5,10

# FREEDOM COURT REPORTING

52:3,16 53:1,5
53:6,17 54:9
55:3 60:5 61:1
78:12,20 79:7
110:11,18
123:8
**supervisors**
60:19 76:19
129:7
**supervisory**
52:11
**supplement** 8:2
132:7,10
**support** 95:6
101:19
**supposed** 15:4
94:15,17
**sure** 6:21 11:21
15:4 16:1
19:10 22:22
27:14 32:2
35:5 40:1,9
46:4 51:14,23
64:10 70:13
73:12 85:6
89:22 92:8
97:16 100:21
101:1,22 109:6
112:16 118:12
126:10 129:15
**surgery** 85:10
86:12 115:13
**Susan** 105:9
106:7
**Sweeney** 4:10
5:4 7:1 19:13
19:17,20 67:12
69:15 70:10,14
82:8 86:18,22
88:22 91:18
131:2,23 132:4
132:13,18
**SWEENY** 1:17
**sworn** 6:16

133:15
**system** 17:6 18:6
24:17 25:5
47:21 60:15
61:14,20 62:16
118:3 123:9
124:9,10 127:5
127:15,16
131:1,13
**systematic** 22:10
92:9
**Systems** 118:2

---

## T

**T** 2:1,1 5:6
**table** 67:2
**take** 24:13 42:12
61:7,8,11 66:8
66:13 73:20
75:7,15 78:12
97:23 102:12
114:14 131:23
**taken** 1:19 2:5
20:17 53:1
76:17 92:15
132:3
**talk** 27:20 30:23
32:15 44:20
48:15
**talked** 36:15
42:21 46:11
47:4,13 53:4
57:12 58:3,9
58:14 68:4
79:21 80:12
114:1
**talking** 33:8
36:19 37:15
39:9,10 49:8
81:11 85:5
90:13 107:9
**tape** 65:15,23
67:7,11 69:14
69:22 73:11,13

73:15,17 75:19
81:9,19 84:11
91:14 111:3,5
111:8,15,20
**tapes** 65:21 66:1
66:3
**Taylor** 16:5 31:9
51:4
**teacher** 37:10
38:3,4 120:20
**teachers** 103:22
104:1 107:16
119:2
**Tech** 118:4
**tell** 11:16 15:5
28:20 30:17,20
31:15 44:11
45:14,18 47:14
47:19 53:18
55:3,7 62:19
63:14 64:6
67:16 68:13
69:19 71:21,22
74:23 80:5
81:18 84:2,12
89:4 96:1,5,12
97:6,18 98:1
113:14 122:14
123:7 125:12
**telling** 43:23
46:8 52:5
96:19 99:4
106:22
**tending** 24:5
**terminate** 86:7
**terminated**
10:19
**terminating**
85:13
**terms** 18:2 26:7
57:22 62:1
93:16
**Terry** 10:17
**testified** 6:17

**testimony** 1:19
57:4 133:4
**theirs** 45:7,9,11
45:12
**Theresa** 58:18
95:4 104:5
**thereto** 3:1
**They'd** 120:20
**thing** 64:21
**things** 20:17,22
21:3 25:18
29:20 70:2
74:4 112:23
**think** 8:1 19:22
28:8 55:7 69:6
72:6,11,19
77:6 84:7 87:1
89:5 92:10
109:13 113:2
113:20 117:17
120:16 125:14
125:16
**thirty-somethi...**
65:22
**thought** 41:7
43:18 54:22
96:5,7 101:17
112:14
**thousand** 62:6,6
**threat** 85:13
89:8
**threatened**
26:23 85:3,18
96:13 123:1
**threatening**
85:20 86:23
**three** 22:19 32:8
63:5 88:6
117:1 118:13
**time** 2:22,23
7:22 11:18
14:7 16:17
17:1 21:3,9
22:21 23:14,15

23:22 24:2,7
25:10,21 26:22
27:2,7,13
33:21 35:6
38:11 42:3,3
44:13 46:10
47:10 52:3
57:6 58:4
59:11 61:15
64:19 66:5,14
69:3 77:10
83:4 87:23
96:14 97:9,17
109:1 114:3,22
116:16 124:12
128:10 129:19
129:23 130:5
131:17
**times** 17:22
20:19 24:22
67:19 70:21
114:5
**Tina** 93:10
104:5
**today** 49:8 109:6
110:5 112:17
**told** 25:3 30:6
37:4 44:17,18
45:8,16 47:16
49:2 53:19
54:17 55:5
63:10,12 65:20
71:5 72:8,21
80:3,18 81:14
81:16,18 82:1
83:8,18 84:7,9
84:10,15,18
86:9 87:21
96:3,7 97:21
99:20 102:13
103:15,18
104:7 105:14
105:21 122:20
123:22

# FREEDOM COURT REPORTING

tolerate 54:9
tonight 71:23
  113:15,18
top 130:20
  131:10
torn 47:8
touch 102:16
  114:7
touched 102:7
  102:17 103:5,8
  113:21 114:4
Town 10:15
track 70:12
Tracy 88:4
traffic 11:20
trailer 82:2,9,17
transcribed
  70:11 91:14
transcript 1:18
  70:17 132:16
  133:4
trash 82:2,10
trauma 114:23
treat 126:12
treating 122:4
treatment 117:3
tree 123:18,19
trees 36:4,6
trial 2:22
trims 36:4,6
trip 113:12
Troy 9:20
truck 36:18
  55:21
true 29:1,5
  87:17 102:10
  107:2 126:18
  128:13 133:5
trusting 43:22
  44:4
truth 28:20 39:2
  83:21
truthful 94:5
try 22:19 103:10

trying 46:6
  47:20 104:20
turn 68:21 75:19
Twenty-five 9:2
Twenty-three
  9:8
twice 33:3
  116:10
two 17:3 18:21
  20:6 34:20
  36:9 104:4
  118:12
two-page 90:16
two-year 21:23
type 21:8 70:23
  74:4,10 90:1
  109:7
typed 20:15,16
  20:18
types 110:22
typical 69:11
typing 21:17

**U**

U 2:1
UAH 9:12
uh-huh 102:9
  103:7,9,11,23
  120:13
uncomfortable
  54:19 104:17
  105:12,19
  111:7,11
  122:23
understand 7:18
  59:10 66:22
  69:16,18 76:21
  77:12 83:7
  123:21 124:13
understood 25:2
UNITED 1:1
upper 72:15
  92:11 93:11
upset 27:1 83:4

97:8,19 104:8
upsetting 114:20
use 76:3
Usual 6:19

**V**

vehicle 58:17
  59:6 64:18
  75:8,10,12,16
  75:17 94:17
vehicles 11:23
veracity 94:1
vicinity 107:9
video 18:23
violate 89:19
visit 95:21,23
visual 12:21
vs 1:7

**W**

wait 38:13 43:9
  43:15 57:20
  82:3 104:18
waiting 43:14
  44:9 93:14
waived 2:11 3:4
walk 50:22
  94:17
walking 56:14
walks 75:12
want 8:14 22:18
  30:17 38:18
  61:19 70:15
  74:18 81:9
  127:13,18
  132:10
wanted 19:15
  22:16,17 28:4
  32:16 39:4
  45:15 47:15
  65:2 81:19
  109:3 119:19
wanting 127:22
  127:23
wasn't 31:13

32:2 42:3,4
  48:19 77:13
  103:19
watching 93:14
way 21:21 47:9
  64:21 69:22
  70:1 82:20
  90:12
wealthy 127:16
wear 112:20
week 33:3
went 18:9 27:6
  31:9,18 40:4
  45:4 46:19,20
  49:16 53:16
  54:17 55:2,18
  56:7 64:9 83:5
  87:21 100:9
  104:6 106:23
  107:4 123:10
weren't 39:11
  53:10 78:11
  80:21
West 118:3
we'll 72:1 91:14
we're 49:7 69:3
we've 66:14
  71:23 91:10
  113:15 114:1
whereabouts
  48:16 87:18
White 4:12
wife 79:12,18,21
  80:12,14 81:17
  83:11 125:6
willing 60:21
window 38:13
  44:8 93:14
winter 21:7
  114:6
wish 73:4 75:1
witness 2:10
  6:11 76:12
  79:15 97:12

101:14 130:2
  133:3,17
witnessed 36:11
  37:1
wondering 88:7
word 70:1
words 21:6
  74:20 82:14
work 11:19 12:1
  36:1 85:12
  86:9 94:21
  127:22
worked 10:14
  10:16 31:10
  34:19 60:7
working 28:1
  61:17 98:7,10
  127:8
works 36:2
  123:13
workshop 24:18
  25:4,8,9 48:22
  49:3,12,16
  51:21 130:23
workshops
  23:10 24:23
worried 96:13
worrisome 27:9
worse 30:21
  97:22 116:14
worth 66:11
wouldn't 25:11
  28:2 32:10
  38:21 40:10
  44:19 73:9
  78:22 99:21
  107:1 126:18
wrist 72:16

**X**

X 5:1,6

**Y**

Yahmi 116:3,5
  116:19

# FREEDOM COURT REPORTING

**Yarbrough**
42:17 43:5,7
43:17,22 98:22
99:7
**yeah** 37:6 69:21
70:22 82:8
86:20
**year** 10:16 13:5
17:11 27:11
106:4 108:22
110:10 120:6
**years** 9:2 10:13
20:9 22:19
33:19 34:20
53:9,14 61:4
116:23 117:1
118:13

---
**0**
**02** 13:4,4 27:4
117:17,19
**03** 13:4 27:4,10
95:19 96:18,20
106:4 107:22
**04** 27:10 56:6
90:19 106:4
115:23
**05** 21:22 23:5
46:16 59:16
67:20,20,23
90:4 92:16
98:2 118:19
122:10,10
**06** 79:13,14
90:19

---
**1**
**1** 5:8 18:16,19
19:6
**1st** 59:9
**10:10** 6:10
**101** 5:10
**102** 4:6
**108** 5:11
**11** 108:21

**12** 110:8
**13** 111:16
**130** 5:12
**14** 113:10
**14th** 59:9
**15** 1:16 113:21
**16** 131:2
**17** 114:19
**18** 5:8
**1819** 4:14 6:8
**1965** 8:18
**1988** 1:16
**1998** 48:22
51:22 131:3

---
**2**
**2** 5:9 20:2,4,7
36:10 91:11
**2nd** 8:18
**2:30** 12:7
**20** 5:9
**2002** 21:7
**2003** 21:8 26:18
33:17 35:6
56:4 108:22
109:1,10,16,23
110:10 115:6
115:18
**2004** 16:14,21
25:21 26:18
33:17 56:4
106:10 108:22
109:1,10,16,23
110:10,20
**2004-2005** 17:11
**2005** 16:14,21
28:8 33:18
44:23 56:5
59:9 62:12
64:20 106:13
110:20,21
128:16
**2007** 1:20 6:9
133:16

**21** 118:23 119:6
**21st** 1:19 6:9
**23** 59:15
**2301** 4:6
**278** 7:5
**28th** 23:16

---
**3**
**3** 5:10 101:6
**3:06-cv-742-V...**
1:8
**3:30** 12:7 38:10
**30** 121:11
**35203** 4:7,15

---
**4**
**4** 5:11 108:13
**4220** 7:5

---
**5**
**5** 5:12 130:7,10

---
**7**
**7** 5:4

---
**9**
**96** 13:16
**97** 120:9,11
**98** 23:14 51:17
51:19 120:9,9
120:11
**99** 51:17,19
116:17



IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

ANGELA PRICE,                              )
                                           )
        Plaintiff,                         )
                                           )
v.                                         )   CIVIL ACTION NUMBER:
                                           )   3:06-cv-742-VPM
ROANOKE CITY BOARD OF                      )
EDUCATION,                                 )
                                           )
        Defendant.                         )

RE-NOTICE TO TAKE DEPOSITION
AND PRODUCTION OF DOCUMENTS

TO:    Adam M. Porter, Esq.
       2301 Morris Avenue, Suite 102
       Birmingham, AL  35203

       Please take notice that pursuant to the Federal Rules of Civil

Procedure 30, Defendant will take the deposition of Angela Price, Plaintiff, upon

oral examination before an officer authorized by law to administer oaths.

       Said deposition shall be taken on Wednesday, March 21, 2007

beginning at 10:00 a.m., at the offices of Bradley Arant Rose & White, LLP, One

Federal Place, 1819 Fifth Avenue North, Birmingham, Alabama, and shall continue and/or be resumed from time to time until completed.

## REQUEST FOR PRODUCTION OF DOCUMENTS

Defendant requests that deponent named herein produce at the time and date of the above set deposition copies of any and documents of whatsoever kind or nature regarding or relevant to the above-referenced lawsuit including, but not limited to:

1.    All records, notes, memoranda, correspondence, audio or video recordings.

2.    All documents which said deponent has utilized to prepare for testimony or refresh said deponent's recollection as to any of the subjects set forth herein.

_Donald B. Sweeney_
Donald B. Sweeney, Jr. (SWE002)

OF COUNSEL

Bradley Arant Rose & White LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2104
Telephone: (205) 521-8000
Facsimile: (205) 521-8800

## CERTIFICATE OF SERVICE

I hereby certify that I have this date served the above and foregoing on:

Adam M. Porter, Esq.
2301 Morris Avenue, Suite 102
Birmingham, AL 35203

by placing a copy of same in the United States Mail, first-class postage prepaid and addressed to his regular mailing address, on this 6th day of March, 2007.

OF COUNSEL

I started directing traffic in the Fall 2002 the first comment was in the winter of 2003
I tried to ignore it. It at this time was not an everyday occurence just a comment about my appearance.

In the Fall of 2004 he had a Drs. appt. in Fl. and asked me to go with him. At this point comments happened more frequently. Not sure of exact dates but he had knee surgery and was out of work for awhile. When he returned to work (winter 2005) I would sit in my car and wait on work time to begin. This is when he began to pull up beside my vehicle or walk to it on a daily base. I would sit there and read or work on a crossword puzzle tring to ignore him. But he continued.

All complaints mentioned happened in 2005 Fall

Mrs. Hunter - witnessed on several occassions my ignoring Mr. Cottle as well as my going inside to get away from him.

Mrs Clarke - Was in the office when it was being discussed about Cottle's comments

Rosemarie Marshall - was aware of most everything mentioned

Sherry Yarbrough - was also aware of my coming in the office both in the mornings and afternoons to wait on Cottle to leave so I wouldn't have to be confronted by him. She was also present on several occassions that when the comments Cottle made to me were being discussed.

In the fall of 2005 I attempted to get a copy of the schoolboard's policy book (handbook).

When I spoke with Mrs. Henson HMS librarian I was told the middle school copy was packed up due to library rennovations, she told me to call the high school.

I then called the high school and spoke with Donna Evans HHS librarian and she told me she didn't know where their copy was because of the remodeling that had been going on there.

I then contacted Central Office and ask for a copy, was told by Mrs. McKenny and Mrs. Martin the CO's copy was torn apart being revised.

So I was not able to get a copy of board policy to see what steps I needed to take.

It was noted in the interview with Mrs. Marshall that I told her and she didn't believe me.
I don't think it was up to her to believe me she should have reported it to someone higher up and let them decide.

There was another incident with another employee earlier when I was a custodian inside the building @ HMS. I reported it to Jamie Taylor and he spoke with the person and it stopped.

Many of the people in the earlier interviews said I went to his post. I would like to know how they would know this because most mornings when they arrive @ work I'm already directing traffic (check sign in sheets as to when they arrive) on mornings that I don't sub I would go in the building and wait on Cottle to leave. But the employees who commented on this would be in their classrooms teaching. Most afternoons I would again go back in the building and wait for Cottle to leave.

These people arrive early for work and know he would be at my car

1. Harriet Jones parks next to me in front of the office.
2. Donna Stephens parks next to Mrs. Jones.
3. Delia Harmon
4. Marilyn Pollard
5. Theresa Hunter
6. Mr. Foster

There was many mornings Cottle would have to move so Mrs. Jones could pull in her parking place. And when ever the office opened I would go in to use the restroom just to get away from him.


DEFENDANT'S
EXHIBIT

2- Price

```
RUN DATE: 03/16/2007
RUN TIME: 07:01
```

```
                              MRAI PAYROLL SYSTEM
                          P/R CHECK JOURNAL REPORT
                  ROANOKE CITY   FROM 03/01/04 TO 05/31/05
```

EMPLOYEE:   0347   ANGELA PRICE
```
=======  FED W/H   STATE W/H   SS W/H   MC W/H   FRINGE BEN   DED-AMT--NUM-DESC      --NET PAY
GROSS PAY  =======  =========  ======   ======   ==========   ====================   =========
 317.92       .00      1.59      4.69     1.10        .00      242.85--013-HEALTH         44.32
                                                              23.97--077-GROUP-LIFE
```
CHECK==>   04380  08/30/04

```
RN U  JOURNAL NUMBER                      REG PAY   OVERTIME   ADJUST
01  1 11-5-4120-103-0010-1310-0-8410-0000  317.92      .00      .00
```
       575.83              11.28      9.45       20.68      4.84
CHECK==>   04654  09/30/04

```
RN U  JOURNAL NUMBER                      REG PAY   OVERTIME   ADJUST   242.85--013-HEALTH     263.36
01  1 1-5-4120-103-0010-1110-0-8410-0000  325.83      .00       .00    23.97--077-GROUP-LIFE
01  1 1-1-100-180-0010-111-0-1200-0000    275.00      .00       .00
02  1 1-1-100-180-0010-111-0-1500-0000    100.00      .00       .00
02  1 1-1-100-180-0010-4110-0-1800-0000    25.00      .00       .00
02  1 1-5-1100-180-0010-4130-0-1200-0000    25.00      .00       .00
```
       815.83              35.28     17.85       35.56      8.32              .00      452.60
CHECK==>   04977  10/29/04

```
RN U  JOURNAL NUMBER                      REG PAY   OVERTIME   ADJUST
01  1 1-5-4120-103-0010-1110-0-8410-0000  325.83      .00       .00
01  1 1-1-100-180-0010-111-0-1200-0000    275.00      .00       .00
02  1 1-1-100-180-0010-111-0-1500-0000    100.00      .00       .00
02  1 1-1-100-180-0010-4110-0-1800-0000    25.00      .00       .00
02  1 1-2-1100-180-0010-4130-0-1200-0000    25.00      .00       .00
02  1 1-1-100-180-0010-1410-0-1700-0000    40.00      .00       .00
```
       705.83              24.23     14.00       28.74      6.72              .00      365.87
CHECK==>   05206  11/23/04

```
RN U  JOURNAL NUMBER                      REG PAY   OVERTIME   ADJUST   242.85--013-HEALTH     255.47
01  1 1-5-4120-103-0010-1110-0-8410-0000  325.83      .00       .00    23.97--077-GROUP-LIFE
01  1 1-1-100-180-0010-111-0-1200-0000    275.00      .00       .00
02  1 1-1-100-180-0010-111-0-1500-0000    125.00      .00       .00
02  1 1-1-100-180-0010-4110-0-1800-0000    30.00      .00       .00
02  1 1-5-1100-180-0010-4130-0-1200-0000    39.50      .00       .00
02  1 1-1-100-180-0010-1410-0-1700-0000    80.00      .00       .00
```
       565.83              10.28      9.11       20.06      4.69              .00
CHECK==>   05543  12/17/04

```
RN U  JOURNAL NUMBER                      REG PAY   OVERTIME   ADJUST
01  1 1-5-4120-103-0010-1110-0-8410-0000  325.83      .00       .00
```

RUN TIME: 08:34:01

P/R CHECK RECORDS REPORT
ROANOKE CITY BOARD OF EDUCATION
FROM 06/'04 TO 05/31/05

EMPLOYEE: 0347   ANGELA PRICE

| GROSS PAY | FED W/H | STATE W/H | SS W/H | MC W/H | FRINGE BEN | DED-AMT---NUM-DESC | NET PAY |
|---|---|---|---|---|---|---|---|
| | | | 325.63 | .00 | .00 | | |
| | | | 77.50 | .00 | .00 | | |
| | | | 3.50 | .00 | .00 | | |
| | | | 417.50 | .00 | .00 | | |
| | | | 50.00 | .00 | .00 | | |
| | | | 40.00 | .00 | .00 | | |
| | | | 20.00 | .00 | .00 | | |

EMPLOYEE TOTALS

6,635.39   288.74   127.51

| REG PAY 261.19 | OVERTIME | ADJUST | | 2,422.50   013-HEALTH   3,294.67 |
| | | | | 239.70   077-GROUP-LIFE |
| 2,932.47 | .00 | .00 | | |
| 3,317.92 | .00 | .00 | | |
| 947.50 | .00 | .00 | | |
| 240.00 | .00 | .00 | | |
| 200.00 | .00 | .00 | | |
| 312.50 | .00 | .00 | | |
| 187.50 | .00 | .00 | | |

61.09

GRAND TOTALS

6,635.39   288.74   127.51

| REG PAY 261.19 | OVERTIME | ADJUST | | 2,422.50   013-HEALTH   3,294.67 |
| | | | | 239.70   077-GROUP-LIFE |
| 1,972.50 | .00 | .00 | | |
| 947.50 | .00 | .00 | | |
| 240.00 | .00 | .00 | | |
| 200.00 | .00 | .00 | | |
| 312.50 | .00 | .00 | | |
| 18.50 | .00 | .00 | | |

61.09

*** END OF REPORT ***

RUN DATE: 03/16/2007
RUN TIME: 07:59:17

MCAI PAYROLL SYSTEM
P/R CHECK RECORDS REGISTER
ROANOKE CI   CARD OF REDUCATION
FROM 07/01/05  TO 08/31/06

EMPLOYEE:        0347   ANGELA PRICE
GROSS PAY              FED W/H      STATE W/H      SS W/H      MC W/H      OVERTIME      FRINGE BEN      DED-AMT  NUM  DESC      NET PAY
=========             =======      =========      ======      ======      ========      ==========      ===============      =======
325.83                   .00           1.84        5.18         1.21                         .00      242.25  013  HEALTH        51.38
                                                                                                      29.97  077  GROUP-LIFE

       CHECK==>   07733  08/30/05

RN  U  JOURNAL NUMBER                                      REG PAY   OVERTIME   ADJUST
01  1  11-5-4120-103-0010-1110-0-8410-0000               325.83        .00       .00
       669.00                20.59            -12.71

       CHECK==>   07965  07/30/05                                                                      242.25  013  HEALTH       336.83
                                                                                                      29.97  077  GROUP-LIFE

RN  U  JOURNAL NUMBER                                      REG PAY   OVERTIME   ADJUST
01  1  11-5-4120-103-0010-1110-0-8410-0000               354.00        .00       .00
08  1  1-1100-180-0010-1110-0-1200-0000                   77.30        .00       .00
08  1  1-1100-180-0010-1110-0-2300-0000                    3.30        .00       .00
08  1  1-1100-180-0010-1110-0-2400-0000               141.50        .00       .00
02  1  1-1100-180-0010-4130-0-1500-0000                   25.00        .00       .00
02  1  1-1100-180-0010-4130-0-1200-0000                   25.00        .00       .00
02  1  1-1100-180-0010-1440-0-1700-0000                   40.00        .00       .00
       669.00                20.59            -12.71                  26.46       6.19

       CHECK==>   08225  10/28/05                                                                      242.25  013  HEALTH       336.83
                                                                                                      29.97  077  GROUP-LIFE

RN  U  JOURNAL NUMBER                                      REG PAY   OVERTIME   ADJUST
01  1  11-5-4120-103-0010-1110-0-8410-0000               354.00        .00       .00
08  1  1-1100-180-0010-1110-0-1200-0000               150.00        .00       .00
08  1  1-1100-180-0010-1110-0-2400-0000                   38.00        .00       .00
02  1  1-1100-180-0010-4130-0-1500-0000                   75.00        .00       .00
02  1  1-5-2310-180-0010-1110-0-8230-0000               40.00        .00       .00
       1,054.00               59.09             26.18                 50.33      11.77

       CHECK==>   08544  11/22/05                                                                      242.25  013  HEALTH       640.41
                                                                                                      29.97  077  GROUP-LIFE

RN  U  JOURNAL NUMBER                                      REG PAY   OVERTIME   ADJUST
01  1  11-5-4120-103-0010-1110-0-8410-0000               354.00        .00       .00
08  1  1-1100-180-0010-1110-0-2300-0000                   48.50        .00       .00
08  1  1-1100-180-0010-1110-0-2400-0000               43.50        .00       .00
02  1  1-1100-180-0010-1110-0-1500-0000                   25.00        .00       .00
02  1  1-1100-180-0010-4110-0-1200-0000               156.00        .00       .00

RUN TIME: 08:29:17

PAY130 (8.7?)

RCSAP... CHECK REGISTER REPORT
SREM... TO 03/31/06

EMPLOYEE: 0347   ANGELA PRICE
GROSS PAY     FED W/H   STATE W/H
654.00        19.09     12.18        CHECK==> 08769 12/16/05

| DED AMT | NUM | DESC | NET PAY |
|---------|-----|------|---------|
| 242.85  | 013 | HEALTH | 325.01 |
| 283.97  | 077 | GROUP LIFE | |

RN  U  JOURNAL NUMBER
01  1  11-5-3900-179-0010-1110-0-8300-0000
08     11-5-1100-180-0016-1110-0-1200-0000
08     11-1-1100-180-0016-1110-0-2300-0000
02     11-1-1100-180-0016-1110-0-2400-0000
02     11-5-1100-180-0010-1110-0-1500-0000

354.00          .00              2.74
CHECK==>  08769  01/30/06

REG PAY  354.00      OVERTIME  .00    REG W/H  3.93    MC W/H 1.62    FRINGE BEN .00    ADJUST
354.00                          .00                                                    .00

RN  U  JOURNAL NUMBER
01  1  11-5-3900-179-0010-1110-0-8300-0000
354.00          .00              2.74
CHECK==>  09286  02/28/06

REG PAY  354.00      OVERTIME  .00    REG W/H  3.93    MC W/H 1.62    FRINGE BEN .00    ADJUST .00

DED AMT 242.85  013 HEALTH
        283.97  077 GROUP LIFE      76.49

RN  U  JOURNAL NUMBER
01  1  11-5-3900-179-0010-1110-0-8300-0000
27.84           .00              .44
CHECK==>  09562  03/30/06

REG PAY  354.00      OVERTIME  .00    REG W/H  1.59    MC W/H .29    FRINGE BEN .00    ADJUST 325.72-

84.72

RN  U  JOURNAL NUMBER
01  1  11-5-3900-179-0010-1110-0-8300-0000
209.10          .00              5.85
CHECK==>  10098  05/25/06

REG PAY  209.10      OVERTIME  .00    REG W/H       MC W/H      FRINGE BEN .00    ADJUST

DED AMT 31.31  077 GROUP LIFE      155.94

RN  U  JOURNAL NUMBER
01  1  11-5-3900-179-0010-1110-0-8300-0000

RUN TIME:

ROANOKE CITY BOARD OF EDUCATION
FROM 08   '05   TO 05/31/06

EMPLOYEE:   0347   ANGELA PRICE

| GROSS PAY | FED W/H | STATE W/H | SS W/H | MC W/H | FRINGE BEN | DED-AMT-NUM DESC | NET PAY |
|---|---|---|---|---|---|---|---|

EMPLOYEE TOTALS

4,316.17   119.36   77.40   162.47   37.99   .00

REG PAY   162.47      OVERTIME      ADJUST   326.76-
                                    .00
                                    .00

1,695.75 -013- HEALTH
  199.10 -077- GROUP LIFE

2,024.10

RN  UNIT JOURNAL NUMBER
01  1-1--180--0010--1110--0--8300--0000
01  1--4120--03--0010--111--0--8410--0000
02  1-1100--180--0010--111--0--8200--0000
02  1-1100--180--0010--1110--0--1500--0000
02  1-1100--180--0010--1110--0--2300--0000
02  1-1100--180--0010--141--0--1700--0000
02  1-2310--180--0010--111--0--2230--0000
02  1-1100--180--0010--111--0--1200--0000
02  1-5-1100--180--0010--4130--0--1200--0000

GRAND TOTALS

4,316.17   119.36   77.40   162.47   37.99   .00

REG PAY   737.50      OVERTIME      ADJUST
  567.50                            .00
   88.50                            .00
    4.00                            .00
   40.00                            .00
 1,462.10                           326.76-
 1,387.80                           .00
   25.00                            .00

1,695.75 -013- HEALTH
  199.10 -077- GROUP LIFE

2,024.10

UNIT JOURNAL NUMBER
1--180--0010--1110--0--1200--0000
1-1100--180--0010--111--0--1500--0000
1-1100--180--0010--111--0--2300--0000
1-1100--180--0010--141--0--1700--0000
1-1100--180--0010--141--0--1900--0000
1-2310--180--0010--111--0--8300--0000
1-4120--03--0010--111--0--8410--0000
1-5-1100--180--0010--4130--0--1200--0000

*** END OF REPORT ***

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| AGENCY | | CHARGE NUMBER |
|---|---|---|
| | FEPA | |
| x | EEOC | 130 2006 00145 |

and EEOC

|  |  |
|---|---|
| State or local Agency, if any | |

**NAME** (Indicate Mr., Ms., Mrs.)

Ms. Angela Price

**HOME TELEPHONE** (Include Area Code)

(334) 885-8679

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 4220 County Road 278 | Five Points, AL 36855-2898 | |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| Roanoke City Bd. of Education | + 15 | 334-863-2628 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 557 Main Street | Roanoke, Alabama 36274-1439 | Randolph |

| NAME | | TELEPHONE NUMBER (Include Area Code) |
|---|---|---|
| | | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | | |

**CAUSE OF DISCRIMINATION BASED ON** (Check appropriate box(es))

| | RACE | | COLOR | x | SEX | | RELIGION | | AGE |
|---|---|---|---|---|---|---|---|---|---|
| | RETALIATION | | NATIONAL ORIGIN | | DISABILITY | | OTHER (Specify) | | |

**DATE DISCRIMINATION TOOK PLACE**
EARLIEST (ADEA/EPA)     LATEST (ALL)

September 22, 2005

| x | CONTINUING ACTION |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I am female and became employed by Roanoke City Schools in 1996. I am a crossing guard at Handley Middle School. Since the beginning of the school year of 2003 2004, I have been sexually harassed by male co-worker Jerrell Cottle. He is also a crossing guard at Handley Middle School. He always tells me I'm pretty and he constantly says things like, " You look good enough to eat this morning," how he wishes he could have found me before Jimmy (my husband) did, he asks me to go out with him and to " go with" him. He touches me on the cheek, shoulder and hand. He walks up to my car when I get to work. These things happen every day and have been very upsetting and distracting to me. It makes me not want to go to work. I have complained to teachers at the school, the secretary, the counselor, and the assistant principal about this but nothing has been done.

I believe that my employer is discriminating against me on the basis of my gender in subjecting me to sexual harassment. I am therefore making a claim under Title VII to the Civil Rights Act of 1964, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary to meet State and Local Requirements) <br> RECEIVED <br> EEOC <br> I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. <br> SEP 27 2005 |
|---|---|
| I declare under penalty of perjury that the foregoing is true and correct. <br> *Angela Price*  9/23/05 <br> Date    Charging Party (Signature) | SIGNATURE OF COMPLAINANT <br> SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE <br> BIRMINGHAM DISTRICT OFFICE <br> (Day, month, and year) |

EEOC FORM 5 (10/94)



DEFENDANT'S EXHIBIT

3-Price

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| AGENCY | CHARGE NUMBER |
|---|---|
| ☐ FEPA | 130 2006 00145 |
| ☒ EEOC | and EEOC |

State or local Agency, if any

| NAME(Indicate Mr., Ms., Mrs.) | HOME TELEPHONE (Include Area Code) |
|---|---|
| Ms. Angela Price | (334) 885-6679 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 4220 County Road 278 | Five Points, AL 36855-2898 | |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| Roanoke City Bd. of Education | + 15 | 334-863-2628 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 557 Main Street | Roanoke, Alabama 36274-1439 | Randolph |

| NAME | | TELEPHONE NUMBER (Include Area Code) |
|---|---|---|
| | | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | | |

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))

☐ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ AGE
☐ RETALIATION  ☐ NATIONAL ORIGIN  ☐ DISABILITY  ☐ OTHER (Specify)

DATE DISCRIMINATION TOOK PLACE
EARLIEST (ADEA/EPA)    LATEST (ALL)
September 22, 2005

☒ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I am female and became employed by Roanoke City Schools in 1996. I am a crossing guard at Handley Middle School. Since the beginning of the school year of 2003 2004, I have been sexually harassed by male co-worker Jerrell Cottle. He is also a crossing guard at Handley Middle School. He always tells me I' m pretty and he constantly says things like, " You look good enough to eat this morning," how he wishes he could have found me before Jimmy (my husband) did, he asks me to go out with him and to " go with" him. He touches me on the cheek, shoulder and hand. He walks up to my car when I get to work. These things happen every day and have been very upsetting and distracting to me. It makes me not want to go to work. I have complained to teachers at the school, the secretary, the counselor, and the assistant principal about this but nothing has been done.

I believe that my employer is discriminating against me on the basis of my gender in subjecting me to sexual harassment. I am therefore making a claim under Title VII to the Civil Rights Act of 1964, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary for State and Local Requirements) |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |
| *Angela Price*    9/23/05 | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year) |
| Date    Charging Party (Signature) | |

RECEIVED
EEOC

BIRMINGHAM DISTRICT OFFICE

EEOC FORM 5 (10/94)

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Statement before completing this form.

| AGENCY | CHARGE NUMBER |
|--------|---------------|
| ☐ FEPA | |
| ☒ EEOC | 130 2006 00145 |
| | and EEOC |

State or local Agency, if any

| NAME(Indicate Mr., Ms., Mrs.) | HOME TELEPHONE (Include Area Code) |
|---|---|
| Ms. Angela Price | (334) 885-6679 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 4220 County Road 278 | Five Points, AL 36855-2898 | |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| Roanoke City Bd. of Education | + 15 | 334-863-2628 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 557 Main Street | Roanoke, Alabama 36274-1439 | Randolph |

| NAME | | TELEPHONE NUMBER (Include Area Code) |
|---|---|---|
| | | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | | |

| CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es)) | DATE DISCRIMINATION TOOK PLACE |
|---|---|
| ☐ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ AGE | EARLIEST (ADEA/EPA)     LATEST (ALL) |
| ☐ RETALIATION  ☐ NATIONAL ORIGIN  ☐ DISABILITY  ☐ OTHER (Specify) | September 22, 2005 |
| | ☒ CONTINUING ACTION |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I am female and became employed by Roanoke City Schools in 1996. I am a crossing guard at Handley Middle School. Since the beginning of the school year of 2003 2004, I have been sexually harassed by male co-worker Jerrell Cottle. He is also a crossing guard at Handley Middle School. He always tells me I' m pretty and he constantly says things like, " You look good enough to eat this morning," how he wishes he could have found me before Jimmy (my husband) did, he asks me to go out with him and to " go with" him. He touches me on the cheek, shoulder and hand. He walks up to my car when I get to work. These things happen every day and have been very upsetting and distracting to me. It makes me not want to go to work. I have complained to teachers at the school, the secretary, the counselor, and the assistant principal about this but nothing has been done.

I believe that my employer is discriminating against me on the basis of my gender in subjecting me to sexual harassment. I am therefore making a claim under Title VII to the Civil Rights Act of 1964, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary for State and Local Requirements) RECEIVED EEOC |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SEP 1 7 2005 |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |
| Angela Price    9/23/05 | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE BIRMINGHAM DISTRICT OFFICE (Day, month, and year) |
| Date    Charging Party (Signature) | |

EEOC FORM 5 (10/94)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### EASTERN DIVISION

RECEIVED

2006 AUG 17  A 10: 10

ANGELA PRICE,                    )
                                 )
    Plaintiff,               )
                                 )
vs.                              )    Civil Action No.
                                 )
ROANOKE CITY BOARD OF EDUCATION, )    3:06CV742-
                                 )
    Defendant.               )

## COMPLAINT

### I. JURISDICTION

1. This is a suit for relief from gender discrimination instituted pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e *et seq.* The jurisdiction of this Court is based on 28 U.S.C. §§1331 and 1343(4).

2. Plaintiff Angela Price ("Plaintiff") timely filed her sex discrimination charge with the Equal Opportunity Commission within 180 days after the last discriminatory treatment. Plaintiff further filed this suit within 90 days after receipt of her right-to-sue letter issued from the E.E.O.C.

### II. PARTIES

3. Plaintiff is a female citizen of the United States over the age of nineteen and a resident of Five Points, Chambers County, Alabama.

4. Defendant Roanoke City Board of Education ("Defendant") is governmental entity located in Roanoke, Randolph County, Alabama and is an employer as that term is contemplated under Title VII.


DEFENDANT'S EXHIBIT
4- Price

## III. BACKGROUND

5. Paragraphs 1-4 above are incorporated by reference.

6. Plaintiff is female.

7. Plaintiff became employed by Defendant in 1996.

8. Plaintiff is a crossing guard at Handley Middle School in Roanoke, which is operated by Defendant.

9. Jerrell Cottle is a crossing guard at Handley Middle School and an employee of Defendant.

10. Cottle is male.

11. Beginning with the start of the school year of 2003-2004, Plaintiff was subjected to sexual harassment by Cottle.

12. The harassment occurred through that school year, the school year of 2004-2005, and the fall semester of 2005 until October, approximately one month after Plaintiff filed her EEOC charge.

13. Cottle frequently remarked on Plaintiff's appearance, such as telling her she is pretty and saying "You look good enough to eat this morning."

14. Cottle further frequently asked Plaintiff to go out with him and to "go with" him.

15. Cottle further touched Plaintiff on the cheek, shoulder and hand.

16. Cottle's harassment of Plaintiff occurred on a daily basis.

17. The harassment was very upsetting and distracting to Plaintiff.

18. The harassment further caused Plaintiff to lose satisfaction and enjoyment in her job and made her not want to come to work.

2

19. Further, whereas Plaintiff had been coming to work about fifteen minutes before her scheduled work time started, after the harassment began she started coming in just before her scheduled start time to try to avoid Cottle.

20. Plaintiff's coming to work closer to her start time caused her to be in a rush to get to her post.

21. Plaintiff complained to teachers at the school, the secretary, the counselor, and the assistant principal about the harassment.

22. However, nothing was done about it until Plaintiff filed her EEOC charge.

23. Plaintiff further made efforts to obtain an employee handbook because she had no information as to any policy or reporting procedure of defendant regarding sexual harassment.

24. Plaintiff called the high school for a copy.

25. However, she was not able to get one as the copy there was reportedly packed up in an unknown location.

26. Plaintiff also called Defendant's central office and asked for a copy.

27. However, she was not able to get one as the copy there was reportedly taken apart at the time due to pending revisions.

## IV. CAUSES OF ACTION

### COUNT I

### TITLE VII

28. Paragraphs 1-27 above are incorporated by reference.

3

29. Defendant violated Plaintiff's rights under Title VII by subjecting her to sexual harassment.

30. As a result of the harassment, Plaintiff has been made to suffer emotional distress and mental anguish.

**WHEREFORE, these premises considered,** Plaintiff respectfully requests the following:

(i) That the Court issue an Order declaring that Defendant's acts as described herein violated Title VII;

(ii) That the Court grant Plaintiff a permanent injunction enjoining Defendant, and its agents, employees, successors, and those acting in concert with Defendant from continuing to violate Title VII;

(iii) That the Court enter an Order requiring Defendant to pay Plaintiff compensatory damages as a jury may assess;

(iv) That the Court award such other legal and equitable relief as justice requires, including, but not limited to, an award of costs, attorney's fees, expert witness fees, and expenses.

Respectfully submitted,

Adam M. Porter
Attorney for Plaintiff
Alabama Bar ID: ASB-2472-P75A
2301 Morris Avenue, Suite 102
Birmingham, Alabama 35203
Phone: (205) 322-8999
Facsimile: (205) 322-8915
Email: adamporter@earthlink.net

4

Plaintiff requests trial by struck jury.

_____
Attorney for Plaintiff

Defendant's Address:
Roanoke City Board of Education
c/o Chuck Marcum, Superintendent
557 Main St.
Roanoke, AL 36274

I attended the <u>Sexual Harassment and Special Education Question and Answer</u> workshop, sponsored by Roanoke City Schools and facilitated by Donald L. Sweeney, held February 16, 1998. I was given the opportunity to ask questions and have my questions answered.

Donna Owens
Salva Burn
Pat Robinson
Brenda Weathers
Bobbie Worthy
Shannon Banks
Jeanine Hineman
Sherrie D. Oaks
Kellie Duke
Kimi Smith
Laura Sanders
Hope Caldwell
Marie Smith
Mattie Davis
Eulette Ward
Joy Burgess
Kay C. Pease
Jessie Lancaster
Myla D. Davenport
Anderson Hooker Jr.
Melanie Cooksie
Debra Royston
Sarah Ellen Phillips
Jane Overton
Carolyn Simpson
Jennifer Basarge

Nancy Norton
Pat Allen
Charlotte Ballard
Marsha Fisher
Vera Cooke
Juliette Marshall
Jean Perry
Kelly D. Booker
Earl H. Hambey
Harriet Baker
Felicia M. Lacy
Mary E. Wilson
Barbara Atkins
Angela Pierce
Jamie Lewis
John Frink Houston
James L. Poof
Stanley Allen
Josephine Lane
Brenda Martin
Ada Gilbert
Effie Jean Waller
Sherry Lewis

Don A. Turner
Sherry Yarbrough
Rosemarie Marshall
Chris Martin
Elaine Daniel
Dennis Willing
Mike White
Merredith Sear
Rick Nolen
David Jones
Leeta Tho.
Linda Smith
Sherry Roberts

DEFENDANT'S EXHIBIT
5 - Price

EXHIBIT 3

1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE MIDDLE DISTRICT OF ALABAMA,
 3                 EASTERN DIVISION
 4
 5   ANGELA PRICE,          )
 6        PLAINTIFF,        )
 7   V                     )    CIVIL ACTION NO.
 8   ROANOKE CITY BOARD OF )    3:06-CV-742-VPM
 9   EDUCATION,             )
10        DEFENDANT.        )
11
12        S T I P U L A T I O N
13        IT IS STIPULATED AND AGREED, by
14   and between the parties, through their
15   respective counsel, that the deposition of
16   CHUCK MARCUM may be taken before Deborah
17   Pudles Schaffer, Commissioner and Notary
18   Public, at Handley Middle School, 251 Gilham
19   Road, Roanoke, Alabama, on the 21st day of
20   June, 2007, commencing at 10:10 a.m.
21        IT IS FURTHER STIPULATED AND AGREED
22   that the signature to and reading of the
23   deposition by the witness is waived, the
```

2

```
 1   deposition to have the same force and effect
 2   as if full compliance had been had with all
 3   laws and rules of Court relating to the
 4   taking of depositions.
 5        IT IS FURTHER STIPULATED AND AGREED
 6   that it shall not be necessary for any
 7   objections to be made by counsel to any
 8   questions, except as to form or leading
 9   questions, and that counsel for the parties
10   may make objections and assign grounds at
11   the time of trial or at the time said
12   deposition is offered in evidence, or prior
13   thereto.
14        IT IS FURTHER STIPULATED AND AGREED
15   that notice of filing of the deposition by
16   the Commissioner is waived.
17
18
19
20
21
22
23
```

3

```
 1
 2                 I N D E X
 3   EXAMINATION BY              PAGE NO.
 4   Mr. Porter                  5 - 109
 5
 6
 7        INDEX OF EXHIBITS
 8   PX-1                   10
 9   PX-2                   13
10   PX-3                   15
11   PX-4                   17
12   PX-5 and 6             38
13   PX-7                   75
14   PX-8                   94
15   PX-9                  100
16   PX-10                 101
17
18
19
20
21
22
23
```

4

```
 1
 2   BEFORE:
 3        Deborah Pudles Schaffer,
 4   Commissioner.
 5
 6   APPEARANCES:
 7        Adam M. Porter, Esquire, 2301 Morris
 8   Avenue, Suite 102, Birmingham, Alabama,
 9   35203, appearing on behalf of the Plaintiff.
10        Donald B. Sweeney, Jr., Esquire, of
11   the firm Bradley, Arant, Rose & White,
12   L.L.P., One Federal Place, 1819 5th Avenue
13   North, Birmingham, Alabama, 35203, appearing
14   on behalf of the Defendant.
15        Also present: Angela Price
16
17
18
19
20
21
22
23
```

5

```
1            I, Deborah Pudles Schaffer, a court
2    reporter acting as Notary Public, State of
3    Alabama at Large, certify that on this date,
4    as provided by Rule 30 of the Alabama Rules
5    of Civil Procedure, and the foregoing
6    stipulation of counsel, there came before
7    me at Handley Middle School, 251 Gilham
8    Road, Roanoke, Alabama, beginning at 10:10
9    a.m., ANGELA PRICE, witness in the above
10   cause, for oral examination, whereupon the
11   following proceedings were had:
12
13           THE COURT REPORTER:  Will this be
14   usual stipulations, Mr. Sweeney?
15           MR. SWEENEY:  Usual stipulations.
16
17                  ANGELA PRICE,
18   being first duly sworn, (AFFIRMED), was
19   examined and testified as follows:
20
21   EXAMINATION BY MR. PORTER:
22   Q       Good morning, Mr. Marcum.  My name is
23   Adam Porter.  We have met before.  How are
```

6

```
1    you this morning?
2    A       Fine, sir.
3    Q       Have you ever given a deposition
4    before?
5    A       Yes, sir.
6    Q       How many times?
7    A       This will be my second one.
8    Q       What did, what did the other case
9    involve?
10   A       A legal issue at the high school.
11   Q       Who brought a suit?
12   A       An employee.
13   Q       Okay.  What was the nature of the
14   claim?
15   A       It was a racial case, racial
16   discrimination.
17   Q       Was the plaintiff a present employee?
18   A       Excuse me?
19   Q       Was he already working at the school?
20   A       It was a female that was already
21   working at the school.
22   Q       Was her claim based on a termination
23   of her employment?
```

7

```
1    A       Yes, that's correct.
2    Q       What school did she work at?
3    A       Excuse me?
4    Q       What school did she work at?
5    A       She worked at Handley High School.
6    Q       What was her name?
7    A       Shirley Barnes.
8    Q       Is that Handley High School?
9    A       Yes.
10   Q       So there's a Handley Middle School
11   and High School?
12   A       Yes, sir.
13   Q       Is that named after the Handley
14   family?
15   A       Yes, sir.
16   Q       I'm sorry.  What was her name,
17   Shirley Barnes?
18   A       Shirley Barnes.
19   Q       What was the results of that lawsuit?
20   A       We settled.
21   Q       Do you remember what year it was
22   filed?
23   A       No, sir, I do not recall.  I would
```

8

```
1    have to go back and look.
2    Q       Were you the superintendent at that
3    time?
4    A       I was the principal at the high
5    school when the case started.
6    Q       Was there any allegation made against
7    you in particular?
8    A       It was based, it was brought, the
9    allegation was brought against the school
10   board.
11   Q       Was any allegation made that involved
12   facts directed at you, accusations made
13   against you?
14   A       I'm sorry, I don't understand the
15   question.
16   Q       Well, did she claim that you had
17   discriminated against her in any way?
18   A       The basis of her case is she was
19   non-renewed because of race.  As far as, I
20   think, I don't think it would be correct to
21   say it was against me.  It was against the
22   decision of the non renewer.
23   Q       Okay.  So you're not the one that
```

9

```
1    made the decision not to renew her?
2    A      That's correct, the school board
3    makes the decision.
4    Q      Okay.  Well, let me refresh your
5    memory as to some of the ground rules.
6    You'll need to verbalize all your answers
7    and try to refrain from saying uh-huh or
8    huh-uh.  If you would, let me finish my
9    question before you begin your answer and,
10   so we don't talk over each other, I'll do
11   the same.
12         Sometimes I talk fast, sometimes I
13   mumble and sometimes I do both, so if you
14   don't understand me, please tell me and I
15   will repeat the question or try to rephrase
16   it.
17         If you do answer my question, I'm
18   going to assume that you understood it; is
19   that fair?
20   A      Yes, sir.
21   Q      We're not going to be here long, but
22   if you do need to take a break, you can do
23   so, but if there is a question on the table,
```

10

```
1    I'll ask that you answer it, okay?
2    A      Yes, sir.
3    Q      Are you under any medication today?
4    A      No, sir.
5    Q      So there's nothing that might affect
6    your ability to understand me or give
7    truthful testimony?
8    A      No, sir.
9    Q      Okay.  Let me show you what was
10   marked as Exhibit 1.  Is this a resume that
11   you prepared?
12   A      Yes, sir.
13   Q      Is all the information in it true and
14   correct?
15   A      Yes, sir.
16   Q      Okay.  Are you married?
17   A      Yes, sir.
18   Q      What is your wife's name?
19   A      Kippie, K-i-p-p-i-e.
20   Q      And what was her maiden name?
21   A      Taylor.
22   Q      Did you grow up in Roanoke?
23   A      No, sir.
```

11

```
1    Q      Where did you grow up?
2    A      In Fayette County, Alabama.
3    Q      Did your wife grow up in Roanoke?
4    A      Yes, sir.
5    Q      Okay.  Does she have a lot of family
6    around here?
7    A      Yes, sir.
8          MR. PORTER:  Was Fayette in -- that's
9    the northern district, isn't it?
10         MR. SWEENEY:  Uh-huh.  It's 60 miles
11   north of Tuscaloosa.
12         MR. PORTER:  Yeah.
13   Q      (BY MR. PORTER:)  Does your wife have
14   any adult family in this area who would have
15   a last name other than Taylor?
16   A      None that I can recall, no one that I
17   can think of.
18   Q      Tell me briefly what your duties are
19   as superintendent.
20   A      I'm the chief executive officer for
21   the school board.
22   Q      Okay.  And do you report directly to
23   the board?
```

12

```
1    A      Yes, sir.
2    Q      How many members are there on the
3    board?
4    A      Five.
5    Q      And the board is the ultimate
6    authority?
7    A      Yes, sir.
8    Q      Okay.  And you've been in this
9    position three years?
10   A      Yes, sir.
11   Q      Since '04?
12   A      April the 8th, '04.
13   Q      Who was the superintendent before
14   that?
15   A      Dr. David Roper.
16   Q      When did you first hear about Ms.
17   Price's claim in this case?
18   A      When I received the EEOC complaint
19   which was somewhere in the middle of October
20   of '05.
21   Q      Okay.  I think I have a copy.  I'm
22   not going to make it an exhibit, but I've
23   got one we can use.  Okay.  Is this what
```

13

1    you're talking about?
2    A    Yes, sir.
3    Q    Okay.  Well, I guess I'll go ahead
4    and mark, make that an exhibit.
5         MR. PORTER:  I don't have any copies
6    of this, Donald, I'm sorry.
7    Q    (BY MR. PORTER:)  All right.  Let me
8    ask you this.  Before you saw this document,
9    received this document and read it, you had
10   not heard anything about any complaint that
11   she had about sexual harassment?
12   A    No, sir.  I had not heard anything.
13   Q    Did you know her before then?
14   A    Yes, sir.
15   Q    How did you know her?
16   A    I knew Ms. Price from having two
17   children in the school system.  Her daughter
18   Courtney was a student of mine when I was a
19   classroom teacher and then her son was a
20   student at the high school while I was the
21   principal would be the, the contact I've had
22   with her.
23   Q    Okay.  You never did have any

14

1    involvement with her related to your job as
2    far as supervising her?
3    A    No, sir, not -- while I was the other
4    principal at the high school, she was always
5    here at Handley Middle School and at the
6    time that I've been superintendent she
7    worked here as a crossing guard which is
8    roughly an hour in the morning and a hour in
9    the afternoon, I have not directly observed
10   her.
11   Q    Okay.  And what did you do once you
12   got that charge?
13   A    Well, the next, my recollection I got
14   it in the afternoon and I set up a meeting
15   for the following morning with Mr. Cottle in
16   my office and Mr. Greg Foster the principal
17   of Handley Middle School and I read the
18   complaint as it was written here to Mr.
19   Cottle and asked him to respond to it.
20        Mr. Cottle responded that it was not
21   true.  He was adamant and he denied what was
22   in there and you could tell he was caught
23   off guard by the things that I was saying,

15

1    but he --
2         MR. SWEENEY:  Chuck, if you will,
3    wait until he asks the next question.
4         THE WITNESS:  Okay.  I'm sorry.
5    Q    (BY MR. PORTER:)  Well, you can
6    finish your answer if you're not done.
7    A    I'm done.
8    Q    Okay.  So you brought him in and
9    interviewed him first; is that right?
10   A    That is correct.
11   Q    And Mr. Foster was in there with you?
12   A    Yes, sir.
13   Q    And did you make some notes of that
14   meeting?
15   A    Yes, sir.
16   Q    And did you subsequently meet with
17   other employees including Ms. Price?
18   A    Yes, sir.
19   Q    And did you make notes of your
20   interviews of those people?
21   A    Yes, sir.
22   Q    Okay.  Let me show you what I'm
23   marking as Exhibit 3 to your deposition and

16

1    see if you recognize these?
2    A    Yes.
3    Q    These are notes, and what was the
4    purpose of making these notes?
5    A    As I do with all investigations or
6    matters that come to my hand, come to me, I
7    make notes so that I can go back and refer
8    to those if needed.
9    Q    Do you, do you try to record things
10   that you hear that you think are important?
11   A    That would be correct.
12   Q    Did you have a tape recorder when you
13   were interviewing these people?
14   A    No, sir.
15   Q    Okay.  And we're going to get to
16   these in a minute.  Here's some typed up
17   notes from those interviews.  Do you see
18   these?
19   A    Uh-huh.
20   Q    And we'll go over these in just a
21   second.  Did you draft those up?
22   A    That's correct.
23   Q    Okay.  So and to draft these up, the

17

```
 1    written notes the only information that you
 2    had to go by was your handwritten notes and
 3    your recollection; is that right?
 4    A      Would you repeat, please?
 5    Q      Okay.  Let's try this.  I'm going to
 6    go ahead and mark it.  Here is Exhibit 4.
 7    Take a look at Exhibit 4 and tell me if
 8    these are typed up notes based on your
 9    handwritten notes?
10    A      That would be correct.
11    Q      And did you draft these yourself too?
12    A      Yes, sir.
13    Q      And the information that you had to
14    draft these was limited to your handwritten
15    notes and your independent recollection of
16    those interviews; is that right?
17    A      That would be correct.
18    Q      Can you do me a favor and read the
19    handwritten notes into the record?
20    A      My handwritten notes?
21    Q      Yeah.  Okay.  The first page of the
22    note reads?
23    A      "Mr. Cottle.  10/14/05.  One, read
```

18

```
 1    complaint.  Two, what is your response?"
 2    Quote from Mr. Cottle.  "I don't know what
 3    she is talking about.  I may have told her
 4    she looks nice.
 5           "Has Ms. Price ever told you that you
 6    were making her uncomfortable?"
 7           "No.
 8           "Read Mr. Sweeney's statement."
 9    Q      Okay.  What was Mr. Sweeney's
10    statement?
11    A      Mr. Sweeney's statement was for me
12    to, to make sure that I, what he, my
13    discussion with him, what he advised me to
14    do is make sure I let Mr. Cottle know the
15    serious nature of this offense.
16    Q      Okay.  Is that it?
17    A      Yes.
18    Q      Okay.  Go to the next page, please,
19    and read that.
20    A      "10/14/05.  Ms. Price.  Continued
21    basis for over two years.  Started in 2003.
22    Events in the complaint have happened during
23    this school year."
```

19

```
 1           "Ms. Price:  I've asked him to stop
 2    and he continues.
 3           "J.C.:  You don't like me saying
 4    stuff like this."
 5    Q      Excuse me.  Does J.C. refer to Mr.
 6    Cottle?
 7    A      Yes, sir.
 8    Q      Okay.  Go ahead.
 9    A      "A.P.:  No, I don't.  He just
10    laughed."
11    Q      And A.P. refers to Ms. Price?
12    A      That's correct.
13    Q      Okay.
14    A      "Counselor was Ms. Hare, was
15    counselor, Ms. Hunter and Ms. Clark.
16           "C.M.:  Any other teachers?
17    Q      C.M. means you?
18    A      Correct.
19    Q      So that's you asking her?
20    Q      Yes.
21    Q      Okay.  Go ahead.
22    A      "A.P.:  None that I'm aware."
23    Q      Okay.  Next page.
```

20

```
 1    A      "C.R.M.:  Was assistant principal
 2    Ms. Benefield?"
 3    Q      Is C.R.M. you?
 4    A      That's correct.
 5    Q      Okay.
 6    A      "A.P.:  She was in the upper part of
 7    office when being discussed, I can't say she
 8    heard but she was there.  Ms. Marshall and
 9    Yarbrough are aware of it.
10           "C.M.:  Have you spoke with Mr.
11    Foster?"
12           "A.P.:  No.  I was not sure which
13    channels to follow since a handbook is the,
14    is the reason I did not follow proper
15    channels."
16    Q      Well, hold on.  Excuse me.  But you
17    left out a little part above that.
18    A      Yeah, I was going to try --
19    Q      It says, "To give hold off," I think.
20    A      Let me see.  Let me start over with
21    that.        "I was not sure which channels
22    to follow since a handbook unable to get
23    ahold off is the reason I did not follow
```

21

1    proper channels. H.M.S. is packed up.
2    H.H.S. was unable to find."
3    Q     And who is HMS?
4    A     HMS would been Handley Middle School.
5    Q     And HHS?
6    A     Handley High School.
7    Q     Okay.  Go ahead.
8    A     "I then called central office, Ms.
9    McKinney told me to talk with C.F.M."
10   C.F.M. would be Chris, Ms. Chris Martin.
11   Q     What is Ms. Martin's position?
12   A     She's my secretary.
13   Q     Okay.
14   A     "C.F.M. said it was all torn apart
15   because it is being revised."
16   Q     Now, that's Ms. Price saying that
17   C.F.M. said that, right?
18   A     Yeah.
19   Q     Okay.  And then there was some
20   reference to me.
21   A     "Adam Porter attorney in Birmingham."
22   Q     Okay.
23   A     Next page.

22

1    Q     The next page.
2    A     "Ms. Clark:  C.R.M..." --
3    Q     Excuse me.  This is your interview
4    with Ms. Clark; is that right?
5    A     Correct.
6    Q     Okay.
7    A     "C.R.M.:  Are you aware of any
8    harassment or anything involving Angela
9    Price and -- or A. Price and J. Cottle?
10        "T.C.:  No, I'm not aware of
11   anything.
12        "C.R.M.:  Have you noticed asking
13   inappropriate -- have you noticed anything
14   inappropriate with Mr. Cottle sexually
15   harassing or saying anything out of the way
16   to Ms. Price?
17        "T.C.:  No.  I've seen them talking
18   but not aware of anything out of the way.
19        "C.R.M.:  Any previous years have you
20   remembered anything?"
21        It says that she does not, she said,
22   she said she does get to work later.
23        "T.C.:  No.

23

1        "T.C.:  I have heard him use
2    curse..." --
3    Q     And then the bottom part is cut off.
4    Okay.
5    A     The next page.
6        "It did not look like anyone was
7    uncomfortable with the conversation.  It
8    looked like a friendly conversation.
9        "T.C.:  Have not heard A. Price use
10   curse words.
11        "C.R.M.:  What were curse words?
12        "T.C.:  Goddamn.
13        "C.R.M.:  Anything sexual in nature?
14        "T.C.:  No.
15        Greg Foster.
16        "G.F.:  Where does she..."
17   No, Price written above it, "direct
18   traffic.
19        "T.C.: In front of the building.
20        "G.F.:  When did you see them
21   talking?
22        "T.C.:  They were propped up on his
23   truck."

24

1        Next page.  "10/14/05.  Ms. Hunter.
2        "C.R.M.:  See T.C. question.
3        "T.H.:  Ms. Price has mentioned that
4    she is uncomfortable with him talking to
5    me.  I'm not sure what the reason for the
6    uncomfortableness was.
7        "C.M.:  When did she..." Price
8    written above it "...tell you this?
9        "T.H.:  It was last school year
10   towards the end of the year.
11        "C.R.M.:  What about the present
12   school year?
13        "T.H.:  I remember one time she
14   mentioned to me that she was coming in the
15   school to get, to go to the bathroom to get
16   away from Mr. Cottle.
17        "C.R.M.:  Have you witnessed anything
18   personally on, from A.P.?
19        "T.H.:  Last year I noticed him
20   walking out to her car while she was reading
21   and talking to him.  This year I have
22   noticed them standing talking out front.
23        "C.R.M.:  Has A.P. ever mentioned

PRICE V ROANOKE CITY BO. OF ED.              CHUCK MARCUM

25

1    being sexually harassed by Mr. Cottle?
2         "T.H.:  No.
3         "Greg Foster.  Question," three
4    question marks.
5         "Have you seen him talking to her in
6    a central location?
7         "No," asterisk.  "I'm not sure what
8    Greg, G.F. is asking.
9         "C.R.M.:  Anything else?
10        "T.H.:  Last year it seemed to
11   through observation that she was trying to
12   ignore him while she was reading.  She did
13   not tell me that but that was my
14   perception.
15        "Ms. Marshall.  10/14/05.  C.R.M. see
16   T.C. question mark.
17        "A.M.:  She has said something in
18   office and I did not believe it.  I
19   witnessed her driving up and talking to Mr.
20   Cottle.  Mr. Cottle would then walk to car.
21   Example..." EX.  "Last year she said that
22   Mr. Cottle had asked her to go to Florida
23   but that very same evening I saw her drive

26

1    up to him talking so I did not believe it.
2    This year was when she mentioned sexual
3    harassment.
4         "C.R.M.:  Explain sexual harassment.
5    I was just walking through.  I don't think,
6    I think..." I think that goes with the next
7    sentence.
8         "I was just walking through the
9    office and heard her talking.  I said that I
10   don't think would, would not be a good
11   idea.
12        "If anything, I've seen her initiate
13   talking with him more than him with her.
14   Lots of time I've seen her where he is."
15        The next page.  A.M. added.
16        "A.P.:  Had also made comments about
17   Mr. Overton.  I didn't believe that then and
18   I don't now.  She likes to be thought of as
19   good looking and likes the attention.
20        "C.R.M.:  Only time about sexual
21   harassment.
22        "A.M.:  That was the only time that I
23   heard sexual harassment and filing a suit.

27

1         "C.R.M.:  Has she asked about
2    handbook?
3         "A.M.:  She asked about a policy, not
4    a handbook.  She then got a student
5    handbook.
6         "Greg Foster:  This year and past
7    talking to him.
8         "A.M.:  Yes.
9         "Ms. Yarbrough.  10/26/05. Ms.
10   Benefield.
11        "Anything going on between Price and
12   Cottle?
13        "S.Y.:  About a year ago she, he had
14   asked her if she wanted to go to Florida.
15        "S.Y.:  Mr. Cottle flirting with her.
16        "C.M.:  Was this last year?
17        "S.Y.:  Yes, I don't recall anything
18   being said this year.
19        "S.Y.:  I do, I do remember seeing
20   her going to where he was talking to him
21   after she had complained in the office.  She
22   went to his post.
23        "C.M.:  Anything this year?

28

1         "I don't remember anything this
2    year."
3    Q    Okay.  Now, at the top of that last
4    page where you have Ms. Benefield in
5    parentheses, what does that mean?
6    A    I think I would I need to go back to
7    refer to my other notes.  My recollection is
8    that Ms. Benefield is the one that sat in.
9    In all of these interviews, I made sure I
10   had a witnesses present, either Mr. Foster
11   and Ms. Benefield or either Mr. Foster or
12   Ms. Benefield.  I think Ms. Benefield is
13   going to be in the meeting with Ms.
14   Yarbrough.
15   Q    Okay.  What I'd like for you to do
16   now is read through Exhibit 4, the typed up
17   one, just read it to yourself and let me
18   know if there's anything in it that is
19   inaccurate to the best of your
20   recollection.  When I say "inaccurate," I
21   don't mean the substance of it that the
22   person didn't say.  Does that make sense to
23   you?

29

1    A    Say it against, please.
2    Q    For example where Ms. Price says that
3    Mr. Cottle made inappropriate remarks, that
4    may be disputed.  I'm not asking you if the
5    remark were actually made, but did Ms. Price
6    actually say that as reflected in the notes?
7    Now, do you see what I mean?
8    A    So what you're asking me is, are the
9    things that's in this note accurate as to
10   what happened in the meeting?
11   Q    As to what was said, yes.
12   A    That would be correct.  Let me read
13   through them.  Mr. Porter, for my
14   clarification, will you ask me the question
15   again where I can answer it.
16   Q    Yeah.  Are these, are these notes --
17   did you draft these up yourself?
18   A    That's correct.
19   Q    Okay.  Do they accurately reflect
20   what was said in these meetings?
21   A    Yes, sir.
22   Q    Okay.  Now, there are some things
23   attributed to people in the typed up notes

30

1    that are not in the handwritten notes.
2    Would you agree with me about that?
3    A    I would agree that the typed up notes
4    are more detailed.  The other is, is just my
5    notes as I was doing the interview.
6    Q    Okay.  For example in the first page
7    on the handwritten notes of Mr. Cottle where
8    it says what is your response, and in the
9    handwritten notes it says, "I don't know
10   what she is talking about.  I may have told
11   her she looks nice."
12        In the typed up notes it repeats that
13   then, but then it says, quote, but never any
14   sexual harassment.
15        Why don't you have that in your
16   handwritten notes?
17   A    Because that is, that is something
18   that I recall from the, the meeting.  I
19   didn't transcribe everything into my
20   handwritten notes that was said during the
21   meeting.  These typed notes are based on my
22   handwritten notes and recollection of things
23   that I recall had from the meeting.

31

1    Q    Okay.  You're sure that he said that,
2    you just didn't put it in your handwritten
3    notes?
4    A    I'm -- yes, sir, he said that several
5    times.
6    Q    Okay.  The same thing with regard to
7    on page 3 of the typed up notes at the top
8    regarding the interview with Ms. Price.  It
9    says Ms. Benefield interjected, "You have
10   never told me any of this before," and I
11   don't see any reference to Ms. Benefield
12   having said that in your handwritten notes
13   regarding the interview of Ms. Price.
14   A    Okay.  So what's the, what's the
15   question?
16   Q    Is that, is the same reason why you
17   don't have that in your handwritten notes?
18   A    The same reason would be that these
19   notes are based on recollection and my
20   notes, were just notes that were taken on
21   the fly as I was doing the interview.
22   Q    All right.  So these are, the typed
23   up ones are more accurate about what was

32

1    said?
2    A    They go in more detail, yes.
3    Q    All right.  Do you recall anybody
4    saying anything that was of significance to
5    you that you don't have in your typed up
6    notes?
7    A    I don't recall anything being said.
8    Q    And what did you do after you
9    interviewed the people and drafted those
10   notes?
11   A    Would, would you be more specific or
12   explain -- rephrase the question because
13   that's --
14   Q    Well, did you do anything further in
15   the investigation of the charge?
16   A    It would be correct to say initially
17   that's all I did, but later on there's, Ms.
18   Price will have a meeting later where she
19   will bring more witnesses that will
20   corroborate her allegations and I'll go
21   interview those later.
22   Q    Okay.  I don't want you to tell me
23   about the substance of any conversations

33

1    with the board's attorney, but did he get
2    involved in the, in this initial phase of
3    the investigation that we've been
4    discussing?
5    A      What do you mean by the work
6    involved?  What, what do you --
7    Q      Did he sit in on interviews?
8    A      No, sir.
9    Q      Okay.  Did you consult with him about
10   what, how to conduct the interview?
11   A      Yes.
12   Q      Okay.  And so the next thing that you
13   recall doing with regard to the
14   investigation was when Ms. Price came
15   forward with some new witnesses; is that
16   right?
17   A      I think, my recollection, that would
18   be correct.
19   Q      I assume that you turned over the
20   handwritten notes and the typed up notes to
21   Mr. Sweeney; is that right?
22   A      That's correct.
23   Q      Okay.  And then the next thing is

34

1    your involvement with these new witnesses;
2    is that right, that's the next thing that
3    you did?
4    A      As I recall, yes.
5    Q      Do you recall when that was?
6    A      When was that?
7    Q      When did you, when did Ms. Price come
8    to you with these new witnesses?
9    A      It would be in the summer of '06.
10   Q      Okay.  The first meeting was in
11   October of '05; is that right?
12   A      That's correct.
13   Q      Okay.  Tell me about that.
14   A      About what?
15   Q      Well, I mean, did she call you on the
16   phone and say I've got new witnesses or
17   what?
18   A      She came to my office.
19   Q      Okay.
20   A      In the summer of '06.
21   Q      Did she have the people with her?
22   A      Excuse me.
23   Q      Did she have the people with her?

35

1    A      What people?
2    Q      These new witnesses?
3    A      No.
4    Q      Okay.
5    A      No.
6    Q      Tell me what was discussed?
7    A      What I remember from that meeting was
8    Ms. Price came to the meeting, it was
9    evident that she had through you or through
10   her lawyer had got transcripts from the
11   witnesses that we had interviewed earlier
12   because she wanted to let me know that what
13   she was saying was true.
14   Q      You're talking about these notes?
15   A      (Nods head affirmatively.)
16   Q      Is that a yes?
17   A      That would be yes.
18   Q      Okay.  So --
19   A      That's my -- let me rephrase.  That's
20   my opinion that she had that because she was
21   discussing some things that I think that's
22   the only way she would have known either
23   through looking at the notes or through

36

1    conversations with you through discovery or
2    whatever that you had gotten.
3    Q      Okay.  And so what did she say?
4    A      Let me know that her charges were,
5    that the things that she was saying was true
6    and that she had a tape that she wanted to
7    play for me that would prove her accusations
8    that, that those were, the things that she
9    was saying were true and she had other
10   teachers that could verify the things that
11   she was saying and she gave me those names
12   and people and --
13   Q      Do you remember who they were?
14   A      I recall, some I do recall, there's a
15   Ms. Delilah Harmon.  I know I interviewed
16   Susan Hare, but I would have to go back and
17   refer to notes of whether that came out of
18   that meeting or a previous meeting.  Susan
19   Hare was a former counselor, but I remember
20   Ms. Harmon, Angela Harmon was one of the
21   names that come out of that and I also would
22   interview Donna Stephens and Harriet Jones
23   and as far as recollection, I don't know if

37

1    that came out my meeting with Ms. Price or
2    through witnesses on that witness list that
3    was sent.
4    Q       Did you make notes of your interview
5    with these people?
6    A       With the ones I interviewed?
7    Q       Yeah.  Delilah Harmon, Susan Hare,
8    Angela Harmon and Donna Stephens and Harriet
9    Jones?
10   A       Yes.
11   Q       Where are those notes?
12   A       What do you mean?
13   Q       Do you still have them?
14   A       Yes.
15   Q       Where are they?
16   A       I guess in my office.
17   Q       Have you ever turned them over to the
18   board's lawyer?
19   A       I don't know.
20           MR. PORTER:   Let's go off the
21   record.
22                   (Whereupon, an off-the-
23                   record discussion and

38

1                    short recess was had.)
2    Q       (BY MR. PORTER:)  Are these
3    handwritten notes what you base the typed --
4    A       (Nods head affirmatively.)
5    Q       Do you have an extra copy I can keep?
6    A       They're yours.  That's yours.
7    Q       Okay.  I'll tell you what, do you
8    have one to make an exhibit out of?
9            MR. SWEENEY:  We'll make a copy.  Why
10   don't we just go ahead.
11           MR. PORTER:  All right.  I'll go
12   ahead and mark it.  What are we on?  5?
13                   (Whereupon, an off-the-
14                   record discussion was had.)
15   Q       (BY MR. PORTER:)  Okay.  Let me show
16   you what I've marked as Exhibits 5 and 6.  5
17   is handwritten notes you made of interviews
18   you conducted of people after Ms. Price told
19   you she had some new witnesses; is that
20   correct?
21   A       Correct.
22   Q       And 6 are some typed up notes that
23   you made based on --

39

1    A       Let me rephrase.
2    Q       Go ahead.
3    A       Because I don't, either they were
4    either through new witnesses that Ms. Price
5    had brought to my attention or the witness
6    list that you had sent out that people may
7    be deposed of.
8    Q       Okay.  The disclosures?
9    A       Disclosures.
10   Q       Okay.  And Exhibit 6 is your typed up
11   notes based on your handwritten notes
12   Exhibit 5, right?
13   A       That's correct.
14   Q       And so Exhibit 6 may have information
15   based on your own independent recollection
16   of the interviews?
17   A       That would be correct.
18   Q       Okay.  You mentioned in the notes
19   that Ms. Price came to you and talked about
20   the tape?
21   A       (Nods head affirmatively.)
22   Q       Is that right?
23   A       That's correct.

40

1    Q       Do you remember -- when was that?
2    A       It was in the summer of '06.  The
3    best of my recollection, it was June, June
4    of '06.
5    Q       And according to your notes she said
6    something about taking the tape to Mr.
7    Cottle's wife?
8    A       That's correct.
9    Q       What did she say?
10   A       She told me that she was going to
11   take them to his wife.
12   Q       And what did you say?
13   A       That that's her business.
14   Q       Right.
15   A       That's not a school matter.  I'd have
16   to, I can't control whether she does or does
17   not.
18   Q       Did you telephone Mrs. Cottle and
19   tell her that?
20   A       No, I did not.
21   Q       Did you tell Mr. Cottle that?
22   A       In her, I had a follow-up meeting
23   with Mr. Cottle with Mr. Foster present and

41

1    asked him was there going to be anything on
2    those tapes that would substantiate her
3    charges.
4          He said they were not and I told him
5    that he was going, that Ms. Price said that
6    she was going to take them, take those tapes
7    to his wife.
8    Q     Okay.  Did you ever have any
9    conversation with his wife?
10   A     Yes.  She came to my office.
11   Q     When was that?
12   A     Sometime in that same time period
13   after the meeting with Mr. Cottle.
14   Q     Last summer?
15   A     Yeah, the summer '06.
16   Q     Okay.  And tell me what was said in
17   meeting.
18   A     Well, basically, she was upset and,
19   about these allegations about her husband
20   and the tapes and I told her I couldn't
21   discuss the case with her, I was not going
22   to, but basically I listened and the gist of
23   her that she was going to get a lawyer and

42

1    she was going to sue.  She was going to
2    countersue Ms. Price and once again I told
3    her, as I told Mr. Cottle when he said the
4    same thing earlier, that's their decision.
5    I can't control that, that's not a school
6    matter.
7    Q     So you didn't say anything about the
8    substantive claim?
9    A     No.
10   Q     Did you say anything to her about Ms.
11   Price having said that she was going to take
12   the tape to her?
13   A     Repeat, please.
14   Q     Did you say anything to Mrs. Cottle
15   about Ms. Price having said that she was
16   going to take the tape to her?
17   A     Mr. Cottle had told her.  I didn't
18   tell her.
19   Q     You didn't say anything to her about
20   that?
21   A     Mrs. Cottle brought it to my
22   attention.
23   Q     Who?

43

1    A     Mrs. Cottle.  The wife, Mrs. Cottle.
2    Q     Brought what to your attention?
3    A     That Mr. Cottle told her that there
4    was some tapes and he said he's fine with
5    the tapes, he wanted them --
6    Q     Okay.
7    A     -- to be transcribed.
8    Q     But you didn't say anything to her
9    about that?
10   A     No.
11   Q     Okay.  So that's in last summer,
12   right?
13   A     The summer of '06.
14   Q     And did you have any other
15   conversations with Ms. Price?
16   A     No.
17   Q     Did you have any other involvement in
18   the investigation of this?
19   A     Explain to me what you mean by other
20   involvement, other than talking to Ms. Price
21   or --
22   Q     Well, other than what you've already
23   told me.

44

1          MR. SWEENEY:  Object to the form.  I
2    don't understand the question.
3    Q     (BY MR. PORTER:)  Did you have any
4    other involvement in any investigation into
5    her claim other than what you've told me?
6    A     Other than my interviewing the
7    witnesses that she had brought to my
8    attention and the ones that was on the
9    disclosure list?
10   Q     Yeah.  What you've already told me
11   about.
12         MR. SWEENEY:  Object to the form.
13         THE WITNESS:  Nothing I can recall.
14   Q     (BY MR. PORTER:)  Did y'all make some
15   sort of a determination, I mean independent
16   of the EEOC, did y'all make a determination
17   on your own as to whether or not there was
18   validity to the claim?
19   A     Explain to me -- re, rephrase.
20   Q     Well, generally when you get a
21   complaint of harassment, whose job is it to
22   investigate it, assuming it comes from an
23   employee, not a student?

45

1    A       If the job is investigated, if the
2    employee deems that it's necessary as to
3    take it to the, according to board policy is
4    take it to our Title IX coordinator.
5    Q       Who is that?
6    A       It's Donna Hodges.
7    Q       So would she, did she get involved in
8    the investigation of Ms. Price's complaint?
9    A       No.
10   Q       Why not?
11   A       Because Ms. Price did not follow
12   board procedures and take it to the Title IX
13   coordinator.
14   Q       So that's why you did the
15   investigation?
16   A       The reason I got involved in the
17   investigation is because the EEOC complaint
18   came to me.
19   Q       Okay.
20   A       And that was not Ms. Price bringing
21   it to me, it was the EEOC.
22   Q       Okay.  So your efforts and your, the
23   investigation that you did was only to

46

1    respond to the EEOC charge?
2    A       I wouldn't agree with that phrasing
3    that it was, we're not going to tolerate
4    sexual harassment in Roanoke City Schools --
5    Q       Okay.
6    A       -- so, yes, I'm, I am addressing
7    that complaint, but also I want to, if
8    there's action that needs to be taken, then,
9    then we're going to take it.
10   Q       Okay.  That comes back to my question
11   I had.  Did you ever make a determination as
12   to whether or not there was any validity to
13   her claim?
14   A       Rephrase, please.
15   Q       Did you ever make a determination as
16   to whether there was any validity to her
17   claim?
18   A       Okay.  Are you asking me to make that
19   determination now --
20   Q       No.
21   A       -- or when the claim was brought to
22   me?
23   Q       At any time.  You said that if there

47

1    is harassment going on, you want to stop it
2    and take steps, right?  Is that right?
3    A       That would be correct.
4    Q       So in this case involving Ms. Price's
5    claim, did you ever make a determination as
6    to whether or not there was any validity to
7    her claim?
8    A       Well, I'm still having trouble
9    understanding what you want me to -- if
10   you're asking me at the beginning did I, did
11   I, was I determined or where I am now,
12   that's two different, when you say any, are
13   you asking at the beginning or now?
14   Q       At any time.
15   A       At any time.  So any time would
16   include present time?
17   Q       Yeah?
18   A       Today?  Well, I, my opinion or my
19   validity is based on the facts.  I have to
20   go where the facts are.
21   Q       Okay.
22   A       And where the facts are with me on
23   6/21/06 is that I have not been able to

48

1    substantiate any of the accusations or
2    allegations that Ms. Price has made.
3    Q       Okay.  So you recall back in June of
4    '06 concluding that you could not
5    substantiate the allegations?
6    A       No, June -- no.  I'm talking about
7    June of '07.
8    Q       Oh, I thought you said June of '06.
9    A       '07.  I'm talking about where, if I
10   did, I misspoke, please correct me.  That's
11   why I'm having, I want to make sure I'm
12   answering your question correctly.
13       If we're talking about here in '07
14   where I, what I know now as compared to what
15   I knew in October of '05 because you used
16   the word any and that's why I want to make
17   sure I'm answering your question correctly.
18   Q       Okay.  Let's try it this way.  After
19   you interviewed the people in October of
20   '05, and we've looked at those notes, did
21   you make a determination as to whether or
22   not there was any validity of claim?
23   A       No, sir, I did not make the

49

1    determination at that time because I hadn't
2    had a chance to do the investigation.
3    Q        Well, who else did you think that you
4    needed to talk to after you interviewed the
5    people reflected in your notes?
6    A        Now, as I'm answering this question
7    the way, is when I completed my initial
8    interview with Mr. Cottle and with Ms. Price
9    that's when I, I have not made the
10   determination, I've got to go to where the
11   facts are, then I go set forth interviewing
12   the people that she has given to me as the
13   people that will corroborate her testimony.
14   Q        And are all of those people included
15   in the notes reflected in Exhibits 3 and 4
16   that we've looked at?
17   A        The question again, please.
18   Q        Are all those people that you're
19   referring to, the witnesses included in the
20   notes in Exhibits 3 and 4?
21   A        That I interviewed in -- are you
22   asking me are those the ones I interviewed
23   in the initial phase of the investigation.

50

1    Q        Yeah, that would be Tina Clark,
2    Teresa  Hunter, Rosemarie Marshall, Sharon
3    Yarbrough.
4    A        That would be correct in the initial
5    phase, yes.
6    Q        All right.  Those were all of the
7    witnesses that you knew of at that time; is
8    that right?
9    A        That's correct.
10   Q        All right.  So after you interviewed
11   those witnesses, did you make the
12   determination about whether or not there was
13   any validity to her claim?
14   A        At that time based upon the evidence
15   I had, I had serious doubts as to whether
16   there was any validity to it as far as
17   making a final determination.  It's not
18   closed.  If something else were to be
19   discovered later or whatever, but we had put
20   in steps, effective steps to make sure that
21   if anything was happening it was not going
22   to continue because of what I told Mr.
23   Cottle that he would have no contact

51

1    whatsoever with Ms. Price and if his job
2    required them to have contact, he was only
3    to do that in the presence of Mr. Foster or
4    Ms. Benefield.
5    Q        Okay.
6    A        So that's our initial, because
7    there's a lot of different tracks with this,
8    that's the initial one as we continue on,
9    and then my directive to Mr. Cottle was the
10   initial step in the process to, that to have
11   no contact with her.
12   Q        Had -- go ahead.
13   A        That would be the initial step and
14   process and then as we continued the
15   investigation.  I'm not here to pass
16   judgment on Ms. Price that maybe she
17   misunderstood something that Mr. Cottle and
18   the actions done or what he said or
19   whatever, but all I can go on is the facts
20   and try to remove the subjectivity out of
21   it and just go with what the people, and the
22   only people that I interviewed was the names
23   that she gave me.  I didn't interview anyone

52

1    else and no one would corroborate that.
2    Q        Well, there was some corroborations
3    from a few of the people, weren't there?
4    A        I would not agree with that.  No one
5    will corroborate that Ms. Price ever came to
6    them saying that she had been sexually
7    harassed.
8    Q        Did Ms. Hunter state that Ms. Price
9    told her that she was uncomfortable around
10   Mr. Cottle?
11   A        Which one are you referring to,
12   please?
13   Q        Ms. Hunter.
14   A        What page would that be?
15   Q        Your interview with Ms. Hunter.  The
16   typed up notes --
17   A        What --
18   Q        -- Exhibit 3.  If you look at the
19   bottom it's got the Bates page numbers on
20   it.  It's number 7.
21   A        Okay.  Now, would you ask your
22   question.
23   Q        Did Ms. Hunter state that Ms. Price

53

1   had told her that she was uncomfortable
2   talking to him?
3   A        Uncomfortable is not the same thing
4   as sexual harassment.
5   Q        I didn't ask you about that.  I just
6   said uncomfortable, okay.  Did she say that?
7   A        Would you ask the question, again,
8   please.
9   Q        Did Ms. Hunter say that Ms. Price had
10  told her that she was uncomfortable talking
11  to him?
12  A        That's correct.
13  Q        Did she say that Ms. Price told her
14  that she would come into the school to go to
15  the bathroom to get away from him?
16  A        That's correct.
17  Q        At the bottom there does it say that
18  she, that Ms. Hunter said that she herself
19  observed that Ms. Price appeared to be
20  trying to ignore him?
21  A        That's correct.
22  Q        And go to the next page.  Did Ms.
23  Marshall say in your interview that Mr.

54

1   Cottle, that Ms. Price had told her that Mr.
2   Cottle had asked her to go to Florida with
3   him?
4   A        That is correct.
5   Q        And did Ms. Marshall say that Ms.
6   Price mentioned sexual harassment?
7   A        Yes, that's correct.
8   Q        You don't think those statement would
9   tend to corroborate her claims?
10  A        No, I don't because none of those
11  people, because you're just taking parts of
12  it out, also I would go back and ask each
13  one of them during the questioning had a,
14  questions about sexual harassment and they
15  would say no, and --
16  Q        You asked them had they observed it,
17  right?
18  A        Uh-huh.
19  Q        The question that I just went over
20  were things Ms. Price told them?
21  A        Well, Ms. Price telling them does not
22  constitute them being sexual harassment.
23  Q        So you concluded that Ms. Price was

55

1   lying?
2   A        I am not concluding that.  What I'm
3   saying is that there's nothing through my
4   interview with any of these people, that
5   would back up the statements that she, that
6   sexual harassment was taking place and also
7   all of these people, none of these were her
8   supervisors.  One is a secretary out in the
9   office who just overheard conversations here
10  where the text of this is where it come
11  from, she was overhearing conversation that
12  was in the office, not that Ms. Price had
13  come to her to tell her this.
14           Ms. Hunter is a teacher, a special
15  education teacher in the building, not an
16  administrator.
17  Q        I move to strike as nonresponsive.
18  When Ms. Price, if she were sick, who would
19  she call and tell I'm sick, I'm not coming
20  to work today?
21  A        The middle school office.  I'm not
22  exactly sure the, now Mr. Foster and their
23  procedures, what their exact procedures are,

56

1   but you would call here at the Handley
2   Middle School.
3   Q        You don't know?
4   A        I don't know.
5   Q        Who was her supervisor?
6   A        Her supervisor?
7   Q        Uh-huh.
8   A        The building administrators are Greg
9   Foster the principal and Robbie Benefield
10  the assistant principal.
11  Q        Who is the, who is the building
12  administrator?
13  A        Building, Mr. Greg Foster.
14  Q        And he's the administrator and the
15  principal?
16  A        He's the principal, yeah.
17  Q        Okay.  Is there some sort of document
18  that designates him as her supervisor,
19  organizational chart or something?
20  A        We have a chain of command, if that's
21  what you're asking as far as the
22  organizational breakdown of the school, yes.
23  Q        There's a document that shows that?

57

1   A       Yes.
2   Q       It's going to have a square with Mr.
3   Foster's name and a line going down to Ms.
4   Price?
5   A       Yes.
6   Q       Where is that?
7   A       I don't have that.
8   Q       But you've seen it?
9   A       We have an organizational chart of
10  Roanoke City Schools, it has a
11  superintendent, the school board at the top
12  and it breaks down as far as a calling tree
13  that we have to, for employees.
14  Q       Does it go down to the level of
15  crossing guard?
16  A       I don't know.
17  Q       Okay.  So after you interviewed these
18  people in October, you determined the claims
19  were unsubstantiated, right?
20  A       That would be correct.
21  Q       Okay.  And I take it no disciplinary
22  action was taken against Mr. Cottle?
23  A       I wouldn't -- yes, there had been in

58

1   that Mr. Cottle was told not to have any
2   contact, he, with Ms. Price and that, and I,
3   and I said in that meeting with him with Mr.
4   Foster present that any contact with Ms.
5   Price would be, be considered
6   insubordination, so --
7   Q       But the instruction for him not to
8   have that interaction with Ms. Price unless
9   under the circumstances you mentioned, that
10  that was not a disciplinary action, was it?
11  A       I would, I would disagree.  I would
12  say that it was in that you're limiting
13  someone's access to someone else.  If you
14  put some restraints on them that I haven't
15  put on other people in this building.
16  Q       So you call that a verbal warning?
17  A       I would call it a direction.
18  Q       Does the --
19  A       Directive.
20  Q       Does the board have a progressive
21  disciplinary policy?
22  A       Not a written policy, no,
23  sir.

59

1   Q       Do you know, do you have an
2   understanding of what that term means?
3   A       Yes.
4   Q       What does it mean to you?
5   A       That you start out with some initial
6   disciplinary action and then if you have
7   further consequences along those same lines,
8   you would go to another step.
9   Q       Okay.  You generally start maybe with
10  a verbal warning and then go to a written
11  warning?
12  A       That could be a possibility, yes.
13  Q       And does the board have a policy of
14  going through steps like you're referring
15  to?
16  A       For -- if you're asking me do we have
17  a written progressive disciplinary policy,
18  the answer is no.
19  Q       Is there a policy or practice, maybe,
20  that's not written where you follow steps
21  like we're talking about?
22  A       Yes, when you're dealing with the
23  situation, you take the totality of the

60

1   situation, and I think that's what you're
2   asking me and make the, and use your
3   professional discretion to make the best
4   decision that you can make based upon the
5   facts that you have.
6   Q       Okay.  When is the last time somebody
7   was terminated?
8   A       Terminated as in non renewed or
9   terminated as a tenured employee as being
10  released?
11  Q       Non-tenured.
12  A       Rephrase, please.
13  Q       Okay.  Let's see.  Who is tenured?
14  A       Excuse me?
15  Q       Who is tenured?  What positions are
16  tenured?
17  A       Anyone that's rehired for a fourth
18  year is put on continuing service.
19  Q       All right.  What does it take to
20  terminate them?
21  A       Once they, continuing service has
22  been granted?
23  Q       Yes.

61

1    A      Well, first I would consult with my
2    attorney because those laws have changed
3    over the past two years with the Fair
4    Dismissal Act but there are steps that you
5    have to go through that's by state law.
6    Q      Do crossing guards fall under that
7    law?
8           MR. SWEENEY:  I don't think so.
9    She's not a full-time employee.
10          THE WITNESS:  She's less than twenty
11   hours a week so she wouldn't be full-time.
12   Q      (BY MR. PORTER:)  Okay.  With regard
13   to people who don't fall under that law, do
14   you have progressive discipline for them?
15   A      If you're asking me do we have a
16   written policy of progressive discipline,
17   the answer is no.
18   Q      No, I'm not asking you if it's
19   written down.  Is it a practice maybe that
20   has been used over the years?
21   A      Well, you, if you're asking me with
22   anyone if we want to follow progressive
23   discipline if the situation arises, yes,

62

1    that would be correct.
2    Q      You have this progressive that we've
3    talked about in the first step and then the
4    second step is more serious, that sort of
5    thing?
6    A      Not a written policy.
7    Q      I know, but a practice?
8    A      A practice, yes.
9    Q      Would you consider what was done to
10   Mr. Cottle to be the first step in that
11   practice?
12   A      I think the first, what we done with
13   Mr. Cottle was preventive step.  I wouldn't
14   go as far as saying it was the first step
15   put in that practice because then that would
16   be saying that I was taking Ms. Price's word
17   over Mr. Cottle's word because Mr. Cottle
18   says it didn't happen.  Ms. Price says that
19   it did happen, so in my position I've got a
20   he said she said and I've got to go with the
21   facts, but I'm taking preventative measures
22   as we go through it as I would do in other
23   situations that so, just to be, to be an act

63

1    rather than a reactor, but to say that that
2    was done as a discipline, as a first step
3    toward Mr. Cottle, no, that wasn't the
4    reason it was done.
5    Q      All right.  So what you did was a
6    preventative measure and not a disciplinary
7    action; is that correct?
8    A      Well, I know I said earlier that we
9    did, that he is limited and I construed that
10   to be a type of a disciplinary action, but
11   having said that I don't want, we didn't do
12   it, I didn't do it on the basis that I was
13   assigning guilt to Mr. Cottle.
14          I did it on the basis to be
15   preventative and this is a serious charge
16   and we're not going, we won't tolerate that
17   in Roanoke City Schools, so we're taking the
18   first step toward making that, making sure
19   that's not going to happen.
20   Q      To your knowledge, has any other
21   employee made an allegation that Mr. Cottle
22   made any inappropriate remarks to them?
23   A      No, sir.

64

1    Q      Okay.  Has he ever been given any
2    training in sexual harassment?
3    A      Yes.
4    Q      When was that?
5    A      We have different seminars and
6    in-service professional development
7    activities too that I, two of which that I
8    recall.  Mr. Sweeney has done one in the
9    past and also Dr. Dave Dagley of the
10   University of Alabama and also an attorney
11   has done a sexual harassment workshop.
12   Q      And do all the employees attend that?
13   A      Yes.  We make, we make it mandatory
14   that they be present for that.
15   Q      Are any employees told that if they
16   hear about a complaint of sexual harassment
17   from somebody else that they need to report
18   it?
19   A      Rephrase, please.
20   Q      In any of this training that you've
21   talked about, have any of the trainers said
22   that if an employee hears a complaint about
23   sexual harassment that that employee should

65

1    report that to the appropriate person?
2    A    I don't recall that being part of the
3    training.
4    Q    Okay. Was Mr. Cottle given any
5    training specifically as a result of Ms.
6    Price's allegations?
7    A    If the question is did Mr. Cottle get
8    specific training or counseling because of
9    this, the answer would be no.
10   Q    Okay. What was the board's policy on
11   sexual harassment at that time?
12   A    The policy on sexual harassment at
13   that time is the same as it is now. Is that
14   it's not tolerated. That we will not have
15   an environment of that and then we have a
16   detailed policy which I can't give that to
17   you verbatim that basically defines what
18   sexual harassment is and then if you feel
19   like that you have been, that gives you
20   steps to go about reporting it.
21   Q    Where, is that policy posted anywhere
22   on bulletin boards or anything?
23   A    It's in the, it's in the board policy

66

1    manual which is kept in the library and the
2    principal's office.
3    Q    Is that distributed to the employees?
4    A    If you're asking me do we give the
5    individual copies out to each employee, the
6    answer would be no.
7    Q    Well, do you give any of them copies?
8    A    If they request them --
9    Q    Okay.
10   A    -- going to the board policy manual.
11   Q    Okay. And you said there was a copy
12   in the library and in the office?
13   A    That would be correct, and the
14   central office.
15   Q    In the office here?
16   A    Yes, the principal's office. At each
17   school and the library at each school.
18   Q    And the central office?
19   A    That's correct.
20   Q    Okay. So if somebody wanted to
21   consult the sexual harassment reporting
22   procedures, they would go to the library,
23   the office in their school and the central

67

1    office?
2    A    Would you repeat for me?
3    Q    If somebody wanted to read about how
4    to follow the sexual harassment reporting
5    procedure, they would go find a manual in
6    the central office, the office in their
7    school or the library in their school; is
8    that right?
9    A    That's correct.
10   Q    Okay. Do you remember Ms. Price
11   saying that people, that she tried to do
12   that and people told her that the policy was
13   being revised?
14   A    Part of Ms. Price's complaint was
15   that she had went to the middle school and
16   asked for one and they said the library was
17   being packed up and I think she went to the
18   high school and she said she went to the
19   high school and we were going through
20   renovation over there and she said those
21   were not available and then she went to my
22   secretary Ms. Chris Martin and asked for
23   one.

68

1    Q    And what does Ms. Price say that Ms.
2    Martin told her?
3    A    Ms. Martin told them that at that
4    time we were going through a revision of our
5    policy, that they were all torn apart, that
6    each school had two copies, if she couldn't
7    get it from the school, to let her know and
8    that she would get her copy of it.
9    Q    That's what Ms. Price said or Ms.
10   Martin?
11   A    That's what Ms. Martin. Excuse me.
12   I thought you said Ms. Martin.
13   Q    Okay. And do you know whether or
14   not the manual was packed up in the library
15   here at Handley Middle School?
16   A    If you're asking -- I'm sure it was
17   because the library was going under a
18   renovation, I'm sure.
19   Q    So you have no reason to disbelieve
20   what she said about how she couldn't get a
21   copy of the policy?
22   A    I, if you're asking me did, you're
23   asking me that if she couldn't get one from

69

```
 1   the library at the middle school because it
 2   was packed up, I would agree with that.
 3   Q      Okay.  What would you disagree with?
 4   A      Well, there's still one in the
 5   principal's office.  There should have been
 6   one here at the middle school that you could
 7   ask for.
 8   Q      Okay.  What did, what did Ms. Price
 9   say about finding one in the principal's
10   office here at the middle school?
11   A      I don't remember her saying anything
12   about that.
13   Q      There's one here then?
14   A      It should have been, yes.
15   Q      And that was the, was the copy at the
16   central office in fact taken apart at that
17   time?
18   A      Yes.  Yes, it was.
19   Q      Do you know whether or not Ms. Martin
20   declined to give Ms. Price access to the
21   policy at that time?
22   A      Ms. Martin told me that what she told
23   Ms. Price was that the, that they were going
```

70

```
 1   through revision, that it was all torn apart
 2   and was disarrayed, but each school had two
 3   copies and that she could go to the school
 4   to get one, but if she was unable to get
 5   one, to let her know, that she would make
 6   sure she got what she needed.
 7   Q      Okay.  How many schools are there?
 8   A      Three.
 9   Q      All right.  And that's Handley High
10   School?
11   A      Yes.
12   Q      And Middle School?
13   A      Yes.
14   Q      And what else?
15   A      Knight Enloe Elementary School.
16   Q      E-n-o-l-w?
17   A      E-n-l-o-e.
18   Q      So there are actually seven copies,
19   two in each school and one in the central
20   office?
21   A      No, sir.  There's actually, at the
22   central office there would be two.  There's
23   one in the central office and the central
```

71

```
 1   office annex which is right behind it.
 2   Q      But do you have a recollection of
 3   revisions being made to the manual back in
 4   during that time?
 5   A      Yes, sir.
 6   Q      And were you involved with that with
 7   the board?
 8   A      Yes, sir.
 9   Q      How long did it take y'all to go
10   through these revisions before you came up
11   with the final product?
12   A      We started in the summer of '04 and
13   eventually they were adopted by the board in
14   different stages starting in the fall of
15   '05.
16   Q      How is the location of the manuals
17   made known to the employees?
18   A      The principals let the employees know
19   where those can be found.
20   Q      What do the principals do?
21   A      Excuse me?
22   Q      What do the principals do?
23   A      What do you -- I don't understand
```

72

```
 1   your question.
 2   Q      You said the principals make it known
 3   to the employees, right?
 4   A      Yes.
 5   Q      So what do they do?
 6   A      They tell the staff where the board
 7   policy manuals are.
 8   Q      Okay.  Do they -- are they required
 9   to tell them like at the beginning of the
10   school year in a meeting or how does that
11   work?
12   A      Well, as principal at the high school
13   at the opening in-service, opening faculty
14   meeting, that's when we would go over those
15   type procedures.
16   Q      Do you attend all of those meetings?
17   A      Do I attend all of them?
18   Q      Yeah.
19   A      As principal or superintendent?
20   Q      Superintendent.
21   A      No, sir.
22   Q      You were -- let's see.  So in '03
23   you were a principal at the high school?
```

73

| 1 | A | That would be correct. |
| 2 | Q | And at the opening meeting did you |
| 3 | tell all of your employees that you want a |
| 4 | copy of the manual, here's where to find it? |
| 5 | A | That's my recollection, yes. |
| 6 | Q | Do you have any personal knowledge as |
| 7 | to whether or not any other principals gave |
| 8 | that information out in those meetings in |
| 9 | subsequent years or at other schools during |
| 10 | those years? |
| 11 | A | It's my understanding that they did. |
| 12 | Q | Where do you get that understanding |
| 13 | from? |
| 14 | A | From, from conversation with them, |
| 15 | but I was not present. |
| 16 | Q | Who did you ask about that? |
| 17 | A | I asked Mr. Foster. |
| 18 | Q | What did you ask him? |
| 19 | A | Excuse me? |
| 20 | Q | What did you ask him? |
| 21 | A | What did I ask him? |
| 22 | Q | Yeah. What did you ask him? |
| 23 | A | At different times I remember Mr. |

74

1  Foster saying that he had, it was because I
2  had asked Mr. Foster the question how did he
3  go about disseminating information about
4  different policies and he said that he let
5  the staff know that the, the board policy
6  manuals are in the library and in the
7  office.
8  Q    Did you ask how did, with regard to
9  Ms. Price's case in particular?
10 A    Yes.
11 Q    So you said did you tell her about
12 the location of the manuals at the beginning
13 of the school year?
14 A    No, sir, that's not what I said.
15 Looking at our sexual harassment policy it
16 talks about that, like I said, I can't quote
17 it verbatim, but the sexual harassment
18 policy says that the school system will take
19 steps to inform employees about sexual
20 harassment and so we've done that through
21 the school system having institutes and
22 in-services and the schools have done that
23 for a specific policy by making the policies

75

1  available in the office and the library.
2  Q    No, my question was, what did you ask
3  him about what he had done?
4  A    I thought I answered that. Mr.
5  Foster said that he had informed staff at
6  faculty meetings that the, where policy
7  manuals were.
8  Q    Where did he tell them where they
9  were? What did he say that he told them
10 where they were?
11 A    I don't understand the question.
12 Q    Did he tell you a specific location
13 that he mentioned to the people in the
14 meeting or did he just say, told them where
15 they were.
16 A    No. He told them that the board
17 policy manual could be found in the library
18 or in his office.
19 Q    So he didn't mention it being at
20 other schools?
21 A    No.
22 Q    All right. Let's look at those.
23 Let me show you what I'm marking as Exhibit

76

1  7 and I'll represent to you these are a
2  collection of documents produced by the
3  board's attorney.
4         Flip through them enough to see if
5  you're familiar them and let me know if you
6  are.
7  A    I am familiar with them but I would
8  add that the last two pages of this sexual
9  harassment, labeled B.14a and D.37a, that
10 policy was not in effect at the time that
11 this was going on.
12 Q    Right. I believe that they had been
13 replaced by these other that came in 2000;
14 is that right?
15 A    That would be correct.
16 Q    Okay. Which of these is the policy?
17 I think we have G.5 and D.37a that were
18 enacted or adopted -- no, excuse me.
19 G.5 was adopted July 2000, right?
20 A    It was -- G.5?
21 Q    Yeah, the top one.
22 A    Adopted 2000 and revised 2005.
23 Q    Okay. And then you have D.37a that

77

1    was adopted in '98 and revised in 2005; is
2    that right?
3    A    Yeah.
4    Q    Why, are these two different
5    policies?
6    A    Yes.  If you look at our board policy
7    manual, G is labeled personnel and D is
8    labeled student.
9    Q    Okay.  So --
10    A    And G is the personnel policy.
11    Q    Okay.  So the policy that would have
12    applied to Ms. Price in '03 and '04 and '05,
13    is G.5?
14    A    That's correct.
15    Q    Okay.  And the, and the reporting
16    procedure would have been in the manual,
17    should have been in the manual in the
18    libraries, offices at the school and in the
19    central office, right?
20    A    That's correct.
21    Q    And down there under Roman numeral
22    III, A, for reporting procedures it says
23    that complaints should be made to the Title

78

1    IX coordinator or a person designated by the
2    superintendent; is that right?
3    A    That's correct.
4    Q    Okay.  Tell me again who was the
5    Title IX coordinator at that time?
6    A    Ms. Donna Hodges.
7    Q    Okay.  And is her being in that
8    position made known to all the employees?
9    A    Yes.
10    Q    How is that?
11    A    As far as her being Title IX
12    coordinator, it's posted on all of her job
13    applications and everything that we have to
14    post her as the Title IX coordinator.
15    Q    You think it's just common knowledge
16    amongst all the employees who she is?
17    A    If you're asking me do I think that
18    most of our employees know that Donna Hodges
19    is the Title IX coordinator, yes.
20    Q    All right.  Are you aware of any
21    steps that the board took to make sure that
22    employees know that she is the Title IX
23    coordinator?

79

1    A    Yes, we have to.  Part of our OCR, we
2    have to publish it in the newspaper that
3    she's the Title IX coordinator.
4    Q    The city newspaper?
5    A    Yes, The Randolph Leader, and also --
6    Q    What if somebody doesn't read the
7    paper?
8    A    Your question was what steps had we
9    taken --
10    Q    Yeah.
11    A    -- to make sure that she was known as
12    Title IX coordinator, some of those steps
13    would be that it's in the paper and also on
14    job applications and forms we have at the
15    bottom Title IX coordinator.
16    Q    So when somebody applies for a job,
17    it's on there?
18    A    Yes.
19    Q    Where else?
20    A    That would be the two places I
21    recall.  Those are two that I recall.
22    Q    Okay.  Who was the person designated
23    by you to receive such complaints?

80

1    A    I didn't designate anyone.
2    Q    Okay.
3    A    Or a person.
4    Q    I beg your pardon?
5    A    The policy says, "Present complaint
6    directly to the superintendent or a person
7    designated by the superintendent.
8    Q    And you didn't designate anybody?
9    A    No, sir.
10    Q    So the only person that would have
11    received such a report under this policy
12    would have been the Title IX coordinator?
13    A    That's correct.
14    Q    Why do you have the Title IX
15    coordinator -- strike that.  You're familiar
16    with Title IX?
17    A    (Nods head affirmatively.)
18    Q    You need to verbalize.
19    A    Yes, sir.
20    Q    That deals with students?
21    A    Yes.  As far as male and female
22    equity.
23    Q    Right.  But absent some sort of

81

```
 1   connection to students, an employee's
 2   problems would not fall under Title IX,
 3   would it?
 4          MR. SWEENEY:  I object to the form.
 5   That's not a correct statement of the law.
 6          MR. PORTER:  Do you want to explain
 7   that?
 8          MR. SWEENEY:  Yeah.  Title IX applies
 9   to any gender discrimination.
10          MR. PORTER:  Well, would not Title
11   VII apply here?
12          MR. SWEENEY:  I mean, you're asking a
13   legal question, I object to the question.
14          MR. PORTER:  Okay.
15   Q     (BY MR. PORTER:)  Okay.  Why do you
16   have a Title IX coordinator to be the person
17   who receives a complaint from one employee
18   about a claim against another employee?
19          MR. SWEENEY:  Object to the form.
20          MR. PORTER:  What's wrong with the
21   form?
22          MR. SWEENEY:  It's not, the question
23   is not clear.
```

82

```
 1          MR. PORTER:  You don't understand it?
 2          MR. SWEENEY:  It's up to him.
 3          THE WITNESS:  I don't understand it.
 4   Q     (BY MR. PORTER:)  What don't you
 5   understand?
 6   A     I don't understand the question.
 7   Q     Why do you have a Title IX
 8   coordinator designated as the person who
 9   receives the complaints that one employee is
10   making against another employee?
11   A     Well, my professional discretion,
12   that's the best person we have in our
13   central office to handle that.  The one
14   thing you have to remember about Roanoke, we
15   only have two people in the central office
16   other than myself.
17   Q     Okay.
18   A     One male and one female, and at this
19   time it's Donna Hodges our Title IX
20   coordinator and it's my belief that she's
21   the best person to --
22   Q     Okay.  So reporting -- unless the
23   Title IX coordinator is your supervisor,
```

83

```
 1   reporting the problem to your supervisor is
 2   not the proper procedure; is that right?
 3   A     If you, the proper procedure, if you
 4   felt, if it's reached the point that you
 5   have got to go, that it has reached to that
 6   level, correct, yes, you would go to your
 7   Title IX coordinator, the correct procedure
 8   would be to go to her, the Title IX
 9   coordinator.
10   Q     Move to strike as nonresponsive.  My
11   question was, if you make a complaint to
12   your supervisor about sexual harassment,
13   that would not be following this procedure
14   unless the Title IX coordinator was your
15   supervisor; is that correct?
16   A     Rephrase it for me.  I don't know
17   what you're asking.
18   Q     Let me try it this way.  Under this
19   reporting procedure it says you can report
20   to one of two people, the Title IX
21   coordinator and the person designated by the
22   superintendent.  We've established there was
23   no person designated by the superintendent,
```

84

```
 1   right?
 2   A     That's correct.
 3   Q     So that leaves the only person to be
 4   reported to under the policy as the Title IX
 5   coordinator, correct?
 6   A     It would be correct if you felt like
 7   that you needed to bring a sexual
 8   harassment report that that's the person
 9   that you would go to would be Title IX.
10   Q     That's what this policy says, right?
11   Take it to the Title IX coordinator?
12   A     If you feel like you need to make a
13   report, yes.
14   Q     All right.  So if somebody made a
15   report to their supervisor, unless their
16   supervisor was the Title IX coordinator,
17   they would not be following the policy,
18   would they?
19   A     Not if they felt like that it was, it
20   had reached the point where they needed to
21   make a report.
22   Q     I don't understand your answer.  If
23   they reported it to their supervisor, have
```

85

1    they followed the policy?
2    A      Not, not if it's to the point where
3    they need to make a report, no.
4    Q      Well, then in what circumstances
5    would it be appropriate?
6    A      Appropriate to do what?
7    Q      You said not if it's necessary to
8    file a report, then under what circumstances
9    would it be appropriate to report it to a
10   supervisor?
11   A      The way I view this policy, the way
12   you have with the board is that it's a
13   report that you make to the board to the
14   Title IX coordinator if it's reached the
15   point that you need to make a report.  If
16   there are some things that are just
17   bothering you, if someone was bothering you
18   that you could take that to a building level
19   administrator and give them the opportunity
20   to deal with it.
21   Q      Where does it say that?
22   A      That's the practice.  It's not
23   written, but that's what we do in practice

86

1    in that, well, you take it then if it's not
2    resolved you can take it to the Title IX
3    coordinator, but you would not have to do
4    that.
5          I think your question is, could you
6    do that.  You could.
7          MR. SWEENEY:  Can you hold your
8    question.  I've got to make an emergency
9    call just real quick.
10               (Whereupon, a short recess
11               was had.)
12         MR. PORTER:  What was the last thing.
13               (Whereupon, the requested
14               portion of the testimony
15               was read back into the
16               record.)
17         MR. PORTER:  Okay.
18   Q      (BY MR. PORTER:)  We were talking,
19   you were talking about if you have a problem
20   that perhaps, and I'm paraphrasing, correct
21   me if I am wrong, that perhaps it may not
22   rise to the level of where you want to take
23   it to the Title IX coordinator, you can go

87

1    to the building administrator, right?
2    A      I mean, it would be correct to say
3    that you could go to your building
4    administrator with problems other than just
5    sexual harassment whether it be a grievance
6    or something else --
7    Q      Right.
8    A      -- that he could take it to the step
9    and then the building administrator could
10   come to me.
11   Q      Okay.  And but you would agree with
12   me that that may be a practice that is
13   inconsistent with his policy?
14         MR. SWEENEY:  Object to the form.
15         THE WITNESS:  No, I would, I can't --
16   I don't agree with that.  I think it is
17   consistent.
18   Q      (BY MR. PORTER:)  Okay.  Where is --
19   okay.  The procedure says, "Any employee who
20   feels he/she has been sexually harassed by
21   another employee or student shall present
22   the complaint directly to the school
23   district Title IX coordinator; is that

88

1    right?
2    A      That's correct, that's what it says,
3    yes.
4    Q      Where in there does it say that you
5    can also go to the building administrator?
6    A      It doesn't say that in that
7    language, but you can, if you have, as I
8    said earlier, if you have a grievance or
9    some other matter, you can take it to the
10   principal.
11   Q      I think a grievance is a different
12   procedure, right?
13   A      Well, it's a procedure that would
14   follow a different -- to answer your
15   question, it would be a different procedure
16   but it's part of a procedure that could be
17   used towards sexual harassment eventually if
18   it just started out as a, something that
19   hadn't reached the level of sexual
20   harassment, just made, someone making you
21   feel uncomfortable.
22   Q      Well, there's a separate, there's a
23   separate provision in the manual that deals

89

1   with grievances, right?
2   A      That's correct.
3   Q      Is that what you're referring to?
4   A      No, what I'm referring to is that
5   there's more than, there's more issues that
6   you, that you can take -- what I'm saying is
7   with the sexual harassment policy we have it
8   written, yes, if it's reached the level of
9   sexual harassment, that's what you've got to
10  do next, yes, you follow this policy.
11  Q      Let's assume it has reached the level
12  of sexual harassment, that the person making
13  the complaint feels that it is sexual
14  harassment. Who does she report it to then?
15  A      If she wants to follow board policy,
16  she would take it to the Title IX
17  coordinator.
18  Q      And not the supervisor?
19  A      If she felt like it had got to that
20  point. If you're asking me if it had got to
21  the point that's where she needs to take it,
22  yes, that would be correct, you take it to
23  the Title IX coordinator.

90

1   Q      You see I'm not following you when
2   you say she feels like it's got to that
3   point. I'm saying it's part of my question.
4   I want you to assume that the person feels
5   that she has been subjected to sexual
6   harassment, not just some disagreement about
7   something, she feels she's been subjected to
8   sexual harassment, that person should make
9   the report to the Title IX coordinator,
10  correct?
11  A      That would be correct.
12  Q      And it would be inconsistent with
13  this policy to make that report to the
14  supervisor?
15  A      If it had got to the level you said,
16  yes, that would be inconsistent.
17  Q      And let me see if you agree with
18  this. When you say if had got to the level
19  you said, you're talking about the employee
20  feels she's been sexually harassed?
21         MR. SWEENEY: Object to the form.
22         THE WITNESS: If you're asking me
23  consistent with your policy if a person

91

1   feels like they've been sexually harassed,
2   should they report it to the Title IX
3   coordinator, yes.
4   Q      (BY MR. PORTER:) And the second part
5   of that question, it would not be the policy
6   to report that to the supervisor?
7   A      That would be correct.
8   Q      Okay. And what do you think that Ms.
9   Price did not do that she should have done
10  to report it?
11  A      There's different, there's different
12  things you could have done. This all could
13  have been avoided if she had gotten the
14  board policy manual.
15  Q      Okay. And what did she not do that
16  she should have done to get the manual?
17  A      I think this all could have been
18  avoided if she had gotten the board policy
19  manual and then followed the reporting
20  procedures because no one knew about it.
21         The administrators at this school
22  didn't know about it, I didn't know about
23  it. Once we found out about it, we took

92

1   action. We were unable to take action
2   because we didn't know anything about it.
3   Q      What did she not do that she should
4   have done to have gotten the manual?
5   A      Excuse me.
6   Q      What did she not do that she should
7   have done to get the manual?
8   A      There were several things you could
9   have done. Here in this building she could
10  have asked Mr. Foster the building
11  principal, can I see a copy of the board
12  policy manual.
13  Q      So you think when she said that she
14  tried to get a copy from the office, but
15  couldn't that she's lying about that?
16  A      Well, if you go by her statement what
17  she said is that she asked Ms. Marshall for
18  a copy of the board policy manual. She
19  didn't ask Mr. Foster.
20  Q      Oh, so --
21  A      She didn't ask Ms. Benefield. She
22  didn't have to, it wasn't an end to all when
23  you didn't get it from a secretary that I've

93

1    got to stop there.
2    Q    Where is it kept?
3    A    In the principal's office.
4    Q    Okay.  And is it somewhere the
5    secretary knows where it is?
6    A    I don't know.
7    Q    Is there some rule that says you
8    can't ask the secretary where it is?
9    A    No, there's not a rule that you
10   cannot do that.  There's also not a rule,
11   you asked the question was, how, what could
12   she have done to get a copy of the board
13   policy manual, what could she have done
14   different.  If she wanted to find what the
15   policy was, she could have found by asking
16   Mr. Foster.  She didn't have to say it was
17   about sexual harassment, she could say where
18   can I get a copy of the board policy manual.
19   She could have been provided one and then
20   she could have followed the procedures.
21   Q    Who told her that the sexual
22   harassment reporting policy was in the board
23   manual?

94

1    A    Well, by Ms. Price's own admission
2    she attended a seminar given by Mr. Sweeney.
3    Q    In 1998?
4    A    If that's when it was held.  By her
5    own admission --
6    Q    Well, we'll get to that.  Let me show
7    you what was marked as 8.  Is this what
8    you're referring to?
9    A    As I started answering my question,
10   yes, that's what I was referring to.
11   Q    Okay.  And I think we have
12   established that the last two pages of
13   Exhibit 7 is the policy that was in effect
14   in 1998 that was not in effect at the time
15   of Ms. Price's allegation; is that right?
16   A    That's correct.
17   Q    So what was Ms. Price told in this
18   1998 workshop that you think alerted her to
19   what she should have done?
20   A    The policy, the procedures on how to
21   go about doing what sexual harassment was
22   and defining what it was, if it was
23   unwelcome and then the next steps to go, and

95

1    also, I mean, it's evident that she knew
2    that the policy existed, why else was she
3    wanting to find a board policy manual by her
4    on admission that she had asked the
5    secretary for one.  She had asked my
6    secretary at the central office for one.
7    Q    For board policy?
8    A    Yes.  She wanted a board policy
9    manual.
10   Q    Did she just say policy or board
11   policy?
12   A    My understanding it was policy
13   manual.
14   Q    Okay.  Policy manual.  Is that an
15   employee policy manual?
16   A    No, the board policy, the board
17   policy is part of the manual.
18   Q    What manual?
19   A    The board policy manual.
20   Q    Okay.  And there's no employee
21   manual?
22   A    There's a personnel section inside
23   the board policy manual.

96

1    Q    All right.  There's no separate
2    personnel manual for employees?
3    A    No.
4    Q    Okay.  So if she had followed what
5    was, I assume relayed in the February '98
6    workshop, she would have been told to report
7    to her supervisor, wasn't that the old way
8    of doing it?
9        MR. SWEENEY:  Object to the form.
10   Q    (BY MR. PORTER:)  I'm sorry.  It does
11   say, it says superintendent, to the
12   superintendent, that's what it used to be,
13   right, they would tell you about it?
14       MR. PORTER:  Object to the form.
15       THE WITNESS:  I'm really not familiar
16   what the policy was, I wasn't superintendent
17   in '98.
18   Q    (BY MR. PORTER:)  Okay.  You're
19   right.  Is there anything else other than
20   what you told that you think Ms. Price
21   should have done to report it?
22   A    Well, that's, your question, I think,
23   again was what could she have done.  One

97

1    thing would have been to get the board
2    policy manual. Another thing is she could
3    have come directly to me.
4        Q    But that wouldn't be following the
5    policy, would it?
6        A    One other thing that she could have
7    done would have been come directly to me and
8    if she had saying that Mr. Marcum, I need to
9    see the board policy manual, I've not been
10   able to get one, could you tell me, and I
11   assure you she would have got whatever what
12   she had wanted but she didn't do that, so
13   that would have been another thing that she
14   could have done that would have stopped it.
15       Q    But that's not in the policy either,
16   though, is it?
17       A    Your question was what could she have
18   done that could have stopped it.
19       Q    Right.
20       A    She's wanting a copy of the board
21   policy manual.
22       Q    Is there anybody else she could have
23   gone to other than you or the principal?

99

1        A    Please rephrase. I'm not sure I'm
2    following where we are.
3        Q    I was asking you about who she should
4    have reported the problem to, maybe we're
5    going on different lines. Were you thinking
6    I was asking you about who she should have
7    asked for the manual?
8        A    No. What I thought you had asked me
9    was what was some things that she could have
10   done that could have --
11       Q    Yeah. You said she could have come
12   to you and reported the problem to you,
13   right?
14       A    No. She could have come to me and
15   asked for a board policy manual since she
16   hadn't been able to get one --
17       Q    Oh.
18       A    -- at the other schools and then she
19   could have followed the policy.
20       Q    Okay. Anything else she could have
21   done other than what you've already told
22   me?
23       A    As I remember right now, that's

98

1        A    Ms. Benefield, a female assistant
2    principal.
3        Q    Okay. Anybody else.
4        A    If she didn't feel comfortable
5    talking to a male, she could have went to a
6    Ms. Robbie Benefield who is the female
7    assistant principal and asked for a copy of
8    that manual.
9        Q    Anybody else?
10       A    Ms. Donna Hodges in the central
11   office is also a female who is the Title IX
12   coordinator that has a copy of the board
13   policy manual in her office, she could have
14   asked for it there.
15       Q    Okay. Anybody else?
16       A    Well, as we stated earlier the
17   schools have two copies, the elementary
18   principal and --
19       Q    I'm not talking about asking
20   specifically for the manual, I'm just
21   talking about who to report the problem to.
22   Anybody else you think she could have done
23   that to?

100

1    what I think she should have done.
2        Q    Well, this is my last chance to ask
3    you, can you think of anything else?
4        A    Not at this time.
5            MR. SWEENEY:  Object to the form.
6        Q    (BY MR. PORTER:)  Let me show you
7    what I'm making as Exhibit 9 and I will
8    represent to you this was a document that
9    was produced by the board's attorney.
10           Have you seen this before?
11       A    Yes, sir.
12       Q    There -- paragraph number 4 is
13   highlighted, right?
14       A    Yes, sir.
15       Q    Did you do that?
16       A    Yes, sir.
17       Q    Okay. What is the importance of
18   that?
19       A    What this is, is each week I send out
20   a weekly newsletter through e-mail to our
21   staff and this is just a notation that was
22   made to the entire staff that everyone
23   received through their e-mail.

101

1   Q     Does every employee have their own
2   e-mail address?
3   A     Yes.
4   Q     Okay.  And what computer do they look
5   on to read the e-mail?
6   A     They can use computers here at school
7   or computers at home.
8   Q     Do the crossing guards get these
9   e-mails?
10  A     Yes.
11  Q     Are you sure about that?
12  A     It's my understanding, my
13  understanding would be, yes, that they do.
14  Q     Who told you that?
15  A     I think, my understanding is that
16  everyone in the school, all of our employees
17  have access to an e-mail address.
18  Q     Cooks?  Everybody?
19  A     It's my understanding.
20  Q     Okay.  Let me show you what I've
21  marked as Plaintiff's Exhibit 10 and ask you
22  to take a look at that.
23        Have you seen this before?

102

1   A     Yes.
2   Q     Is this a printout of an e-mail that
3   you sent?
4   A     Yes, sir.  Yes, sir.
5   Q     Did you know that you were sending it
6   to Donald Sweeney?
7   A     Yes.
8   Q     Did you know you were sending it to
9   Angela Price?
10  A     No, sir.
11  Q     Would you, would, this was not a
12  reply to some other e-mail, was it?
13  A     My recollection, Mr. Porter, is that
14  it was inadvertently sent to Ms. Price, but
15  it was asking Mr. Sweeney had we made our
16  response in the Angela Price matter.
17  Q     My question was, this is an original
18  e-mail, meaning it is not a reply from some
19  other e-mail, is it?
20  A     No, sir.
21  Q     So you would have had to have taken
22  an affirmative act to have put her name in
23  there as an e-mail address in there as

103

1   addressee; is that right?
2   A     Once again, Mr. Porter, I don't know
3   how this, I don't know.  I don't know how
4   this got, I don't know if I did this or Ms.
5   Martin my secretary or how it was copied to
6   Ms. Price, I don't know.
7   Q     No, my question is, it would take an
8   affirmative act to put her e-mail address in
9   there as an addressee; is that right?
10  A     What do you mean by affirmative act?
11  Q     I mean, it's not just going to pop up
12  automatically, somebody has got to put it in
13  there.
14  A     Well, if it hadn't been typed in
15  there it could have been cut and pasted or
16  something, I don't know.
17  Q     Right.  Somebody --
18  A     To answer your question, I don't know
19  how it go in there.
20  Q     But my, I'm asking a more general
21  question.  To get in there somebody has to
22  do something affirmative to put it in there,
23  either cutting and pasting it in there or

104

1   type it in there, right?
2   A     I don't know.  I would answer that
3   question I would think so but with
4   computers, I don't know.
5   Q     And you say maybe somebody other than
6   you sent this e-mail, maybe Ms. Marshall?
7   A     No, what I said was my recollection
8   was I do not know how Ms. Price got it.  It
9   could have been Chris Martin my secretary,
10  but, looking at it, it should have come from
11  me, but I don't know how Ms. Price got it.
12  Q     Well, you e-mailed it to her, didn't
13  you?
14  A     No.
15  Q     How --
16  A     Not intentionally.  If I did, it was
17  accidental.
18  Q     Would you agree that she's down there
19  as an addressee?
20  A     Yes.
21  Q     Well, then how could it have got to
22  her other than you e-mailing it to her?
23        MR. SWEENEY:  Adam, is there some

105

1    relevance to this?  They made a mistake,
2    they sent it, it's an innocuous statement.
3    Do we need to milk this for the longevity?
4           MR. PORTER:  Yeah.  Yeah.  I want to
5    find out.
6           THE WITNESS:  As I answered --
7           MR SWEENEY:  Object to the form.
8           THE WITNESS:  To answer your
9    question, inadvertently was sent to Ms.
10   Price.  I don't know how her name got on
11   there, how it was done.  Did I intentionally
12   send it to Ms. Price, no.
13   Q       (BY MR. PORTER:)  Okay.  Down there
14   in the second paragraph, in the body of your
15   e-mail you say that you need to know what we
16   need to be doing other than process, comma,
17   et cetera in order to start the process of
18   getting unitary status.  Do you see that?
19   A       Yes.
20   Q       What do you mean by unitary status?
21   A       Something that's totally unrelated
22   with this case.  This was a Roanoke City
23   Schools, up until this spring, was under a

106

1    court ordered desegregation suit and we were
2    starting our process towards working towards
3    what we needed to do to file for unitary
4    status.
5    Q       That's a term of art somewhere?
6    A       Excuse me?
7    Q       That's like a legal term or
8    something?
9           MR. SWEENEY:  That's correct.  We'll
10   stipulate that.
11          MR. PORTER:  Well, I want him to
12   answer the questions.
13          MR. SWEENEY:  Well, you're asking a
14   legal question and I'm responding.
15          MR. PORTER:  He can tell me what he
16   knows.  If you want to get under oath, I'll
17   take you next, but I want him to answer.
18          MR. SWEENEY:  Come on, Adam.
19          MR. PORTER:  No, Don, I want him
20   to --
21          MR. SWEENEY:  I'm trying to -- well,
22   get mad and say whatever you have to.
23          MR. PORTER:  Look, you can object to

107

1    the form and instruct him not to answer.
2           MR. SWEENEY:  It's a legal matter.  I
3    understand that.  You asked a legal
4    question, I was trying to be helpful.  I'll
5    withdraw my help.
6           MR. PORTER:  All right.  Do.
7    Q       (BY MR. PORTER:)  What is your
8    understanding of what that means?
9    A       What means?
10   Q       Unitary status?
11   A       What does unitary status mean?
12   Q       Yeah.
13   A       Well, what happens if you want to be
14   a unit, unified school system, we were under
15   a court order since the early '70s that we
16   had to make annual reports and in 1997 we
17   entered a consent decree in efforts to gain
18   unitary status and we were given that or
19   awarded that in the spring and what it means
20   is that you're no longer under the court
21   system anymore, the school board has
22   complete control of local matters and you're
23   no longer under the jurisdiction of the

108

1    district court.
2    Q       That's what unitary status mean?
3    A       Yes.
4    Q       Why did you put that in an e-mail
5    regarding Ms. Price?
6    A       I was just too, I was sending an
7    e-mail to Mr. Sweeney dealing with a couple
8    of legal issues.  One, had we made our
9    response in the Angela Price matter, which I
10   don't remember the, that reason for it, I
11   guess it was due to the EEOC or, or
12   whatever, but I knew somewhere I had been
13   given a date that it was due the 9th, 9/13,
14   so I wanted to know where we was at and then
15   in the same e-mail I asked where we were,
16   what I, what we needed to do to start the
17   unitary status process.
18   Q       And did y'all start that?
19   A       Yes.
20   Q       When did you get it?
21   A       Gosh, I should remember that.  Either
22   March the 15th or 16th.
23   Q       This year?

PRICE V ROANOKE CITY BO. OF ED.          CHUCK MARCUM

109

```
 1   A     Yes.
 2   Q     So that's when y'all came out from
 3   under the court order?
 4   A     Yes.
 5         MR. PORTER:  Okay.  Let me talk to
 6   her and see if she has --
 7                  (Whereupon, a short recess
 8                   was had.)
 9         MR. PORTER:  That's all I've got.
10   Thanks.
11
12         FURTHER THE DEPONENT SAITH NOT.
13         (EXHIBITS ATTACHED AND ENCLOSED.)
14
15
16
17
18
19
20
21
22
23
```

110

```
 1
 2              C E R T I F I C A T E
 3
 4   STATE OF ALABAMA )
 5   JEFFERSON COUNTY )
 6
 7        I hereby certify that the above and
 8   foregoing deposition was taken down by me in
 9   stenotype and the questions and answers
10   thereto were reduced to writing under my
11   supervision, and that the foregoing
12   represents a true and correct transcript of
13   the testimony given by said witness on said
14   occasion.
15        I further certify that I am neither
16   of counsel nor of kin to the parties to the
17   action, not am I in anywise interested in
18   the result of said cause.
19
20        _____
21              COMMISSIONER
22
23
```

PRICE V ROANOKE CITY BO. OF ED.          CHUCK MARCOM

<>
'03: 72;22, 77;12
'04: 12;11, 12;12, 71;12, 77;12
'05: 12;20, 34;11, 48;15, 48;20, 71;15, 77;12
'06: 34;9, 34;20, 40;2, 40;4, 41;15, 43;13, 48;4, 48;8
'07: 48;7, 48;9, 48;13
'70s: 107;15
'98: 77;1, 96;5, 96;17

<1>
10: 3;8
10/14/05: 17;23, 18;20, 24;1, 25;15
10/26/05: 27;9
10:10 a.m.: 1;20, 5;8
100: 3;15
101: 3;16
102: 4;8
109: 3;4
13: 3;9
15: 3;10
15th: 108;22
16th: 108;22
17: 3;11
1819: 4;12
1997: 107;16
1998: 94;3, 94;14, 94;18

<2>
2000: 76;13, 76;22
2003: 18;21
2005: 76;22, 77;1
21st: 1;19
2301: 4;7
251: 1;18, 5;7

<3>
3: 31;7, 49;15, 49;20
3:06-CV-742-VPM: 1;8
30: 5;4

35203: 4;9, 4;13
38: 3;12

<4>
4: 49;15, 49;20, 100;12

<5>
5: 3;4, 38;12, 38;16, 38;16
5th: 4;12

<6>
6: 3;12, 38;16, 38;22
6/21/06: 47;23
60: 11;10

<7>
7: 52;20
75: 3;13

<8>
8: 94;7
8th: 12;12

<9>
9/13: 108;13
94: 3;14
9th: 108;13

<A>
A.M.: 25;17, 26;15, 26;22, 27;3, 27;8
A.P.: 19;9, 19;11, 19;22, 20;6, 20;12, 24;18, 24;23, 26;16
ability: 10;6
able: 47;23, 97;10, 99;16
above: 5;9, 20;17, 23;17, 24;8, 110;7
absent: 80;23
access: 58;13, 69;20, 101;17
accidental: 104;17
according: 40;5, 45;3
accurate: 29;9, 31;23
accurately: 29;19

accusations: 8;12, 36;7, 48;1
Act: 61;4, 62;23, 102;22, 103;8, 103;10
acting: 5;2
ACTION: 1;7, 46;8, 57;22, 58;10, 59;6, 63;7, 63;10, 92;1, 92;1, 110;17
actions: 51;18
activities: 64;7
actually: 29;5, 29;6, 70;18, 70;21
Adam: 4;7, 5;23, 21;21, 104;23, 106;18
adamant: 14;21
add: 78;8
added: 26;15
address: 101;2, 101;17, 102;23, 103;8
addressee: 103;1, 103;9, 104;19
addressing: 46;6
administrator: 55;16, 56;12, 56;14, 85;19, 87;1, 87;4, 87;9, 88;5
administrators: 56;8, 91;21
admission: 94;1, 94;5, 95;4
Adopted: 71;13, 76;18, 76;19, 76;22, 77;1
adult: 11;14
advised: 18;13
affect: 10;5
affirmative: 102;22, 103;8, 103;10, 103;22
affirmatively: 35;15, 38;4, 39;21, 80;17
AFFIRMED: 5;18
afternoon: 14;9, 14;14
ago: 27;13
agree: 30;2, 30;3, 46;2, 52;4, 69;2, 87;11, 87;16, 90;17, 104;18
AGREED: 1;13, 1;21, 2;5, 2;14
ahead: 13;3, 17;6, 19;8, 19;21, 21;7, 38;10, 38;12, 39;2, 51;12
ahold: 20;23
ALABAMA: 1;2, 1;19, 4;8, 4;13, 5;3, 5;4, 5;8, 11;2, 64;10, 110;4
alerted: 94;18
allegation: 8;6, 8;9, 8;11, 63;21, 94;15
allegations: 32;20, 41;19, 48;2, 48;5, 65;6
already: 6;19, 6;20, 43;22, 44;10, 99;21
amongst: 78;16
ANGELA: 1;5, 4;15, 5;9, 5;17, 22;8, 36;20, 37;8, 102;9, 102;16, 108;9
annex: 71;1
annual: 107;16

answer: 9;9, 9;17, 10;1, 15;6, 29;15, 59;18, 61;17, 85;9, 66;6, 84;22, 88;14, 103;18, 104;2, 105;8, 106;12, 106;17, 107;1
answered: 75;4, 105;6
answering: 48;12, 48;17, 49;6, 94;9
answers: 9;6, 110;9
Anybody: 32;3, 80;8, 97;22, 98;3, 98;9, 98;15, 98;22
anywise: 110;17
apart: 21;14, 68;5, 69;16, 70;1
APPEARANCES: 4;6
appeared: 53;19
appearing: 4;9, 4;13
applications: 78;13, 79;14
applied: 77;12
applies: 79;16, 81;8
apply: 81;11
Appropriate: 65;1, 85;5, 85;6, 85;9
April: 12;12
Arant: 4;11
area: 11;14
arises: 61;23
around: 11;6, 52;9
art: 106;5
asks: 15;3
assign: 2;10
assigning: 63;13
assistant: 20;1, 56;10, 98;1, 98;7
assume: 9;18, 33;19, 89;11, 90;4, 96;5
assuming: 44;22
assure: 97;11
asterisk: 25;7
ATTACHED: 109;13
attend: 64;12, 72;16, 72;17
attended: 94;2
attention: 26;19, 39;5, 42;22, 43;2, 44;8
attorney: 21;21, 33;1, 61;2, 64;10, 76;3, 100;9
attributed: 28;23
authority: 12;6
automatically: 103;12
available: 67;21, 75;1
Avenue: 4;8, 4;12

avoided: 91;13, 91;18
awarded: 107;19
aware: 19;22, 20;9, 22;7, 22;10, 22;18, 78;20
away: 24;16, 53;15

<B>
B.14a: 76;9
back: 8;1, 16;7, 28;6, 36;16, 46;10, 48;3, 54;12, 55;5, 71;3, 86;15
Barnes: 7;7, 7;17, 7;18
base: 38;3
based: 6;22, 8;8, 17;8, 30;21, 31;19, 38;23, 39;11, 39;15, 47;19, 50;14, 60;4
basically: 41;18, 41;22, 65;17
basis: 8;18, 18;21, 63;12, 63;14
Bates: 52;19
bathroom: 24;15, 53;15
beg: 80;4
begin: 9;9
beginning: 5;8, 47;10, 47;13, 72;9, 74;12
behalf: 4;9, 4;14
behind: 71;1
belief: 82;20
believe: 25;18, 26;1, 26;17, 76;12
Benefield: 20;2, 27;10, 28;4, 28;8, 28;11, 28;12, 28;12, 31;9, 31;11, 51;4, 56;9, 92;21, 98;1, 98;6
best: 28;19, 40;3, 60;3, 82;12, 82;21
Birmingham: 4;8, 4;13, 21;21
BOARD: 1;8, 8;10, 9;2, 11;21, 11;23, 12;3, 12;5, 45;3, 45;12, 57;11, 58;20, 59;13, 65;23, 66;10, 71;7, 71;13, 72;6, 74;5, 75;16, 77;6, 78;21, 85;12, 85;13, 89;15, 91;14, 91;18, 92;11, 92;18, 93;12, 93;18, 93;22, 95;3, 95;7, 95;8, 95;10, 95;16, 95;16, 95;19, 95;23, 97;1, 97;9, 97;20, 98;12, 99;15, 107;21
board's: 33;1, 37;18, 65;10, 76;3, 100;9
boards: 65;22
body: 105;14
bothering: 85;17, 85;17
bottom: 23;3, 52;19, 53;17, 79;15
Bradley: 4;11
break: 9;22
breakdown: 56;22

breaks: 57;12
briefly: 11;18
bring: 32;19, 84;7
bringing: 45;20
Brought: 6;11, 8;8, 8;9, 15;8, 39;5, 42;21, 43;2, 44;7, 46;21
Building: 23;19, 55;15, 56;8, 56;11, 56;13, 58;15, 85;18, 87;1, 87;3, 87;9, 88;5, 92;9, 92;10
bulletin: 65;22
business: 40;13

<C>
C.F.M.: 21;9, 21;10, 21;14, 21;17
C.M.: 19;16, 19;17, 20;10, 24;7, 27;16, 27;23
C.R.M.: 20;1, 20;3, 22;7, 22;12, 22;19, 23;11, 23;13, 24;2, 24;11, 24;17, 24;23, 25;9, 25;15, 26;4, 26;20, 27;1
C.R.M..: 22;2
call: 34;15, 55;19, 56;1, 58;16, 58;17, 86;9
called: 21;8
calling: 57;12
car: 24;20, 25;20
case: 6;8, 6;15, 8;5, 8;18, 12;17, 41;21, 47;4, 74;9, 105;22
caught: 14;22
cause: 5;10, 110;18
central: 21;8, 25;6, 66;14, 66;18, 66;23, 67;6, 69;16, 70;19, 70;22, 70;23, 70;23, 77;19, 82;13, 82;15, 95;6, 98;10
certify: 5;3, 110;7, 110;15
cetera: 78;4
chain: 56;20
chance: 49;2, 100;2
changed: 61;2
channels: 20;13, 20;15, 20;21, 21;1
charge: 14;12, 32;15, 46;1, 63;15
charges: 36;4, 41;3
chart: 56;19, 57;9
chief: 11;20
children: 13;17
Chris: 21;10, 21;10, 67;22, 104;9
CHUCK: 1;16, 15;2
circumstances: 58;9, 85;4, 85;8
CITY: 1;8, 46;4, 57;10, 63;17, 79;4, 105;22

CIVIL: 1;7, 5;5
claim: 6;14, 6;22, 8;16, 12;17, 42;8, 44;5, 44;18, 46;13, 46;17, 46;21, 47;5, 47;7, 48;22, 50;13, 81;18
claims: 54;9, 57;18
clarification: 29;14
Clark: 19;15, 22;2, 22;4, 50;1
classroom: 13;19
clear: 81;23
closed: 50;18
collection: 76;2
comes: 44;22, 46;10
comfortable: 98;4
coming: 24;14, 55;19
comma: 105;16
comment: 56;20
commencing: 1;20
comments: 26;16
COMMISSIONER: 1;17, 2;16, 4;4, 110;21
common: 78;15
compared: 44;18
complained: 44;21
complaint: 12;18, 13;10, 14;18, 18;1, 18;22, 44;21, 45;8, 45;17, 46;7, 64;16, 64;22, 67;14, 80;5, 81;17, 83;11, 87;22, 89;13
complaints: 77;23, 79;23, 82;9
complete: 107;22
completed: 49;7
compliance: 2;2
computer: 101;4
computers: 101;6, 101;7, 104;4
concluded: 54;23
concluding: 48;4, 55;2
conduct: 33;10
conducted: 38;18
connection: 81;1
consent: 107;17
consequences: 59;7
consider: 62;9
considered: 58;5
consistent: 87;17, 90;23
constitute: 54;22

construed: 63;9
consult: 33;9, 61;1, 66;21
contact: 13;21, 50;23, 51;2, 51;11, 58;2, 58;4
continue: 50;22, 51;8
Continued: 18;20, 51;14
continues: 19;2
continuing: 60;18, 60;21
control: 40;16, 42;5, 107;22
conversation: 23;7, 23;8, 41;9, 55;11, 73;14
conversations: 32;23, 36;1, 43;15, 55;9
Cooks: 101;18
coordinator: 45;4, 45;13, 78;1, 78;5, 78;12, 78;14, 78;19, 78;23, 79;3, 79;12, 79;15, 80;12, 80;15, 81;16, 82;8, 82;20, 82;23, 83;7, 83;9, 83;14, 83;21, 84;5, 84;11, 84;16, 85;14, 86;3, 86;23, 87;23, 89;17, 89;23, 90;9, 91;3, 98;12
copied: 103;5
copies: 13;5, 66;5, 66;7, 68;6, 70;3, 70;18, 98;17
copy: 12;21, 38;5, 38;9, 66;11, 68;8, 68;21, 69;15, 73;4, 92;11, 92;14, 92;18, 93;12, 93;18, 97;20, 98;7, 98;12
Correct: 7;1, 8;20, 9;2, 10;14, 15;10, 16;11, 16;22, 17;10, 17;17, 19;12, 19;18, 20;4, 22;5, 29;12, 29;18, 32;16, 33;18, 33;22, 34;12, 38;20, 38;21, 39;13, 39;17, 39;23, 40;8, 47;3, 48;10, 50;4, 50;9, 53;12, 53;16, 53;21, 54;4, 54;7, 57;20, 62;1, 63;7, 66;13, 66;19, 67;9, 73;1, 76;15, 77;14, 77;20, 78;3, 80;13, 81;5, 83;6, 83;7, 83;15, 84;2, 84;5, 84;6, 86;20, 87;2, 88;2, 89;2, 89;22, 90;10, 90;11, 91;7, 94;16, 106;9, 110;12
correctly: 48;12, 48;17
corroborate: 32;20, 49;13, 52;1, 52;5, 54;9
corroborations: 52;2
Cottle: 14;15, 14;19, 14;20, 17;23, 18;2, 18;14, 19;6, 22;9, 22;14, 24;16, 25;1, 25;20, 25;20, 25;22, 27;12, 27;15, 29;3, 30;7, 40;18, 40;21, 40;23, 41;13, 42;3, 42;14, 42;17, 42;21, 43;1, 43;1, 43;3, 49;8, 50;23, 51;9, 51;17, 52;10, 54;1, 54;2, 57;22, 58;1, 62;10, 62;13, 62;17, 63;3, 63;13, 63;21, 65;4, 65;7
Cottle's: 40;7, 62;17
counsel: 1;15, 2;7, 2;9, 5;6, 110;16
counseling: 65;8
Counselor: 19;14, 19;15, 36;19
countersue: 42;2
COUNTY: 11;2, 110;5

couple: 108;7
COURT: 1;1, 2;3, 5;1, 5;13, 106;1, 107;15, 107;20, 108;1, 109;3
Courtney: 13;18
crossing: 14;7, 57;15, 61;6, 101;8
curse: 23;10, 23;11
curse...: 23;2
cut: 23;3, 103;15
cutting: 103;23

&lt;D&gt;
D.37a: 76;9, 76;17, 76;23
Dagley: 64;9
date: 5;3, 108;13
daughter: 13;17
Dave: 64;9
David: 12;15
day: 1;19
deal: 85;20
dealing: 59;22, 108;7
deals: 80;20, 88;23
Deborah: 1;16, 4;3, 5;1
decision: 8;22, 9;1, 9;3, 42;4, 60;4
declined: 69;20
decree: 107;17
deems: 45;2
DEFENDANT: 1;10, 4;14
defines: 65;17
defining: 94;22
Delilah: 36;15, 37;7
denied: 14;21
DEPONENT: 109;12
deposed: 39;7
deposition: 1;15, 1;23, 2;1, 2;12, 2;15, 6;3, 15;23, 110;8
depositions: 2;4
desegregation: 106;1
designate: 80;1, 80;8
designated: 78;1, 79;22, 80;7, 82;8, 83;21, 83;23
designates: 56;18
detail: 32;2
detailed: 30;4, 65;16

determination: 44;15, 44;16, 46;11, 46;15, 46;19, 47;5, 48;21, 49;1, 49;10, 50;12, 50;17
determined: 47;11, 57;18
development: 64;6
different: 47;12, 51;7, 64;5, 71;14, 73;23, 74;4, 77;4, 88;11, 88;14, 88;15, 91;11, 91;11, 93;14, 99;5
direct: 23;17
directed: 8;12
direction: 58;17
Directive: 51;9, 58;19
directly: 11;22, 14;9, 80;6, 87;22, 97;3, 97;7
disagree: 58;11, 69;3
disagreement: 90;6
disarrayed: 70;2
disbelieve: 68;19
disciplinary: 57;21, 58;10, 58;21, 59;6, 59;17, 63;6, 63;10
discipline: 61;14, 61;16, 61;23, 63;2
disclosure: 44;9
Disclosures: 39;8, 39;9
discovered: 50;19
discovery: 36;1
discretion: 80;3, 82;11
discriminated: 8;17
discrimination: 6;16, 81;9
discuss: 41;21
discussed: 20;7, 35;6
discussing: 33;4, 35;21
discussion: 18;13, 37;23, 38;14
Dismissal: 61;4
disputed: 29;4
disseminating: 74;3
distributed: 66;3
DISTRICT: 1;1, 1;2, 11;9, 87;23, 108;1
DIVISION: 1;3
document: 13;8, 13;9, 56;17, 56;23, 100;8
documents: 76;2
doing: 30;5, 31;21, 33;13, 94;21, 96;8, 105;16
Don: 106;19
Donald: 4;10, 13;6, 102;6
done: 15;6, 15;7, 51;18, 62;9, 62;12, 63;2, 63;4, 64;8, 64;11, 74;20,

74;22, 75;3, 91;9, 91;12, 91;16, 92;4, 92;7, 92;9, 93;12, 93;13, 94;19, 96;21, 96;23, 97;7, 97;14, 97;18, 98;22, 99;10, 99;21, 100;1, 105;11
Donna: 36;22, 37;8, 45;6, 78;6, 78;18, 82;19, 98;10
doubts: 50;15
Down: 57;3, 57;12, 57;14, 61;19, 77;21, 104;18, 105;13, 110;8
draft: 16;21, 16;23, 17;11, 17;14, 29;17
drafted: 32;9
drive: 25;23
driving: 25;19
due: 108;11, 108;13
duly: 5;18
during: 18;22, 30;20, 54;13, 71;4, 73;9
duties: 11;18

&lt;E&gt;
e-mail: 100;20, 100;23, 101;2, 101;5, 101;17, 102;2, 102;12, 102;18, 102;19, 102;23, 103;8, 104;6, 105;15, 108;4, 108;7, 108;15
e-mailed: 104;12
e-mailing: 104;18
e-mails: 101;9
E-n-l-o-e: 70;17
E-n-o-l-w: 70;16
earlier: 35;11, 42;4, 63;8, 88;8, 98;16
early: 107;15
EASTERN: 1;3
EDUCATION: 1;9, 55;15
EEOC: 12;18, 44;16, 45;17, 45;21, 46;1, 108;11
effect: 2;1, 76;10, 94;13, 94;14
effective: 50;20
efforts: 45;22, 107;17
Either: 28;10, 28;11, 35;22, 39;3, 39;4, 97;15, 103;23, 108;21
Elementary: 70;15, 98;17
emergency: 86;8
employee: 6;12, 6;17, 44;23, 45;2, 60;9, 61;9, 63;21, 64;22, 64;23, 66;5, 81;17, 81;18, 82;9, 82;10, 87;19, 87;21, 90;19, 95;15, 95;20, 101;1
employee's: 81;1
employees: 15;17, 57;13, 64;12, 64;15, 66;3, 71;17, 71;18, 72;3, 73;3, 74;19, 78;8, 78;16, 78;18, 78;22, 96;2, 101;16

employment: 6;23
enacted: 76;18
ENCLOSED: 109;13
end: 24;10, 92;22
Enloe: 70;15
enough: 76;4
entered: 107;17
entire: 100;22
environment: 65;15
equity: 80;22
Esquire: 4;7, 4;10
established: 83;22, 94;12
et: 105;17
evening: 25;23
Events: 18;22
eventually: 71;13, 88;17
Everybody: 101;18
everyone: 100;22, 101;16
everything: 30;19, 78;13
evidence: 2;12, 50;14
evident: 35;9, 95;1
EX: 25;21
exact: 55;23
exactly: 55;22
EXAMINATION: 3;3, 5;10, 5;21
examined: 5;19
example: 29;2, 30;6
Example...: 25;21
except: 2;8
Excuse: 6;18, 7;3, 19;5, 20;16, 22;3, 34;22, 60;14, 68;11, 71;21, 73;19, 76;18, 92;5, 106;6
executive: 11;20
Exhibit 1: 10;10
Exhibit 10: 101;21
Exhibit 3: 15;23, 52;18
Exhibit 4: 17;6, 17;7, 28;16
Exhibit 5: 39;12
Exhibit 6: 39;10, 39;14
Exhibit 7: 75;23, 94;13
Exhibit 9: 100;7

exhibit: 12;22, 13;4, 38;8
EXHIBITS: 3;7, 38;16, 49;15, 49;20, 109;13
existed: 95;2
Explain: 26;4, 32;12, 43;19, 44;19, 81;6
extra: 38;5

<F>
fact: 69;16
facts: 8;12, 47;19, 47;20, 47;22, 49;11, 51;19, 60;5, 62;21
faculty: 72;13, 75;6
Fair: 9;19, 61;3
fall: 61;6, 61;13, 71;14, 81;2
familiar: 76;5, 76;7, 80;15, 96;15
family: 7;14, 11;5, 11;14
far: 8;19, 14;2, 36;23, 50;16, 56;21, 57;12, 62;14, 78;11, 80;21
fast: 9;12
favor: 17;18
Fayette: 11;2, 11;8
February: 96;5
Federal: 4;12
feel: 65;16, 84;12, 88;21, 98;4
feels: 87;20, 89;13, 90;2, 90;4, 90;7, 90;20, 91;1
felt: 83;4, 84;6, 84;19, 89;19
female: 8;20, 80;21, 82;18, 98;1, 98;6, 98;11
few: 52;3
file: 85;8, 106;3
filed: 7;22
filing: 2;15, 26;23
final: 50;17, 71;11
find: 21;2, 67;5, 73;4, 93;14, 95;3, 105;5
finding: 69;9
Fine: 6;2, 43;4
finish: 9;8, 15;6
firm: 4;11
first: 5;18, 12;16, 15;9, 17;21, 30;6, 34;10, 61;1, 62;3, 62;10,
    62;12, 62;14, 63;2, 63;18
Five: 12;4
Flip: 76;4
flirting: 27;15
Florida: 25;22, 27;14, 54;2

fly: 31;21
follow: 20;13, 20;14, 20;22, 20;23, 45;11, 59;20, 61;22, 67;4, 88;14,
    89;10, 89;15
follow-up: 40;22
followed: 85;1, 91;19, 93;20, 96;4, 99;19
following: 5;11, 14;15, 83;13, 84;17, 90;1, 97;4, 99;2
follows: 5;19
force: 2;1
foregoing: 5;5, 110;8, 110;11
form: 2;8, 44;1, 44;12, 81;4, 81;19, 81;21, 87;14, 90;21, 96;9,
    96;14, 100;5, 105;7, 107;1
former: 36;19
forms: 79;14
forth: 49;11
forward: 33;15
Foster: 14;16, 15;11, 20;11, 23;15, 25;3, 27;6, 28;10, 28;11, 40;23,
    51;3, 55;22, 56;9, 56;13, 58;4, 73;17, 74;1, 74;2, 75;5, 92;10,
    92;19, 93;16
Foster's: 57;3
found: 71;19, 75;17, 91;23, 93;15
fourth: 60;17
friendly: 23;8
front: 23;19, 24;22
full: 2;2
full-time: 61;9, 61;11

<G>
G.5: 76;17, 76;19, 76;20, 77;13
G.F.: 23;16, 23;20, 25;8
gain: 107;17
gave: 36;11, 51;23, 73;7
gender: 81;9
general: 103;20
generally: 44;20, 59;9
getting: 105;18
Gilham: 1;18, 5;7
gist: 41;22
give: 10;6, 20;19, 65;16, 66;4, 66;7, 69;20, 85;19
given: 6;3, 49;12, 64;1, 65;4, 94;2, 107;18, 108;13, 110;13
gives: 65;19

Goddamn: 23;12
Gosh: 108;21
gotten: 36;2, 91;13, 91;18, 92;4
granted: 60;22
Greg: 14;16, 23;15, 25;3, 25;8, 27;6, 56;8, 56;13
grievance: 87;5, 88;8, 88;11
grievances: 89;1
ground: 9;5
grounds: 82;10
grow: 10;22, 11;1, 11;3
guard: 14;7, 14;23, 57;15
guards: 61;6, 101;8
guess: 13;3, 37;16, 108;11
guilt: 63;13

<H>
H.H.S.: 21;2
H.M.S.: 21;1
hand: 16;6
handbook: 20;13, 20;22, 27;2, 27;4, 27;5
handle: 82;13
Handley: 1;18, 5;7, 7;5, 7;8, 7;10, 7;13, 14;5, 14;17, 21;4, 21;6,
    56;1, 68;15, 70;9
handwritten: 17;2, 17;9, 17;14, 17;19, 17;20, 30;1, 30;7, 30;9,
    30;16, 30;20, 30;22, 31;2, 31;12, 31;17, 33;20, 38;3, 38;17, 39;11
happen: 62;16, 62;19, 63;19
happened: 18;22, 29;10
happening: 50;21
happens: 107;13
harassed: 25;1, 52;7, 87;20, 90;20, 91;1
harassing: 22;15
harassment: 13;11, 22;8, 26;3, 26;4, 26;21, 26;23, 30;14, 44;21,
    46;4, 47;1, 53;4, 54;6, 54;14, 54;22, 55;6, 64;2, 64;11, 64;16,
    64;23, 65;11, 65;12, 65;18, 66;21, 67;4, 74;15, 74;17, 74;20,
    76;9, 83;12, 84;8, 87;5, 88;17, 88;20, 89;7, 89;9, 89;12, 89;14,
    90;6, 90;8, 93;17, 93;22, 94;21
Hare: 19;14, 36;16, 36;19, 37;7
Harmon: 36;15, 36;20, 36;20, 37;7, 37;8
Harriet: 36;22, 37;8
he/she: 87;20

head: 35;15, 38;4, 39;21, 80;17
hear: 12;16, 16;10, 64;16
heard: 13;10, 13;12, 20;8, 23;1, 23;9, 26;9, 26;23
hears: 64;22
held: 94;4
help: 107;5
helpful: 107;4
hereby: 110;7
herself: 53;18
HHS: 21;5
High: 6;10, 7;5, 7;8, 7;11, 8;4, 13;20, 14;4, 21;6, 67;18, 67;19,
    70;9, 72;12, 72;23
highlighted: 100;13
HMS: 21;3, 21;4
Hodges: 45;6, 78;6, 78;18, 82;19, 98;10
hold: 20;16, 20;19, 86;7
home: 101;7
hour: 14;8, 14;8
hours: 61;11
huh-uh: 9;8
Hunter: 19;15, 24;1, 50;2, 52;8, 52;13, 52;15, 52;23, 53;9, 53;18,
    55;14
husband: 41;19

<I>
idea: 26;11
ignore: 25;12, 53;20
ill: 77;22
importance: 100;17
important: 16;10
in-service: 64;6, 72;13
in-services: 74;22
inaccurate: 28;19, 28;20
inadvertently: 104;14, 105;9
inappropriate: 22;13, 22;14, 29;3, 63;22
include: 47;16
included: 49;14, 49;19
including: 15;17
inconsistent: 87;13, 90;12, 90;16
independent: 17;15, 39;15, 44;15

INDEX: 3;7
individual: 66;5
inform: 74;19
information: 10;13, 17;1, 17;13, 39;14, 73;8, 74;3
informed: 75;5
initial: 33;2, 49;7, 49;23, 50;4, 51;6, 51;8, 51;10, 51;13, 59;5
initially: 32;16
initiate: 26;12
innocuous: 105;2
inside: 95;22
institutes: 74;21
instruct: 107;1
instruction: 58;7
insubordination: 58;6
intentionally: 104;16, 105;11
interaction: 58;8
interested: 110;17
interjected: 31;9
interview: 22;3, 30;5, 31;8, 31;13, 31;21, 32;21, 33;10, 36;22, 37;4,
    49;8, 51;23, 52;15, 53;23, 55;4
interviewed: 15;9, 32;9, 35;11, 36;15, 37;6, 48;19, 49;4, 49;21,
    49;22, 50;10, 51;22, 57;17
interviewing: 16;13, 44;6, 49;11
interviews: 15;20, 16;17, 17;16, 28;9, 33;7, 38;17, 39;16
investigate: 44;22
investigated: 45;1
investigation: 32;15, 33;3, 33;14, 43;18, 44;4, 45;8, 45;15, 45;17,
    45;23, 49;2, 49;23, 51;15
investigations: 16;5
involve: 6;9
involved: 8;11, 33;2, 33;6, 45;7, 45;16, 71;6
involvement: 14;1, 34;1, 43;17, 43;20, 44;4
involving: 22;8, 47;4
issue: 6;10
issues: 89;5, 108;8
IX: 45;4, 45;12, 78;1, 78;5, 78;11, 78;14, 78;19, 78;22, 79;3, 79;12,
    79;15, 80;12, 80;14, 80;16, 81;2, 81;8, 81;16, 82;7, 82;19, 82;23,
    83;7, 83;8, 83;14, 83;20, 84;4, 84;9, 84;11, 84;16, 85;14, 86;2,
    86;23, 87;23, 89;16, 89;23, 90;9, 91;2, 98;11

legal: 6;10, 81;13, 106;7, 106;14, 107;2, 107;3, 108;8
less: 61;10
level: 57;14, 83;6, 85;18, 86;22, 88;19, 89;8, 89;11, 90;15, 90;18
libraries: 77;18
library: 66;1, 66;12, 66;17, 66;22, 67;7, 67;16, 68;14, 68;17, 69;1,
    74;8, 75;1, 75;17
likes: 26;18, 26;19
limited: 17;14, 63;9
limiting: 58;12
line: 57;3
lines: 59;7, 99;5
list: 37;2, 39;6, 44;9
listened: 41;22
little: 20;17
local: 107;22
location: 25;6, 71;16, 74;12, 75;12
long: 9;21, 71;9
longer: 107;20, 107;23
longevity: 105;3
Look: 8;1, 17;7, 23;6, 52;18, 75;22, 77;6, 101;4, 101;22, 106;23
looked: 23;8, 48;20, 49;16
Looking: 26;19, 35;23, 74;15, 104;10
looks: 18;4, 30;11
lot: 11;5, 51;7
Lots: 26;14
lying: 55;1, 92;15

<M>
mad: 106;22
maiden: 10;20
male: 80;21, 82;18, 98;5
mandatory: 64;13
manual: 66;1, 66;10, 67;5, 68;14, 71;3, 73;4, 75;17, 77;7, 77;16,
    77;17, 88;23, 91;14, 91;16, 91;19, 92;4, 92;7, 92;12, 92;18,
    93;13, 93;18, 93;23, 95;3, 95;9, 95;13, 95;14, 95;15, 95;17,
    95;18, 95;19, 95;21, 95;23, 96;2, 97;2, 97;9, 97;21, 98;8, 98;13,
    98;20, 99;7, 99;15
manuals: 71;16, 72;7, 74;6, 74;12, 75;7
March: 108;22
MARCUM: 1;16, 5;22, 97;8

<J>
J.C.: 19;3, 19;5
JEFFERSON: 110;5
job: 14;1, 44;21, 45;1, 51;1, 78;12, 79;14, 79;16
Jones: 38;22, 37;9
Jr: 4;10
judgment: 51;16
July 2000,: 76;19
June 2007,: 1;20
June: 40;3, 40;3, 48;3, 48;6, 48;7, 48;8
jurisdiction: 107;23

<K>
K-i-p-p-i-e: 10;19
keep: 38;5
kept: 66;1, 93;2
kin: 110;16
Kippie: 10;19
Knight: 70;15
knowledge: 63;20, 73;6, 78;15
known: 35;22, 71;17, 72;2, 78;8, 79;11
knows: 93;5, 106;16

<L>
L.L.P.: 4;12
labeled: 76;9, 77;7, 77;8
language: 88;7
Large: 5;3
Last: 11;15, 24;9, 24;19, 25;10, 25;21, 27;16, 28;3, 41;14, 43;11,
    60;6, 76;8, 86;12, 94;12, 100;2
later: 22;22, 32;17, 32;18, 32;21, 50;19
laughed: 19;10
law: 61;5, 61;7, 61;13, 81;5
laws: 2;3, 61;2
lawsuit: 7;19
lawyer: 35;10, 37;18, 41;23
Leader: 79;5
leading: 2;8
leaves: 84;3
left: 20;17

mark: 13;4, 17;6, 25;16, 38;12
marked: 10;10, 38;16, 94;7, 101;21
marking: 15;23, 75;23
marks: 25;4
married: 10;16
Marshall: 20;8, 25;15, 50;2, 53;23, 54;5, 92;17, 104;6
Martin: 21;10, 67;22, 68;2, 68;3, 68;10, 68;11, 68;12, 69;19, 69;22,
    103;5, 104;9
Martin's: 21;11
matter: 40;15, 42;6, 88;9, 102;16, 107;2, 108;9
matters: 16;6, 107;22
McKinney: 21;9
mean: 28;5, 28;21, 29;7, 33;5, 34;15, 37;12, 43;19, 44;15, 59;4,
    81;12, 87;2, 95;1, 103;10, 103;11, 105;20, 107;11, 108;2
meaning: 102;18
means: 19;17, 59;2, 107;8, 107;9, 107;19
measure: 63;8
measures: 62;21
medication: 10;3
meet: 15;16
meeting: 14;14, 15;14, 28;13, 29;10, 30;18, 30;21, 30;23, 32;18,
    34;10, 35;7, 35;8, 36;18, 36;18, 37;1, 40;22, 41;13, 41;17, 58;3,
    72;10, 72;14, 73;2, 75;14
meetings: 29;20, 72;16, 73;8, 75;6
members: 12;2
memory: 9;5
mention: 75;19
mentioned: 24;3, 24;14, 24;23, 26;2, 39;18, 54;6, 58;9, 75;13
met: 5;23
MIDDLE: 1;2, 1;18, 5;7, 7;10, 12;19, 14;5, 14;17, 21;4, 55;21, 56;2,
    67;15, 68;15, 69;1, 69;6, 69;10, 70;12
miles: 11;10
milk: 105;3
mine: 13;18
minute: 16;16
misspoke: 48;10
mistake: 105;1
misunderstood: 51;17
morning: 5;22, 6;1, 14;8, 14;15
Morris: 4;7

Move: 55;17, 83;10
Ms: 12;16, 13;16, 15;17, 18;5, 18;20, 19;1, 19;11, 19;14, 19;15,
    19;15, 20;2, 20;8, 21;8, 21;10, 21;11, 21;16, 22;2, 22;4, 22;16,
    24;1, 24;3, 25;15, 27;9, 27;9, 28;4, 28;8, 28;11, 28;12, 28;12,
    28;13, 29;2, 29;5, 31;8, 31;9, 31;11, 31;13, 32;17, 33;14, 34;7,
    35;8, 36;15, 36;20, 37;1, 38;18, 39;4, 39;19, 41;5, 42;2, 42;10,
    42;15, 43;15, 43;20, 45;8, 45;11, 45;20, 47;4, 48;2, 49;8, 51;1,
    51;4, 51;16, 52;5, 52;8, 52;8, 52;13, 52;15, 52;23, 52;23, 53;9,
    53;9, 53;13, 53;18, 53;19, 53;22, 54;1, 54;5, 54;5, 54;20, 54;21,
    54;23, 55;12, 55;14, 55;18, 57;3, 58;2, 58;4, 58;8, 62;16, 62;18,
    65;5, 67;10, 67;14, 67;22, 68;1, 68;1, 68;3, 68;9, 68;9, 68;11,
    68;12, 69;8, 69;19, 69;20, 69;22, 69;23, 74;9, 77;12, 78;6, 91;8,
    92;17, 92;21, 94;1, 94;15, 94;17, 96;20, 98;1, 98;6, 98;10,
    102;14, 103;4, 103;6, 104;6, 104;8, 104;11, 105;9, 105;12, 108;5
mumble: 9;13
myself: 82;16

<N>
name: 5;22, 7;6, 7;16, 10;18, 10;20, 11;15, 57;3, 102;22, 105;10
named: 7;13
names: 36;11, 36;21, 51;22
nature: 6;13, 18;15, 23;13
necessary: 2;6, 45;2, 85;7
need: 9;6, 9;22, 28;6, 64;17, 80;18, 84;12, 85;3, 85;15, 97;8, 105;3,
    105;15, 105;16
needed: 16;8, 49;4, 70;6, 84;7, 84;20, 106;3, 108;16
needs: 46;8, 89;21
neither: 110;15
new: 33;15, 34;1, 34;8, 34;16, 35;2, 38;19, 39;4
newsletter: 100;20
newspaper: 79;2, 79;4
Next: 14;13, 15;3, 18;18, 19;23, 21;23, 22;1, 23;5, 24;1, 26;6,
    26;15, 33;12, 33;23, 34;2, 53;22, 89;10, 94;23, 106;17
nice: 18;4, 30;11
Nods: 35;15, 38;4, 39;21, 80;17
non: 8;22, 60;8
non-renewed: 8;19
Non-tenured: 60;11
None: 11;16, 19;22, 54;10, 55;7
nonresponsive: 55;17, 83;10

nor: 110;16
North: 4;13, 11;11
northern: 11;9
Notary: 1;17, 5;2
notation: 100;21
note: 17;22, 29;9
notes: 15;13, 15;19, 16;3, 16;4, 16;7, 16;17, 17;1, 17;2, 17;8, 17;9,
    17;15, 17;19, 17;20, 28;7, 29;6, 29;16, 29;23, 30;1, 30;3, 30;5,
    30;7, 30;9, 30;12, 30;16, 30;20, 30;21, 30;22, 31;3, 31;7, 31;12,
    31;17, 31;19, 31;20, 31;20, 32;6, 32;10, 33;20, 33;20, 35;14,
    35;23, 36;17, 37;4, 37;11, 38;3, 38;17, 38;22, 39;11, 39;11,
    39;18, 40;5, 48;20, 49;5, 49;15, 49;20, 52;16
Nothing: 10;5, 44;13, 55;3
notice: 2;15
noticed: 22;12, 22;13, 24;19, 24;22
number: 52;20, 100;12
numbers: 52;19
numeral: 77;21

<O>
oath: 106;16
Object: 44;1, 44;12, 81;4, 81;13, 81;19, 87;14, 90;21, 96;9, 96;14,
    100;5, 105;7, 106;23
objections: 2;7, 2;10
observation: 25;11
observed: 14;9, 53;19, 54;16
occasion: 110;14
OCR: 79;1
October: 12;19, 34;11, 48;15, 48;19, 57;18
off-the: 37;22, 38;13
offense: 18;15
offered: 2;12
office: 14;16, 20;7, 21;8, 25;18, 26;9, 27;21, 34;18, 37;16, 41;10,
    55;9, 55;12, 55;21, 66;2, 66;12, 66;14, 66;15, 66;16, 66;18,
    66;23, 67;1, 67;6, 67;6, 69;5, 68;10, 69;16, 70;20, 70;22, 70;23,
    71;1, 74;7, 75;1, 75;18, 77;19, 82;13, 82;15, 92;14, 93;3, 95;6,
    98;11, 98;13
officer: 11;20
offices: 77;18
Okay: 6;13, 8;23, 9;4, 10;1, 10;9, 10;16, 11;5, 11;22, 12;8, 12;21,

12;23, 13;3, 13;23, 14;11, 15;4, 15;8, 15;22, 16;15, 16;23, 17;5,
    17;21, 18;9, 18;16, 18;18, 19;8, 19;13, 19;21, 19;23, 20;5, 21;7,
    21;13, 21;19, 21;22, 22;6, 23;4, 28;3, 28;15, 29;19, 29;22, 30;6,
    31;1, 31;6, 31;14, 32;22, 33;9, 33;12, 33;23, 34;10, 34;13, 34;19,
    35;4, 35;18, 36;3, 38;7, 38;15, 39;8, 39;10, 39;18, 41;8, 41;16,
    43;6, 43;11, 45;19, 45;22, 46;5, 48;10, 46;18, 47;21, 48;3, 48;18,
    51;5, 52;21, 53;6, 56;17, 57;17, 57;21, 59;9, 60;6, 60;13, 61;12,
    64;1, 65;4, 65;10, 66;9, 66;11, 66;20, 67;10, 68;13, 69;3, 69;8,
    70;7, 72;8, 76;16, 76;23, 77;9, 77;11, 77;15, 78;4, 78;7, 79;22,
    80;2, 81;14, 81;15, 82;17, 82;22, 86;17, 87;11, 87;18, 87;19,
    91;8, 91;15, 93;4, 94;11, 95;14, 95;20, 96;4, 96;18, 98;3, 98;15,
    99;20, 100;17, 101;4, 101;20, 105;13, 109;5
old: 96;7
Once: 14;11, 42;2, 60;21, 91;23, 103;2
One: 4;12, 6;7, 8;23, 11;16, 12;23, 17;23, 24;13, 28;8, 28;17, 36;20,
    38;8, 51;3, 52;1, 52;4, 52;11, 54;13, 55;8, 64;8, 67;16, 67;23,
    68;23, 69;4, 69;6, 69;9, 69;13, 70;4, 70;5, 70;19, 70;23, 78;21,
    81;17, 82;9, 82;13, 82;18, 83;20, 91;20, 93;19, 95;5, 95;6,
    96;23, 97;6, 97;10, 99;16, 108;8
ones: 31;23, 37;8, 44;8, 49;22
opening: 72;13, 72;13, 73;2
opinion: 35;20, 47;18
opportunity: 85;19
oral: 5;10
order: 105;17, 107;15, 109;3
ordered: 108;1
organizational: 56;19, 56;22, 57;9
original: 102;17
overheard: 55;9
overhearing: 55;11
Overton: 26;17
own: 39;15, 44;17, 94;1, 94;5, 101;1

<P>
packed: 21;1, 67;17, 68;14, 69;2
PAGE: 3;3, 17;21, 18;18, 19;23, 21;23, 22;1, 23;5, 24;1, 26;15, 28;4,
    30;6, 31;7, 52;14, 52;19, 53;22
pages: 76;8, 94;12
paper: 79;7, 79;13
paragraph: 100;12, 105;14

paraphrasing: 86;20
pardon: 80;4
parentheses: 28;5
Part: 20;6, 20;17, 23;3, 65;2, 67;14, 79;1, 88;16, 90;3, 91;4, 95;17
particular: 8;7, 74;9
parties: 1;14, 2;9, 110;16
parts: 54;11
pass: 51;15
past: 27;8, 61;3, 64;9
pasted: 103;15
pasting: 103;23
people: 15;20, 16;13, 29;23, 32;9, 34;21, 34;23, 35;1, 36;12, 37;5,
    38;18, 39;6, 48;19, 49;5, 49;12, 49;13, 49;14, 49;18, 51;21,
    51;22, 52;3, 54;11, 55;4, 55;7, 57;18, 58;15, 61;13, 67;11, 67;12,
    75;13, 82;15, 83;20
perception: 25;14
perhaps: 86;20, 86;21
period: 41;12
person: 28;22, 65;1, 78;1, 79;22, 80;3, 80;6, 80;10, 81;16, 82;8,
    82;12, 82;21, 83;21, 83;23, 84;3, 84;8, 89;12, 90;4, 90;8, 90;23
personal: 73;6
personally: 24;18
personnel: 77;7, 77;10, 95;22, 96;2
phase: 33;2, 49;23, 50;5
phone: 34;16
phrasing: 46;2
Place: 4;12, 55;6
places: 79;20
PLAINTIFF: 1;6, 4;9, 6;17
Plaintiffs: 101;21
play: 36;7
Please: 9;14, 17;4, 18;18, 29;1, 42;13, 46;14, 48;10, 49;17, 52;12,
    53;8, 60;12, 64;19, 99;1
point: 33;4, 84;20, 85;2, 85;15, 89;20, 89;21, 90;3
policies: 74;4, 74;23, 77;5
Policy: 27;3, 45;3, 58;21, 58;22, 59;13, 59;17, 59;19, 61;16, 62;6,
    65;9, 65;12, 65;16, 65;21, 65;23, 66;10, 67;12, 68;5, 68;21,
    69;21, 72;7, 74;5, 74;15, 74;18, 74;23, 75;6, 75;17, 76;10, 76;16,
    77;6, 77;10, 77;11, 80;5, 80;11, 84;4, 84;10, 84;17, 85;1, 85;11,
    87;13, 89;7, 89;10, 89;15, 90;13, 90;23, 91;5, 91;14, 91;18,

92;12, 92;18, 93;13, 93;15, 93;18, 93;22, 94;13, 94;20, 95;2, 95;3, 95;7, 95;8, 95;10, 95;11, 95;12, 95;14, 95;15, 95;16, 95;17, 95;19, 95;23, 96;16, 97;2, 97;5, 97;9, 97;15, 97;21, 98;13, 99;15, 99;19
pop: 103;11
PORTER: 3;4, 4;7, 5;21, 5;23, 11;8, 11;12, 11;13, 13;5, 13;7, 15;5, 21;21, 29;13, 37;20, 38;2, 38;11, 38;15, 44;3, 44;14, 61;12, 81;6, 81;10, 81;14, 81;15, 81;20, 82;1, 82;4, 86;12, 86;17, 86;18, 87;18, 91;4, 96;10, 96;14, 98;18, 100;6, 102;13, 103;2, 105;4, 105;13, 106;11, 106;15, 106;19, 106;23, 107;6, 107;7, 109;5, 109;9
portion: 86;14
position: 12;9, 21;11, 62;19, 78;8
positions: 60;15
possibility: 59;12
post: 27;22, 78;14
posted: 62;21, 78;12
practice: 59;19, 61;19, 62;7, 62;8, 62;11, 62;15, 85;22, 85;23, 87;12
prepared: 10;11
presence: 51;3
Present: 4;15, 6;17, 24;11, 28;10, 40;23, 47;16, 58;4, 64;14, 73;15, 80;5, 87;21
preventative: 62;21, 63;6, 63;15
preventive: 62;13
previous: 22;19, 36;18
PRICE: 1;5, 4;15, 5;9, 5;17, 13;16, 15;17, 18;5, 18;20, 19;1, 19;11, 21;16, 22;9, 22;9, 22;16, 23;9, 23;17, 24;3, 24;7, 27;11, 29;2, 29;5, 31;8, 31;13, 32;18, 33;14, 34;7, 35;8, 37;1, 38;18, 39;4, 39;19, 41;5, 42;2, 42;11, 42;15, 43;15, 43;20, 45;11, 45;20, 48;2, 49;8, 51;1, 51;16, 52;5, 52;8, 52;23, 53;9, 53;13, 53;19, 54;1, 54;6, 54;20, 54;21, 54;23, 55;12, 55;18, 57;4, 58;2, 58;5, 58;8, 62;18, 67;10, 68;1, 68;9, 69;8, 69;20, 69;23, 77;12, 91;9, 94;17, 96;20, 102;9, 102;14, 102;16, 103;6, 104;8, 104;11, 105;10, 105;12, 108;5, 108;9
Price's: 12;17, 45;8, 47;4, 62;16, 65;6, 67;14, 74;9, 94;1, 94;15
principal: 8;4, 13;21, 14;4, 14;16, 20;1, 56;9, 56;10, 56;15, 56;16, 72;12, 72;19, 72;23, 88;10, 92;11, 97;23, 98;2, 98;7, 98;18
principal's: 66;2, 66;16, 69;5, 69;9, 93;3
principals: 71;18, 71;20, 71;22, 72;2, 73;7
printout: 102;2
prior: 2;12

problem: 83;1, 86;19, 98;21, 99;4, 99;12
problems: 81;2, 87;4
Procedure: 5;5, 67;5, 77;16, 83;2, 83;3, 83;7, 83;13, 83;19, 87;19, 88;12, 88;13, 88;15, 88;16
procedures: 45;12, 55;23, 55;23, 66;22, 72;15, 77;22, 91;20, 93;20, 94;20
proceedings: 5;11
process: 51;10, 51;14, 105;16, 105;17, 106;2, 108;17
produced: 76;2, 100;9
product: 71;11
professional: 60;3, 64;6, 82;11
progressive: 58;20, 59;17, 61;14, 61;16, 61;22, 62;2
proper: 20;14, 21;1, 83;2, 83;3
propped: 23;22
prove: 36;7
provided: 5;4, 93;19
provision: 88;23
Public: 1;18, 5;2
publish: 79;2
Pudles: 1;17, 4;3, 5;1
purpose: 16;4
put: 31;2, 50;19, 58;14, 58;15, 60;18, 62;15, 102;22, 103;8, 103;12, 103;22, 108;4
PX-1: 3;8
PX-10: 3;16
PX-2: 3;9
PX-3: 3;10
PX-4: 3;11
PX-5: 3;12
PX-7: 3;13
PX-8: 3;14
PX-9: 3;15

<Q>
Question: 8;15, 9;9, 9;15, 9;17, 9;23, 15;3, 24;2, 25;3, 25;4, 25;16, 29;14, 31;15, 32;12, 44;2, 46;10, 48;12, 48;17, 49;6, 49;17, 52;22, 53;7, 54;19, 65;7, 72;1, 74;2, 75;2, 75;11, 79;8, 81;13, 81;13, 81;22, 82;6, 83;11, 86;5, 86;8, 88;15, 90;3, 91;5, 93;11, 94;9, 96;22, 97;17, 102;17, 103;7, 103;18, 103;21, 104;3, 105;9, 106;14, 107;4

questioning: 54;13
questions: 2;8, 2;9, 54;14, 106;12, 110;9
quick: 86;9
Quote: 18;2, 30;13, 74;16

<R>
race: 8;19
racial: 6;15, 6;15
Randolph: 79;5
rather: 63;1
re: 44;19
reached: 83;4, 83;5, 84;20, 85;14, 88;19, 89;8, 89;11
reactor: 63;1
Read: 13;9, 14;17, 17;16, 17;23, 18;8, 18;19, 28;16, 28;17, 29;12, 67;3, 79;6, 86;15, 101;5
reading: 1;22, 24;20, 25;12
reads: 17;22
real: 86;9
really: 96;15
recall: 7;23, 11;16, 27;17, 30;18, 30;23, 32;3, 32;7, 33;13, 34;4, 34;5, 36;14, 36;14, 44;13, 48;3, 64;8, 65;2, 79;21, 79;21, 79;21
receive: 79;23
received: 12;18, 13;9, 80;11, 100;23
receives: 81;17, 82;9
recess: 38;1, 86;10, 109;7
recognize: 16;1
recollection: 14;13, 17;3, 17;15, 28;7, 28;20, 30;22, 31;19, 33;17, 36;23, 39;15, 40;3, 71;2, 73;5, 102;13, 104;7
record: 16;9, 17;19, 37;21, 37;23, 38;14, 86;16
recorder: 16;12
reduced: 110;10
refer: 16;7, 19;5, 28;7, 36;17
reference: 21;20, 31;11
referring: 49;19, 52;11, 59;14, 89;3, 89;4, 94;8, 94;10
refers: 19;11
reflect: 29;19
reflected: 29;6, 49;5, 49;15
refrain: 9;7
refresh: 9;4

regard: 31;6, 33;13, 61;12, 74;8
regarding: 31;8, 31;13, 108;5
rehired: 60;17
related: 14;1
relating: 2;3
relayed: 96;5
released: 60;10
relevance: 105;1
remark: 29;5
remarks: 29;3, 63;22
remember: 7;21, 24;13, 27;19, 28;1, 35;7, 36;13, 36;19, 40;1, 67;10, 69;11, 73;23, 82;14, 99;23, 108;10, 108;21
remembered: 22;20
remove: 51;20
renew: 9;1
renewed: 60;8
renewer: 8;22
renovation: 67;20, 68;18
Repeat: 9;15, 17;4, 42;13, 67;2
repeats: 30;12
Rephrase: 9;15, 32;12, 35;19, 39;1, 44;19, 46;14, 60;12, 64;19, 83;16, 99;1
replaced: 76;13
reply: 102;12, 102;18
report: 11;22, 64;17, 65;1, 80;11, 83;19, 84;8, 84;13, 84;15, 84;21, 85;3, 85;8, 85;9, 85;13, 85;15, 89;14, 90;9, 90;13, 91;2, 91;6, 91;10, 96;6, 96;21, 98;21
reported: 84;4, 84;23, 99;4, 99;12
REPORTER: 5;2, 5;13
reporting: 65;20, 68;21, 67;4, 77;15, 77;22, 82;22, 83;1, 83;19, 91;19, 93;22
reports: 107;16
represent: 76;1, 100;8
represents: 110;12
request: 66;8
requested: 86;13
required: 51;2, 72;8
resolved: 86;2
respective: 1;15
respond: 14;19, 46;1

responded: 14;20
responding: 106;14
response: 18;1, 30;8, 102;16, 108;9
restraints: 58;14
result: 65;5, 110;18
results: 7;19
resume: 10;10
revised: 21;15, 67;13, 76;22, 77;1
revision: 68;4, 70;1
revisions: 71;3, 71;10
rise: 86;22
Road: 1;19, 5;8
ROANOKE: 1;8, 1;19, 5;8, 10;22, 11;3, 46;4, 57;10, 63;17, 82;14,
    105;22
Robbie: 56;9, 98;6
Roman: 77;21
Roper: 12;15
Rose: 4;11
Rosemarie: 50;2
roughly: 14;8
Rule: 5;4, 93;7, 93;9, 93;10
Rules: 2;3, 5;4, 9;5

<S>
S.Y.: 27;13, 27;15, 27;17, 27;19
SAITH: 109;12
sat: 28;8
saw: 13;8, 25;23
saying: 9;7, 14;23, 19;3, 21;16, 22;15, 32;4, 35;13, 36;5, 36;9,
    36;11, 52;6, 55;3, 62;14, 62;16, 67;11, 69;11, 74;1, 89;6, 90;3,
    97;8
says: 20;19, 22;21, 29;2, 30;8, 30;9, 30;13, 31;9, 62;18, 62;18,
    74;18, 77;22, 80;5, 83;19, 84;10, 87;19, 88;2, 93;7, 96;11
Schaffer: 1;17, 4;3, 5;1
School: 1;18, 5;7, 6;10, 6;19, 6;21, 7;2, 7;4, 7;5, 7;8, 7;10, 7;11,
    8;5, 8;9, 9;2, 11;21, 13;17, 13;20, 14;4, 14;5, 14;17, 18;23,
    21;4, 21;6, 24;9, 24;12, 24;15, 40;15, 42;5, 53;14, 55;21, 56;2,
    56;22, 57;11, 66;17, 66;17, 66;23, 67;7, 67;7, 67;15, 67;18,
    67;19, 68;6, 68;7, 68;15, 69;1, 69;6, 69;10, 70;2, 70;3, 70;10,
    70;12, 70;15, 70;19, 72;10, 72;12, 72;23, 74;13, 74;18, 74;21,

signature: 1;22
significance: 32;4
sir: 6;2, 6;5, 7;12, 7;15, 7;23, 9;20, 10;2, 10;4, 10;8, 10;12,
    10;15, 10;17, 10;23, 11;4, 11;7, 12;1, 12;7, 12;10, 13;2, 13;12,
    13;14, 14;3, 15;12, 15;15, 15;18, 15;21, 16;14, 17;12, 19;7,
    29;21, 31;4, 33;8, 48;23, 58;23, 63;23, 70;21, 71;5, 71;8, 72;21,
    74;14, 80;9, 80;19, 100;11, 100;14, 100;16, 102;4, 102;4, 102;10,
    102;20
sit: 33;7
situation: 59;23, 60;1, 61;23
situations: 62;23
Somebody: 60;6, 64;17, 66;20, 67;3, 79;6, 79;16, 84;14, 103;12,
    103;17, 103;21, 104;5
someone: 58;13, 85;17, 88;20
someone's: 58;13
Sometime: 41;12
Sometimes: 9;12, 9;12, 9;13
somewhere: 12;19, 93;4, 106;5, 108;12
son: 13;19
sorry: 7;16, 8;14, 13;6, 15;4, 96;10
sort: 44;15, 56;17, 62;4, 80;23
special: 55;14
specific: 32;11, 65;8, 74;23, 75;12
specifically: 65;5, 98;20
spoke: 20;10
spring: 105;23, 107;19
square: 57;2
staff: 72;6, 74;5, 75;5, 100;21, 100;22
stages: 71;14
standing: 24;22
start: 20;20, 59;5, 59;9, 105;17, 108;16, 108;18
Started: 8;5, 18;21, 71;12, 88;18, 94;9
starting: 71;14, 106;2
STATE: 5;2, 52;8, 52;23, 61;5, 110;4
stated: 98;16
statement: 18;8, 18;10, 18;11, 54;8, 81;5, 92;16, 105;2
statements: 55;5
STATES: 1;1
status: 105;18, 105;20, 106;4, 107;10, 107;11, 107;18, 108;2, 108;17
stenotype: 110;9

77;18, 87;22, 91;21, 101;6, 101;16, 107;14, 107;21
Schools: 46;4, 57;10, 63;17, 70;7, 73;9, 74;22, 75;20, 98;17, 99;18,
    105;23
second: 6;7, 16;21, 62;4, 91;4, 105;14
secretary: 21;12, 55;8, 67;22, 92;23, 93;5, 93;8, 95;5, 95;6, 103;5,
    104;9
section: 95;22
seeing: 27;19
seemed: 25;10
seen: 22;17, 25;5, 26;12, 26;14, 57;8, 100;10, 101;23
seminar: 94;2
seminars: 64;5
send: 100;19, 105;12
sending: 102;5, 102;8, 108;6
sense: 28;22
sent: 37;3, 39;6, 102;3, 102;14, 104;6, 105;2, 105;9
sentence: 26;7
separate: 88;22, 88;23, 96;1
serious: 18;15, 50;15, 62;4, 63;15
service: 60;18, 60;21
set: 14;14, 49;11
settled: 7;20
seven: 70;18
several: 31;4, 92;8
sexual: 13;11, 23;13, 26;2, 26;4, 26;20, 26;23, 30;14, 46;4, 53;4,
    54;6, 54;14, 54;22, 55;6, 64;2, 64;11, 64;16, 64;23, 65;11, 65;12,
    65;18, 66;21, 67;4, 74;15, 74;17, 74;19, 76;8, 83;12, 84;7, 87;5,
    88;17, 88;19, 89;7, 89;9, 89;12, 89;13, 90;5, 90;8, 93;17, 93;21,
    94;21
sexually: 22;14, 25;1, 52;6, 87;20, 90;20, 91;1
shall: 2;6, 87;21
Sharon: 50;2
She's: 21;12, 61;9, 61;10, 79;3, 82;20, 90;7, 90;20, 92;15, 97;20,
    104;18
she...: 23;16, 24;7
Shirley: 7;7, 7;17, 7;18
short: 38;1, 86;10, 109;7
show: 10;9, 15;22, 38;15, 75;23, 94;6, 100;6, 101;20
shows: 58;23
sick: 55;18, 55;19

step: 51;10, 51;13, 59;8, 62;3, 62;4, 62;10, 62;13, 62;14, 63;2,
    63;18, 87;8
Stephens: 36;22, 37;8
steps: 47;2, 50;20, 50;20, 59;14, 59;20, 61;4, 65;20, 74;19, 78;21,
    79;8, 79;12, 94;23
stipulate: 106;10
STIPULATED: 1;13, 1;21, 2;5, 2;14
stipulation: 5;6
stipulations: 5;14, 5;15
stop: 19;1, 47;1, 93;1
stopped: 97;14, 97;18
strike: 55;17, 80;15, 83;10
student: 13;18, 13;20, 27;4, 44;23, 77;8, 87;21
students: 80;20, 81;1
stuff: 19;4
subjected: 90;5, 90;7
subjectivity: 51;20
subsequent: 73;9
subsequently: 15;16
substance: 28;21, 32;23
substantiate: 41;2, 48;1, 48;5
substantive: 42;8
sue: 42;1
suit: 6;11, 26;23, 106;1
Suite: 4;8
summer: 34;9, 34;20, 40;2, 41;14, 41;15, 43;11, 43;13, 71;12
Superintendent: 8;2, 11;19, 12;13, 14;6, 57;11, 72;19, 72;20, 78;2,
    80;6, 80;7, 83;22, 83;23, 96;11, 96;12, 96;16
supervising: 14;2
supervision: 110;11
supervisor: 56;5, 56;6, 56;18, 82;23, 83;1, 83;12, 83;15, 84;15,
    84;16, 84;23, 85;10, 89;18, 90;14, 91;6, 96;7
supervisors: 55;8
Susan: 36;16, 36;18, 37;7
SWEENEY: 4;10, 5;14, 15;2, 33;21, 38;9, 44;1, 44;12,
    61;8, 64;8, 81;4, 81;8, 81;12, 81;19, 81;22, 82;2, 86;7, 87;14,
    90;21, 94;2, 96;9, 100;5, 102;6, 102;15, 104;23, 105;7, 106;9,
    106;13, 106;18, 106;21, 107;2, 108;7
Sweeney's: 18;8, 18;9, 18;11
sworn: 5;18

system: 13;17, 74;18, 74;21, 107;14, 107;21

<T>
T.C.: 22;10, 22;17, 22;23, 23;1, 23;9, 23;12, 23;14, 23;19, 23;22, 24;2, 25;16
T.H.: 24;3, 24;9, 24;13, 24;19, 25;2, 25;10
table: 9;23
talked: 39;19, 62;3, 64;21
talks: 74;16
tape: 16;12, 38;6, 39;20, 40;6, 42;12, 42;16
tapes: 41;2, 41;6, 41;20, 43;4, 43;5
Taylor: 10;21, 11;15
teacher: 13;19, 55;14, 55;15
teachers: 19;16, 36;10
telephone: 40;18
tend: 54;9
tenured: 60;9, 60;13, 60;15, 60;16
Teresa: 50;2
term: 59;2, 106;5, 106;7
terminate: 60;20
Terminated: 60;7, 60;8, 60;9
termination: 6;22
testified: 5;19
testimony: 10;7, 49;13, 86;14, 110;13
text: 55;10
Thanks: 109;10
There's: 7;10, 10;5, 28;18, 32;17, 36;14, 46;8, 51;7, 55;3, 56;23, 69;4, 69;13, 70;21, 70;22, 88;22, 88;22, 89;5, 89;5, 91;11, 91;11, 93;9, 93;10, 95;20, 95;22, 96;1
thereto: 2;13, 110;10
they've: 91;1
think...: 26;6
thinking: 99;5
though: 97;16
Three: 12;9, 25;3, 70;8
Tina: 50;1
Title: 45;4, 45;12, 77;23, 78;5, 78;11, 78;14, 78;19, 78;22, 79;3, 79;12, 79;15, 80;12, 80;14, 80;16, 81;2, 81;8, 81;10, 81;16, 82;7, 82;19, 82;23, 83;7, 83;8, 83;14, 83;20, 84;4, 84;9, 84;11, 84;16, 85;14, 86;2, 86;23, 87;23, 89;16, 89;23, 90;9, 91;2, 98;11

Today: 10;3, 47;18, 55;20
tolerate: 46;3, 63;16
tolerated: 65;14
took: 78;21, 91;23
top: 28;3, 31;7, 57;11, 76;21
torn: 21;14, 68;5, 70;1
totality: 59;23
totally: 105;21
toward: 63;3, 63;18
towards: 24;10, 88;17, 106;2, 106;2
tracks: 51;7
traffic: 23;18
trainers: 64;21
training: 64;2, 64;20, 65;3, 65;5, 65;8
transcribe: 30;19
transcribed: 43;7
transcript: 110;12
transcripts: 35;10
tree: 57;12
trial: 2;11
tried: 67;11, 92;14
trouble: 47;8
truck: 23;23
true: 10;13, 14;21, 35;13, 36;5, 36;9, 110;12
truthful: 10;7
try: 9;7, 9;15, 16;9, 17;5, 20;18, 48;18, 51;20, 83;18
trying: 25;11, 53;20, 106;21, 107;4
turned: 33;19, 37;17
Tuscaloosa: 11;11
twenty: 61;10
Two: 13;16, 18;1, 18;21, 47;12, 61;3, 64;7, 68;6, 70;2, 70;19, 70;22, 76;8, 77;4, 79;20, 79;21, 82;15, 83;20, 94;12, 98;17
type: 63;10, 72;15, 104;1
typed: 16;16, 17;8, 28;16, 29;23, 30;3, 30;12, 30;21, 31;7, 31;22, 32;5, 33;20, 38;3, 38;22, 39;10, 52;16, 103;14

<U>
ultimate: 12;5
unable: 20;22, 21;2, 70;4, 92;1
Uncomfortable: 18;6, 23;7, 24;4, 52;9, 53;1, 53;3, 53;6, 53;10, 88;21

uncomfortableness: 24;6
understand: 8;14, 9;14, 10;6, 44;2, 71;23, 75;11, 82;1, 82;3, 82;5, 82;6, 84;22, 107;3
understanding: 47;9, 59;2, 73;11, 73;12, 95;12, 101;12, 101;13, 101;15, 101;19, 107;8
understood: 9;18
unified: 107;14
unit: 107;14
Unitary: 105;18, 105;20, 106;3, 107;10, 107;11, 107;18, 108;2, 108;17
UNITED: 1;1
University: 64;10
unless: 58;8, 82;22, 83;14, 84;15
unrelated: 105;21
unsubstantiated: 57;19
until: 15;3, 105;23
unwelcome: 94;23
upper: 20;6
upset: 41;18
Usual: 5;14, 5;15

<V>
validity: 44;18, 46;12, 46;16, 47;6, 47;19, 48;22, 50;13, 50;16
verbal: 58;16, 59;10
verbalize: 9;6, 80;18
verbatim: 65;17, 74;17
verify: 36;10
view: 85;11
VII: 81;11

<W>
wait: 15;3
waived: 1;23, 2;16
walk: 25;20
walking: 24;20, 26;5, 26;8
wanted: 27;14, 35;12, 36;6, 43;5, 66;20, 67;3, 93;14, 95;8, 97;12, 108;14
wanting: 95;3, 97;20
wants: 89;15
warning: 58;16, 59;10, 59;11
week: 61;11, 100;19

weekly: 100;20
whatever: 36;2, 50;19, 51;19, 97;11, 106;22, 108;12
whatsoever: 51;1
Whereupon: 5;10, 37;22, 38;13, 86;10, 86;13, 109;7
whether: 36;17, 40;16, 44;17, 46;12, 46;16, 47;6, 48;21, 50;12, 50;15, 68;13, 69;19, 73;7, 87;5
White: 4;11
wife: 11;3, 11;13, 40;7, 40;11, 41;7, 41;9, 43;1
wife's: 10;18
Will: 5;13, 6;7, 9;15, 15;2, 29;14, 32;18, 32;19, 32;19, 49;13, 52;5, 65;14, 74;18, 100;7
withdraw: 107;5
WITNESS: 1;23, 5;9, 15;4, 37;2, 39;5, 44;13, 61;10, 82;3, 87;15, 90;22, 96;15, 105;6, 105;8, 110;13
witnessed: 24;17, 25;19
witnesses: 28;10, 32;19, 33;15, 34;1, 34;8, 34;16, 35;2, 35;11, 37;2, 38;19, 39;4, 44;7, 49;19, 50;7, 50;11
word: 48;16, 62;16, 62;17
words: 23;10, 23;11
work: 7;2, 7;4, 22;22, 33;5, 55;20, 72;11
worked: 7;5, 14;7
working: 6;19, 6;21, 106;2
workshop: 64;11, 94;18, 96;6
writing: 110;10
written: 14;18, 17;1, 23;17, 24;8, 58;22, 59;10, 59;17, 59;20, 61;16, 61;19, 62;6, 85;23, 89;8

<Y>
y'all: 44;14, 44;16, 71;9, 108;18, 109;2
Yarbrough: 20;9, 27;9, 28;14, 50;3
year: 7;21, 18;23, 24;9, 24;10, 24;12, 24;19, 24;21, 25;10, 25;21, 26;2, 27;6, 27;13, 27;16, 27;18, 27;23, 28;2, 60;18, 72;10, 74;13, 108;23
years: 12;9, 18;21, 22;19, 61;3, 61;20, 73;9, 73;10
yourself: 17;11, 28;17, 29;17

RÉSUMÉ

NAME: _Chuck Marcum_

ADDRESS: _276 Fincher Road    Roanoke, Al    36274_

PLACE OF EMPLOYMENT: _Roanoke City Schools_

POSITION OF EMPLOYMENT: _Superintendent_    HOW LONG: _3 years_

EMPLOYMENT BACKGROUND (LAST 10 YEARS:

_2004 — present - Superintendent_

_2000 - 2004 -    Principal  Handly High School_

_1990 - 2000 -    Social Studies teacher/coach Handly High_

EDUCATIONAL BACKGROUND:

HIGH SCHOOL: _Hubbertville High School_

COLLEGE: _University of North Alabama, JSU_

POST GRADUATE DEGREES: _BS- UNA, Masters Social Science - JSU, Masters in Adm - JSU, Educational Specialist in Adm - JSU_



PLAINTIFF'S EXHIBIT 1

RÉSUMÉ

NAME: Gregory Donnell Foster

ADDRESS: 513 Overby Park Drive Newnan, GA 30263

PLACE OF EMPLOYMENT: Roanoke City Schools

POSITION OF EMPLOYMENT: Principal   HOW LONG: 4 years

EMPLOYMENT BACKGROUND (LAST 10 YEARS:

- 1996 - 1998 Subsitute Teacher / Jackson, MS
- 1998 - 2001 Booker T. Washington, World History Teacher / Tuskegee, AL
- 2001 - 2003 Forest Park High School, 9th grade history teacher / Forest Park, GA
- 2003 - Present Handley Middle School, Asst. Principal & Principal / Roanoke, AL

EDUCATIONAL BACKGROUND:

HIGH SCHOOL: William - Sullivan High School
COLLEGE: Tuskegee University
POST GRADUATE DEGREES: M.Ed.  EDS.



PLAINTIFF'S
EXHIBIT
1 Foster

EXHIBIT 5

1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2      FOR THE MIDDLE DISTRICT OF ALABAMA,
 3                 EASTERN DIVISION
 4
 5   ANGELA PRICE,          )
 6         PLAINTIFF,       )
 7   V                      )   CIVIL ACTION NO.
 8   ROANOKE CITY BOARD OF )   3:06-CV-742-VFM
 9   EDUCATION,             )
10        DEFENDANT.        )
11
12         S T I P U L A T I O N
13        IT IS STIPULATED AND AGREED, by
14   and between the parties, through their
15   respective counsel, that the deposition of
16   ROBBIE BENEFIELD, may be taken before
17   Deborah Pudles Schaffer, Commissioner and
18   Notary Public, at 251 Gilham Road, Roanoke,
19   Alabama, on the 22nd day of June, 2007,
20   commencing at 10:40 a.m.
21        IT IS FURTHER STIPULATED AND AGREED
22   that the signature to and reading of the
23   deposition by the witness is waived, the
```

3

```
 1
 2              I N D E X
 3   EXAMINATION BY              PAGE NO.
 4   Mr. Porter                   5 - 8
 5
 6
 7              INDEX OF EXHIBITS
 8   PX-1                          5
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

2

```
 1   deposition to have the same force and effect
 2   as if full compliance had been had with all
 3   laws and rules of Court relating to the
 4   taking of depositions.
 5        IT IS FURTHER STIPULATED AND AGREED
 6   that it shall not be necessary for any
 7   objections to be made by counsel to any
 8   questions, except as to form or leading
 9   questions, and that counsel for the parties
10   may make objections and assign grounds at
11   the time of trial or at the time said
12   deposition is offered in evidence, or prior
13   thereto.
14        IT IS FURTHER STIPULATED AND AGREED
15   that notice of filing of the deposition by
16   the Commissioner is waived.
17
18
19
20
21
22
23
```

4

```
 1
 2   BEFORE:
 3            Deborah Pudles Schaffer,
 4   Commissioner.
 5
 6   APPEARANCES:
 7        Adam M. Porter, Esquire, 2301 Morris
 8   Avenue, Suite 102, Birmingham, Alabama,
 9   35203, appearing on behalf of the Plaintiff.
10        Donald B. Sweeney, Jr., Esquire, of
11   the firm Bradley, Arant, Rose & White,
12   L.L.P., One Federal Place, 1819 5th Avenue
13   North, Birmingham, Alabama, 35203, appearing
14   on behalf of the Defendant.
15        Also present: Angela Price
16                      Chuck Marcum
17
18
19
20
21
22
23
```

5

```
 1        I, Deborah Pudles Schaffer, a court
 2   reporter acting as Notary Public, State of
 3   Alabama at Large, certify that on this date,
 4   as provided by Rule 30 of the Alabama Rules
 5   of Civil Procedure, and the foregoing
 6   stipulation of counsel, there came before
 7   me at Handley Middle School, 251 Gilham
 8   Road, Roanoke, Alabama, beginning at 10:40
 9   a.m., ROBBIE BENEFIELD, witness in the above
10   cause, for oral examination, whereupon the
11   following proceedings were had:
12
13            ROBBIE BENEFIELD,
14   being first duly sworn, was examined and
15   testified as follows:
16
17   EXAMINATION BY MR. PORTER:
18   Q       Good morning, Ms. Benefield.  My
19   name is Adam Porter and I represent Ms.
20   Price in her lawsuit against the board.  I
21   appreciate your coming in.  Let me show you
22   what I'm marking as Exhibit 1 to your
23   deposition.
```

6

```
 1        Is this a brief resume that you
 2   drafted for us with some contact background
 3   information?
 4   A       Yes, sir, it is.
 5   Q       Are you aware of the claims that Ms.
 6   Price makes in this case?
 7   A       Yes.
 8   Q       What is your understanding of them?
 9   A       Only that she claims that Mr. Cottle
10   has sexually harassed her.
11   Q       When did you first hear about that
12   allegation?
13   A       When Mr. Foster told me that Mr.
14   Marcum had, that she had discussed it with
15   Mr. Marcum.
16   Q       Okay.  Do you know what the EEOC is,
17   Equal Employment Opportunity Commission?
18   A       Yes.
19   Q       At that point had she already filed a
20   claim with them like this, do you recall
21   that?
22   A       I have no knowledge of that.
23   Q       Okay.  Do you remember the month or
```

7

```
 1   season of when this occurred?
 2   A       No.
 3   Q       Was it like a year ago?
 4   A       Yes.
 5   Q       Okay.  Had you ever heard Ms. Price
 6   say anything about Mr. Cottle doing
 7   something inappropriate?
 8   A       No.
 9   Q       Okay.  Have you ever seen them
10   talking out in front of the school?
11   A       Yes.
12   Q       How often?
13   A       A lot of mornings I would see her
14   down at his truck talking to him.
15   Q       Okay.  Do you remember what year that
16   was?
17   A       I've been here over three years.  It
18   seems like it was last year, the first two
19   years I was here.
20   Q       What two years, what was your first
21   year here?
22   A       2004, 2005.
23   Q       So it would have been that school
```

8

```
 1   year and then 2005 and 2006?
 2   A       I'm not quite sure of every day, sir,
 3   but I would see her occasionally down there
 4   at his truck talking to him.
 5   Q       Did you ever see him at her car?
 6   A       No.
 7   Q       Never did?
 8   A       No.  No, sir.
 9   Q       Are you familiar with the
10   board's sexual harassment policy?
11   A       Yes, sir.
12   Q       If an employee has a sexual
13   harassment complaint, who do they report
14   that to?
15   A       They would go to their supervisor,
16   they would go to the assistant principal or
17   the principal or the superintendent.
18        MR. PORTER:  Thank you very much.
19        MR. SWEENEY:  Thank you, Ms.
20   Benefield.
21
22   FURTHER THE DEPONENT SAITH NOT.
23   (EXHIBIT ATTACHED AND ENCLOSED.)
```

9

```
 1                 C E R T I F I C A T E
 2
 3      STATE OF ALABAMA )
 4      JEFFERSON COUNTY )
 5
 6           I hereby certify that the above and
 7      foregoing deposition was taken down by me in
 8      stenotype and the questions and answers
 9      thereto were reduced to writing under my
10      supervision, and that the foregoing
11      represents a true and correct transcript of
12      the testimony given by said witness on said
13      occasion.
14           I further certify that I am neither
15      of counsel nor of kin to the parties to the
16      action, not am I in anywise interested in
17      the result of said cause.
18
19                        _____
20                        COMMISSIONER
21
22
23
```

<1>
10:40 a.m.: 1;20, 5;8
102: 4;8
1819: 4;12

<2>
2004: 7;22
2005: 7;22, 8;1
2006: 8;1
22nd: 1;19
2301: 4;7
251: 1;18, 5;7

<3>
3:06-CV-742-VPM: 1;8
30: 5;4
35203: 4;9, 4;13

<5>
5: 3;4, 3;8
5th: 4;12

<8>
8: 3;4

<A>
above: 5;9, 9;6
acting: 5;2
ACTION: 1;7, 9;16
Adam: 4;7, 5;19
ago: 7;3
AGREED: 1;13, 1;21, 2;5, 2;14
ALABAMA: 1;2, 1;19, 4;8, 4;13, 5;3, 5;4, 5;8, 9;3
allegation: 8;12
already: 6;19
ANGELA: 1;5, 4;15
answers: 9;8
anywise: 9;16
APPEARANCES: 4;6

appearing: 4;9, 4;13
appreciate: 5;21
Arant: 4;11
assign: 2;10
assistant: 8;16
ATTACHED: 8;23
Avenue: 4;8, 4;12
aware: 6;5

<B>
background: 6;2
beginning: 5;8
behalf: 4;9, 4;14
BENEFIELD: 1;16, 5;9, 5;13, 5;18, 8;20
Birmingham: 4;8, 4;13
BOARD: 1;8, 5;20
board's: 8;10
Bradley: 4;11
brief: 6;1

<C>
car: 8;5
case: 6;6
cause: 5;10, 9;17
certify: 5;3, 9;6, 9;14
Chuck: 4;16
CITY: 1;8
CIVIL: 1;7, 5;5
claim: 6;20
claims: 6;5, 6;9
coming: 5;21
commencing: 1;20
Commission: 6;17
COMMISSIONER: 1;17, 2;16, 4;4, 9;20
complaint: 8;13
compliance: 2;2
contact: 6;2
correct: 9;11
Cottle: 6;9, 7;6
counsel: 1;15, 2;7, 2;9, 5;6, 9;15

COUNTY: 9;4
COURT: 1;1, 2;3, 5;1

<D>
date: 5;3
day: 1;19, 8;2
Deborah: 1;17, 4;3, 5;1
DEFENDANT: 1;10, 4;14
DEPONENT: 8;22
deposition: 1;15, 1;23, 2;1, 2;12, 2;15, 5;23, 9;7
depositions: 2;4
discussed: 8;14
DISTRICT: 1;1, 1;2
DIVISION: 1;3
doing: 7;8
Donald: 4;10
down: 7;14, 8;3, 9;7
drafted: 6;2
duly: 5;14

<E>
EASTERN: 1;3
EDUCATION: 1;9
EEOC: 6;16
effect: 2;1
employee: 8;12
Employment: 6;17
ENCLOSED: 8;23
Equal: 6;17
Esquire: 4;7, 4;10
evidence: 2;12
EXAMINATION: 3;3, 5;10, 5;17
examined: 5;14
except: 2;8
Exhibit 1: 5;22
EXHIBIT: 8;23
EXHIBITS: 3;7

<F>
familiar: 8;9

Federal: 4;12
filed: 6;19
filing: 2;16
firm: 4;11
first: 5;14, 6;11, 7;18, 7;20
following: 5;11
follows: 5;15
force: 2;1
foregoing: 5;5, 9;7, 9;10
form: 2;8
Foster: 6;13
front: 7;10
full: 2;2

<G>
Gilham: 1;18, 5;7
given: 9;12
grounds: 2;10

<H>
Handley: 5;7
harassed: 6;10
harassment: 8;10, 8;13
hear: 6;11
heard: 7;5
hereby: 9;6

<I>
inappropriate: 7;7
INDEX: 3;7
information: 6;3
interested: 9;16

<J>
JEFFERSON: 9;4
Jr.: 4;10
June 2007,: 1;19

<K>
kin: 9;15

knowledge: 6;22

<L>
L.L.P.: 4;12
Large: 5;3
last: 7;18
laws: 2;3
lawsuit: 5;20
leading: 2;8
lot: 7;13

<M>
Marcum: 4;16, 6;14, 6;15
marking: 5;22
MIDDLE: 1;2, 5;7
month: 6;23
morning: 5;18
mornings: 7;13
Morris: 4;7
Ms: 5;18, 5;19, 6;5, 7;5, 8;19

<N>
name: 5;19
necessary: 2;6
neither: 9;14
nor: 9;15
North: 4;13
Notary: 1;18, 5;2
notice: 2;15

<O>
objections: 2;7, 2;10
occasion: 9;13
occasionally: 8;3
occurred: 7;1
offered: 2;12
often: 7;12
Okay: 6;16, 6;23, 7;5, 7;9, 7;15, 8;9
One: 4;12
Opportunity: 6;17

ROBBIE: 1;16, 5;9, 5;13
Rose: 4;11
Rule: 5;4
Rules: 2;3, 5;4

<S>
SAITH: 8;22
Schaffer: 1;17, 4;3, 5;1
School: 5;7, 7;10, 7;23
season: 7;1
seems: 7;18
seen: 7;9
sexual: 8;10, 8;12
sexually: 6;10
shall: 2;6
show: 5;21
signature: 1;22
sir: 6;4, 8;2, 8;8, 8;11
STATE: 5;2, 9;3
STATES: 1;1
stenotype: 9;8
STIPULATED: 1;13, 1;21, 2;5, 2;14
stipulation: 5;6
Suite: 4;8
superintendent: 8;17
supervision: 9;10
supervisor: 8;15
SWEENEY: 4;10, 8;19
sworn: 5;14

<T>
testified: 5;15
testimony: 9;12
thereto: 2;13, 9;9
three: 7;17
transcript: 9;11
trial: 2;11
truck: 7;14, 8;4
true: 9;11
two: 7;18, 7;20

oral: 5;10

<P>
PAGE: 3;3
parties: 1;14, 2;9, 9;15
Place: 4;12
PLAINTIFF: 1;6, 4;9
point: 6;19
policy: 8;10
PORTER: 3;4, 4;7, 5;17, 5;19, 8;18
present: 4;15
PRICE: 1;5, 4;15, 5;20, 6;6, 7;5
principal: 8;16, 8;17
prior: 2;12
Procedure: 5;5
proceedings: 5;11
provided: 5;4
Public: 1;18, 5;2
Pudles: 1;17, 4;3, 5;1
PX-1: 3;8

<Q>
questions: 2;8, 2;9, 9;8
quite: 8;2

<R>
reading: 1;22
recall: 6;20
reduced: 9;9
relating: 2;3
remember: 6;23, 7;15
report: 8;13
reporter: 5;2
represent: 5;19
represents: 9;11
respective: 1;15
result: 9;17
resume: 6;1
Road: 1;18, 5;8
ROANOKE: 1;8, 1;18, 5;8

<U>
understanding: 6;8
UNITED: 1;1

<W>
waived: 1;23, 2;16
whereupon: 5;10
White: 4;11
witness: 1;23, 5;9, 9;12
writing: 9;9

<Y>
year: 7;3, 7;15, 7;18, 7;21, 8;1
years: 7;17, 7;19, 7;20

RÉSUMÉ

NAME: *Robbie Benefield*

ADDRESS: *191 County Rd 289 Wedowee Al 36278*

PLACE OF EMPLOYMENT: *Roanoke City Bd of Ed*

POSITION OF EMPLOYMENT: *Assistant* HOW LONG: *21 yrs*
*Principal* *12 yrs teaching*
*9 " administrator*

EMPLOYMENT BACKGROUND (LAST 10 YEARS:

*Roanoke City Schools*

_____

_____

_____

_____

_____

_____

_____

EDUCATIONAL BACKGROUND:

HIGH SCHOOL: *Randolph County 1977*

COLLEGE: *Jacksonville State Univ. 1982 BS*

POST GRADUATE DEGREES: *Jacksonville State Univ 1992 Masters*
*Jacksonville State*
*Administration Degree 1997*



PLAINTIFF'S
EXHIBIT
*Benefield*
PENGAD 800-631-6989

EXHIBIT 6

1

1   IN THE UNITED STATES DISTRICT COURT
2   FOR THE MIDDLE DISTRICT OF ALABAMA
3            EASTERN DIVISION
4
5   ANGELA PRICE,           )
6        PLAINTIFF,         )
7   V                       )   CIVIL ACTION NO.
8   ROANOKE CITY BOARD OF ) 3:06-CV-742-VPM
9   EDUCATION,              )
10       DEFENDANT.         )
11
12          S T I P U L A T I O N
13       IT IS STIPULATED AND AGREED, by
14  and between the parties, through their
15  respective counsel, that the deposition of
16  ROSEMARIE MARSHALL, may be taken before
17  Deborah Pudles Schaffer, Commissioner and
18  Notary Public, at Handley Middle School, 251
19  Gilham Road, Roanoke, Alabama, on the 21st
20  day of June, 2007, commencing at 1:40 p.m.
21       IT IS FURTHER STIPULATED AND AGREED
22  that the signature to and reading of the
23  deposition by the witness is waived, the

2

1   deposition to have the same force and effect
2   as if full compliance had been had with all
3   laws and rules of Court relating to the
4   taking of depositions.
5        IT IS FURTHER STIPULATED AND AGREED
6   that it shall not be necessary for any
7   objections to be made by counsel to any
8   questions, except as to form or leading
9   questions, and that counsel for the parties
10  may make objections and assign grounds at
11  the time of trial or at the time said
12  deposition is offered in evidence, or prior
13  thereto.
14       IT IS FURTHER STIPULATED AND AGREED
15  that notice of filing of the deposition by
16  the Commissioner is waived.
17
18
19
20
21
22
23

3

1
2                    I N D E X
3   EXAMINATION BY               PAGE NO
4   Mr. Porter                   5 - 31
5
6
7            INDEX OF EXHIBITS
8   PX-1                         5
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

4

1   BEFORE:
2        Deborah Pudles Schaffer,
3   Commissioner.
4
5   APPEARANCES:
6        Adam M. Porter, Esquire, 2301 Morris
7   Avenue, Suite 102, Birmingham, Alabama,
8   35203, appearing on behalf of the Plaintiff.
9        Donald B. Sweeney, Jr., Esquire, of
10  the firm Bradley, Arant, Rose & White,
11  L.L.P., One Federal Place, 1819 5th Avenue
12  North, Birmingham, Alabama, 35203, appearing
13  on behalf of the Defendant.
14       Also present: Angela Price
15                      Chuck Marcum
16
17
18
19
20
21
22
23

5

1       I, Deborah Pudles Schaffer, a court
2   reporter acting as Notary Public, State of
3   Alabama at Large, certify that on this date,
4   as provided by Rule 30 of the Alabama Rules
5   of Civil Procedure, and the foregoing
6   stipulation of counsel, there came before
7   me at Handley Middle School, 251 Gilham
8   Road, Roanoke, Alabama, beginning at 1:40
9   p.m., ROSEMARIE MARSHALL, witness in the
10  above cause, for oral examination, whereupon
11  the following proceedings were had:
12
13          ROSEMARIE MARSHALL,
14  being first duly sworn, was examined and
15  testified as follows:
16
17  EXAMINATION BY MR. PORTER:
18  Q       Good afternoon, Ms. Marshall.  My
19  name is Adam Porter.  I represent Ms. Price
20  in her lawsuit against the board.
21  A       Hello.
22  Q       I'm reading over your resume.  Let me
23  show you what I'm marking as Exhibit 1 to

6

1   your deposition.
2           Is that a resume of sorts that you
3   have created for us?
4   A       Yes, sir.
5   Q       All the information in there
6   accurate?
7   A       Yes, sir.
8   Q       And how long have you worked here?
9   A       I've been here for thirteen and a
10  half years.
11  Q       Okay.  Have you ever heard any,
12  anything from Ms. Price about Mr. Cottle
13  engaging in any sort of inappropriate
14  behavior?
15  A       I only have twice.
16  Q       Okay.  Do you remember when that was?
17  A       One time was the end of the '04, '05
18  school year she talked about him asking her
19  to go to Florida.
20  Q       That would be around May of '05 or
21  so?
22  A       It was -- yeah, probably May.
23  Q       Okay.  She said --

7

1   A       Maybe April.
2   Q       She said he had asked her to go to
3   Florida?
4   A       Uh-huh.
5   Q       I'm sorry, I didn't --
6   A       Yes, sir.
7   Q       You need to say yes or no.
8   A       Sorry.
9   Q       All right.  I didn't go over the
10  ground rules with you.  That's all right.
11  Did she seem to be happy about that?
12  A       She didn't seem upset.
13  Q       But I mean did she seem happy?
14  A       Neither happy nor upset.
15  Q       How often would you talk to her?
16  A       Most of the time daily basis.  I
17  didn't stay out in this part of the office
18  most of the time, to the front office, I
19  usually stay in my office which is the
20  little office off to the left up there.
21  Q       Where is the board policy manual
22  kept? A       It is kept in Mr. Foster's
23  office and one in the library.

8

1   Q       Okay.  And what did you say, did you
2   say anything to Ms. Price when she made the
3   comment about him asking her to go to
4   Florida?
5   A       No, I did not.
6   Q       And did you believe that he had asked
7   her to go to Florida?
8   A       There was a possibility because he's
9   a very friendly guy like that and he had
10  also said something to me to that effect one
11  time, I knew it was a family vacation, we
12  had talked about it when he was picking up
13  his check, and so when I went outside that
14  afternoon, I said, "I'm so jealous because
15  you're going to Florida."
16          He said, "Well, just hop in and let's
17  go," but it was a family vacation.  I took,
18  you know, I didn't think anything about it.
19  Q       Look at, look at Exhibit 4 to Mr.
20  Marcum's deposition.  Look at that page
21  that's got your name at the top.
22  A       Okay.
23          MR. SWEENEY:  Read the whole thing

9

1   and then respond to a question.
2   Q      (BY MR. PORTER:)  Let me know when
3   you've read the whole thing.
4   A      Okay.
5   Q      Do these notes accurately reflect
6   what you said in that meeting?
7   A      Yes, sir, it does.
8   Q      Okay.  Toward the top it says you
9   said that, "Ms. Price said something in the
10  office, I did not believe it."
11  A      Uh-huh.
12  Q      What were you referring to there?
13  A      About him sexually harassing her.
14  Q      Okay.  And again the comment about
15  going to Florida was in the '04, '05 school
16  year toward the end of the year, right?
17  A      Yes, sir.
18  Q      And the comment about sexual
19  harassment was when?
20  A      The comment about sexual harassment
21  was at the beginning of the '05 school year.
22  Q      Okay.
23  A      When she was talking about she was

10

1   going to file a lawsuit.
2   Q      Fall of '05?
3   A      Fall of '05.
4   Q      Tell me what you can recall her
5   saying.
6   A      I was walking through the office, I
7   was not even talking to her at that time,
8   she was sitting out front with Ms. Sherry
9   and talking to Ms. Sherry.
10  Q      Sherry who?
11  A      Yarbrough.
12  Q      Okay.
13  A      And when I came through, that's when
14  she was talking about if he didn't leave her
15  alone she was going to file a suit.
16  Q      Did she make that comment in Ms.
17  Yarbrough's presence?
18  A      Yes, she did, but, you know, I don't
19  know if Ms. Sherry heard that.  I mean,
20  that's who she was talking to.
21  Q      How far away was Ms. Yarbrough from
22  Ms. Price when she said that?
23  A      The next seat over, two feet.

11

1   Q      And it appeared to you that they had
2   been in a conversation before that?
3   A      Yes, sir.  Now, Ms. Sherry's back was
4   to her, I mean, Ms. Sherry does that a lot.
5   She will sit facing her computer typing and
6   talking be going on around her and she will
7   not, I mean, she works on her computer.
8   Q      Well, do you have a specific
9   recollection of seeing Ms. Yarbrough working
10  on her computer facing away from Ms. Price
11  during a conversation with Ms. Price?
12  A      Yes, I do.
13  Q      And did she appear to be
14  participating in this conversation?
15  A      She would answer her on some
16  questions.
17  Q      Okay.  So, what, did you stand there
18  and observe this conversation?
19  A      No, I just was going through when she
20  said it.  I was walking to the copy room.
21  Q      Well, then how do you know that she
22  would have answered some questions?
23  A      Because I can hear her sometimes.  I

12

1   mean, can hear some of the conversations.
2   I'm in that first office, it's not very far
3   away.
4   Q      What was the conversation about?
5   A      It was about Mr. Cottle.
6   Q      What was said?
7   A      The only thing I heard was about her
8   going to file a suit.
9   Q      And you -- and what did you say?
10  A      And I told her it was not a good
11  idea.
12  Q      Why did you tell her that?
13  A      Because I didn't see filing suit
14  against your employer.
15  Q      Why not?
16  A      Unless you have valid good reason, I
17  would not file suit against my employer.
18  I'm not that kind of person.  I don't
19  believe in filing lawsuits unless there is a
20  valid reason and I did not see a valid
21  reason.
22  Q      Based on what?
23  A      My observation of her relationship

13

1    with Mr. Cottle.

2    Q    Okay.  Tell me what you saw.

3    A    I seen her going to his vehicle.  I

4    have had to drive around her car parked

5    beside his vehicle in the afternoon as I

6    left.

7    Q    Okay.  How many times was this?

8    A    Approximately five or six times.

9    Q    And what school year?

10   A    The '04 school year.

11   Q    '04, '05?

12   A    Uh-huh.

13   Q    That's a yes?

14   A    Yes, sir.

15   Q    And so you say you saw her car parked

16   next to his approximately five times?

17   A    Four or five, five or six times, yes,

18   sir.

19   Q    Okay.  And what were they doing?

20   A    She would be sitting in her car

21   parked up beside his truck and I have seen

22   him come to her as she has parked there.  He

23   was not waving her down, and as a matter of

14

1    fact one day, the day that she told me about

2    the Florida trip was one of those days, and

3    that's what made me not believe her.

4    Q    About what?

5    A    The sexual harassment suit when she

6    brought it up.

7    Q    Okay.  Well, do you know what they

8    were talking about in the car?

9    A    No, I do not.

10   Q    Do you know if he said anything of a

11   sexual nature at the car?

12   A    No, I do not.

13   Q    You don't like her, do you?

14   A    I don't have any problems with

15   Angela.

16   Q    You've got some remark that she likes

17   to think that she's pretty or something like

18   that; is that right?

19   A    I made that remark, yes, I did.

20   Q    Is that how you feel?

21   A    Yes, at that time I felt that way.

22   Q    Well, you don't feel that way

23   anymore?

15

1    A    I don't have a problem with Angela

2    but I did not feel that she was doing Mr.

3    Cottle right.

4    Q    Well, you had a problem with her back

5    then?

6    A    No, we were friends.  I thought we

7    were friends.

8    Q    You say in here it says she likes to

9    be thought of as good looking and likes the

10   attention, was that your feeling back then?

11   A    That, that was my feeling because she

12   never acted like she was hurt by the stuff

13   she's calling harassment.

14   Q    Okay.

15   A    She never made any remarks, you know,

16   that was, that would make me think she was

17   upset and she was smiling about it when she

18   would tell us.

19   Q    About the sexual harassment?

20   A    When she talked about the flirting.

21   Q    Oh, she talked about flirting too?

22   A    (Nods head affirmatively.)

23   Q    When was this?

16

1    A    To Ms. Sherry.  She never made an

2    accusation.  That day that all that was

3    going on.

4    Q    When did Ms. Price say something to

5    Ms. Yarbrough about flirting?

6    A    It was that day that she was talking

7    about the, him getting, going along with

8    her.

9    Q    To Florida?

10   A    Uh-huh.

11   Q    That's a yes?

12   A    That's a yes.

13   Q    Okay.  So you, in addition to hearing

14   the comment about him asking her to go to

15   Florida she also said that he was flirting

16   with her?

17   A    That's the way I took it.  She may

18   not have used the word flirting.

19   Q    Okay.  Well, that's not in these

20   notes, is it?

21   A    Right.  No, it's not because I didn't

22   hear the word flirting.  I heard the word

23   harassment later.

17

```
1    Q      Well, the flirting word was said in
2    May of '05, right?
3    A      Well, she never said the flirting
4    word to me.  I took it as flirting when she
5    was talking about the going to Florida.
6    Q      I thought you just said that you
7    heard her say something about flirting when
8    she was talking to Ms. Yarbrough?
9    A      I did not hear the word flirting.  I
10   took it as her saying flirting, but she was
11   talking about going to Florida.
12   Q      Oh, so your testimony is you never
13   heard the word flirting come out of her
14   mouth?
15   A      Exactly.
16   Q      Why did you think the statement going
17   to Florida had anything to do with flirting
18   if you felt it was totally innocent?
19   A      Well, that's the way I took it as an
20   opinion.
21   Q      Took what as an opinion?
22   A      Her talking about going to Florida.
23   Q      You thought that she took it as
```

18

```
1    flirting?
2    A      No, I took it as flirting as what she
3    was talking about.
4    Q      What, that the invitation to go to
5    Florida?
6    A      Right.
7    Q      You took that as flirting?
8    A      The way she was putting it that day,
9    yes, I took it as flirting.
10   Q      Okay.  The way she described his
11   invitation you took it that she felt it was
12   flirting?
13   A      Yes.
14   Q      Okay.  Who do, who do, if you think
15   you've been sexually harassed, who do you
16   report that to?
17   A      I would report it to my supervisor
18   which is Mr. Foster or Ms. Benefield.
19   Q      Okay.  Any other comments that you
20   ever heard Ms. Price make about any
21   inappropriate comments from Mr. Cottle?
22   A      Only that day she, she, it was
23   nothing about comments only the day that she
```

19

```
1    said that she was going to file a suit for
2    sexual harassment if he didn't leave her
3    alone.
4    Q      Well, if Ms. Price had a valid claim
5    of sexual harassment, what did you have a
6    problem with her suing her employer then?
7    A      If she had a valid claim, no, I would
8    not.
9    Q      And you don't know what he said to
10   her out there in the parking lot, do you?
11   A      No, I do not.
12   Q      Do you ever socialize with him?
13   A      With Mr. Cottle?
14   Q      Yeah.
15   A      I've talked to him.  I don't go out
16   in public or anything else.  I've talked to
17   him here as a school setting passing out
18   checks because I pass out checks most of the
19   time.
20   Q      Do you consider him a friend?
21   A      Not really.  I consider him a
22   colleague.
23   Q      Have you ever heard any of the
```

20

```
1    conversations between Mr. Cottle and Ms.
2    Price?
3    A      No, I have not.
4    Q      Do you know if she may have
5    approached him to talk something, about
6    something work related?
7    A      There could be a possibility.  I
8    don't know what they talk about.
9    Q      And if she had something to discuss
10   with him that was work related and he was
11   not standing next to her, she would have to
12   approach him to discuss that; isn't that
13   right?
14   A      I would think so.
15   Q      Do you think she's just fabricated
16   this whole thing up?
17   A      Yes.
18   Q      Why?
19   A      For money.
20   Q      Oh, okay.  What makes you think that?
21   A      I kindly know her family.
22   Q      Uh-huh.
23   A      Her brother used to work with my
```

PRICE V ROANOKE CITY BO. OF ED.                    R. MARSHALL

---

21

1    husband and he has been to my house, he's
2    dead now, so he can't, you know, say
3    anything about this, but he would come to my
4    house and he would talk about the family.
5    Q     Her brother would?
6    A     Yes.
7    Q     What would he say?
8    A     That they were a bunch of liars and
9    that they were always trying to sue somebody
10   and he was not like that he said.
11   Q     Well, did he refer to Angela
12   specifically?
13   A     No, his family.
14   Q     Did he say who he was talking about?
15   A     No.  He, he drank a lot, so --
16   Q     But he didn't mention anybody in
17   particular?
18   A     No, he did not.
19   Q     But you thought he was talking about
20   Angela?
21   A     No, just family.  That's all he said,
22   family.  She's family.
23   Q     So you --

---

22

1    A     Possibility.
2    Q     So you feel that because she's in
3    that family she's out to sue somebody on a
4    baseless claim?
5    A     A possibility.
6    Q     Is that what you think is going on
7    here?
8    A     I do.
9    Q     Why did you make -- what formed the
10   basis of your comment that she likes to be
11   thought of as good looking?
12   A     My opinion.
13   Q     Well, how did you form that opinion?
14   A     Some of our conversations and things
15   in the past --
16   Q     Okay.  What --
17   A     -- and how she felt about herself
18   when things happened in her, at her
19   household.
20   Q     Okay.  What conversations?
21   A     Just, I don't know if I should even
22   talk about her conversations because that's
23   hearsay also.

---

23

1    Q     I don't think she'll mind.
2    A     Well, do you mind, Angela?
3         MR. SWEENEY:  He's entitled to ask
4    that, so if you remember the responses,
5    share that with him.
6         THE WITNESS:  Okay.
7         MR. SWEENEY:  I object to the form,
8    but you can go ahead and answer it.
9         THE WITNESS:  Her husband fooled
10   around on her one time, she told me about
11   it, she felt very down on herself.
12   Q     (BY MR. PORTER:)  And then how does
13   that lead you to think that she likes to
14   think of herself as good looking?
15   A     Just some of the things that she said
16   during our conversation.
17   Q     Okay.  What are those things that she
18   said that makes you conclude that she likes
19   to be thought of as good looking?
20   A     That she thought she was pretty, that
21   she didn't think he needed to do that.
22   Q     She's told you that she thought she
23   was pretty and he didn't need to do that?

---

24

1    A     Uh-huh.
2    Q     That's a yes?
3    A     That's a yes.
4    Q     Did she make -- tell you that she
5    thought she was pretty in any other
6    conversation?
7    A     No, that was one conversation we had
8    during the summer.
9    Q     Was she upset then?
10   A     Yes.
11   Q     Okay.  So based on her conversation
12   where she was upset about her husband
13   apparently being unfaithful, you took her to
14   be a person who likes to be thought of as
15   good looking?
16   A     That she thought she was good
17   looking.
18   Q     Okay.  Did she say anything else
19   about her being good looking?
20   A     No.
21   Q     All right.  So, so this statement
22   here that you made that she likes to be
23   thought of as good looking is based on that

---

25

```
 1    conversation?
 2    A      Yes, sir.
 3    Q      Okay.  And what about the statement
 4    that she likes the attention, where do you
 5    get that from?
 6    A      Just from what I observed, that she
 7    was not unhappy about the attention that she
 8    was getting.
 9    Q      What attention?
10    A      What she was talking about.
11    Q      What was that?
12    A      The one time that he asked her to go
13    to Florida she was not unhappy about
14    it.
15    Q      She seemed excited about it?
16    A      She didn't seem --
17    Q      Sort of flattered?
18    A      She didn't seem upset at all.
19    Q      I thought that you said that --
20    A      I had seen her upset --
21    Q      Excuse me.  Let me finish my
22    question.  I thought you just said five
23    minutes ago that, that you got the
```

26

```
 1    impression that she was saying that he was
 2    flirting with her?
 3    A      That's my opinion that I took.
 4    Q      So your read from her comment about
 5    the invitation going to Florida was that Mr.
 6    Cottle was flirting with her and she
 7    flattered or liked it?
 8    A      In my opinion, I thought she liked
 9    it.
10    Q      Okay.  And that's what forms the
11    basis of your opinion that she likes
12    attention?
13    A      Yes, sir.
14    Q      Okay.
15    A      This one is mine.
16    Q      Are you married?
17    A      Yes sir.
18    Q      How long have you been married?
19    A      Almost thirty years.
20    Q      You also reference in here, in these
21    notes, it says, "If anything, I have seen
22    her initiate talking with him more than him
23    with her."  Is that accurate?
```

27

```
 1    A      That is accurate.
 2    Q      Have you ever seen him walk up to
 3    where she was?
 4    A      No, sir.
 5    Q      Never?
 6    A      No, sir -- only to the car from where
 7    she had parked beside him.  I seen him walk
 8    up to her car, but she was already parked
 9    beside his truck.  Never have I seen him
10    walk down to here, but I did not try to pay
11    attention to things either like that, I
12    mean, I get here, I do my job.
13    Q      How many times did you see him walk
14    up to her car?
15    A      Approximately three.
16    Q      Over what period?
17    A      That '04, '05 school, I mean, yeah,
18    '04, '05 school year.
19    Q      When, when, when you told Ms. Price
20    that you did not think it would be a good
21    idea to file a suit against him -- did she
22    say to file a suit against him or the
23    school?
```

28

```
 1    A      She said file suit against him.
 2    Q      And you had a problem with that too?
 3    A      I just didn't think it was a, for
 4    real, so it's not really a problem with it,
 5    I just didn't think it was the right thing
 6    to do because I did not see what she's
 7    talking about.
 8    Q      But you will admit that you were
 9    around them when they were together very
10    little time?
11    A      Yes.
12    Q      And is it possible that he said some
13    things to her that she says he did and you
14    just weren't there?
15    A      I have no idea.  I would not think
16    so.
17    Q      Why not?
18    A      Because he has not ever come on to
19    anyone else that I know of.
20    Q      Including you?
21    A      Including me.
22    Q      Well, is it possible that he finds
23    her more attractive than you?
```

29

1    A        Yeah, that's possible.  Definitely.
2    Q        You make the comment that she also
3    made comments about Mr. Overton flirting
4    with her?
5    A        Yes, she did.
6    Q        What did you hear about that?
7    A        She came in here and told me that he
8    was flirting with her.
9    Q        When was this?
10   A        That was probably the summer,
11   probably '97.
12   Q        And you didn't believe that?
13   A        No.
14   Q        You thought she made that up?
15   A        I did.
16   Q        Did you ever hear about Mr. Overton
17   apologizing, admitting it and apologizing?
18   A        He never admitted it.  He apologized
19   in front of me and Ms. Sherry to her in the
20   office.
21   Q        As far as you know he never admitted
22   it?
23   A        He did not admit it.  He said if I

30

1    have ever done anything to you, which I do
2    not think I did, I am sorry.
3    Q        Okay.  You don't think much of her,
4    do you?
5    A        I don't have any problems with
6    Angela.
7    Q        You don't?
8    A        No, I don't.  She has not talked to
9    me at all since she's read these statements
10   but, that's, that's no problem.
11   Q        You've worked here nineteen years,
12   how long?
13   A        No, thirteen and a half years.
14   Q        Thirteen and a half years.
15   A        Uh-huh.
16   Q        You take a lot of pride in working
17   here, right?
18   A        I do.  I take a lot of pride in both
19   my jobs.
20   Q        And you think that she is suing them
21   on a baseless claim and you have no problem
22   with that?
23   A        That is not my idea of anything, you

31

1    know, that would bother me.  I mean, it does
2    not bother me that she's doing this to the
3    system, it is not me.  If she was doing it
4    to me, I would have a problem with that.
5    Q        Okay.  Have you ever talked to Mr.
6    Cottle about his claim -- her claim?
7    A        No.  I have not talked to anyone
8    about this.
9         MR. PORTER:  Okay.  That's all I
10   have.  Thank you.
11        MR. SWEENEY:  Thank you very much.
12
13
14   FURTHER THE DEPONENT SAITH NOT.
15   (EXHIBIT ATTACHED AND ENCLOSED.)
16
17
18
19
20
21
22
23

32

1
2              C E R T I F I C A T E
3
4    STATE OF ALABAMA )
5    JEFFERSON COUNTY )
6
7         I hereby certify that the above and
8    foregoing deposition was taken down by me in
9    stenotype and the questions and answers
10   thereto were reduced to writing under my
11   supervision, and that the foregoing
12   represents a true and correct transcript of
13   the testimony given by said witness on said
14   occasion.
15        I further certify that I am neither
16   of counsel nor of kin to the parties to the
17   action, not am I in anywise interested in
18   the result of said cause.
19
20
21              COMMISSIONER
22
23

&lt;&gt;
'04: 6;17, 9;15, 13;10, 13;11, 27;17, 27;18
'05: 6;17, 6;20, 9;15, 9;21, 10;2, 10;3, 13;11, 17;2, 27;17, 27;18
'97: 29;11

&lt;1&gt;
1:40 p.m.: 1;20, 5;8
102: 4;7
1819: 4;11

&lt;2&gt;
21st: 1;19
2301: 4;8
251: 1;18, 5;7

&lt;3&gt;
3:06-CV-742-VPM: 1;8
30: 5;4
31: 3;4
35203: 4;8, 4;12

&lt;5&gt;
5: 3;4, 3;8
5th: 4;11

&lt;A&gt;
above: 5;10, 32;7
accurate: 6;6, 26;23, 27;1
accurately: 9;5
accusation: 16;2
acted: 15;12
acting: 5;2
ACTION: 1;7, 32;17
Adam: 4;6, 5;19
addition: 16;13
admit: 28;8, 29;23
admitted: 29;18, 29;21
admitting: 29;17
affirmatively: 15;22

afternoon: 5;18, 8;14, 13;5
ago: 25;23
AGREED: 1;13, 1;21, 2;5, 2;14
ahead: 23;8
ALABAMA: 1;2, 1;19, 4;7, 4;12, 5;3, 5;4, 5;8, 32;4
Almost: 26;19
alone: 10;15, 19;3
already: 27;8
ANGELA: 1;5, 4;14, 14;15, 15;1, 21;11, 21;20, 23;2, 30;6
answer: 11;15, 23;8
answered: 11;22
answers: 32;9
anybody: 21;16
anywise: 32;17
apologized: 29;18
apologizing: 29;17, 29;17
apparently: 24;13
appear: 11;13
APPEARANCES: 4;5
appeared: 11;1
appearing: 4;8, 4;12
approach: 20;12
approached: 20;5
Approximately: 13;8, 13;16, 27;15
April: 7;1
Arant: 4;10
around: 6;20, 11;6, 13;4, 23;10, 28;9
assign: 2;10
ATTACHED: 31;15
attention: 15;10, 25;4, 25;7, 25;9, 26;12, 27;11
attractive: 28;23
Avenue: 4;7, 4;11
away: 10;21, 11;10, 12;3

&lt;B&gt;
back: 11;3, 15;4, 15;10
Based: 12;22, 24;11, 24;23
baseless: 22;4, 30;21
basis: 7;16, 22;10, 26;11
beginning: 5;8, 9;21

behalf: 4;8, 4;13
behavior: 6;14
believe: 8;6, 9;10, 12;19, 14;3, 29;12
Benefield: 18;18
beside: 13;5, 13;21, 27;7, 27;9
Birmingham: 4;7, 4;12
BOARD: 1;8, 5;20, 7;21
bother: 31;1, 31;2
Bradley: 4;10
brother: 20;23, 21;5
brought: 14;6
bunch: 21;8

&lt;C&gt;
calling: 15;13
car: 13;4, 13;15, 13;20, 14;8, 14;11, 27;6, 27;8, 27;14
cause: 5;10, 32;18
certify: 5;3, 32;7, 32;15
check: 8;13
checks: 19;18, 19;18
Chuck: 4;15
CITY: 1;8
CIVIL: 1;7, 5;5
claim: 19;4, 19;7, 22;4, 30;21, 31;6, 31;6
colleague: 19;22
commencing: 1;20
comment: 8;3, 9;14, 9;18, 9;20, 10;16, 16;14, 22;10, 26;4, 29;2
comments: 18;19, 18;21, 18;23, 29;3
COMMISSIONER: 1;17, 2;16, 4;3, 32;21
compliance: 2;2
computer: 11;5, 11;7, 11;10
conclude: 23;18
consider: 19;20, 19;21
conversation: 11;2, 11;11, 11;14, 11;18, 12;4, 23;16, 24;6, 24;7, 24;11, 25;1
conversations: 12;1, 20;1, 22;14, 22;20, 22;22
copy: 11;20
correct: 32;12
Cottle: 6;12, 12;5, 13;1, 15;3, 18;21, 19;13, 20;1, 26;6, 31;6
counsel: 1;15, 2;7, 2;9, 5;6, 32;16

COUNTY: 32;5
COURT: 1;1, 2;3, 5;1
created: 6;3

&lt;D&gt;
daily: 7;16
date: 5;3
day: 1;20, 14;1, 14;1, 16;2, 16;6, 18;8, 18;22, 18;23
days: 14;2
dead: 21;2
Deborah: 1;17, 4;2, 5;1
DEFENDANT: 1;10, 4;13
Definitely: 29;1
DEPONENT: 31;14
deposition: 1;15, 1;23, 2;1, 2;12, 2;15, 6;1, 8;20, 32;8
depositions: 2;4
described: 18;10
discuss: 20;9, 20;12
DISTRICT: 1;1, 1;2
DIVISION: 1;3
doing: 13;19, 15;2, 31;2, 31;3
Donald: 4;9
done: 30;1
down: 13;23, 23;11, 27;10, 32;8
drank: 21;15
drive: 13;4
duly: 5;14
during: 11;11, 23;16, 24;8

&lt;E&gt;
EASTERN: 1;3
EDUCATION: 1;9
effect: 2;1, 8;10
either: 27;11
employer: 12;14, 12;17, 19;6
ENCLOSED: 31;15
end: 6;17, 9;16
engaging: 6;13
entitled: 23;3
Esquire: 4;6, 4;9

evidence: 2;12
Exactly: 17;15
EXAMINATION: 3;3, 5;10, 5;17
examined: 5;14
except: 2;8
excited: 25;15
Excuse: 25;21
Exhibit 1: 5;23
Exhibit 4: 8;19
EXHIBIT: 31;15
EXHIBITS: 3;7

<F>
fabricated: 20;15
facing: 11;5, 11;10
fact: 14;1
Fall: 10;2, 10;3
family: 8;11, 8;17, 20;21, 21;4, 21;13, 21;21, 21;22, 21;22, 22;3
far: 10;21, 12;2, 29;21
Federal: 4;11
feel: 14;20, 14;22, 15;2, 22;2
feeling: 15;10, 15;11
feet: 10;23
felt: 14;21, 17;18, 18;11, 22;17, 23;11
file: 10;1, 10;15, 12;8, 12;17, 19;1, 27;21, 27;22, 28;1
filing: 2;15, 12;13, 12;19
finds: 28;22
finish: 25;21
firm: 4;10
first: 5;14, 12;2
five: 13;8, 13;16, 13;17, 13;17, 25;22
flattered: 25;17, 26;7
flirting: 16;20, 15;21, 16;5, 16;15, 16;18, 16;22, 17;1, 17;3, 17;4,
    17;7, 17;9, 17;10, 17;13, 17;17, 18;1, 18;2, 18;7, 18;9, 18;12,
    26;2, 26;6, 29;3, 29;8
Florida: 6;19, 7;3, 8;4, 8;7, 8;15, 9;15, 14;2, 16;9, 16;15, 17;5,
    17;11, 17;17, 17;22, 18;5, 25;13, 26;5
following: 5;11
follows: 5;15
fooled: 23;9

force: 2;1
foregoing: 5;5, 32;8, 32;11
form: 2;8, 22;13, 23;7
formed: 22;9
forms: 26;10
Foster: 18;16
Foster's: 7;22
Four: 13;17
friend: 19;20
friendly: 8;9
friends: 15;6, 15;7
front: 7;18, 10;8, 29;19
full: 2;2

<G>
getting: 16;7, 25;8
Gilham: 1;19, 5;7
given: 32;13
ground: 7;10
grounds: 2;10
guy: 8;9

<H>
half: 6;10, 30;13, 30;14
Handley: 1;18, 5;7
happened: 22;18
happy: 7;11, 7;13, 7;14
harassed: 18;15
harassing: 9;13
harassment: 9;19, 9;20, 14;5, 15;13, 15;19, 16;23, 19;2, 19;5
head: 15;22
hear: 11;23, 12;1, 16;22, 17;9, 29;6, 29;16
heard: 6;11, 10;19, 12;7, 16;22, 17;7, 17;13, 18;20, 19;23
hearing: 16;13
hearsay: 22;23
hereby: 5;21
herself: 22;17, 23;11, 23;14
hop: 8;16
house: 21;1, 21;4

household: 22;19
hurt: 15;12
husband: 21;1, 23;9, 24;12

<I>
idea: 12;11, 27;21, 28;15, 30;23
impression: 26;1
inappropriate: 6;13, 18;21
Including: 28;20, 28;21
INDEX: 3;7
information: 6;5
initiate: 26;22
innocent: 17;18
interested: 32;17
invitation: 18;4, 18;11, 26;5

<J>
jealous: 8;14
JEFFERSON: 32;5
job: 27;12
jobs: 30;19
Jr: 4;9
June 2007,: 1;20

<K>
kept: 7;22, 7;22
kin: 32;16
kind: 12;18
kindly: 20;21

<L>
L.L.P.: 4;11
Large: 5;3
later: 16;23
laws: 2;3
lawsuit: 5;20, 10;1
lawsuits: 12;19
lead: 23;13
leading: 2;8
leave: 10;14, 19;2

left: 7;20, 13;6
liars: 21;8
library: 7;23
likes: 14;16, 15;8, 15;9, 22;10, 23;13, 23;18, 24;14, 24;22, 25;4,
    26;11
little: 7;20, 28;10
long: 6;8, 26;18, 30;12
Look: 8;19, 8;19, 8;20
looking: 15;9, 22;11, 23;14, 23;19, 24;15, 24;17, 24;19, 24;23
lot: 11;4, 19;10, 21;15, 30;16, 30;18

<M>
manual: 7;21
Marcum: 4;15
Marcum's: 8;20
marking: 5;23
married: 28;16, 26;18
MARSHALL: 1;16, 5;9, 5;13, 5;18
matter: 13;23
mean: 7;13, 10;19, 11;4, 11;7, 12;1, 27;12, 27;17, 31;1
meeting: 9;6
mention: 21;16
MIDDLE: 1;2, 1;18, 5;7
mind: 23;1, 23;2
mine: 26;15
minutes: 25;23
money: 20;19
Morris: 4;6
mouth: 17;14
Ms: 5;18, 5;19, 6;12, 8;2, 9;9, 10;8, 10;9, 10;16, 10;19, 10;21,
    10;22, 11;3, 11;4, 11;9, 11;10, 11;11, 16;1, 16;4, 16;5, 17;8,
    18;18, 18;20, 19;4, 20;1, 27;19, 29;19

<N>
name: 5;19, 8;21
nature: 14;1
necessary: 2;6
need: 7;7, 23;23
needed: 23;21
Neither: 7;14, 32;15

PRICE V. ROANOKE CITY BO. OF ED.                    R. MARSHALL

next: 10;23, 13;16, 20;11
nineteen: 30;11
Nods: 15;22
nor: 7;14, 32;16
North: 4;12
Notary: 1;18, 5;2
notes: 9;5, 16;20, 26;21
nothing: 18;23
notice: 2;15

<O>
object: 23;7
objections: 2;7, 2;10
observation: 12;23
observe: 11;18
observed: 25;6
occasion: 32;14
offered: 2;12
often: 7;15
Okay: 6;11, 6;16, 6;23, 8;1, 8;22, 9;4, 9;8, 9;14, 9;22, 10;12,
    11;17, 13;2, 13;7, 13;19, 14;7, 15;14, 16;13, 16;19, 18;10, 18;14,
    18;19, 20;20, 22;16, 22;20, 23;6, 23;17, 24;11, 24;18, 25;3,
    26;10, 26;14, 30;3, 31;5, 31;9
One: 4;11, 6;17, 7;23, 8;10, 14;1, 14;2, 23;10, 24;7, 25;12, 26;15
opinion: 17;20, 17;21, 22;12, 22;13, 26;3, 26;8, 26;11
oral: 5;10
outside: 8;13
Overton: 29;3, 29;16

<P>
PAGE: 3;3, 8;20
parked: 13;4, 13;15, 13;21, 13;22, 27;7, 27;8
parking: 19;10
part: 7;17
participating: 11;14
particular: 21;17
parties: 1;14, 2;9, 32;16
pass: 19;18
passing: 19;17

recollection: 11;9
reduced: 32;10
refer: 21;11
reference: 26;20
referring: 9;12
reflect: 9;5
related: 20;6, 20;10
relating: 2;3
relationship: 12;23
remark: 14;16, 14;19
remarks: 15;15
remember: 6;16, 23;4
report: 18;16, 18;17
reporter: 5;2
represent: 5;19
represents: 32;12
respecive: 1;15
respond: 9;1
responses: 23;4
result: 32;18
resume: 5;22, 6;2
Road: 1;19, 5;8
ROANOKE: 1;8, 1;19, 5;8
room: 11;20
Rose: 4;10
ROSEMARIE: 1;16, 5;9, 5;13
Rule: 5;4
Rules: 2;3, 5;4, 7;10

<S>
SAITH: 31;14
saw: 13;2, 13;15
saying: 10;5, 17;10, 26;1
says: 9;8, 15;8, 26;21, 28;13
Schaffer: 1;17, 4;2, 5;1
School: 1;18, 5;7, 6;18, 9;15, 9;21, 13;9, 13;10, 19;17, 27;17,
    27;18, 27;23
seat: 10;23
seeing: 11;9
seem: 7;11, 7;12, 7;13, 25;16, 25;18

past: 22;15
pay: 27;10
period: 27;16
person: 12;18, 24;14
picking: 8;12
Place: 4;11
PLAINTIFF: 1;6, 4;8
policy: 7;21
PORTER: 3;4, 4;6, 5;17, 5;19, 9;2, 23;12, 31;9
Possiblity: 8;6, 20;7, 22;1, 22;5
possible: 28;12, 28;22, 29;1
presence: 10;17
present: 4;14
pretty: 14;17, 23;20, 23;23, 24;5
PRICE: 1;5, 4;14, 5;19, 6;12, 8;2, 9;9, 10;22, 11;10, 11;11, 16;4,
    18;20, 19;4, 20;2, 27;19
pride: 30;16, 30;18
prior: 2;12
probably: 6;22, 29;10, 29;11
problem: 15;1, 15;4, 19;6, 28;2, 28;4, 30;10, 30;21, 31;4
problems: 14;14, 30;5
Procedure: 5;5
proceedings: 5;11
provided: 5;4
Public: 1;18, 5;2, 19;16
Pudles: 1;17, 4;2, 5;1
putting: 18;8
PX-1: 3;8

<Q>
question: 9;1, 25;22
questions: 2;8, 2;9, 11;16, 11;22, 32;9

<R>
Read: 8;23, 9;3, 26;4, 30;9
reading: 1;22, 5;22
real: 28;4
really: 19;21, 28;4
reason: 12;16, 12;20, 12;21
recall: 10;4

seemed: 25;15
seen: 13;3, 13;21, 25;20, 26;21, 27;2, 27;7, 27;9
setting: 19;17
sexual: 9;18, 9;20, 14;5, 14;11, 15;19, 19;2, 19;5
sexually: 9;13, 18;15
shall: 2;6
share: 23;5
she'll: 23;1
She's: 14;17, 15;13, 20;15, 21;22, 22;2, 22;3, 23;22, 28;6, 30;9,
    31;2
Sherry: 10;8, 10;9, 10;10, 10;19, 11;4, 16;1, 29;19
Sherry's: 11;3
show: 5;23
signature: 1;22
sir: 6;4, 6;7, 7;8, 8;7, 9;17, 11;3, 13;14, 13;18, 25;2, 26;13,
    26;17, 27;4, 27;6
sit: 11;5
sitting: 10;8, 13;20
six: 13;8, 13;17
smiling: 15;17
socialize: 19;12
somebody: 21;9, 22;3
sometimes: 11;23
Sorry: 7;5, 7;8, 30;2
Sort: 6;13, 25;17
sorts: 6;2
specific: 11;8
specifically: 21;12
stand: 11;17
standing: 20;11
STATE: 5;2, 32;4
statement: 17;16, 24;21, 25;3
statements: 30;9
STATES: 1;1
stay: 7;17, 7;19
stenotype: 32;9
STIPULATED: 1;13, 1;21, 2;5, 2;14
stipulation: 5;6
stuff: 15;12
sue: 21;9, 22;3

suing: 19;6, 30;20
suit: 10;15, 12;8, 12;13, 12;17, 14;5, 19;1, 27;21, 27;22, 28;1
Suite: 4;7
summer: 24;8, 29;10
supervision: 32;11
supervisor: 18;17
SWEENEY: 4;9, 8;23, 23;3, 23;7, 31;11
sworn: 5;14
system: 31;3

<T>
talked: 6;18, 8;12, 15;20, 15;21, 19;15, 19;16, 30;8, 31;5, 31;7
testified: 5;15
testimony: 17;12, 32;13
thereto: 2;13, 32;10
Thirteen: 6;9, 30;13, 30;14
thirty: 26;19
three: 27;15
together: 28;9
Took: 8;17, 16;17, 17;4, 17;10, 17;19, 17;21, 17;23, 18;2, 18;7,
    18;9, 18;11, 24;13, 26;3
top: 8;21, 9;8
totally: 17;18
Toward: 9;8, 9;16
transcript: 32;12
trial: 2;11
trip: 14;2
truck: 13;21, 27;9
true: 32;12
try: 27;10
trying: 21;9
twice: 6;15
two: 10;23
typing: 11;5

<U>
unfaithful: 24;13
unhappy: 25;7, 25;13
UNITED: 1;1
Unless: 12;16, 12;19

upset: 7;12, 7;14, 15;17, 24;9, 24;12, 25;18, 25;20

<V>
vacation: 8;11, 8;17
valid: 12;16, 12;20, 12;20, 19;4, 19;7
vehicle: 13;3, 13;5

<W>
waived: 1;23, 2;16
walk: 27;2, 27;7, 27;10, 27;13
walking: 10;6, 11;20
waving: 13;23
whereupon: 5;10
White: 4;10
whole: 8;23, 9;3, 20;16
will: 11;5, 11;6, 28;8
WITNESS: 1;23, 5;9, 23;6, 23;9, 32;13
word: 16;18, 16;22, 16;22, 17;1, 17;4, 17;9, 17;13
work: 20;6, 20;10, 20;23
worked: 6;8, 30;11
working: 11;9, 30;16
works: 11;7
writing: 32;10

<Y>
Yarbrough: 10;11, 10;21, 11;9, 16;5, 17;8
Yarbrough's: 10;17
year: 6;18, 9;16, 9;16, 9;21, 13;9, 13;10, 27;18
years: 6;10, 26;19, 30;11, 30;13, 30;14

EXHIBIT 7

STATE OF ALABAMA    )
RANDOLPH COUNTY    )

## AFFIDAVIT OF
## JERRELL COTTLE

Before me, the undersigned Notary Public, in and for said county and said state, personally appeared Jerrell Cottle, who being by me first duly sworn, deposes and says as follows:

My name is Jerrell Cottle. I am an adult, over the age of 21 years of age and with no impediments, physical or otherwise, that would impair me from truthfully stating facts known to me.

I am employed as a part-time crossing guard at Handley Middle School.

I am retired at 68.

I retired after a 30-year career with CSX Railroad. For the last 15 years I was in management as Chief Train Dispatcher, supervising some 100 or so dispatchers both male and female. I have never been accused of misconduct before. I am married to Janell who works at the bank in Roanoke.

I am saddened by the complaint brought by Angela Price.

We talked almost every day at the school. For her to say, for example, that my comment about going to Florida was sexual harassment is terribly disappointing.

1

I have to go to Florida every three months to see the doctor. I have laughed with lots of people to lighten up the chore of going to the doctor in Florida. I would say – got to go to Florida, don't you want to come too?

I do not mean anything by it. I have said this to coworkers at the school like Rosemarie Marshall and to people at Burger King. I was just joking.

As an employee of the Roanoke School System, I have been to training on sexual harassment at the first of every school year. We were told to report any problem to Mr. Foster, our principal, or Mr. Marcum, our superintendent.

If I have said or done anything offensive to Ms. Price, I did not mean to. I am so sorry. When the complaint was brought to my attention by Mr. Marcum, our Superintendent, I was shocked and embarrassed. Shocked because it was such a surprise. Embarrassed to be accused at my age of sexual harassment. Embarrassed because of how I like to think of myself to be and yet being accused of being crude to a fellow employee and unfaithful to my wife.

As soon as the complaint was brought to my attention by Superintendent Marcum after the EEOC complaint was filed, I stopped talking to or having anything to do with Ms. Price.

The complaint was filed in October of 2005. I had knee surgery in January of 2005. I use a cane and a walker.

I would never have knowingly engaged in sexual harassment and am sorry – terribly sorry that this happened.

2

_Jerrell Cottle_
Jerrell Cottle

Sworn to and subscribed before me this the 6th day of August 2007.

_Chris F. Martin_
Notary Public

My Commission expires: 6/20/2010
(Seal)

3

# EXHIBIT 8

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| AGENCY | CHARGE NUMBER |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | 130 2006 00145 |
| | and EEOC |

State or local Agency, if any

| NAME(Indicate Mr., Ms., Mrs.) | HOME TELEPHONE (Include Area Code) | |
|---|---|---|
| Ms. Angela Price | (334) 885-6679 | |
| STREET ADDRESS        CITY, STATE AND ZIP CODE | | DATE OF BIRTH |
| 4220 County Road 278        Five Points, AL 36855-2898 | | |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| Roanoke City Bd. of Education | + 15 | 334-863-2628 |
| STREET ADDRESS        CITY, STATE AND ZIP CODE | | COUNTY |
| 557 Main Street        Roanoke, Alabama 36274-1439 | | Randolph |
| NAME | TELEPHONE NUMBER (Include Area Code) | |
| | | |
| STREET ADDRESS        CITY, STATE AND ZIP CODE | | COUNTY |

| CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es)) | DATE DISCRIMINATION TOOK PLACE EARLIEST (ADEA/EPA)        LATEST (ALL) |
|---|---|
| ☐ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ AGE  ☐ RETALIATION  ☐ NATIONAL ORIGIN  ☐ DISABILITY  ☐ OTHER (Specify) | September 22, 2005  ☒ CONTINUING ACTION |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I am female and became employed by Roanoke City Schools in 1996. I am a crossing guard at Handley Middle School. Since the beginning of the school year of 2003-2004, I have been sexually harassed by male co-worker Jerrell Cottle. He is also a crossing guard at Handley Middle School. He always tells me I'm pretty and he constantly says things like, "You look good enough to eat this morning," how he wishes he could have found me before Jimmy (my husband) did, he asks me to go out with him and to "go with" him. He touches me on the cheek, shoulder and hand. He walks up to my car when I get to work. These things happen every day and have been very upsetting and distracting to me. It makes me not want to go to work. I have complained to teachers at the school, the secretary, the counselor, and the assistant principal about this but nothing has been done.

I believe that my employer is discriminating against me on the basis of my gender in subjecting me to sexual harassment. I am therefore making a claim under Title VII to the Civil Rights Act of 1964, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary for State and local Requirements) RECEIVED EEOC |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. OCT 0 4 2005 |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |
| Angela Price        9/23/05 | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE BIRMINGHAM DISTRICT OFFICE (Day, month, and year) |
| Date        Charging Party (Signature) | |

EEOC FORM 5 (10/94)

# EXHIBIT 9

1

```
 1          IN THE UNTIED STATES DISTRICT COURT
 2          FOR THE MIDDLE DISTRICT OF ALABAMA
 3                    EASTERN DIVISION
 4
 5   ANGELA PRICE,        )
 6         PLAINTIFF,     )
 7   V                   )      CIVIL ACTION NO.
 8   ROANOKE CITY BOARD OF )
 9   EDUCATION,           )      3:06-CV-742-VPM
10         DEFENDANT.     )
11
12          S T I P U L A T I O N
13        IT IS STIPULATED AND AGREED, by
14   and between the parties, through their
15   respective counsel, that the deposition of
16   JERRELL COTTLE, may be taken before Deborah
17   Pudles Schaffer, Commissioner and Notary
18   Public, at Handley Middle School, 251 Gilham
19   Road, Roanoke, Alabama, on the 21st day
20   of June, 2007, commencing at 1:10 p.m.
21        IT IS FURTHER STIPULATED AND AGREED
22   that the signature to and reading of the
23   deposition by the witness is waived, the
```

2

```
 1   deposition to have the same force and effect
 2   as if full compliance had been had with all
 3   laws and rules of Court relating to the
 4   taking of depositions.
 5        IT IS FURTHER STIPULATED AND AGREED
 6   that it shall not be necessary for any
 7   objections to be made by counsel to any
 8   questions, except as to form or leading
 9   questions, and that counsel for the parties
10   may make objections and assign grounds at
11   the time of trial or at the time said
12   deposition is offered in evidence, or prior
13   thereto.
14        IT IS FURTHER STIPULATED AND AGREED
15   that notice of filing of the deposition by
16   the Commissioner is waived.
17
18
19
20
21
22
23
```

3

```
 1
 2                   I N D E X
 3   EXAMINATION BY              PAGE NO.
 4   Mr. Porter                  5 - 25
 5
 6
 7              INDEX OF EXHIBITS
 8   PX-1                        5
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

4

```
 1
 2   BEFORE:
 3             Deborah Pudles Schaffer,
 4   Commissioner.
 5
 6       APPEARANCES:
 7       Adam M. Porter, Esquire, 2301 Morris
 8   Avenue, Suite 102, Birmingham, Alabama,
 9   35203, appearing on behalf of the Plaintiff.
10       Donald B. Sweeney, Jr., Esquire, of
11   the firm Bradley, Arant, Rose & White,
12   L.L.P., One Federal Place, 1819 5th Avenue
13   North, Birmingham, Alabama, 35203, appearing
14   on behalf of the Defendant.
15       Also present:  Angela Price
16                       Chuck Marcum
17
18
19
20
21
22
23
```

5

1        I, Deborah Pudles Schaffer, a court

2  reporter acting as Notary Public, State of

3  Alabama at Large, certify that on this date,

4  as provided by Rule 30 of the Alabama Rules

5  of Civil Procedure, and the foregoing

6  stipulation of counsel, there came before

7  me at Handley Middle School, 251 Gilham

8  Road, Roanoke, Alabama, beginning at 1:10

9  p.m., JERRELL COTTLE, witness in the above

10  cause, for oral examination, whereupon the

11  following proceedings were had:

12

13            JERRELL COTTLE,

14  being first duly sworn, was examined and

15  testified as follows:

16

17  EXAMINATION BY MR. PORTER:

18  Q    Good afternoon, Mr. Cottle. My name

19  is Adam Porter.  We met a moment ago.  I

20  represent Ms. Price in her lawsuit against

21  the board.

22      First, I've got your resume here that

23  I've marked as Exhibit 1.  Is that your

6

1  writing on there?

2  A    That's my wife's.

3  Q    Okay.  Is everything -- did you read

4  over it?

5  A    Right.

6  Q    Is it all accurate?

7  A    Right.

8  Q    Is your address, is that Airport

9  Road?

10  A    Right.

11  Q    Okay.  Thanks.  Have you ever given a

12  deposition before?

13  A    Yes, sir.

14  Q    What was that about?

15  A    That's when I was with the railroad.

16  We had a, the State of Florida was pulling

17  the, I forgot how many million dollar

18  transformer across the tracks and the state

19  troopers were leading them and they didn't

20  tell the railroad about it and one of our

21  trains cut it in half and I had to give a

22  deposition on it.  I was the chief train

23  dispatch over that territory --

7

1  Q    Uh-huh.

2  A    -- and I had to go down town and give

3  a deposition to five lawyers, I believe it

4  was.

5  Q    Has that been a while ago?

6  A    It's been several years ago.

7  Q    Well, I will refamiliarize you with

8  some ground rules.  You need to verbalize

9  all your answers and try not to say uh-huh

10  or huh-uh.  If you would, let me finish my

11  question before you begin your answer, and

12  if you don't understand a question, let me

13  know, okay?

14  A    Okay.

15  Q    And if you answer it, I'm going to

16  assume you understood it, okay?

17  A    (Nods head affirmatively.)

18  Q    You have to verbalize your answer,

19  speak out.

20  A    I understand.

21  Q    Okay.  I don't think we'll be here

22  long, but if you need to take a break, we

23  can do that.  If you do, if there's a

8

1  question on the table at the time, I'll need

2  you to answer that before we take a break,

3  okay?

4  A    Okay.

5  Q    Are you under any medication today

6  that might prevent you from understanding my

7  questions or testifying truthfully?

8  A    No, sir.

9  Q    Okay.  What is, what's your wife's

10  name?

11  A    Janell.

12  Q    How do you spell that?

13  A    J-a-n-e-l-l.

14  Q    J-a-n-e-l-l.  Does she work?

15  A    Yes, sir.

16  Q    Where does she work?

17  A    Small Town Bank.

18  Q    Are they here in Roanoke?

19  A    Right.  Yes, sir.

20  Q    Are you aware of what Ms. Price

21  alleges in her lawsuit?

22  A    Yes, sir.

23  Q    What is your understanding of that?

1   A    My understanding it's not true and
2   I've told Mr. Marcum about it and he has
3   told me what transpired and all.
4   Q    I'm not asking you to, to agree with
5   her.  I just wanted to know what is your
6   understanding of what she claims?
7   A    She claims that I had harassed her,
8   sexually harassed her.
9   Q    Okay.  When did you first hear that
10  she made that complaint?
11  A    I don't know how long it's been, but
12  Mr. Marcum called me into his office, him
13  and Mr. Foster --
14  Q    Okay.
15  A    -- and advised me of it.
16        MR. PORTER:  Did he listen to the
17  video -- the audiotape, Donald?
18        MR. SWEENEY:  I'm sorry?
19        MR. PORTER:   Did he listen to the
20  tape, the audiotape?
21        MR. SWEENEY:  The tape that y'all
22  gave us?
23        MR. PORTER:  Yeah.

10

1        MR. SWEENEY:  Huh-uh.
2        MR. PORTER:  Okay.
3        MR. SWEENEY:  As far as we're
4  concerned, it's inaudible.
5   Q    (BY MR. PORTER:)  Okay.  Did, did,
6  did you ever say anything to her about going
7  to Florida with you?
8   A    The only thing that I could have said
9  about going to Florida, I worked in Florida
10  for eleven years and I was always making the
11  comment to somebody because I go back to the
12  doctors down there about every three months
13  and I do it to, at the Burger King, any
14  place.  A lot of times they'll ask me, where
15  are you going and I'll say going to Florida,
16  would you like to go with me and that was
17  the extent of it.
18  Q    So, so you did ask her to go to
19  Florida with you?
20  A    I just asked her probably if, you
21  know, I said I'm going to Florida, let's go,
22  or something like that.  I mean, I meant
23  nothing by it.

11

1   Q    Okay.  I'm not suggesting that you
2  did, but you did ask her if she wanted to go
3  to Florida with you?
4   A    I just made the comment.
5   Q    Okay.  I'm not --
6   A    I didn't come out and ask her.
7   Q    Okay.  I wasn't clear if you were
8  talking about a conversation with her or
9  conversations you had with people in
10  general.  You're talking about a
11  conversation with her?
12  A    No, I didn't ask her to go to
13  Florida, no.
14  Q    Did you say anything to her about
15  going to Florida?
16  A    I probably told her I had to go to
17  the doctor in Florida.
18  Q    Did you ask her to come on?
19  A    I don't remember that if I did.
20  Q    Would this have just been on one
21  occasion?
22  A    If I did it, that would be the only
23  one.

12

1   Q    Okay.  And you may have said
2  something to her like let's go?
3   A    Yeah.
4   Q    Were you joking?
5   A    Joking.  I mean, you know, I just,
6  because I usually had to ask off out here to
7  go to the doctors.
8   Q    You used to have to have what?
9   A    Ask off and let them notify so
10  they'll get somebody to fill my job.
11  Q    Did you ever receive any training in
12  sexual harassment from the school?
13  A    Yes, sir.  I think the first of the
14  year they always go through it.
15  Q    What, what do they tell you about if
16  you think you've been sexually harassed what
17  you should do about it?
18  A    Report it to the proper authorities.
19  Q    Who is that?
20  A    Mr. Marcum or Mr. Foster.
21  Q    Okay.  Did you ever say anything to
22  Ms. Price about her appearance?
23  A    I don't remember making that comment,

13

1   no, sir.
2   Q     Is it possible that you may have made
3   comments to her about her appearance?
4   A     I don't think so, no, sir.
5   Q     Okay.  Did you ever say anything to
6   her about being attractive or words of that
7   nature?
8   A     I don't remember making a comment
9   like that.
10  Q     Is it possible you did?
11  A     No, I don't think so.
12  Q     Okay.  Did you ever make any comments
13  to her about her clothing or what she was
14  wearing?
15  A     I don't, I don't recall making
16  anything like that because I don't usually
17  say stuff like that to women.
18  Q     So it's not possible that you did?
19  A     No.
20  Q     To your knowledge, has any other
21  person ever said that you have said anything
22  sexually appropriate -- inappropriate?
23  A     Have anybody out here made a claim

14

1   that I made some sexual remarks about?
2   Q     Yes.
3   A     No.
4   Q     Okay.  Did you ever say anything to
5   Ms. Price about going out with you somewhere
6   other than Florida on a date or something?
7   A     No.
8   Q     Did you ever make a comment to her
9   that she looked good enough to eat?
10  A     No.
11  Q     Did you ever use any profanity around
12  her?
13  A     No.
14  Q     What time would you usually get to
15  school in the morning?
16  A     I usually got here about ten 'til
17  seven because people started coming in about
18  seven o'clock school, the school bus arrived
19  about ten after seven.
20  Q     And when y'all -- when did you become
21  a crossing guard?
22  A     I worked at Knight Enloe one year.
23  Q     That's the elementary school?

15

1   A     That's the elementary school, the
2   first year I started and I can't remember, I
3   think it was '2, 2002, maybe '3 or '4 when I
4   came over here.
5   Q     Okay.  And you and Ms. Price were the
6   only crossing guards at that time?
7   A     I believe Mr. Mooring was working at
8   the time when I came over here.
9   Q     Okay.  Did you have a post that you
10  assumed every day?
11  A     Right.
12  Q     Where was that?
13  A     That was out in the road.
14  Q     Right directly in front of the
15  school?
16  A     Right, up here at the outlet up here.
17  Q     Where would Ms. Price be located?
18  A     Well, she was, worked, always worked
19  in front of the building.
20  Q     Okay.
21  A     Where the students disembarked and --
22  Q     So you handled the traffic out in the
23  road and she handled getting the children in

16

1   and out of the car?
2   A     Right.
3   Q     Would y'all ever talk in the mornings
4   before you would go to your post?
5   A     We had before.
6   Q     Before what?
7   A     Yes, before seven o'clock.
8   Q     Okay.  Did, so did she ever say
9   anything to you that indicated to you that
10  she didn't want you to be around?
11  A     No.
12  Q     Did she ever say anything to you that
13  she thought you were saying something
14  inappropriate?
15  A     No.
16  Q     In, in the mornings when you got
17  there before you go to your post, would you
18  talk with her?
19  A     Before we went to work?
20  Q     Yeah.
21  A     Yeah.  We, maybe for ten minutes, you
22  know, before the school traffic started.
23  Q     Would you typically go over to her

17

```
 1   car or would she go over to your car?
 2   A      She came to my truck, you know, when
 3   we first started talking and then she got a
 4   new car and I, you know, I started walking
 5   down to the flag pole, you know, until the
 6   traffic started.
 7   Q      Who would usually get here first, you
 8   or her?
 9   A      I really don't remember.  Sometimes
10   it was me, sometimes it was her probably.
11   Q      Was there a period where she would
12   get here like right at the time to start
13   work?
14   A      Possibly sometimes.
15   Q      After Mr. Marcum told you about the
16   complaint -- well, let me ask you.  Did he
17   show you this document right here if you
18   recall?
19   A      Mr. Marcum?
20   Q      Yes, sir.
21   A      I don't remember showing this, seeing
22   this, no, sir.  He told me about it.  He
23   could have shown me and I just don't
```

18

```
 1   remember it.  He discussed it with me
 2   thoroughly though.
 3   Q      Did you ever say anything to Ms.
 4   Price about you wished you could have found
 5   her before her husband did?
 6   A      I don't remember saying anything like
 7   that.
 8   Q      Is it possible you did?
 9   A      No.
10   Q      And you never asked her to go
11   anywhere with you?
12   A      No, sir.
13   Q      Did you ever touch her?
14   A      (Shakes head negatively.)
15   Q      You need to speak out?
16   A      No.  No.
17   Q      Look at what was marked as Exhibit 4
18   to Mr. Marcum's deposition and let me know
19   if you've ever seen that before.
20   A      Now, what was your question?
21   Q      Have you ever seen that before?
22   A      I don't remember seeing it.
23   Q      Do you remember your meeting with Mr.
```

19

```
 1   Marcum and I think Mr. Foster was there?
 2   A      Right.  Yes, sir.
 3   Q      Do you recall what was said in that
 4   meeting?
 5   A      I recall Mr. Marcum telling me what
 6   had, the charges were and I was instructed
 7   not to speak to her or, you know, get around
 8   her or anything like that.
 9   Q      Did you ever talk to her again after
10   that?
11   A      No, sir.
12   Q      And, and what's stated on that page
13   as what you said, is that an accurate
14   statement of what you said?
15   A      What, about this being nice?
16   Q      Yeah, everything that is attributed
17   to you that you said.  Did you say all that
18   or is there something in here that you
19   didn't say?
20   A      Like I say, I don't remember saying
21   anything like that.  I don't believe I said
22   it, you know, I don't remember saying it.
23   Q      You're talking about in this meeting
```

20

```
 1   or, or to Ms. Price?
 2   A      To Ms. Price.
 3   Q      Do you recall saying something about
 4   telling her she looked nice in this meeting?
 5   A      In this meeting?
 6   Q      No, in your meeting with Mr. Marcum
 7   and Mr. Foster?
 8   A      I don't remember, I could have.
 9   Q      It says, "I may have on occasion told
10   her she looks nice," did you say that in
11   that meeting?
12   A      I possibly could have, if I told her.
13   Q      And what was your next -- oh, strike
14   that.  Did anybody talk to you again about
15   her claims after you met with Mr. Marcum and
16   Mr. Foster?
17   A      I would confer with Mr. Marcum every
18   once in a while about, you know, how things
19   were going about it, you know.
20   Q      About what?
21   A      About her claim against, you know,
22   what was transpired and he'd always tell me
23   that he would notify me if, you know,
```

21

1    anything came up.
2    Q    Was it your understanding that she
3    had filed this claim with the government
4    agency?
5    A    Right.
6    Q    Okay.  And did he ever tell you what
7    happened with it?
8    A    No.  He just told me that he would
9    let me know if he heard from it and --
10   Q    Did he ever tell you whether or not
11   he had decided whether or not there was any
12   truth to what she said?
13   A    No.  He never gave me that
14   indication.
15   Q    Did you ever ask him?
16   A    No.  The only thing I ever asked if
17   he heard any more information about what was
18   transpiring and he said he hadn't heard
19   anything but he would advise me if, if, you
20   know, if he got any notice about anything
21   transpiring.
22   Q    Did you get any disciplinary action
23   as a result of her claim?

22

1    A    No.
2    Q    Okay.  At some point did somebody
3    mention something to you about Ms. Price
4    having a tape?
5    A    Yes.  Mr. Marcum mentioned to it.
6    Q    Did he call you into his office?
7    A    Right.
8    Q    When was that, do you remember?
9    A    I don't remember the dates.
10   Q    What did he tell you?
11   A    He just told me that she had a bunch
12   of tapes where we had talked and I said I
13   didn't know anything about them.
14   Q    Did he say anything else?
15   A    And I don't remember what he said
16   really.
17   Q    Okay.  Well, did you tell your wife
18   about that?
19   A    The first day it happened, I told
20   her.
21   Q    What did you tell her about the
22   tapes?
23   A    I told her about the tapes and she

23

1    said she would love to hear them and I said
2    I'd love for you to hear them.
3    Q    Did Mr. Marcum tell you that Ms.
4    Price had said something about giving the
5    tapes to your wife?
6    A    I don't remember him saying anything
7    about that.
8    Q    Okay.  Did anybody else -- now if Mr.
9    Sweeney asked you questions about what
10   happened, I don't want you to tell me what
11   was said, okay, but did anybody else
12   interview you or ask you questions about Ms.
13   Price and her claims?
14   A    No.
15   Q    Okay.  So to sum up, you never said
16   anything of a sexual nature to her?
17   A    I wouldn't say anything about a
18   sexual nature to a woman.  I've got more,
19   I'm more appreciative of a woman than that.
20   Q    So that's a no; is that right?
21   A    Right.
22   Q    And you never asked her to go out on
23   a date or go anywhere with you?

24

1    A    No, sir.
2    Q    You never made any remarks about her
3    appearance?
4    A    No.  Huh-uh.
5         MR. PORTER:  That's all I have.
6    Thank you.
7         MR. SWEENEY:  Thank you very much,
8    Mr. Cottle.  Nice to see you.  Thanks for
9    waiting around.
10        THE WITNESS:  All right.
11        MR. PORTER:  I appreciate you doing
12   that.
13             (Whereupon, an off-the-
14             record discussion was had.)
15        MR. PORTER:  Can I ask you one more
16   question?
17        THE WITNESS:  All right.
18        MR. PORTER:  You don't have to sit
19   back down.
20   Q    (BY MR. PORTER:)  I noticed that you
21   were here today with a walker, when did you
22   start using that?
23   A    I had knee surgery last Wednesday in

25

```
1    Birmingham for the second time.
2    Q    Okay.
3    A    I had knee replacement in January of
4    '05.   I never could bend my knee and --
5    Q    When, when did you start using the
6    walker?
7    A    This week.  I've been using a walking
8    stick.
9    Q    You used a cane?
10   A    Right.
11   Q    Since January of '05?
12   A    Well, about a year after that.
13   Q    Since January of '06?
14   A    Yeah.
15        MR. PORTER:  Okay.  Thank you.
16        THE WITNESS:  I had to go to the
17   walker because I still got my clamps stuff
18   in.
19        MR. PORTER:  Well, all right, sir.
20   Take it easy on that.
21        THE WITNESS:  Okay.
22        FURTHER THE DEPONENT SAITH NOT
23        (EXHIBIT ATTACHED AND ENCLOSED.)
```

26

```
1              C E R T I F I C A T E
2
3    STATE OF ALABAMA )
4    JEFFERSON COUNTY )
5
6         I hereby certify that the above and
7    foregoing deposition was taken down by me in
8    stenotype and the questions and answers
9    thereto were reduced to writing under my
10   supervision, and that the foregoing
11   represents a true and correct transcript of
12   the testimony given by said witness on said
13   occasion.
14        I further certify that I am neither
15   of counsel nor of kin to the parties to the
16   action, not am I in anywise interested in
17   the result of said cause.
18
19        _____
20              COMMISSIONER
21
22
23
```

PRICE - ROANOKE CITY BO. OF ED.                                    JERRELL COTTLE

<**'**>
'05: 25;4, 25;11
'06: 25;13
'2: 15;3
'3: 15;3
'4: 15;3
'til: 14;16

<**1**>
1:10 p.m.: 1;20, 5;8
102: 4;8
1819: 4;12

<**2**>
2002: 15;3
21st: 1;19
2301: 4;7
25: 3;4
251: 1;18, 5;7

<**3**>
3:06-CV-742-VPM: 1;8
30: 5;4
35203: 4;9, 4;13

<**5**>
5: 3;4, 3;8
5th: 4;12

<**A**>
above: 5;9, 26;6
accurate: 6;6, 19;13
across: 6;18
acting: 5;2
ACTION: 1;7, 21;22, 26;16
Adam: 4;7, 5;19
address: 6;8
advise: 21;19
advised: 9;15

affirmatively: 7;17
afternoon: 5;18
agency: 21;4
ago: 5;19, 7;5, 7;6
agree: 9;4
AGREED: 1;13, 1;21, 2;5, 2;14
Airport: 6;8
ALABAMA: 1;2, 1;19, 4;8, 4;13, 5;3, 5;4, 5;8, 26;3
alleges: 8;21
ANGELA: 1;5, 4;15
answer: 7;11, 7;15, 7;18, 8;2
answers: 7;9, 26;8
anybody: 13;23, 20;14, 23;8, 23;11
anywise: 26;16
appearance: 12;22, 13;3, 24;3
APPEARANCES: 4;6
appearing: 4;9, 4;13
appreciate: 24;11
appreciative: 23;19
appropriate: 13;22
Arant: 4;11
around: 14;11, 16;10, 19;7, 24;9
arrived: 14;18
assign: 2;10
assume: 7;16
assumed: 15;10
ATTACHED: 25;23
attractive: 13;6
attributed: 19;16
audiotape: 9;17, 9;20
authorities: 12;18
Avenue: 4;8, 4;12
aware: 8;20

<**B**>
back: 10;11, 24;19
Bank: 8;17
become: 14;20
begin: 7;11
beginning: 5;8

behalf: 4;9, 4;14
believe: 7;3, 15;7, 19;21
bend: 25;4
Birmingham: 4;8, 4;13, 25;1
BOARD: 1;8, 5;21
Bradley: 4;11
break: 7;22, 8;2
building: 15;19
bunch: 22;11
Burger: 10;13
bus: 14;18

<**C**>
call: 22;6
called: 9;12
cane: 25;9
car: 16;1, 17;1, 17;1, 17;4
cause: 5;10, 26;17
certify: 5;3, 26;6, 26;14
charges: 19;6
chief: 6;22
children: 15;23
Chuck: 4;16
CITY: 1;8
CIVIL: 1;7, 5;5
claim: 13;23, 20;21, 21;3, 21;23
claims: 9;6, 9;7, 20;15, 23;13
clamps: 25;17
clear: 11;7
clothing: 13;13
coming: 14;17
commencing: 1;20
comment: 10;11, 12;23, 13;8, 14;8
comments: 13;3, 13;12
COMMISSIONER: 1;17, 2;16, 4;4, 26;20
complaint: 9;10, 17;16
compliance: 2;2
concerned: 10;4
confer: 20;17
conversation: 11;8, 11;11

conversations: 11;9
correct: 26;11
COTTLE: 1;16, 5;9, 5;13, 5;18, 24;8
counsel: 1;15, 2;7, 2;9, 5;6, 26;15
COUNTY: 26;4
COURT: 1;1, 2;3, 5;1
crossing: 14;21, 15;6
cut: 6;21

<**D**>
date: 5;3, 14;6, 23;23
dates: 22;9
day: 1;19, 15;10, 22;19
Deborah: 1;16, 4;3, 5;1
decided: 21;11
DEFENDANT: 1;10, 4;14
DEPONENT: 25;22
deposition: 1;15, 1;23, 2;1, 2;12, 2;15, 6;12, 6;22, 7;3, 18;18, 26;7
depositions: 2;4
directly: 15;14
disciplinary: 21;22
discussed: 18;1
discussion: 24;14
disembarked: 15;21
dispatch: 6;23
DISTRICT: 1;1, 1;2
DIVISION: 1;3
doctor: 11;17
doctors: 10;12, 12;7
document: 17;17
doing: 24;11
dollar: 6;17
Donald: 4;10, 9;17
down: 7;2, 10;12, 17;5, 24;19, 26;7
duly: 5;14

<**E**>
EASTERN: 1;3
easy: 25;20
eat: 14;9

PRICE V ROANOKE CITY BO. OF ED.    JERRELL COTTLE

EDUCATION: 1;9
effect: 2;1
elementary: 14;23, 15;1
eleven: 10;10
ENCLOSED: 25;23
Enloe: 14;22
enough: 14;9
Esquire: 4;7, 4;10
everything: 6;3, 19;16
evidence: 2;12
EXAMINATION: 3;3, 5;10, 5;17
examined: 5;14
except: 2;8
Exhibit 1: 5;23
Exhibit 4: 18;17
EXHIBIT: 25;23
EXHIBITS: 3;7
extent: 10;17

<F>
far: 10;3
Federal: 4;12
filed: 21;3
filing: 2;15
fill: 12;10
finish: 7;10
firm: 4;11
First: 5;14, 5;22, 9;9, 12;13, 15;2, 17;3, 17;7, 22;19
five: 7;3
flag: 17;5
Florida: 8;16, 10;7, 10;9, 10;9, 10;15, 10;19, 10;21, 11;3, 11;13,
    11;15, 11;17, 14;6
following: 5;11
follows: 5;15
force: 2;1
foregoing: 5;5, 26;7, 26;10
forgot: 6;17
form: 2;8
Foster: 9;13, 12;20, 19;1, 20;7, 20;16
found: 18;4

front: 15;14, 15;19
full: 2;2

<G>
gave: 9;22, 21;13
general: 11;10
getting: 15;23
Gilham: 1;18, 5;7
give: 6;21, 7;2
given: 6;11, 26;12
giving: 23;4
government: 21;3
ground: 7;8
grounds: 2;10
guard: 14;21
guards: 15;6

<H>
half: 6;21
handled: 15;22, 15;23
Handley: 1;18, 5;7
happened: 21;7, 22;19, 23;10
harassed: 9;7, 9;8, 12;16
harassment: 12;12
head: 7;17, 18;14
hear: 9;9, 23;1, 23;2
heard: 21;9, 21;17, 21;18
hereby: 26;6
Huh-uh: 7;10, 10;1, 24;4
husband: 18;5

<I>
inappropriate: 13;22, 16;14
inaudible: 10;4
INDEX: 3;7
indicated: 16;9
indication: 21;14
information: 21;17
instructed: 19;6
interested: 26;16

interview: 23;12

<J>
J-a-n-e-l-l: 8;13, 8;14
Janell: 8;11
January: 25;3, 25;11, 25;13
JEFFERSON: 26;4
JERRELL: 1;16, 5;9, 5;13
job: 12;10
Joking: 12;4, 12;5
Jr: 4;10
June 2007,: 1;20

<K>
kin: 26;15
King: 10;13
knee: 24;23, 25;3, 25;4
Knight: 14;22
knowledge: 13;20

<L>
L.L.P.: 4;12
Large: 5;3
last: 24;23
laws: 2;3
lawsuit: 5;20, 8;21
lawyers: 7;3
leading: 2;8, 6;19
listen: 9;16, 9;19
located: 15;17
long: 7;22, 8;11
Look: 18;17
looked: 14;9, 20;4
looks: 20;10
lot: 10;14
love: 23;1, 23;2

<M>
Marcum: 4;16, 9;2, 9;12, 12;20, 17;15, 17;19, 19;1, 19;5, 20;6,
    20;15, 20;17, 22;5, 23;3

Marcum's: 18;18
marked: 5;23, 18;17
mean: 10;22, 12;5
meant: 10;22
medication: 8;5
meeting: 18;23, 19;4, 19;23, 20;4, 20;5, 20;6, 20;11
mention: 22;3
mentioned: 22;5
met: 5;19, 20;15
MIDDLE: 1;2, 1;18, 5;7
million: 6;17
minutes: 16;21
moment: 5;19
months: 10;12
Mooring: 15;7
morning: 14;15
mornings: 16;3, 16;16
Morris: 4;7
Ms: 5;20, 8;20, 12;22, 14;5, 15;5, 15;17, 18;3, 20;1, 20;2, 22;3,
    23;3, 23;12

<N>
name: 5;18, 8;10
nature: 13;7, 23;16, 23;18
necessary: 2;6
need: 7;8, 7;22, 8;1, 18;15
negatively: 18;14
neither: 26;14
new: 17;4
next: 20;13
Nice: 19;15, 20;4, 20;10, 24;8
Nods: 7;17
nor: 26;15
North: 4;13
Notary: 1;17, 5;2
nothing: 10;23
notice: 2;15, 21;20
noticed: 24;20
notify: 12;9, 20;23

**<O>**
o'clock: 14;18, 16;7
objections: 2;7, 2;10
occasion: 11;21, 20;9, 26;13
off-the: 24;13
offered: 2;12
office: 9;12, 22;6
Okay: 6;3, 8;11, 7;13, 7;14, 7;16, 7;21, 8;3, 8;4, 8;9, 9;9, 9;14,
   10;2, 10;5, 11;1, 11;5, 11;7, 12;1, 12;21, 13;5, 13;12, 14;4,
   15;5, 15;9, 15;20, 16;8, 21;6, 22;2, 22;17, 23;8, 23;11, 23;15,
   25;2, 25;15, 25;21
once: 20;18
One: 4;12, 6;20, 11;20, 11;23, 14;22, 24;15
oral: 5;10
outlet: 15;16

**<P>**
PAGE: 3;3, 19;12
parties: 1;14, 2;9, 26;15
people: 11;9, 14;17
period: 17;11
person: 13;21
Place: 4;12, 10;14
PLAINTIFF: 1;6, 4;9
point: 22;2
pole: 17;5
PORTER: 3;4, 4;7, 5;17, 5;19, 9;16, 9;19, 9;23, 10;2, 10;5, 24;5,
   24;11, 24;15, 24;18, 24;20, 25;15, 25;19
possible: 13;2, 13;10, 13;18, 18;8
Possibly: 17;14, 20;12
post: 15;9, 16;4, 16;17
present: 4;15
prevent: 8;6
PRICE: 1;5, 4;15, 5;20, 8;20, 12;22, 14;5, 15;5, 15;17, 18;4, 20;1,
   20;2, 22;3, 23;4, 23;13
prior: 2;12
probably: 10;20, 11;16, 17;10
Procedure: 5;5
proceedings: 5;11
profanity: 14;11

SAITH: 25;22
saying: 16;13, 18;6, 19;20, 19;22, 20;3, 23;6
says: 20;9
Schaffer: 1;17, 4;3, 5;1
School: 1;18, 5;7, 12;12, 14;15, 14;18, 14;18, 14;23, 15;1, 15;15,
   16;22
second: 25;1
seeing: 17;21, 18;22
seen: 18;19, 18;21
seven: 14;7, 14;18, 14;19, 16;7
several: 7;6
sexual: 12;12, 14;1, 23;16, 23;18
sexually: 9;8, 12;16, 13;22
Shakes: 18;14
shall: 2;6
show: 17;17
showing: 17;21
shown: 17;23
signature: 1;22
sir: 6;13, 8;8, 8;15, 8;19, 8;22, 12;13, 13;1, 13;4, 17;20, 17;22,
   18;12, 19;2, 19;11, 24;1, 25;19
sit: 24;18
Small: 8;17
somebody: 10;11, 12;10, 22;2
Sometimes: 17;9, 17;10, 17;14
somewhere: 14;5
sorry: 9;18
spell: 8;12
start: 17;12, 24;22, 25;5
started: 14;17, 15;2, 16;22, 17;3, 17;4, 17;6
STATE: 5;2, 6;16, 6;18, 26;3
stated: 19;12
statement: 19;14
STATES: 1;1
stenotype: 26;8
stick: 26;8
STIPULATED: 1;13, 1;21, 2;5, 2;14
stipulation: 5;6
strike: 20;13
students: 15;21

proper: 12;18
provided: 5;4
Public: 1;18, 5;2
Pudles: 1;17, 4;3, 5;1
pulling: 6;16
PX-1: 3;8

**<Q>**
question: 7;11, 7;12, 8;1, 18;20, 24;16
questions: 2;8, 2;9, 8;7, 23;9, 23;12, 26;8

**<R>**
railroad: 6;15, 6;20
read: 6;3
reading: 1;22
really: 17;9, 22;16
recall: 13;15, 17;18, 19;3, 19;5, 20;3
receive: 12;11
record: 24;14
reduced: 26;9
refamiliarize: 7;7
relating: 5;15
remarks: 14;1, 24;2
remember: 11;19, 12;23, 13;8, 15;2, 17;9, 17;21, 18;1, 18;6, 18;22,
   18;23, 19;20, 19;22, 20;8, 22;8, 22;9, 22;15, 23;6
replacement: 25;3
Report: 12;18
reporter: 5;2
represent: 5;20
represents: 26;11
respective: 1;15
result: 21;23, 26;17
resume: 5;22
Road: 1;19, 5;8, 6;9, 15;13, 15;23
ROANOKE: 1;8, 1;19, 5;8, 8;18
Rose: 4;11
Rule: 5;4
Rules: 2;3, 5;4, 7;8

**<S>**

stuff: 13;17, 25;17
suggesting: 11;1
Suite: 4;8
sum: 23;15
supervision: 26;10
surgery: 24;23
SWEENEY: 4;10, 9;18, 9;21, 10;1, 10;3, 23;9, 24;7
sworn: 5;14

**<T>**
table: 8;1
talked: 22;12
tape: 9;20, 9;21, 22;4
tapes: 22;12, 22;22, 22;23, 23;5
ten: 14;16, 14;19, 16;21
territory: 6;23
testified: 5;15
testifying: 8;7
testimony: 26;12
Thanks: 6;11, 24;8
there's: 7;23
thereto: 2;13, 26;9
they'll: 10;14, 12;10
thoroughly: 18;2
though: 18;2
three: 10;12
today: 8;5, 24;21
touch: 18;13
Town: 7;2, 8;17
tracks: 6;18
traffic: 15;22, 16;22, 17;6
train: 6;22
training: 12;11
trains: 6;21
transcript: 26;11
transformer: 6;18
transpired: 9;3, 20;22
transpiring: 21;18, 21;21
trial: 2;11
troopers: 6;19

truck: 17;2
true: 9;1, 26;11
truth: 21;12
truthfully: 8;7
try: 7;9
typically: 16;23

<U>
understand: 7;12, 7;20
understanding: 8;6, 8;23, 9;1, 9;6, 21;2
understood: 7;16
UNTIED: 1;1
until: 17;5
using: 24;22, 25;5, 25;7

<V>
verbalize: 7;8, 7;18
video: 9;17

<W>
waiting: 24;9
waived: 1;23, 2;16
walker: 24;21, 25;6, 25;17
walking: 17;4, 25;7
wanted: 9;5, 11;2
wearing: 13;14
Wednesday: 24;23
week: 25;7
Whereupon: 5;10, 24;13
whether: 21;10, 21;11
White: 4;11
wife: 22;17, 23;5
wife's: 6;2, 8;9
will: 7;7
wished: 18;4
WITNESS: 1;23, 5;9, 24;10, 24;17, 25;16, 25;21, 26;12
woman: 23;18, 23;19
women: 13;17
words: 13;6
work: 8;14, 8;16, 16;19, 17;13

worked: 10;9, 14;22, 15;18, 15;18
working: 15;7
writing: 6;1, 26;9

<Y>
y'all: 9;21, 14;20, 16;3
year: 12;14, 14;22, 15;2, 25;12
years: 7;6, 10;10

# EXHIBIT 10



## G-5 SEXUAL HARASSMENT

I.  **POLICY**

   A.  It is the policy of the Board to maintain a learning and working-environment that is free from sexual harassment. No employee of the School District shall be subjected to sexual harassment.

   B.  It shall be a violation of this policy for any employee of the School District to harass another staff member or student through conduct or communications of a sexual nature as defined in Section II below.

   C.  Each administrator shall be responsible for promoting understanding and acceptance of, and assuring compliance with, state and federal laws and board policy and procedures governing sexual harassment within her or his school or office.

   D.  Violations of this policy or procedure will be cause for disciplinary action.

II.  **DEFINITION**

   A.  Sexual harassment means unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when:

   1)  submission to such conduct is made either explicitly or implicitly a term or condition of a person's employment or advancement or of a student's participation in school programs or activities; or

   2)  submission to or rejection of such conduct by an employee or student is used as the basis for decisions affecting the employee or student; or

   3)  such conduct has the purpose or effect of unreasonably interfering with an employee's or student's performance or creating an intimidating, hostile, or offensive work or learning environment.

   B.  Sexual harassment, as set forth in Section II-A, may include, but is not limited to, the following:
   1. verbal harassment or abuse; 2. pressure for sexual activity; 3. repeated remarks with sexual or demeaning implications; 4. unwelcome touching; and 5. sexual jokes, posters, etc. suggesting or demanding sexual involvement, accompanied by implied or explicit threats concerning one's grades, job, etc.

III.  **REPORTING PROCEDURES**

   A.  Any employee who feels he/she has been sexually harassed by another employee(s) or student(s) of the School District should present the complaint directly to the School District Title IX Coordinator or a person designated by the Superintendent. The complaint should be filed as soon as possible after the incident or the latest occurrence if a series of incidents are involved. The employee should submit the report no later than forty-five (45) calendar days following the incident of the latest occurrence in the series of such incidents.

   B.  The complaint should be made in person or in writing. If the initial complaint is made in person, the

*Price v. Roanoke City*
*Board of Education*
*Document Produced by Defendant*
*No. 22*

Page 1 of



G.5 continued

complainant will then be responsible for preparing a signed, written complaint detailing the events/occurrences giving rise to the sexual harassment charge.

C.    Such complaint of sexual harassment will not reflect upon the complainant's status, nor will it affect future employment, or work assignments.

IV.    <u>INVESTIGATION - HEARING PROCEDURES</u>

A.    The Title IX Coordinator or the Superintendent's designee will <u>promptly</u> initiate an investigation of the allegation. Due process shall be accorded to all parties involved in the allegation throughout the investigation. The person(s) accused will be given an opportunity to present a written, signed statement detailing his/her recall of the events/occurrences leading to the sexual harassment complaint against him/her.

B.    When the investigation is completed the person conducting the investigation shall report the findings to the Superintendent. The findings of the investigation shall then be reduced to writing and copies presented to the complainant and the accused employee(s). The Superintendent and investigating officer shall meet with the complainant and accused employee to attempt to resolve the complaint.

C.    If the complaint cannot be resolved as noted above, the Superintendent shall report the matter to the Board. The Board, at its discretion, may conduct a hearing in accordance with applicable laws and attempt to resolve the complaint.

D.    If the complaint cannot be resolved by the Board, the complainant may seek redress in an appropriate court.

E.    In all situations, the confidentiality of the complainant and the accused will be respected consistent with the School District's legal obligations and with the necessity to investigate fully any allegations of misconduct and to take corrective action when it is determined that sexual harassment has occurred.

V.    <u>SANCTIONS</u>

A substantiated charge against an employee of the School District shall subject that employee to disciplinary action, up to and including discharge.

VI.    <u>NOTIFICATION</u>

This policy will be placed in the School District policy manual

ADOPTED: July 25, 2000
REVISED: November 22, 2005
LEGAL REF.:        The Code of Alabama: 16-8-23; Meritor Savings Bank FSB v. Vinson, 477 U.S. 57 (1986); <u>Civil Rights Act of 1964, Title VII</u>; <u>EEOC Guidelines</u>. Equal Employment Opportunities Commission (EEOC), Minnesota Department of Education; and Programs for Educational Opportunity (PEO), Univ. of Michigan, Ann Arbor, Michigan;

*Price v. Roanoke City*
*Board of Education*
*Document Produced by Defendant*
*No. 23*

FILE: GAJDBH

## SEXUAL HARASSMENT
### POLICY

I.

A.  It is the policy of the Board to maintain a learning and working-environment that is free from sexual harassment. No employee of the School District shall be subjected to sexual harassment.

B.  It shall be a violation of this policy for any employee of the School District to harass another staff member or student through conduct or communications of a sexual nature as defined in Section II below.

C.  Each administrator shall be responsible for promoting understanding and acceptance of, and assuring compliance with, state and federal laws and board policy and procedures governing sexual harassment within her or his school or office.

D.  Violations of this policy or procedure will be cause for disciplinary action.

II.  DEFINITION

A.  Sexual harassment means unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when:

1)  submission to such conduct is made either explicitly or implicitly a term or condition of a person's employment or advancement or of a student's participation in school programs or activities; or

2)  submission to or rejection of such conduct by an employee or student is used as the basis for decisions affecting the employee or student; or

3)  such conduct has the purpose or effect of unreasonably interfering with an employee's or student's performance or creating an intimidating, hostile, or offensive work or learning environment.

B.  Sexual harassment, as set forth in Section II-A, may include, but is not limited to, the following:
1. verbal harassment or abuse; 2. pressure for sexual activity; 3. repeated remarks with sexual or demeaning implications; 4. unwelcome touching; and 5. sexual jokes, posters, etc. suggesting or demanding sexual involvement, accompanied by implied or explicit threats concerning one's grades, job, etc.

III.  REPORTING PROCEDURES

A.  Any employee who feels he/she has been sexually harassed by another employee(s) or student(s) of the School District should present the complaint directly to the School District Title IX Coordinator or a person designated by the Superintendent. The complaint should be filed as soon as possible after the incident or the latest occurrence if a series of incidents are involved. The employee should submit the report no later than forty-five (45) calendar days following the incident of the latest occurrence in the series of such incidents.

B.  The complaint should be made in person or in writing. If the initial complaint is made in person, the

Page 1 of 2

*Price v. Roanoke City
Board of Education
Document Produced by Defendant
No. 24*

FILE: GAJDBH
(Continued)

complainant will then be responsible for preparing a signed, written complaint detailing the events/occurrences giving rise to the sexual harassment charge.

C.    Such complaint of sexual harassment will not reflect upon the complainant's status, nor will it affect future employment, or work assignments.

## IV.  INVESTIGATION - HEARING PROCEDURES

A.    The Title IX Coordinator or the Superintendent's designee will promptly initiate an investigation of the allegation. Due process shall be accorded to all parties involved in the allegation throughout the investigation. The person(s) accused will be given an opportunity to present a written, signed statement detailing his/her recall of the events/occurrences leading to the sexual harassment complaint against him/her.

B.    When the investigation is completed the person conducting the investigation shall report the findings to the Superintendent. The findings of the investigation shall then be reduced to writing and copies presented to the complainant and the accused employee(s). The Superintendent and investigating officer shall meet with the complainant and accused employee to attempt to resolve the complaint.

C.    If the complaint cannot be resolved as noted above, the Superintendent shall report the matter to the Board. The Board, at its discretion, may conduct a hearing in accordance with applicable laws and attempt to resolve the complaint.

D.    If the complaint cannot be resolved by the Board, the complainant may seek redress in an appropriate court.

E.    In all situations, the confidentiality of the complainant and the accused will be respected consistent with the School District's legal obligations and with the necessity to investigate fully any allegations of misconduct and to take corrective action when it is determined that sexual harassment has occurred.

## V.  SANCTIONS

A substantiated charge against an employee of the School District shall subject that employee to disciplinary action, up to and including discharge.

## VI.  NOTIFICATION

This policy will be placed in the School District policy manual

SOURCE: Roanoke City Board of Education, Roanoke, AL
ADOPTED: 7-25-00
LEGAL REF.:        The Code of Alabama: 16-8-23; Meritor Savings Bank FSB v. Vinson, 477 U.S. 57 (1986); Civil Rights Act of 1964, Title VII; EEOC Guidelines. Equal Employment Opportunities Commission (EEOC), Minnesota Department of Education; and Programs for Educational Opportunity (PEO), Univ. of Michigan, Ann Arbor, Michigan;

Page 2 of 2

*Price v. Roanoke City Board of Education*
*Document Produced by Defendant*
*No. 25*

## D.37a  SEXUAL HARRASSMENT

**General**

It is the policy of the Board that sexual harassment of employees or students by employees or other students is strictly prohibited.  The Board is committed to providing a working environment that is free of sexual harassment and will seek to utilize available measures to deter such conduct.

**Sexual Harassment Defined**

Sexual harassment is defined as unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when:

1.  submission to such conduct is made, either explicitly or implicitly, a term or condition of the individual's employment;
2.  submission to or rejection of such conduct by an individual is used as a basis for employment decisions affecting such individual;
3.  such conduct has the purpose or effect of substantially interfering with the individual's performance or creating a hostile or offensive working environment.

**Example of Sexual Harassment**

Examples of sexual harassment include, but are not limited to:  continued or repeated offensive sexual flirtation, advances, or propositions; continued or repeated verbal remarks about an individual's body; and sexually degrading words used toward an individual or to describe objects or pictures.

**Designation of Reporting Officer**

The Board hereby directs the Superintendent to appoint annually, prior to the beginning of the school year, two administrative employees, one male and one female, to serve as reporting officers for all complaints of sexual harassment involving employees of the Board and students.  Written notice by the Superintendent of the name and manner in which any complaint may be reported to such officer will be publicized.

**Harassment by or to Students**

Harassment of any employee or student by another student is expressly prohibited and will be handled in accordance with the provisions of the Code of Student Conduct.

**Reporting Incidents of  Sexual Harassment**

An employee who feels that he/she has been sexually harassed should report the incident to the Superintendent and/or the designated reporting officers.  Such report shall be made as soon as possible after the incident or, if a series of incidents, as soon as possible after the latest occurrence.  The employee should submit the report no later than forty-five (45) calendar days following the incident or the latest occurrence in the series of such incidents.  The complaint may be made to the designated reporting officers in person or in writing signed by the complainant and delivered to the reporting officers.  If such report is first made verbally then it will be the responsibility of the complainant to reduce the same to writing and to sign the written complaint.  The reporting officer shall forthwith commence an investigation of such written complaint.

Page 1 of 3

*Price v. Roanoke City*
*Board of Education*
*Document Produced by Defendant*
*No. 26*

D.37a continued

Complaint Resolution Procedure

Upon completing an investigation of the complaint, the designated reporting officer shall report to the

Superintendent the results of the investigation of the complaint. Such report shall be in writing and a copy thereof shall be provided both the complainant and the charged employee. The superintendent shall thereupon meet with the complainant and the charged employee, together with the designated reporting officer, and make every effort to resolve such complaint to the satisfaction of both parties. If such complaint cannot be resolved at this level, the Superintendent shall report the same to the Board and, if in his/her discretion it is warranted, he/she may recommend disciplinary action up to and including a proposed contract termination.

Students who believe that they have been sexually harassed should report the incident(s) to a teacher or administrator or a designated reporting officer for the school system immediately. If a student believes that he/she has been harassed by a teacher, administrator, or other employee, a report to that employee's immediate supervisor should be made immediately.

## SEXUAL HARASSMENT

The primary purpose of this policy is to provide for prompt ant equitable resolution of students' complaints and grievances.

Students shall not engage in conduct constituting sexual harassment. Sexual harassment, whether between students or between a student and an employee, will not be tolerated. The Board will investigate all allegations of sexual harassment and take appropriate action against those who engage in such behavior. Sanctions for violation of this policy may include verbal or written warning, suspension , or expulsion.

Definition

Sexual harassment is defined as verbal or physical conduct of a sexual nature when the advances, requests, or conduct have the effect of interfering with performance of school-related activities or creating an intimidating, hostile, or otherwise offensive environment.

Complaint Procedure

A student who believes that he or she has been or is being subjected to any form of sexual harassment shall immediately report the matter to a teacher, the school counselor, principal, the designated reporting officer for the school system, or the superintendent. Any student or employee who suspects that a student is being sexually harassed shall immediately report the information to the school counsel, principal, or Superintendent. A student's request to make his or her report to someone of the same sex shall be granted.

If the complaint is received by someone other than the school principal, the person receiving the complaint shall promptly inform the school principal. The principal shall start an immediate investigation into the matter. The custodial parent(s) of the student will be informed of the complaint.

Page 2 of 3

*Price v. Roanoke City*
*Board of Education*
*Document Produced by Defendant*
*No. 27*

D.37a continued

The completed investigation shall be review by the Superintendent or the Superintendent's designee and legal counsel for prompt and appropriate action, if warranted. A written response to the student's compliant will be provided to the custodial parent(s) and the student within forty-five (45) days of the date the student first registered the complaint. The student or the custodial parent(s) may appeal the decision within ten (10) days of the receipt of the decision by filing a written notice of appeal with the Superintendent. The Superintendent shall present the decision and notice of appeal to the Board as soon as practicable. The Board shall make a final decision and notify the student and the custodial parent(s) in writing of its decision.

Protection of Complainant

No student shall be subject to adverse action for any good faith report of sexual harassment under this policy. To the extent practicable, all reports of sexual harassment will remain confidential.


ADOPTED: February 16, 1998
REVISED: October 25, 2005
REA/ESPO consulted

### B.14a and D.37a SEXUAL HARASSMENT

**General**

It is the policy of the Board that sexual harassment of employees or students by employees or other students is strictly prohibited. The Board is committed to providing a working environment that is free of sexual harassment and will seek to utilize available measures to deter such conduct.

**Sexual Harassment Defined**

Sexual harassment is defined as unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when:

1.  submission to such conduct is made, either explicitly or implicitly, a term or condition of the individuals employment;
2.  submission to or rejection of such conduct by an individual is used as a basis for employment decisions affecting such individual;
3.  such conduct has the purpose or effect of substantially interfering with the individual's performance or creating a hostile or offensive working environment.

**Example of Sexual Harassment**

Examples of sexual harassment include, but are not limited to: continued or repeated offensive sexual flirtation, advances, or propositions; continued or repeated verbal remarks about an individual's body; and sexually degrading works used toward an individual or to describe objects or pictures.

**Designation of Reporting Officer**

The Board hereby directs the Superintendent to appoint annually, prior to the beginning of the school year, two administrative employees, one male and one female, to serve as reporting officers for all complaints of sexual harassment involving employees of the Board and students. Written notice by the Superintendent of the name and manner in which any complaint may be reported to such officer will be publicized.

**Harassment by or to Students**

Harassment of any employee or student by another student is expressly prohibited and will be handled in accordance with the provisions of the Code of Student Conduct. Sexual harassment by an employee toward a student shall be treated in the same manner as employee to employee harassment.

**Reporting Incidents of Sexual Harassment**

An employee who feels that he/she has been sexually harassed should report the incident to the Superintendent and/or the designated reporting officers. Such report shall be made as soon as possible after the incident or, if a series of incidents, as soon as possible after the latest occurrence. The employee should submit the report no later than forty-five (45) calendar days following the incident or the latest occurrence in the series of such incidents. The complaint may be made to the designated reporting officers in person or in writing signed by the complainant and delivered to the reporting officers. If such report is first made verbally then it will be the responsibility of the complainant to reduce the same to writing and to sign the written complaint. The reporting officer shall forthwith commence an investigation of such written complaint.

**Complaint Resolution Procedure**

Upon completing an investigation of the complaint, the designated reporting officer shall report to the Superintendent the results of the investigation of the complaint. Such report shall be in writing and a copy thereof shall be provided both the complainant and the charged employee. The superintendent shall thereupon meet with the complainant and the charged employee, together with the designated reporting officer, and make every effort to resolve such complaint to the satisfaction of both parties. If

*Price v. Roanoke City
Board of Education
Document Produced by Defendant
No. 29*

such complaint cannot be resolved at this level, the Superintendent shall report the same to the Board and, if in his/her discretion it is warranted, he/she may recommend that a hearing be held by the Board in accordance with the laws and statutes applicable to the charged employee's contract status.

Students who believe that they have been sexually harassed should report the incident(s) to a teacher or administrator or a designated reporting officer for the school system immediately. If a student believes that he/she has been harassed by a teacher, administrator, or other employee, a report to that employee's immediate supervisor should be made immediately.

## SEXUAL HARASSMENT

The primary purpose of this policy is to provide for prompt ant equitable resolution of students' complaints and grievances.

Students shall not engage in conduct constituting sexual harassment. Sexual harassment, whether between students or between a student and an employee, will not be tolerated. The Board will investigate all allegations of sexual harassment and take appropriate action against those who engage in such behavior. Sanctions for violation of this policy may include verbal or written warning, suspension , or expulsion.

### Definition

Sexual harassment is defined as verbal or physical conduct of a sexual nature when the advances, requests, or conduct have the effect of interfering with performance of school-related activities or creating an intimidating, hostile, or otherwise offensive environment on school property.

### Complaint Procedure

A student who believes that he or she has been or is being subjected to any form of sexual harassment shall immediately report the matter to a teacher, the school counselor, principal, the designated reporting officer for the school system, or the superintendent. Any student who suspects that a student is being sexually harassed shall immediately report the information to the school counsel, principal, or Superintendent. A student's request to make his or her report to someone of the same sex shall be granted.

If the complaint is received by someone other than the school principal, the person receiving the complaint shall promptly inform the school principal. The principal shall start an immediate investigation into the matter. The custodial parent(s) of the student will be informed of the complaint. The completed investigation shall be review by the Superintendent or the Superintendent's designee and legal counsel for prompt ant appropriate action, if warranted. A written response to the student's compliant will be provided to the custodial parent(s) and the student within forty-five (45) days of the date the student first registered the complaint. The student or the custodial parent(s) may appeal the decision within ten (10) days of the receipt of the decision by filing a written notice of appeal with the Superintendent. The Superintendent shall present the decision and notice of appeal to the Board as soon as practicable. The Board shall make a final decision and notify the student and the custodial parent(s) in writing of its decision.

### Protection of Complainant

No student shall be subject to adverse action for any good faith report of sexual harassment under this policy. To the extent practicable, all reports of sexual harassment will remain confidential.

ADOPTED: February 16, 1998
REA CONCURRED: February 9, 1998
ESPO CONCURRED: February 9, 1998

*Price v. Roanoke City Board of Education*
*Document Produced by Defendant*
*No. 30*

EXHIBIT 11

STATE OF ALABAMA )
RANDOLPH COUNTY )

## AFFIDAVIT OF
## GREG FOSTER

Before me, the undersigned Notary Public, in and for said county and said state, personally appeared Greg Foster, who being by me first duly sworn, deposes and says as follows:

My name is Greg Foster. I am an adult, over the age of 21 years of age and with no impediments, physical or otherwise, that would impair me from truthfully stating facts known to me.

I am employed by the Roanoke City Board of Education as Principal at Handley Middle School. I have been in this position since July 1, 2004. Prior to becoming Principal at Handley Middle School, I served as Assistant Principal at Handley from October 17, 2003.

I know Angela Price. Ms. Price is a part-time crossing guard at Handley Middle School. I have worked with her since October of 2003.

Ms. Price claims she was sexually harassed by Jerrell Cottle. At no time has Ms. Price ever complained to me about Jerrell Cottle or about being sexually harassed. At no time has she ever asked to see a copy of the Board policy

1

manual, a copy of which is available at all times to any employee who wants to see it. A copy is also kept in our school library.

As Principal of Handley Middle School, it is my responsibility to see that the policies of the Roanoke City Board of Education are implemented. The Roanoke City Board of Education has a policy prohibiting sexual harassment. Policy G.5 states:

> It is the policy of the Board to maintain a learning and working environment that is free from sexual harassment. No employee of the School District shall be subjected to sexual harassment. . . .
>
> Each administrator shall be responsible for promoting understanding and acceptance of, and assuring compliance with ... board policy and procedures governing sexual harassment within her or his school or office.

As Principal, I have emphasized this policy in discussions with my staff and employees. These discussions have occurred at meetings in addition to in-service seminars put on by the Board for all employees.

I tell all employees every year at orientation that they should come to me if they have any problem whatsoever. I stress that I have an open door policy. I also tell them where in my office I keep the Board policies so they can have access to them.

2

I keep two or three copies of the Board policy manual in my office so I have copies in my office at all times if someone has a question or wants to review Board policy.

Ms. Price frequently stops by the administrative office at Handley. She may come to the office everyday, but if not, she does so frequently.

I know of no reason why she would not have complained to me or our Assistant Principal Robbie Benefield if she had a problem. I am an open, accessible person and I pride myself on having an open door policy.

I know of no reason why Ms. Price never asked me for a copy of the Roanoke City Board policy manual.

If Ms. Price had said anything to me about Mr. Cottle, I would have addressed her complaint immediately. We simply will not and do not tolerate sexual harassment.

What is the best evidence of that attitude: immediately after Ms. Price complained about Mr. Cottle, the Superintendent and I confronted him. I understand that Ms. Price has testified that once we brought her complaint to Mr. Cottle's attention it stopped – stopped completely. We take our no sexual harassment policy very seriously.

Mr. Cottle, according to school records, was born November 19, 1938. He is 69 years old. He has worked in our school for six years. I have never

3

had any complaint about Mr. Cottle. He is well liked and very outgoing. He chats with all the employees, parents, and students. He is a very likeable person.

If he said to Ms. Price something like "going to Florida – would you like to go?" – it would have been, in my opinion, friendly banter.

Prior to coming to Handley Middle School, Mr. Cottle retired from a long career with CSX Railroad, some 30 years in all, 15 of which he was in management. He is married and seems devoted to his wife.

Against this background, I think it is relevant to state that no one has reported any complaint about Mr. Cottle – no other employee, no parent and no student during the entire time I have been at Handley Middle School.

If Ms. Price or anyone else had complained about Mr. Cottle, I would have taken immediate steps to address and enforce our no sexual harassment policy.

Ms. Price never complained to me prior to filing an EEOC complaint and she never asked to see the policy manual.

Given how often Ms. Price came to the office, I think it is highly relevant that she did not complain to me or to my female assistant principal one time about Mr. Cottle.

4

_Gregory Foster_

Greg Foster

Sworn to and subscribed before me this the 3rd day of August, 2007.

_Chris F. Martin_

Notary Public

My Commission expires: 6/20/2010

(Seal)

EXHIBIT 12

STATE OF ALABAMA )
RANDOLPH COUNTY )

## AFFIDAVIT OF
## ROSEMARIE MARSHALL

Before me, the undersigned Notary Public, in and for said county and said state, personally appeared Rosemarie Marshall, who being by me first duly sworn, deposes and says as follows:

My name is Rosemarie Marshall.  I am an adult, over the age of 21 years of age and with no impediments, physical or otherwise, that would impair me from truthfully stating facts known to me.

I work at Handley Middle School. I am the secretary/bookkeeper. I have been in this position thirteen and a half years.

I would see and talk with Angela Price on most days – a daily basis. Her duty hours as a part-time crossing guard were 7:30 to 8:30 and 2:30 to 3:30. She would come to the office to talk after her morning and before her afternoon duty on most days.

Ms. Price never asked me about a policy manual and never asked me about the school's sexual harassment policy.  She only asked for and received a student handbook.  We keep the policy manual in Principal Foster's office and another copy in the library.

1

Ms. Price never asked me how she should report a problem with Mr. Cottle in any of our daily conversations.

I think Ms. Price is fabricating these charges to make money. I have known Ms. Price professionally since 1995 when she was a custodian. I knew her family and her problems with her husband cheating on her. Ms. Price's brother worked with my husband.

I do not think Ms. Price is treating Mr. Cottle right in making these complaints. No one else has had any problem with Mr. Cottle. I have never heard him say anything inappropriate. And Ms. Price initiated the dialogue with Mr. Cottle. She would walk up to his truck to talk. She would park next to his truck in the afternoon. And she would smile when she was talking about Mr. Cottle.

Ms. Price likes attention. She likes to think she is good looking.

I think she is fabricating these charges. Mr. Cottle is an older man with several health problems: 68 years or so. He is very friendly and likeable.

She claims it was sexual harassment for him to invite her to Florida. I want to say two things about that.

First, when Ms. Price told me that Mr. Cottle had invited her to Florida, she was not upset at all about it.

Second, Mr. Cottle asked me to go to Florida. But the invitation was a joke and entirely innocent. Mr. Cottle had to go to Florida to see his doctor every

2

couple of months. On one occasion when he told me he was going to Florida, I told him I was jealous that he was going to Florida and I was not.

Mr. Cottle told me to hop in and let's go.

This was all a joke. There was nothing to it.

Mr. Cottle was married and from all I know he has had a long and happy marriage.

As I said, I have known Ms. Price since she worked at our school as a custodian in the 1990's. In 1998 or so, she complained to her supervisor that a fellow employee was bothering her. While the employee apologized if he upset her by anything he did, he did not agree with her accusations. The supervisor looked into the complaint immediately and made the employee apologize. It stopped then and there.

But that episode makes it clear that Ms. Price knew and, in my opinion, knows that you report problems to your supervisor.

I cannot imagine any adult in the work place not knowing that. It is emphasized at our in-school seminars as well. In fact, I know she attended one of these seminars in which sexual harassment was discussed in detail. Ms. Price sat in front of me at the seminar.

In our school – a small school – the principal and assistant principal are always accessible. Mr. Foster, our principal, has an open door policy and he

3

means that. He welcomes employees to come to him. Since Ms. Price would come to the office almost daily, she had almost daily access to Mr. Foster if she wanted to complain about Mr. Cottle.

The same thing is true with Ms. Benefield, our assistant principal. Ms. Price would have access to Ms. Benefield if she wanted access whenever she came to the office.

Ms. Price is not shy. She talks to everyone. If I were asked if she has a shy bone in her body, I would say absolutely not.

Ms. Price would talk to the people in the office about anything on her mind. If she had asked any of us to complain for her to the principal or assistant principal, we would have done so.

In a small school, you have to work together and look after each other. Sexual harassment is not tolerated -- not from students, not from adults. If Ms. Price had asked for help, it would have been there from any of us.

The fact that she did not report this to her supervisors when she knew to do so is why I think she is fabricating all this. I think she is fabricating that she did not know how to report a problem, and I think she is making up the allegations to fit her lawsuit. Just like the invitation to Florida.

4

_Rosemarie Marshall_
Rosemarie Marshall

Sworn to and subscribed before me this the 6th day of August 2007.

_Chris F. Martin_

Notary Public

My Commission expires: 6/20/2010

(Seal)

5

EXHIBIT 13

STATE OF ALABAMA )
RANDOLPH COUNTY )

## <u>AFFIDAVIT OF</u>
## <u>ROBBIE BENEFIELD</u>

Before me, the undersigned Notary Public, in and for said county and said state, personally appeared Robbie Benefield, who being by me first duly sworn, deposes and says as follows:

My name is Robbie Benefield. I am an adult, over the age of 21 years of age and with no impediments, physical or otherwise, that would impair me from truthfully stating facts known to me.

I am the Assistant Principal at Handley Middle School, a position I have held for the last three years.

I know Angela Price. In fact, I have known Ms. Price for many years. Our children went to school together. We have a very open and friendly relationship. I know that she is accusing Jerrell Cottle of sexually harassing her.

The first I ever heard of any problem in this regard was when Superintendent Marcum advised me, and school principal Greg Foster that he had received an EEOC complaint.

1

At no time prior to the filing of her EEOC complaint did Ms. Price mention any complaint to me about Mr. Cottle. I never heard about any complaint from Ms. Price, or from anybody else.

As a female administrator, I take the Board policy prohibiting sexual harassment very, very seriously.

If Ms. Price had mentioned any complaint about Mr. Cottle – sexual harassment – or otherwise, I would have investigated it.

That is, in fact, what we did immediately after we received the EEOC complaint. I met with Ms. Price to go over the allegations. I met with her along with Superintendent Marcum and Principal Greg Foster. All of us were concerned. All three of us are her supervisors.

In that meeting, we explained to Ms. Price that none of us knew anything about her complaints against Mr. Cottle – absolutely nothing.

I think it is important to point out that I have frequent contact with Ms. Price. She comes to the office very regularly. When she is sick or needs to miss work, she often calls me as one of her supervisors.

I am accessible to her and have a very open relationship with her.

Ms. Price never asked me about the Board policy manual. If she had, I would have gotten it for her.

2

From my point of view, there is absolutely no reason why we would have been reluctant to give Ms. Price the Board policy manual. It is available to all employees and any member of the public.

As I said at my deposition in this case, if an employee has a complaint – a sexual harassment complaint or any complaint – they go to their supervisor. I would be one of Ms. Price's supervisors. I am a female. I am at school almost every day. I am and was available to Ms. Price since we have at Handley a small administrative office. But the office is centrally located and regularly used by Ms. Price.

I say all this because I can think of no good reason why Ms. Price did not mention her complaint about Mr. Cottle to me.

Ms. Price says she mentioned her discomfort to some people at the school. Obviously she was not inhibited to that extent. So she certainly could have come to me as a female administrator. But she did not do so. She did not do so even though she admits that she had a problem in 1998 when she was working as a custodian, she knew to complain to her supervisor.

Not only did I have no knowledge of any complaint by Ms. Price about Mr. Cottle, I had no reason to suspect any problem.

In the first place, I had never heard any complaint against Mr. Cottle other than this one.

3

Second, I often saw Ms. Price talking to Mr. Cottle. I would see Ms. Price talking to Mr. Cottle standing by Mr. Cottle's truck. Since Ms. Price parked at the other end of the parking lot from where Mr. Cottle parked, Ms. Price had to walk up to Mr. Cottle's truck. By my way of thinking, this observed conduct did not give me any basis to think Ms. Price was afraid of Mr. Cottle. I thought from what I could see that they were on very friendly terms.

And this was consistent with my view of Mr. Cottle. I have never heard of any other complaint about Mr. Cottle.

Mr. Cottle is a retired railroad man. He is 68 and married. As far as I know, he works to be useful; he does not have to work. And he is a useful, outgoing friendly man, who chats with everyone and he is very well liked.

I am a woman. (My picture is attached as Appendix A.) Mr. Cottle has never said anything inappropriate to me, nor have I ever heard him say anything inappropriate to anyone else—any of the other female employees at the school.

I hope the Court will understand that we knew nothing about any complaint Ms. Price had about Mr. Cottle but once we did, we acted immediately, we took steps to make sure Mr. Cottle never did or say anything to Ms. Price or have any dealings with her without our intervention and that Ms. Price admits that she had no further reason to complain bout Mr. Cottle once we were notified.

4

_Robbie Benefield_
Robbie Benefield

Sworn to and subscribed before me this the 3rd day of August, 2007.

_Chris F. Martin_
Notary Public

My Commission expires: 6/20/2010
(Seal)

5

# EXHIBIT 14

STATE OF ALABAMA )
RANDOLPH COUNTY )

## **AFFIDAVIT OF**
## **CHUCK R. MARCUM**

Before me, the undersigned Notary Public, in and for said county and said state, personally appeared Chuck R. Marcum, who being by me first duly sworn, deposes and says as follows:

My name is Chuck Marcum. I am an adult, over the age of 21 years of age and with no impediments, physical or otherwise, that would impair me from truthfully stating facts known to me.

I am the Superintendent of the Roanoke City Board of Education ("Board"). I have held this position since March 2004.

Plaintiff Angela Price is a part-time crossing guard working at Handley Middle School. As a crossing guard, helping students navigate through traffic at the start and the end of each day, she works a couple of hours a day.

Ms. Price says in her deposition that she wants money damages from our school system because she was sexually harassed by Jerrell Cottle, who also works as a crossing guard. Our school system is one of the smallest in the state of Alabama, and one of the poorest. Any money judgment against us would come out of our general education budget.

1

If we had done something wrong, to be sure, we should be held accountable.

But Ms. Price gave no supervisory official any notice that she was being sexually harassed. We have a no tolerance policy against sexual harassment and I hope the Court will take notice how quickly and thoroughly we responded once we received notice of Ms. Price's complaint. We reacted the same day, setting in motion interviews for all involved. I talked to the Principal Greg Foster immediately to see if he had any knowledge of this problem. He did not. I then set up meetings with Jerrell Cottle and Angela Price.

When we met with Ms. Price, I asked all her supervisors to join us: her Principal Greg Foster and her Assistant Principal Robbie Benefield. I wanted to make sure that all of us had been attentive and diligent.

Each one of us explained to Ms. Price that we had no prior knowledge of her complaint; no prior knowledge of any problem regarding Mr. Cottle.

Ms. Price did not take issue with our representation to her that we have never received any complaint from her – that she had not spoken to any of us about Mr. Cottle. Nor did she ever ask any of us for a copy of the Roanoke policy manual.

Ms. Price said in her EEOC complaint (Appendix A) that she had complained to her assistant principal. She has admitted that this was not true. She

never complained to Robbie Benefield. At Ms. Price's deposition (p. 28) she admitted again she had never gone to her principal or the assistant principal about any problem with Mr. Cottle. (Price Deposition 28, 63.)

Ms. Price said in her complaint that she did not know how to report a complaint. Yet she admitted that she knew in 1998, when she was a custodian at Handley Middle School, to report complaints to her supervisor. She did that in 1998. (Price Deposition 15, 51.)

As I have said, the Board has a strict no sexual harassment policy (attached as Appendix B). The policy sets forth clearly how an employee should report a complaint. We have conducted sexual harassment seminars with mandatory attendance for all employees. At our seminars we stress how to report a problem.

Ms. Price, as Appendix C shows, attended at least one of our workshops/seminars on sexual harassment. Plaintiff not only attended this workshop/seminar, but she knew and acted upon her knowledge to report to her supervisor any complaint in 1998.

Plaintiff stated in her complaint that she mentioned to teachers her discomfort. Each and every teacher deposed by Plaintiff's attorney stated they all knew that you report complaints to your supervisors. That is common knowledge and something we emphasize time and time again.

3

Plaintiff took the depositions of most of these people. Without exception, every employee testified that they knew to bring any complaint to their supervisor.

I believe all our employees have been told to bring any complaint to their supervisor. I know we have explained that procedure at our seminars such as the seminar Plaintiff attended. I know further that our grievance policy specifies that a complaint should be brought to the attention of the employee's supervisor.

While I cannot speak for Ms. Price, I believe every adult employee who has worked in the Roanoke School System would know to bring complaints to their supervisor. That is just common sense.

Ms. Price acknowledged she knew to do that in 1998. She also acknowledged in her deposition that she knew to call her supervisor Robbie Benefield if she had a work problem like being sick or absent. (Price Deposition 15.)

When we interviewed Mr. Cottle, he denied ever sexually harassing Ms. Price. Prior to Ms. Price's complaint, none of us have ever received a complaint about Mr. Cottle. After we received Ms. Price's complaint, we talked with every one that Ms. Price said might have some knowledge about her complaint. No one could corroborate what might have been said or done between Ms. Price and Mr. Cottle.

4

NOTE:  I am attaching pictures of the people I talked to about Price's complaint:

    A.    Jerrell Cottle
    B.    Superintendent Marcum
    C.    Principal Greg Foster
    D.    Assistant Principal Robbie Benefield
    E.    Secretary/Bookkeeper Rosemarie Marshall
    F.    Secretary Sherry Yarbrough
    G.    Teacher Delia Harmon
    H.    Teacher Kristine Clarke
    I.    Special Ed Teacher Theresa Hunter
    J.    Special Ed Aide Marilyn Pollard

Ms. Price has given us no reason why she did not inform Robbie Benefield, a female and her assistant principal, of her problems with Mr. Cottle.

As I said, the first notice I had about this matter arrived in the mail with her EEOC complaint.

Ms. Price stated that her attorney helped her with the complaint.  But neither Ms. Price nor her attorney contacted me before filing the EEOC complaint.

If Ms. Price or her attorney had called me or written me, I would have investigated the matter immediately and thoroughly.  That is what I did upon receiving Ms. Price's complaint. I immediately set in motion efforts to learn about and then act upon the complaint. I talked with the school supervisor, the accused (Mr. Cottle), the complaining party (Ms. Price) and people who might have knowledge of the problem.  I am attaching my typed notes of those interviews. (Appendix D)

No one could corroborate what Ms. Price was alleging. No one had heard of or experience any problems with Mr. Cottle. Nevertheless, I took what I thought was appropriate action to talk with and warn Mr. Cottle how serious the accusations were and that he should have no further contact with Ms. Price except in the presence of his principal or assistant principal.

Ms. Price states in her deposition that after we commenced our investigation, Ms. Price has had no further problem from Mr. Cottle. (Price Deposition 64, 124.)

Ms. Price says she has had no further problem with Mr. Cottle once we had information about the situation. Yet Ms. Price wants money damages for what she says happened. Any money damages would have to be paid by the Board from its general education fund – from money that is allocated for the operation of our school system.

I believe we have acted in a fair, decisive, responsible manner regarding Ms. Price. I hope the Court agrees.

_Chuck Marcum_
Chuck Marcum

Sworn to and subscribed before me this the 3rd day of August 2007.

_Chris F. Martin_
Notary Public

My Commission expires: 6/20/2010
(Seal)

7

# APPENDIX A



# APPENDIX B



06/28/2007

# APPENDIX C



# APPENDIX D



# APPENDIX E



# APPENDIX F



# APPENDIX G



Debra Harmon

# APPENDIX H



# APPENDIX I



Thomas Hunter
Special Education

# APPENDIX J



# EXHIBIT 15

STATE OF ALABAMA )
RANDOLPH COUNTY )

## AFFIDAVIT OF
## CHRIS MARTIN

Before me, the undersigned Notary Public, in and for said county and said state, personally appeared Chris Martin, who being by me first duly sworn, deposes and says as follows:

My name is Chris Martin. I am an adult, over the age of 21 years of age and with no impediments, physical or otherwise, that would impair me from truthfully stating facts known to me.

I am the secretary to the Superintendent. I have held this position since 1996 and have been employed by the Board since 1984.

During the summer of 2005, Angela Price asked me for a copy of the school district's policy manual.

I told her the central office copy was all torn apart and in disarray because we were revising it.

But I told her each school had two copies and she could get a copy at her school.

I also told her if she was unable to get a copy to let me know and I would make sure she got what she needed.

1

Price never mentioned sexual harassment or that she wanted just the sexual harassment policy. She asked about the entire District policy manual. I could have given her that section and would have been happy to do so. My problem at the specific time she came by the office was producing the whole policy manual. The whole policy manual is very large and contains all the District's policies. It had been disassembled because we were in the middle of revising it. She wanted a copy of the whole policy manual. That was the problem.

On the other hand, I knew her school kept several copies of the entire policy manual so I was confident Mr. Foster could provide her with what she needed.

Price never called me back about having difficulty getting what she needed.

Price never asked me how to report a sexual harassment problem. I would have told her to report it to the Title IX coordinator, or to the principal or assistant principal.

We – all District employees – attend school seminars about sexual harassment. We are told about our No Tolerance Sexual Harassment Policy and how to report any complaints.

_Chris F. Martin_
Chris Martin

Sworn to and subscribed before me this the 6ᵗʰ day of August 2007.

_Rosemarie Marshall_
Notary Public

My Commission expires: _September 24, 2008_
(Seal)

3

EXHIBIT 16

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

EASTERN DIVISION

ANGELA PRICE,            )

            PLAINTIFF,   )

V                        )   CIVIL ACTION NO.

ROANOKE CITY BOARD OF    )

EDUCATION,               )   3:06-CV-742-VPM

            DEFENDANT.   )

S T I P U L A T I O N

IT IS STIPULATED AND AGREED, by
and between the parties, through their
respective counsel, that the deposition of
KRISTINE CLARKE, may be taken before Deborah
Pudles Schaffer, Commissioner and Notary
Public, at Handley Middle School, 251 Gilham
Road, Roanoke, Alabama, on the 21st day
of June, 2007, commencing at 12:10 p.m.

IT IS FURTHER STIPULATED AND AGREED
that the signature to and reading of the
deposition by the witness is waived, the

2

deposition to have the same force and effect
as if full compliance had been had with all
laws and rules of Court relating to the
taking of depositions.

IT IS FURTHER STIPULATED AND AGREED
that it shall not be necessary for any
objections to be made by counsel to any
questions, except as to form or leading
questions, and that counsel for the parties
may make objections and assign grounds at
the time of trial or at the time said
deposition is offered in evidence, or prior
thereto.

IT IS FURTHER STIPULATED AND AGREED
that notice of filing of the deposition by
the Commissioner is waived.

3

I N D E X

EXAMINATION BY                    PAGE NO.

Mr. Porter                         5 - 14

INDEX OF EXHIBITS

PX-1                                  7

4

BEFORE:

        Deborah Pudles Schaffer,
Commissioner.

APPEARANCES:

        Adam M. Porter, Esquire, 2301 Morris
Avenue, Suite 102, Birmingham, Alabama,
35203, appearing on behalf of the Plaintiff.

        Donald B. Sweeney, Jr., Esquire, of
the firm Bradley, Arant, Rose & White,
L.L.P., One Federal Place, 1819 5th Avenue
North, Birmingham, Alabama, 35203, appearing
on behalf of the Defendant.

        Also present: Angela Price

                      Chuck Marcum

5

```
 1        I, Deborah Pudles Schaffer, a court
 2   reporter acting as Notary Public, State of
 3   Alabama at Large, certify that on this date,
 4   as provided by Rule 30 of the Alabama Rules
 5   of Civil Procedure, and the foregoing
 6   stipulation of counsel, there came before
 7   me at Handley Middle School, 251 Gilham
 8   Road, Roanoke, Alabama, beginning at 12:10
 9   p.m., KRISTINE CLARKE, witness in the above
10   cause, for oral examination, whereupon the
11   following proceedings were had:
12
13        THE COURT REPORTER:  Mr. Sweeney,
14   usual stipulations for Ms.Clarke?
15        MR. SWEENEY:  For all of them.
16
17             KRISTINE CLARKE,
18   being first duly sworn, was examined and
19   testified as follows:
20
21   EXAMINATION BY MR. PORTER:
22   Q     Good afternoon, Ms. Clarke.  My name
23   is Adam Porter.  I represent Ms. Price in
```

7

```
 1   questions or to testify truthfully?
 2   A     No.
 3   Q     Okay.  Let me show you what I've
 4   marked as Exhibit 1 to your deposition.  Is
 5   that sort of a resume that you drafted?
 6   A     Yes.
 7   Q     Okay.  Is all that information
 8   accurate?
 9   A     Yes.
10   Q     Okay.  Are you aware of what Ms.
11   Price alleges in this lawsuit?
12   A     Yes.
13   Q     What's your understanding of that?
14   A     That she has brought harassment
15   charges against Mr. Cottle.
16   Q     Sexual harassment?
17   A     Yes.
18   Q     When is the first that you heard that
19   she made that claim?
20   A     I really don't remember, maybe a year
21   before last, I was asked to come in for, to
22   answer some questions.
23   Q     Okay.  Let me show you what was
```

6

```
 1   her lawsuit against the board.
 2        Have you ever given a deposition
 3   before?
 4   A     No.
 5   Q     We won't be here very long but let me
 6   give you some ground rules.  If you would,
 7   verbalize all your answers and try to
 8   refrain from saying uh-huh or huh-uh.
 9        If you don't understand a question I
10   ask, let me know and I'll try to rephrase
11   it, okay?
12   A     Yes.
13   Q     If you answer a question, I'm going
14   to assume that you understood it, okay?
15   A     Yes.
16   Q     And like I said we won't be here very
17   long, but if you need to take a break, let
18   me know and you can do that, but if I have a
19   question on the table, I'll ask that you
20   answer it first, okay?
21   A     Yes.
22   Q     Are you under any medication that
23   might affect your ability to understand my
```

8

```
 1   marked as Exhibit 4 to Mr. Marcum's
 2   deposition, some notes, and ask you if
 3   you've ever seen this page with your name at
 4   the top?
 5   A     Yes.
 6   Q     Okay.  You've seen that before?
 7   A     Yes.
 8   Q     Do you remember that interview or
 9   that meeting?
10   A     Yes.
11   Q     Do these notes accurately reflect
12   what you said?
13   A     Yes.
14   Q     Can you remember anything else that
15   you said other than what's in that notes?
16   A     No.
17   Q     Before this meeting, you had not
18   heard anything about an allegation from Ms.
19   Price about sexual harassment against Mr.
20   Cottle?
21   A     No.
22   Q     You referenced that you heard Mr.
23   Cottle using curse words in her presence,
```

9

1   GD?
2   A      Yes.
3   Q      What was the context of that
4   conversation, if you recall?
5   A      I don't remember the context.
6   Q      Do you remember what he said other
7   than GD?
8   A      No.
9   Q      Okay.  Have you ever heard him use
10  profanity on any other occasion?
11  A      No.
12  Q      Have you ever heard him say something
13  that you thought was sexually inappropriate?
14  A      No.
15  Q      Has any other persons told you that
16  they heard him say something that was
17  sexually inappropriate?
18  A      No.
19  Q      Are you aware of the board's policy
20  about sexual harassment?
21  A      Yes.
22  Q      What is your understanding of that
23  policy?

10

1   A      That they do not accept it and that
2   if we feel that we have been harassed either
3   verbally or physically or anything that we
4   are to report it to our supervisors.
5   Q      Who told you that?
6   A      Well, we've heard it at a sexual
7   harassment workshop we had, you know, in
8   that and then it's also in our policies,
9   school board policies.
10  Q      Where are those policies located?
11  A      Well, Mr. Foster has one in his
12  office and there's also one in the library.
13  Q      Okay.  And when is the last time you
14  went to one of these training sessions you
15  referred to?
16         MR. SWEENEY:  What was the question
17  now?
18  Q      (BY MR. PORTER:)  When is the last
19  time you went to one of these training
20  sessions you referred to?
21  A      We had a workshop on it at in-service
22  at the beginning of this last school year.
23  Q      That would have been May or so of

11

1   '06?
2   A      No.  I think our in-service is more
3   in August, 1st of August.
4   Q      Before the start of the school year?
5   A      Yes.
6   Q      Okay.  Who attends those in-service
7   meetings?
8   A      All, all school board personnel is
9   required to attend these meetings.
10  Q      Okay.  Cooks and janitors?
11  A      Yes.
12  Q      Crossing guards?
13  A      Yes.
14  Q      Are you sure?
15  A      That's my understanding.
16  Q      Okay.  Did you know Ms. Price very
17  well during the period of, say, 2003 to
18  2005?
19  A      I knew Ms. Price, but, when she was a
20  custodian here.  I knew her as the crossing
21  guard, but I did not know her outside of
22  school.
23  Q      Okay.  How often would you talk to

12

1   her at school?
2   A      When she was cleaning my room.  If I
3   saw her in the hall, we would talk.  It's,
4   you know, if I just happened to see her.  I
5   can't tell you exactly how many times a week
6   or a day.
7   Q      All right.  What about when she was a
8   crossing guard?
9   A      When she was a crossing guard every
10  morning that I was at school when she was at
11  school I would see her in crossing, you
12  know, the street.
13  Q      Okay.  On your way in?
14  A      Yes.
15  Q      What time do you usually get to
16  school?
17  A      Usually, this past year, I would get
18  to school around seven-twenty.
19  Q      What about the year before that?
20  A      Well, before my granddaughter started
21  riding with me, I could get here around
22  seven, but when she started which was in,
23  two years ago, it's, I, it's hard to get

13

1    here before twenty after seven.
2    Q       When Ms. Price worked as a crossing
3    guard, did you ever, did you ever see her
4    appear to be, you know, having a
5    conversation with Mr. Cottle?
6    A       Yes.
7    Q       Where were they located?
8    A       Many times Ms. Price would be
9    standing beside Mr. Cottle's truck.  It
10   would be parked out here on the north end of
11   the parking lot.
12   Q       What time of day would this be?
13   A       In the mornings.
14   Q       Do you know what time they would get
15   to work?
16   A       Not really.
17   Q       Would she usually get here before
18   you?
19   A       Yes, she would.
20   Q       Do you know what they were talking
21   about when you would see them out there?
22   A       No.  I did not park close enough to
23   hear conversations.

14

1    Q       Okay.  Did you ever see him approach
2    her vehicle?
3    A       I can't remember noticing that.
4    Q       Okay.  Did she ever tell you that she
5    was, wanted to come into the building to get
6    away from him?
7    A       No.  I never heard her tell me that.
8            MR. PORTER:  Okay.  That's all I
9    have.  Thank you.
10           MR. SWEENEY:  Thank you so much.
11
12       FURTHER THE DEPONENT SAITH NOT.
13       (EXHIBIT ATTACHED AND ENCLOSED.)
14
15
16
17
18
19
20
21
22
23

15

1                C E R T I F I C A T E
2
3    STATE OF ALABAMA )
4    JEFFERSON COUNTY )
5
6        I hereby certify that the above and
7    foregoing deposition was taken down by me in
8    stenotype and the questions and answers
9    thereto were reduced to writing under my
10   supervision, and that the foregoing
11   represents a true and correct transcript of
12   the testimony given by said witness on said
13   occasion.
14       I further certify that I am neither
15   of counsel nor of kin to the parties to the
16   action, not am I in anywise interested in
17   the result of said cause.
18
19       _____
20                COMMISSIONER
21
22
23

&lt;'&gt;
'06: 11;1

&lt;1&gt;
102: 4;8
12:10 p.m.: 1;20, 5;8
14: 3;3
1819: 4;12

&lt;2&gt;
2003: 11;17
2005: 11;18
21st: 1;19
2301: 4;7
251: 1;18, 5;7

&lt;3&gt;
3:06-CV-742-VPM: 1;8
30: 5;4
35203: 4;9, 4;13

&lt;5&gt;
5: 3;3
5th: 4;12

&lt;7&gt;
7: 3;6

&lt;A&gt;
ability: 6;23
above: 5;9, 15;6
accept: 10;1
accurate: 7;8
accurately: 8;11
acting: 5;2
ACTION: 1;7, 15;16
Adam: 4;7, 5;23
affect: 6;23
afternoon: 5;22

ago: 12;23
AGREED: 1;13, 1;21, 2;5, 2;14
ALABAMA: 1;2, 1;19, 4;8, 4;13, 5;3, 5;4, 5;8, 15;3
allegation: 8;18
alleges: 7;11
ANGELA: 1;5, 4;15
answer: 6;13, 6;20, 7;22
answers: 6;7, 15;8
anywise: 15;16
appear: 13;4
APPEARANCES: 4;6
appearing: 4;9, 4;13
approach: 14;1
Arant: 4;11
around: 12;18, 12;21
assign: 2;10
assume: 6;14
ATTACHED: 14;13
attend: 11;9
attends: 11;6
August 1st: 11;3
August: 11;3
Avenue: 4;8, 4;12
aware: 7;10, 9;19
away: 14;6

&lt;B&gt;
beginning: 5;8, 10;22
behalf: 4;9, 4;14
beside: 13;9
Birmingham: 4;8, 4;13
BOARD: 1;8, 6;1, 10;9, 11;8
board's: 9;19
Bradley: 4;11
break: 6;17
brought: 7;14
building: 14;5

&lt;C&gt;
cause: 5;10, 15;17

certify: 5;3, 15;6, 15;14
charges: 7;15
Chuck: 4;16
CITY: 1;8
CIVIL: 1;7, 5;5
claim: 7;19
CLARKE: 1;16, 5;9, 5;17, 5;22
cleaning: 12;2
close: 13;22
commencing: 1;20
COMMISSIONER: 1;17, 2;16, 4;4, 15;20
compliance: 2;2
context: 9;3, 9;5
conversation: 9;4, 13;5
conversations: 13;23
Cooks: 11;10
correct: 15;11
Cottle: 7;15, 8;20, 8;23, 13;5
Cottle's: 13;9
counsel: 1;15, 2;7, 2;9, 5;6, 15;15
COUNTY: 15;4
COURT: 1;1, 2;3, 5;1, 5;13
Crossing: 11;12, 11;20, 12;8, 12;9, 12;11, 13;2
curse: 8;23
custodian: 11;20

&lt;D&gt;
date: 5;3
day: 1;19, 12;6, 13;12
Deborah: 1;16, 4;3, 5;1
DEFENDANT: 1;10, 4;14
DEPONENT: 14;12
deposition: 1;15, 1;23, 2;1, 2;12, 2;15, 6;2, 7;4, 8;2, 15;7
depositions: 2;4
DISTRICT: 1;1, 1;2
DIVISION: 1;3
Donald: 4;10
down: 15;7
drafted: 7;5
duly: 5;18

during: 11;17

&lt;E&gt;
EASTERN: 1;3
EDUCATION: 1;9
effect: 2;1
either: 10;2
ENCLOSED: 14;13
end: 13;10
enough: 13;22
Esquire: 4;7, 4;10
evidence: 2;12
exactly: 12;5
EXAMINATION: 3;2, 5;10, 5;21
examined: 5;18
except: 2;8
Exhibit 1: 7;4
Exhibit 4: 8;1
EXHIBIT: 14;13
EXHIBITS: 3;5

&lt;F&gt;
Federal: 4;12
feel: 10;2
filing: 2;15
firm: 4;11
first: 5;18, 6;20, 7;18
following: 5;11
follows: 5;19
force: 2;1
foregoing: 5;5, 15;7, 15;10
form: 2;8
Foster: 10;11
full: 2;2

&lt;G&gt;
GD: 9;1, 9;7
Gilham: 1;18, 5;7
give: 6;6
given: 6;2, 15;12

granddaughter: 12;20
ground: 6;6
grounds: 2;10
guard: 11;21, 12;8, 12;9, 13;3
guards: 11;12

<H>
hall: 12;3
Handley: 1;18, 5;7
happened: 12;4
harassed: 10;2
harassment: 7;14, 7;16, 8;19, 9;20, 10;7
hard: 12;23
hear: 13;23
heard: 7;18, 8;18, 8;22, 9;9, 9;12, 9;16, 10;6, 14;7
hereby: 15;6
huh-uh: 6;8

<I>
in-service: 10;21, 11;2, 11;6
inappropriate: 9;13, 9;17
INDEX: 3;5
information: 7;7
interested: 15;16
interview: 8;8

<J>
janitors: 11;10
JEFFERSON: 15;4
Jr.: 4;10
June 2007,: 1;20

<K>
kin: 15;15
KRISTINE: 1;16, 5;9, 5;17

<L>
L.L.P.: 4;12
Large: 5;3
last: 7;21, 10;13, 10;18, 10;22

laws: 2;3
lawsuit: 6;1, 7;11
leading: 2;8
library: 10;12
located: 10;10, 13;7
long: 6;5, 6;17
lot: 13;11

<M>
Marcum: 4;16
Marcum's: 8;1
marked: 7;4, 8;1
medication: 6;22
meeting: 8;9, 8;17
meetings: 11;7, 11;9
MIDDLE: 1;2, 1;18, 5;7
morning: 12;10
mornings: 13;13
Morris: 4;7
Ms: 5;22, 5;23, 7;10, 8;18, 11;16, 11;19, 13;2, 13;8
Ms.Clarke: 5;14

<N>
name: 5;22, 8;3
necessary: 2;6
need: 6;17
neither: 15;14
nor: 15;15
North: 4;13, 13;10
Notary: 1;17, 5;2
notes: 8;2, 8;11, 8;15
notice: 2;15
noticing: 14;3

<O>
objections: 2;7, 2;10
occasion: 9;10, 15;13
offered: 2;12
office: 10;12
often: 11;23

Okay: 6;11, 6;14, 6;20, 7;3, 7;7, 7;10, 7;23, 8;6, 9;9, 10;13, 11;6,
    11;10, 11;16, 11;23, 12;13, 14;1, 14;4, 14;8
One: 4;12, 10;11, 10;12, 10;14, 10;19
oral: 5;10
outside: 11;21

<P>
PAGE: 3;2, 8;3
park: 13;22
parked: 13;10
parking: 13;11
parties: 1;14, 2;9, 15;15
past: 12;17
period: 11;17
personnel: 11;8
persons: 9;15
physically: 10;3
Place: 4;12
PLAINTIFF: 1;6, 4;9
policies: 10;8, 10;9, 10;10
policy: 9;19, 9;23
PORTER: 3;3, 4;7, 5;21, 5;23, 10;18, 14;8
presence: 8;23
present: 4;15
PRICE: 1;5, 4;15, 5;23, 7;11, 8;19, 11;16, 11;19, 13;2, 13;8
prior: 2;12
Procedure: 5;5
proceedings: 5;11
profanity: 9;10
provided: 6;4
Public: 1;18, 5;2
Pudles: 1;17, 4;3, 5;1
PX-1: 3;6

<Q>
question: 6;9, 6;13, 6;19, 10;16
questions: 2;8, 2;9, 7;1, 7;22, 15;8

<R>
reading: 1;22

really: 7;20, 13;16
recall: 9;4
reduced: 15;9
referenced: 8;22
referred: 10;15, 10;20
reflect: 8;11
refrain: 6;8
relating: 2;3
remember: 7;20, 8;8, 8;14, 9;5, 9;6, 14;3
rephrase: 6;10
report: 10;4
REPORTER: 5;2, 5;13
represent: 5;23
represents: 15;11
required: 11;9
respective: 1;15
result: 15;17
resume: 7;5
riding: 12;21
Road: 13;9, 15;8
ROANOKE: 1;8, 1;19, 5;8
room: 12;2
Rose: 4;11
Rule: 5;4
Rules: 2;3, 5;4, 6;6

<S>
SAITH: 14;12
saw: 12;3
saying: 6;8
Schaffer: 1;17, 4;3, 5;1
School: 1;18, 5;7, 10;9, 10;22, 11;4, 11;8, 11;22, 12;1, 12;10,
    12;11, 12;16, 12;18
seen: 8;3, 8;6
sessions: 10;14, 10;20
seven: 12;22, 13;1
seven-twenty: 12;18
Sexual: 7;16, 8;19, 9;20, 10;6
sexually: 9;13, 9;17
shall: 2;6

PAGE 8  ROANOKE CITY BO. OF ED.   KRISTINE CLARKE

show: 7;3, 7;23
signature: 1;22
sort: 7;5
standing: 13;9
start: 11;4
started: 12;20, 12;22
STATE: 5;2, 15;3
STATES: 1;1
stenotype: 15;8
STIPULATED: 1;13, 1;21, 2;5, 2;14
stipulation: 5;6
stipulations: 5;14
street: 12;12
Suite: 4;8
supervision: 15;10
supervisors: 10;4
SWEENEY: 4;10, 5;13, 5;15, 10;16, 14;10
sworn: 5;18

<T>
table: 6;19
testified: 5;19
testify: 7;1
testimony: 15;12
there's: 10;12
thereto: 2;13, 15;9
top: 8;4
training: 10;14, 10;19
transcript: 15;11
trial: 2;11
truck: 13;9
true: 15;11
truthfully: 7;1
try: 6;7, 6;10
twenty: 13;1
two: 12;23

<U>
understand: 6;9, 6;23
understanding: 7;13, 9;22, 11;15

understood: 6;14
UNITED: 1;1
using: 8;23
usual: 5;14

<V>
vehicle: 14;2
verbalize: 6;7
verbally: 10;3

<W>
waived: 1;23, 2;16
wanted: 14;5
week: 12;5
whereupon: 5;10
White: 4;11
witness: 1;23, 5;9, 15;12
words: 8;23
work: 13;15
worked: 13;2
workshop: 10;7, 10;21
writing: 15;9

<Y>
year: 7;20, 10;22, 11;4, 12;17, 12;19
years: 12;23

EXHIBIT 17

1    IN THE UNITED STATED DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF ALABAMA,
3            EASTERN DIVISION
4
5    ANGELA PRICE,          )
6         PLAINTIFF,        )
7    V                      )    CIVIL ACTION NO.
8    ROANOKE CITY BOARD OF )     3:06-CV-742-VPM
9         DEFENDANT.        )
10
11        S T I P U L A T I O N
12        IT IS STIPULATED AND AGREED, by
13   and between the parties, through their
14   respective counsel, that the deposition of
15   THERESA HUNTER, may be taken before Deborah
16   Pudles Schaffer, Commissioner and Notary
17   Public, at Handley Middle School, 251 Gilham
18   Road, Roanoke, Alabama, on the 22nd day of
19   June, 2007, commencing at 10:05 a.m.
20        IT IS FURTHER STIPULATED AND AGREED
21   that the signature to and reading of the
22   deposition by the witness is waived, the
23   deposition to have the same force and effect

---

1    as if full compliance had been had with all
2    laws and rules of Court relating to the
3    taking of depositions.
4        IT IS FURTHER STIPULATED AND AGREED
5    that it shall not be necessary for any
6    objections to be made by counsel to any
7    questions, except as to form or leading
8    questions, and that counsel for the parties
9    may make objections and assign grounds at
10   the time of trial or at the time said
11   deposition is offered in evidence, or prior
12   thereto.
13       IT IS FURTHER STIPULATED AND AGREED
14   that notice of filing of the deposition by
15   the Commissioner is waived.
16
17
18
19
20
21
22
23

---

1
2            I N D E X
3    EXAMINATION BY              PAGE NO.
4    Mr. Porter                  5 - 24
5
6            INDEX OF EXHIBITS
7    PX-1                        6
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

---

1
2    BEFORE:
3         Deborah Pudles Schaffer,
4    Commissioner.
5
6    APPEARANCES:
7         Adam M. Porter, Esquire, 2301 Morris
8    Avenue, Suite 102, Birmingham, Alabama,
9    35203, appearing on behalf of the
10   Plaintiff.
11        Donald B. Sweeney, Jr., Esquire, of
12   the firm Bradley, Arant, Rose & White,
13   L.L.P., One Federal Place, 1819 5th Avenue
14   North, Birmingham, Alabama, 35203, appearing
15   on behalf of the Defendant.
16        Also present:  Angela Price
17                       Chuck Marcum
18
19
20
21
22
23

---

5

```
 1          I, Deborah Pudles Schaffer, a court
 2   reporter acting as Notary Public, State of
 3   Alabama at Large, certify that on this date,
 4   as provided by Rule 30 of the Alabama Rules
 5   of Civil Procedure, and the foregoing
 6   stipulation of counsel, there came before
 7   me at Handley Middle School, 251 Gilham
 8   Road, Roanoke, Alabama, beginning at 10:05
 9   a.m., THERESA HUNTER, witness in the above
10   cause, for oral examination, whereupon the
11   following proceedings were had:
12
13                THERESA HUNTER,
14   being first duly sworn, was examined and
15   testified as follows:
16
17   EXAMINATION BY MR. PORTER:
18   Q     Good morning, Ms. Hunter.
19   A     Good morning.
20   Q     My name is Adam Porter and I
21   represent Ms. Price in her lawsuit against
22   the school board.
23          Let me see that, please.
```

7

```
 1   A     That he did what?
 2   Q     That he said or did something
 3   inappropriate?
 4   A     No, I don't recall that.
 5   Q     No, my question is, do recall her
 6   saying anything like that?
 7   A     Her saying it to me or to others?
 8   Q     Well, to you or others --
 9   A     No, I don't recall that.
10   Q     -- in your presence.  Do you remember
11   talking with Mr. Marcum about a complaint
12   from Ms. Price against Mr. Cottle?
13   A     Yes, I remember that.
14   Q     Okay.  If you would, take a look at
15   what was marked as Exhibit 4 to his
16   deposition and let me --
17   A     I was going to say, do you want me to
18   read all of that?  What exactly I'm looking
19   for in this?
20   Q     Right here.  This page right here.
21   This is the page with your name at the top.
22   Read --
23   A     And this is supposed to be what?
```

6

```
 1   A     (Witness complies.)
 2   Q     Let me show you what I'm marking as
 3   Exhibit 1 to your deposition and ask you if
 4   that's a resume of sorts that you have
 5   drafted for us?
 6   A     This is a short version of my resume.
 7   Q     Right, with some, just some
 8   background information?
 9   A     It just mainly has my address and
10   that I work at Roanoke and that I used to
11   teach in Texas and that I'm a Roll Tider.
12   Q     I beg your pardon?
13   A     I said I'm a Roll Tider.
14   Q     Good for you.  Ms. Hunter, do you
15   ever recall hearing any comments from Ms.
16   Price indicating that she felt that Mr.
17   Cottle had said or done something
18   inappropriate?
19   A     Do I recall that?
20   Q     Yes, ma'am.
21   A     That's Mr. Cottle or Cottle
22   whatever --
23   Q     Jerrell Cottle or Jerry?
```

8

```
 1   Q     These are some notes that were made
 2   in your interview with Mr. Marcum.
 3   A     Uh-huh.  And when did I make these?
 4   Q     At the top the date there is October
 5   the 14th, 2005.
 6          MR. PORTER:  Anybody warm?
 7                (Whereupon, an off-the-
 8                record discussion was had.)
 9   Q     (BY MR. PORTER:)  If you would, read
10   that page while he's doing that.
11   A     Okay.  And this was '05, two years
12   ago?
13   Q     Almost.
14   A     I just see they have my name
15   misspelled.
16          MR. SWEENEY:  Take, take your time
17   and read it --
18          THE WITNESS:  Okay.
19          MR. SWEENEY:  -- and then he'll ask
20   you a question.
21          THE WITNESS:  All rightee.  Okay.
22   I've finished reading it.
23   Q     (BY MR. PORTER:)  Have you ever read
```

9

```
 1    that before?
 2    A     Yes.
 3    Q     Okay.  When was that?
 4    A     Today.
 5    Q     Okay.  And did you make the comments
 6    that are attributed to you in these notes in
 7    that meeting?
 8    A     I assume I made them since Mr. Marcum
 9    wrote this up.
10    Q     All right.  Do you have any reason to
11    believe that you did not say the things that
12    are put forth here?
13    A     No.
14    Q     Okay.  In that meeting with Mr.
15    Marcum, did you tell him that Ms. Price had
16    told you that she was uncomfortable talking
17    to Mr. Cottle.
18    A     Can you say that again, please.
19    Q     You see where it says Ms. Price has
20    mentioned that she is uncomfortable with him
21    talking to her toward the top?
22    A     That what I said Ms. -- I'm not sure
23    the reason for her being uncomfortable.
```

10

```
 1    Q     Well, did you say to Mr. Marcum that
 2    Ms. Price mentioned to you that she was
 3    uncomfortable talking to Mr. Cottle?
 4    A     That's what I said then.
 5    Q     Okay.  And did Ms. Price tell you
 6    that?
 7    A     That's, that's what I said then.
 8    Q     I understand that that's what you
 9    told Mr. Marcum.  My question is, do you
10    remember Ms. Price saying that to you?
11    A     No, I don't.
12    Q     Okay.  If you told Mr. Marcum that,
13    would you have any reason to believe that,
14    that you had made it up?
15    A     Pardon me?
16    Q     If you told that to Mr. Marcum, do
17    you have any reason to believe that Ms.
18    Price did not actually say that to you?
19    A     Say that one more time.  I'm sorry.
20    Q     If you said that to Mr. Marcum --
21    A     Uh-huh.
22    Q     -- do you know of any reason why, do
23    you think that you would have just made that
```

11

```
 1    up?
 2    A     So you're asking me if lied --
 3    Q     Yes.
 4    A     -- on this paper?
 5    Q     Yes.
 6    A     No, I did not lie --
 7    Q     So --
 8    A     -- I have no reason to lie.
 9    Q     Right.  So my question is, do you
10    have any reason to think that Ms. Price did
11    not actually say that to you?
12    A     Possibly could be because I often do
13    kind of generate my own conversations and
14    stuff.  With working with kids, oftentimes
15    what I'll do is I'll talk to a kid and I'll
16    go by how I feel or what I'm thinking.
17    Q     So you're saying you may have
18    embellished what Ms. Price told you?
19    A     No.
20    Q     Okay.  Again, do you have any reason
21    to think that she would not have said that
22    to you if you related it to Mr. Marcum?
23    A     Okay.  I'm getting a little confused
```

12

```
 1    here because what I'm saying is, is
 2    oftentimes with me that for example right
 3    now I think you're saying one thing but I
 4    could be thinking it's another thing.
 5    Q     What do you think I'm saying?
 6    A     I'm thinking right now that you're
 7    saying, okay, woman, I've asked you this
 8    question, please explain it to me and I feel
 9    like that I have explained it to you.
10    Q     No.  Well, I guess we just disagree
11    on that.
12    A     Okay.  And see, that's often what
13    happens with me is I tend to do too much
14    perception of my own and looking and
15    watching at things --
16    Q     Okay.
17    A     -- and oftentimes I could be wrong or
18    I could be right.
19    Q     Okay.  If Ms. Price were to say that
20    she told you that she felt uncomfortable
21    talking with Mr. Cottle, would you have any
22    reason to believe that she's lying?
23    A     Any reason to believe that she was
```

13

1    lying?
2    Q      Yes.
3    A      No, but I could, I would think that
4    maybe I don't remember it or maybe she did
5    not see it the same way that I saw it.
6    Q      Saw what?
7    A      Whatever she was saying and talking
8    about.
9    Q      Okay.  And according to these notes
10   it says that Ms. Price told you this comment
11   the, the last school year toward the end of
12   the year; is that right?
13   A      And this was in '05?
14   Q      Yes, in the meeting?
15   A      So -- in the meeting?
16   Q      The meeting occurred October 2005?
17   A      Uh-huh.
18   Q      The notes say that you told Mr.
19   Marcum that Ms. Price told you the comment
20   about being uncomfortable toward the end of
21   the last school year; is that correct, is
22   that what that says?
23   A      Okay.  Let me get comfortable here

14

1    because but I'm not following you.
2    Q      What is it you don't follow?
3    A      The question the way you're asking
4    the question.
5    Q      Okay.  Does this note say when Ms.
6    Price, when did Ms. Price tell you this and
7    your answer was, "It was last school year
8    towards the end of the year."  Is what that
9    says?
10   A      Okay.  That's what this says on the
11   paper.
12   Q      Okay.  So would that be spring of
13   2005?
14   A      That I said this or she said this to
15   me.
16   Q      When she said it to you?
17   A      And I'm not trying to be difficult,
18   you might think --
19   Q      I believe you are.
20   A      I am, I'm not trying to be difficult.
21   Q      Okay.
22   A      One of my -- I'm trying to get all of
23   this information in my head and remember the

15

1    dates and things, okay, because I have
2    difficulty remembering dates.
3    Q      Okay.
4    A      So if you don't mind, if I could
5    write it down.
6    Q      Write what down?
7    A      The dates.
8    Q      Okay.  Don't write on that exhibit,
9    please, you can -- do you want a piece of
10   paper?
11   A      Because you're asking me about the
12   spring, you're asking me about this paper.
13   Okay.  What is your question again?
14   Q      Okay.  The meeting with Mr. Marcum
15   was October 2005?
16   A      October 2005.
17   Q      Okay.
18   A      Okay.
19   Q      At that time, in October 2005,
20   according to these notes you said that Ms.
21   Price made the comment toward the end of the
22   last school year --
23   A      Okay.  According to these?

16

1    Q      -- so my question is -- yes.  So my
2    question would be when was that?
3    A      When was what?
4    Q      When she made the comment.
5    A      Okay.  All I remember about this is
6    these notes, so I cannot go back into
7    another time frame and say what happened
8    then.
9    Q      Okay.  If you would look at those
10   notes and go down below that and Mr. Marcum
11   asked you about the present school year and
12   that would be beginning in the fall of 2005,
13   correct?
14   A      The present school year was '06, '07.
15   Q      If this meeting occurred in October
16   of 2005 --
17   A      Uh-huh.
18   Q      -- okay, and he asked you about the
19   present school year, that would be the
20   school year beginning fall of 2005, right?
21   A      Okay.  So --
22   Q      Okay?
23   A      What -- okay.  Go ahead and ask your

17

```
 1   question.
 2   Q     He asked you about the present school
 3   year which was beginning -- fall of 2005,
 4   according to the notes you said that you
 5   remember one time that Ms. Price told you
 6   that she was coming into the school to go to
 7   the bathroom to get away from Mr. Cottle.
 8   A     Okay.
 9   Q     Do you see that?
10   A     According to the note.
11   Q     Yes.  Okay.  You've read that?
12   A     Uh-huh.  I just read it just now.
13   Q     Okay.  Did Ms. Price say that to you?
14   A     I don't remember.
15   Q     Okay.  Do you have any reason to
16   believe that she did not say that to you?
17   A     No.
18   Q     Okay.  And go down a little further
19   it says, according, according to these notes
20   you said that last year that you would
21   notice him walking to her car while she was
22   reading and talking with her?
23   A     Let's -- yes, that's what I had said
```

18

```
 1   here.
 2   Q     Do you have any reason to believe
 3   that you did not tell that to Mr. Marcum?
 4   A     Any reason to believe what?
 5   Q     That you did not make that statement
 6   to Mr. Marcum?
 7   A     That I did not -- no, I don't have
 8   any reason to believe, I did say that.
 9   Q     All right.  Do you have any reason to
10   believe that what you said to him was not
11   true?
12   A     No, because I remember that.
13   Q     Okay.  You remember seeing him walk
14   to her car?
15   A     Yes.
16   Q     How many times?
17   A     I have no idea.
18   Q     All right.  Was that a regular thing?
19   A     It probably was almost every morning,
20   maybe.
21   Q     Okay.
22   A     But it wasn't, that was at a time
23   because at first it was out under the tree
```

19

```
 1   and then later it was at her car.
 2   Q     Okay.  What was out under the tree?
 3   A     They would stand there and talk.
 4   Q     Okay.  Out sort of on the, sort of
 5   the side of the school?
 6   A     No.
 7   Q     Okay.  Out toward the road?
 8   A     Uh-huh.
 9   Q     Okay.  And she said they would talk
10   out there?
11   A     I guess they were talking.  I never
12   did join them.
13   Q     Okay.  Then and at some point they
14   started talking in front of the school?
15   A     Not that I remember.
16   Q     Okay.  A minute ago you said at first
17   it would happen out there and then it would
18   be, I thought you said, in front of the
19   school?
20   A     No, not in front of the school, in
21   the parking lot.
22   Q     Okay.  And, and would he typically
23   walk up to her?
```

20

```
 1   A     I don't know.  I didn't see where he
 2   was when he came up there, I don't know.
 3   Q     Okay.  How long would they talk?
 4   A     I don't know.
 5   Q     Okay.  The last comment down there
 6   attributed to you says that, "Last year it
 7   seems to me through observation that she was
 8   trying to ignore him while she was reading.
 9   She did not tell me that, but that was my
10   perception."
11         Do you have any reason that you did
12   not tell that to Mr. Marcum?
13   A     No, I assume this has to be --
14   Q     Okay.
15   A     -- since -- yeah, I assume this is
16   all correct.
17   Q     Okay.  Do you have an independent
18   recollection of that?
19   A     Of what?
20   Q     Of seeing her in what you thought was
21   trying to ignore him?
22   A     When she was sitting in her car
23   reading her book?
```

21

```
 1   Q      Whatever you were referring to
 2   there.
 3   A      "Last year it seems to me through
 4   observation that she was trying to ignore
 5   him while she was reading," and she did not
 6   tell me that because that was my perception.
 7   Q      Okay.  Do you remember seeing that
 8   and making that perception?
 9   A      My perception was that she was
10   sitting in the car reading the book.
11   Q      Uh-huh.
12   A      That's what I saw.
13   Q      And what made you feel that she was
14   trying to ignore him?
15   A      She was reading the book, just like
16   now if I pick up a book and started reading
17   it, we would all assume that I was trying to
18   ignore you.
19   Q      Okay.  So they would be talking and
20   she would pick up a book?
21   A      No, she was reading a book.
22   Q      Okay.
23   A      I don't know when she picked up the
```

22

```
 1   book because I don't know when he came.
 2   Q      Okay.  But you just got the sense
 3   that she was trying to ignore him?
 4   A      Or she was just trying to read her
 5   book.
 6   Q      Okay.  Well, if you told Mr. Marcum
 7   that you got the perception that she was
 8   trying to ignore him, do you have any reason
 9   to believe why that you would have been
10   saying something false to Mr. Marcum?
11   A      No, but I have the reason to believe
12   that I can perceive and see things
13   differently.
14   Q      Okay.  Let me ask you this.  That
15   last statement attributed to you --
16   A      Uh-huh.
17   Q      -- beginning with, "last year it
18   seems to me all the way through but that was
19   my perception," do you have any reason to
20   believe that you were not telling the truth
21   then and that that is not --
22   A      I try to make a habit of never lying.
23   Q      Okay.  So you have no reason to
```

23

```
 1   believe that you were lying on that
 2   occasion; is that right?
 3   A      Okay.  No, I have no reason to
 4   believe that I was lying.
 5   Q      Okay.  And, and you have no reason to
 6   believe that what you said there was not
 7   accurate; is that correct?
 8   A      It was my perception.
 9   Q      Right.
10   A      So my perception is not always
11   accurate.
12   Q      Right.  What is accurate is your
13   perception it can be; is that right?
14   A      My own personal perception?
15   Q      Yes.
16   A      As accurate as my, at that time
17   because my perception can change.
18   Q      Well, we won't get in to how
19   that can happen, but let me ask you this.
20   Are you familiar with the school's sexual
21   harassment policy?
22   A      Yes.
23   Q      What is your understanding of how to
```

24

```
 1   report sexual harassment?
 2   A      How to report it, you go to your
 3   some, your supervisor.
 4   Q      Okay.
 5   A      Which happens to be Mr. Foster or Mr.
 6   Marcum.
 7          MR. PORTER:  Okay.  Thank you very
 8   much.  That's all I have.
 9          MR. SWEENEY:  No questions.
10
11          FURTHER THE DEPONENT SAITH NOT.
12          (EXHIBIT ATTACHED AND ENCLOSED.)
13
14
15
16
17
18
19
20
21
22
23
```

25

```
 1
 2                 C E R T I F I C A T E
 3
 4    STATE OF ALABAMA )
 5    JEFFERSON COUNTY )
 6
 7         I hereby certify that the above and
 8    foregoing deposition was taken down by me in
 9    stenotype and the questions and answers
10    thereto were reduced to writing under my
11    supervision, and that the foregoing
12    represents a true and correct transcript of
13    the testimony given by said witness on said
14    occasion.
15         I further certify that I am neither
16    of counsel nor of kin to the parties to the
17    action, not am I in anywise interested in
18    the result of said cause.
19
20                      _____
21                      COMMISSIONER
22
23
```

PRICE V ROANOKE CITY BO. OF ED.        THERESA HUNTER

**< >**
'05: 8;11, 13;13
'06: 16;14
'07: 16;14

**<1>**
10:05 a.m.: 1;19, 5;8
102: 4;8
14th: 8;5
1819: 4;13

**<2>**
2005: 8;5, 14;13, 16;12, 16;16, 16;20, 17;3
22nd: 1;18
2301: 4;7
24: 3;4
251: 1;17, 5;7

**<3>**
3:06-CV-742-VPM: 1;8
30: 5;4
35203: 4;9, 4;14

**<5>**
5: 3;4
5th: 4;13

**<6>**
6: 3;7

**<A>**
above: 5;9, 25;7
According: 13;9, 15;20, 15;23, 17;4, 17;10, 17;19, 17;19
accurate: 23;7, 23;11, 23;12, 23;16
acting: 5;2
ACTION: 1;7, 25;17
actually: 10;18, 11;11
Adam: 4;7, 5;20
address: 6;9

ago: 8;12, 19;16
AGREED: 1;12, 1;20, 2;4, 2;13
ahead: 16;23
ALABAMA: 1;2, 1;18, 4;8, 4;14, 5;3, 5;4, 5;8, 25;4
Almost: 8;13, 18;19
ANGELA: 1;5, 4;16
answer: 14;7
answers: 25;9
Anybody: 8;6
anywise: 25;17
APPEARANCES: 4;6
appearing: 4;9, 4;14
Arant: 4;12
assign: 2;9
assume: 9;8, 20;13, 20;15, 21;17
ATTACHED: 24;12
attributed: 9;6, 20;6, 22;15
Avenue: 4;8, 4;13
away: 17;7

**<B>**
back: 16;6
background: 6;8
bathroom: 17;7
beg: 6;12
beginning: 5;8, 16;12, 16;20, 17;3, 22;17
behalf: 4;9, 4;15
believe: 9;11, 10;13, 10;17, 12;22, 12;23, 14;19, 17;16, 18;2, 18;4, 18;8, 18;10, 22;9, 22;11, 22;20, 23;1, 23;4, 23;6
below: 16;10
Birmingham: 4;8, 4;14
BOARD: 1;8, 5;22
book: 20;23, 21;10, 21;15, 21;16, 21;20, 21;21, 22;1, 22;5
Bradley: 4;12

**<C>**
car: 17;21, 18;14, 19;1, 20;22, 21;10
cause: 5;10, 25;18
certify: 5;3, 25;7, 25;15
change: 23;17

Chuck: 4;17
CITY: 1;8
CIVIL: 1;7, 5;5
comfortable: 13;23
coming: 17;6
commencing: 1;19
comment: 13;10, 13;19, 15;21, 16;4, 20;5
comments: 6;15, 9;5
COMMISSIONER: 1;16, 2;15, 4;4, 25;21
complaint: 7;11
compliance: 2;1
complies: 6;1
confused: 11;23
conversations: 11;13
correct: 13;21, 16;13, 20;16, 23;7, 25;12
Cottle: 6;17, 6;21, 6;21, 6;23, 7;12, 9;17, 10;3, 12;21, 17;7
counsel: 1;14, 2;6, 2;8, 5;6, 25;16
COUNTY: 25;5
COURT: 1;1, 2;2, 5;1

**<D>**
date: 5;3, 8;4
dates: 15;1, 15;2, 15;7
day: 1;18
Deborah: 1;15, 4;3, 5;1
DEFENDANT: 1;9, 4;15
DEPONENT: 24;11
deposition: 1;14, 1;22, 1;23, 2;11, 2;14, 6;3, 7;16, 25;8
depositions: 2;3
differently: 22;13
difficult: 14;17, 14;20
difficulty: 15;2
disagree: 12;10
discussion: 8;8
DISTRICT: 1;1, 1;2
DIVISION: 1;3
doing: 8;10
Donald: 4;11
done: 6;17
down: 15;5, 15;6, 16;10, 17;18, 20;5, 25;8

drafted: 6;5
duly: 5;14

**<E>**
EASTERN: 1;3
effect: 1;23
embellished: 11;18
ENCLOSED: 24;12
end: 13;11, 13;20, 14;8, 15;21
Esquire: 4;7, 4;11
evidence: 2;11
exactly: 7;18
EXAMINATION: 3;3, 5;10, 5;17
examined: 5;14
example: 12;2
except: 2;7
Exhibit 1: 6;3
Exhibit 4: 7;15
EXHIBIT: 15;8, 24;12
EXHIBITS: 3;6
explain: 12;8
explained: 12;9

**<F>**
fall: 16;12, 16;20, 17;3
false: 22;10
familiar: 23;20
Federal: 4;13
feel: 11;16, 12;8, 21;13
felt: 6;16, 12;20
filing: 2;14
finished: 8;22
firm: 4;12
first: 5;14, 18;23, 19;16
follow: 14;2
following: 5;11, 14;1
follows: 5;15
force: 1;23
foregoing: 5;5, 25;8, 25;11
form: 2;7

PRICE V ROANOKE CITY BO. OF ED.   THERESA HUNTER

forth: 9;12
Foster: 24;5
frame: 16;7
front: 19;14, 19;18, 19;20
full: 2;1

<G>
generate: 11;13
getting: 11;23
Gilham: 1;17, 5;7
given: 25;13
grounds: 2;9
guess: 12;10, 19;11

<H>
habit: 22;22
Handley: 1;17, 5;7
happen: 19;17, 23;19
happened: 16;7
happens: 12;13, 24;5
harassment: 23;21, 24;1
he'll: 8;19
head: 14;23
hearing: 6;15
hereby: 25;7
HUNTER: 1;15, 5;9, 5;13, 5;18, 6;14

<I>
idea: 18;17
ignore: 20;8, 20;21, 21;4, 21;14, 21;18, 22;3, 22;8
inappropriate: 6;18, 7;3
independent: 20;17
INDEX: 3;6
indicating: 6;16
information: 6;8, 14;23
interested: 25;17
interview: 8;2

<J>
JEFFERSON: 25;5

Jerrell: 6;23
Jerry: 6;23
join: 19;12
Jr: 4;11
June 2007,: 1;19

<K>
kid: 11;15
kids: 11;14
kin: 25;16
kind: 11;13

<L>
L.L.P.: 4;13
Large: 5;3
Last: 13;11, 13;21, 14;7, 15;22, 17;20, 20;5, 20;6, 21;3, 22;15, 22;17
later: 19;1
laws: 2;2
lawsuit: 5;21
leading: 2;7
lie: 11;6, 11;8
lied: 11;2
little: 11;23, 17;18
long: 20;3
look: 7;14, 16;9
looking: 7;18, 12;14
lot: 19;21
lying: 12;22, 13;1, 22;22, 23;1, 23;4

<M>
ma'am: 6;20
mainly: 6;9
Marcum: 4;17, 7;11, 8;2, 9;8, 9;15, 10;1, 10;9, 10;12, 10;16, 10;20, 11;22, 13;19, 15;14, 16;10, 18;3, 18;6, 20;12, 22;6, 22;10, 24;6
marked: 7;15
marking: 6;2
meeting: 9;7, 9;14, 13;14, 13;15, 13;16, 15;14, 16;15
mentioned: 9;20, 10;2
MIDDLE: 1;2, 1;17, 5;7

mind: 15;4
minute: 19;16
misspelled: 8;15
morning: 5;18, 5;19, 18;19
Morris: 4;7
Ms: 5;18, 5;21, 6;14, 6;15, 7;12, 9;15, 9;19, 9;22, 10;2, 10;5, 10;10, 10;17, 11;10, 11;18, 12;19, 13;10, 13;19, 14;5, 14;6, 15;20, 17;5, 17;13

<N>
name: 5;20, 7;21, 8;14
necessary: 2;5
neither: 25;15
nor: 25;16
North: 4;14
Notary: 1;16, 5;2
note: 14;5, 17;10
notes: 8;1, 9;6, 13;9, 13;18, 15;20, 16;6, 16;10, 17;4, 17;19
notice: 2;14, 17;21

<O>
objections: 2;6, 2;9
observation: 20;7, 21;4
occasion: 23;2, 25;14
occurred: 13;16, 16;15
October 2005,: 15;19
October 2005.: 15;16
October 2005?: 13;16, 15;15
October: 8;4, 16;15
off-the: 8;7
offered: 2;11
often: 11;12, 12;12
oftentimes: 11;14, 12;2, 12;17
Okay: 7;14, 8;11, 8;18, 8;21, 9;3, 9;5, 9;14, 10;5, 10;12, 11;20, 11;23, 12;7, 12;12, 12;16, 12;19, 13;9, 13;23, 14;5, 14;10, 14;12, 14;21, 15;1, 15;3, 15;8, 15;13, 15;14, 15;17, 15;18, 15;23, 16;5, 16;9, 16;18, 16;21, 16;22, 16;23, 17;8, 17;11, 17;13, 17;15, 17;18, 18;13, 18;21, 19;2, 19;4, 19;7, 19;9, 19;13, 19;16, 19;22, 20;3, 20;5, 20;14, 20;17, 21;7, 21;19, 21;22, 22;2, 22;6, 22;14, 22;23, 23;3, 23;5, 23;18, 24;4, 24;7

One: 4;13, 10;19, 12;3, 14;22, 17;5
oral: 5;10
others: 7;7, 7;8
own: 11;13, 12;14, 23;14

<P>
PAGE: 3;3, 7;20, 7;21, 8;10
paper: 11;4, 14;11, 15;10, 15;12
Pardon: 6;12, 10;15
parking: 19;21
parties: 1;13, 2;8, 25;16
perceive: 22;12
perception: 12;14, 20;10, 21;6, 21;8, 21;9, 22;7, 22;19, 23;8, 23;10, 23;13, 23;14, 23;17
personal: 23;14
pick: 21;16, 21;20
picked: 21;23
piece: 15;9
Place: 4;13
PLAINTIFF: 1;6, 4;10
please: 5;23, 9;18, 12;8, 15;9
point: 19;13
policy: 23;21
PORTER: 4;4, 4;7, 5;17, 5;20, 8;6, 8;9, 8;23, 24;7
Possibly: 11;12
presence: 7;10
present: 4;16, 16;11, 16;14, 16;19, 17;2
PRICE: 1;5, 4;16, 5;21, 6;16, 7;12, 9;15, 9;19, 10;2, 10;5, 10;10, 10;18, 11;10, 11;18, 12;19, 13;10, 13;19, 14;6, 14;6, 15;21, 17;5, 17;13
prior: 2;11
probably: 18;19
Procedure: 5;5
proceedings: 5;11
provided: 5;4
Public: 1;17, 5;2
Pudles: 1;16, 4;3, 5;1
put: 9;12
PX-1: 3;7

<Q>
question: 7;5, 8;20, 10;9, 11;9, 12;8, 14;3, 14;4, 15;13, 16;1, 16;2, 17;1
questions: 2;7, 2;8, 24;9, 25;9

<R>
Read: 7;18, 7;22, 8;9, 8;17, 8;23, 17;11, 17;12, 22;4
reading: 1;21, 8;22, 17;22, 20;8, 20;23, 21;5, 21;10, 21;15, 21;16, 21;21
reason: 9;10, 9;23, 10;13, 10;17, 10;22, 11;8, 11;10, 11;20, 12;22, 12;23, 17;15, 18;2, 18;4, 18;8, 18;9, 20;11, 22;8, 22;11, 22;19, 22;23, 23;3, 23;5
recall: 6;15, 6;19, 7;4, 7;5, 7;9
recollection: 20;18
record: 8;8
reduced: 25;10
referring: 21;1
regular: 18;18
related: 11;22
relating: 2;2
remember: 7;10, 7;13, 10;10, 13;4, 14;23, 16;5, 17;5, 17;14, 18;12, 18;13, 19;15, 21;7
remembering: 15;2
report: 24;1, 24;2
reporter: 5;2
represent: 5;21
represents: 25;12
respective: 1;14
result: 25;18
resume: 6;4, 6;6
rightee: 8;21
Road: 1;18, 5;8, 19;7
ROANOKE: 1;8, 1;18, 5;8, 6;10
Roll: 6;11, 6;13
Rose: 4;12
Rule: 5;4
Rules: 2;2, 5;4

<S>
SAITH: 24;11

Saw: 13;5, 13;6, 21;12
saying: 7;6, 7;7, 10;10, 11;17, 12;1, 12;3, 12;5, 12;7, 13;7, 22;10
says: 9;19, 13;10, 13;22, 14;9, 14;10, 17;19, 20;6
Schaffer: 1;16, 4;3, 5;1
School: 1;17, 5;7, 5;22, 13;11, 13;21, 14;7, 15;22, 16;11, 16;14, 16;19, 16;20, 17;2, 17;6, 19;5, 19;14, 19;19, 19;20
school's: 23;20
seeing: 18;13, 20;20, 21;7
seems: 20;7, 21;3, 22;18
sense: 22;2
sexual: 23;20, 24;1
shall: 2;5
she's: 12;22
short: 6;6
show: 6;2
side: 19;5
signature: 1;21
sitting: 20;22, 21;10
sorry: 10;19
sort: 19;4, 19;4
sorts: 6;4
spring: 14;12, 15;12
stand: 19;3
started: 19;14, 21;16
STATE: 5;2, 25;4
STATED: 1;1
statement: 18;5, 22;15
stenotype: 25;9
STIPULATED: 1;12, 1;20, 2;4, 2;13
stipulation: 5;6
stuff: 11;14
Suite: 4;8
supervision: 25;11
supervisor: 24;3
supposed: 7;23
SWEENEY: 4;11, 8;16, 8;19, 24;9
sworn: 5;14

<T>
teach: 6;11

tend: 12;13
testified: 5;15
testimony: 25;13
Texas: 6;11
THERESA: 1;15, 5;9, 5;13
thereto: 2;12, 25;10
thinking: 11;16, 12;4, 12;6
Tider: 6;11, 6;13
Today: 9;4
top: 7;21, 8;4, 9;21
toward: 9;21, 13;11, 13;20, 15;21, 19;7
towards: 14;8
transcript: 25;12
tree: 18;23, 19;2
trial: 2;10
true: 18;11, 25;12
truth: 22;20
try: 22;22
trying: 14;17, 14;20, 14;22, 20;8, 20;21, 21;4, 21;14, 21;17, 22;3, 22;4, 22;8
two: 8;11
typically: 19;22

<U>
uncomfortable: 9;16, 9;20, 9;23, 10;3, 12;20, 13;20
understand: 10;8
understanding: 23;23
UNITED: 1;1

<V>
version: 6;6

<W>
waived: 1;22, 2;15
walk: 18;13, 19;23
walking: 17;21
warm: 8;6
watching: 12;15
Whatever: 6;22, 13;7, 21;1
Whereupon: 5;10, 8;7

White: 4;12
WITNESS: 1;22, 5;9, 6;1, 8;18, 8;21, 25;13
woman: 12;7
work: 6;10
working: 11;14
Write: 15;5, 15;6, 15;8
writing: 25;10
wrote: 9;9

<Y>
year: 13;11, 13;12, 13;21, 14;7, 14;8, 15;22, 16;11, 16;14, 16;19, 16;20, 17;3, 17;20, 20;6, 21;3, 22;17
years: 8;11

EXHIBIT 18

PRICE V ROANOKE CITY BO. OF ED.                          DELIA HARMON

---

1

```
1          IN THE UNITED STATES DISTRICT COURT
2         FOR THE MIDDLE DISTRICT OF ALABAMA
3                   EASTERN DIVISION
4
5    ANGELA PRICE,           )
6          PLAINTIFF,        )
7    V                       )    CIVIL ACTION NO.
8    ROANOKE CITY BOARD OF ) 3:06-CV-742-VPM
9       DEFENDANT.           )
10
11            S T I P U L A T I O N
12          IT IS STIPULATED AND AGREED, by
13   and between the parties, through their
14   respective counsel, that the deposition of
15   DELIA HARMON, may be taken before Deborah
16   Pudles Schaffer, Commissioner and Notary
17   Public, at Handley Middle School, 251 Gilham
18   Road, Roanoke, Alabama, on the 22nd day
19   of June, 2007, commencing at 10:20 a.m.
20          IT IS FURTHER STIPULATED AND AGREED
21   that the signature to and reading of the
22   deposition by the witness is waived, the
23   deposition to have the same force and effect
```

2

```
1    as if full compliance had been had with all
2    laws and rules of Court relating to the
3    taking of depositions.
4          IT IS FURTHER STIPULATED AND AGREED
5    that it shall not be necessary for any
6    objections to be made by counsel to any
7    questions, except as to form or leading
8    questions, and that counsel for the parties
9    may make objections and assign grounds at
10   the time of trial or at the time said
11   deposition is offered in evidence, or prior
12   thereto.
13          IT IS FURTHER STIPULATED AND AGREED
14   that notice of filing of the deposition by
15   the Commissioner is waived
16
17
18
19
20
21
22
23
```

3

```
1
2                    I N D E X
3    EXAMINATION BY              PAGE NO.
4    Mr. Porter                    5 - 9
5
6
7              INDEX OF EXHIBITS
8    PX-1                           5
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

4

```
1
2    BEFORE:
3          Deborah Pudles Schaffer,
4    Commissioner.
5
6    APPEARANCES:
7          Adam M. Porter, Esquire, 2301 Morris
8    Avenue, Suite 102, Birmingham, Alabama,
9    35203, appearing on behalf of the Plaintiff.
10         Donald B. Sweeney, Jr., Esquire, of
11   the firm Bradley, Arant, Rose & White,
12   L.L.P., One Federal Place, 1819 5th Avenue
13   North, Birmingham, Alabama, 35203, appearing
14   on behalf of the Defendant.
15         Also present:  Angela Price
16                         Chuck Marcum
17
18
19
20
21
22
23
```

---

5

```
 1          I, Deborah Pudles Schaffer, a court
 2    reporter acting as Notary Public, State of
 3    Alabama at Large, certify that on this date,
 4    as provided by Rule 30 of the Alabama Rules
 5    of Civil Procedure, and the foregoing
 6    stipulation of counsel, there came before
 7    me at Handley Middle School, 251 Gilham
 8    Road, Roanoke, Alabama, beginning at 10:20
 9    a.m., DELIA HARMON, witness in the above
10    cause, for oral examination, whereupon the
11    following proceedings were had:
12
13              DELIA HARMON,
14    being first duly sworn, was examined and
15    testified as follows:
16
17    EXAMINATION BY MR. PORTER:
18    Q     Good morning, Ms. Harmon.  My name
19    is Adam Porter and I represent Ms. Price in
20    her lawsuit against the board.  I appreciate
21    you coming in here.
22          Let me show you what I'm going to
23    mark as Exhibit 1 to your deposition.  Is
```

6

```
 1    this a resume of sorts that you have drafted
 2    up for us?
 3    A     Yes.
 4    Q     Okay.  Do you remember hearing at
 5    some point in time that Ms. Price had made a
 6    claim about Mr. Cottle?
 7    A     Yes, I do.
 8    Q     What was your understanding of what
 9    that claim is?
10    A     That Mr. Cottle was sexually
11    harassing her.
12    Q     Do you have any idea when you heard
13    that?
14    A     I heard that back in the fall of the
15    year, back --
16    Q     Fall of '06?
17    A     August -- yes, '06 and '07.
18    Q     Did you -- back from like '03 to '05,
19    did you talk to Ms. Price very often?
20    A     Well, now during that time, yes, I
21    did.
22    Q     Okay.  How often?
23    A     Well, at that point, you know, each,
```

7

```
 1    she and I and Mr. Cottle would arrive at
 2    school early each morning.  We were the
 3    first ones to get to school, so usually I
 4    get out of the car and Mr. Cottle and I
 5    would be standing there talking and each
 6    morning Angela would walk up to the car and
 7    we would stand around and talk until the
 8    school building was open and then I would
 9    leave the two of them standing there
10    talking.
11    Q     And do you remember what year this is
12    or years?
13    A     It was, I know it was '04 and '05 and
14    then it seems like it was part of '5 and '6,
15    and at that point it stopped, and she
16    started sitting in the car during that time
17    in '05 and '06.
18    Q     Did Ms. Price ever say anything to
19    you that Mr. Cottle had said or done
20    something that was inappropriate toward her?
21    A     She never did, no.
22    Q     Okay.  Did they park in different
23    places?
```

8

```
 1    A     Yes.
 2    Q     Who parked where?
 3    A     Ms. Price parked here in the front
 4    under the flagpole and I parked on the very
 5    end down here and Mr. Cottle would park
 6    behind me on the curb.
 7    Q     And then --
 8    A     Because his duty was here and her
 9    duty was here in the front.
10    Q     Right.  Where would y'all talk?
11    A     I would usually get out of the car
12    and stand and he would get out of his truck
13    and he would come over to me and we would
14    talk and then Ms. Price was parked and she
15    would get out of her vehicle and she would
16    walk up to where we were standing up here.
17    Q     And y'all would talk until the school
18    opened?
19    A     Well, usually at that point, we would
20    stand around and talk just a few minutes.  I
21    might speak to Ms. Price.  We never did
22    really, at this point, do a whole lot, we
23    just talked.
```

9

```
 1     Q      Did Mr. Cottle ever say anything to
 2   you that you felt was inappropriate?
 3     A      Absolutely not.
 4     Q      Comment on your appearance or
 5   anything?
 6     A      Never on my appearance.
 7     Q      Do you have an understanding of the
 8   board's sexual harassment policy?
 9     A      I certainly do.
10     Q      Who do you report sexual harassment
11   to?
12     A      Well, I would certainly go to my
13   assistant principal, Ms. Benefield.
14            MR. PORTER:  Okay.  That's all I
15   have.  Thank you.
16            MR. SWEENEY:  Thank you, Ms. Harmon.
17   It's nice to see you.
18
19
20            FURTHER THE DEPONENT SAITH NOT.
21            (EXHIBIT ATTACHED AND ENCLOSED.)
22
23
```

10

```
 1              C E R T I F I C A T E
 2
 3   STATE OF ALABAMA )
 4   JEFFERSON COUNTY )
 5
 6            I hereby certify that the above and
 7   foregoing deposition was taken down by me in
 8   stenotype and the questions and answers
 9   thereto were reduced to writing under my
10   supervision, and that the foregoing
11   represents a true and correct transcript of
12   the testimony given by said witness on said
13   occasion.
14            I further certify that I am neither
15   of counsel nor of kin to the parties to the
16   action, not am I in anywise interested in
17   the result of said cause.
18
19            _____
20                       COMMISSIONER
21
22
23
```

<>
'03: 6;18
'04: 7;13
'05: 6;18, 7;13, 7;17
'06: 6;16, 6;17, 7;17
'07: 6;17
'5: 7;14
'6: 7;14

<1>
10:20 a.m.: 1;19, 5;8
102: 4;8
1819: 4;12

<2>
22nd: 1;18
2301: 4;7
251: 1;17, 5;7

<3>
3:06-CV-742-VPM: 1;8
30: 5;4
35203: 4;9, 4;13

<5>
5: 3;4, 3;8
5th: 4;12

<9>
9: 3;4

<A>
above: 5;9, 10;6
Absolutely: 9;3
acting: 5;2
ACTION: 1;7, 10;16
Adam: 4;7, 5;19
AGREED: 1;12, 1;20, 2;4, 2;13
ALABAMA: 1;2, 1;18, 4;8, 4;13, 5;3, 5;4, 5;8, 10;3

ANGELA: 1;5, 4;15, 7;6
answers: 10;8
anywise: 10;16
appearance: 9;4, 9;6
APPEARANCES: 4;6
appearing: 4;9, 4;13
appreciate: 5;20
Arant: 4;11
around: 7;7, 8;20
arrive: 7;1
assign: 2;9
assistant: 9;13
ATTACHED: 9;21
August: 6;17
Avenue: 4;8, 4;12

<B>
back: 6;14, 6;15, 6;18
beginning: 5;8
behalf: 4;9, 4;14
behind: 8;6
Benefield: 9;13
Birmingham: 4;8, 4;13
BOARD: 1;8, 5;20
board's: 9;8
Bradley: 4;11
building: 7;8

<C>
car: 7;4, 7;6, 7;16, 8;11
cause: 5;10, 10;17
certainly: 9;9, 9;12
certify: 5;3, 10;6, 10;14
Chuck: 4;16
CITY: 1;8
CIVIL: 1;7, 5;5
claim: 6;8, 6;9
coming: 5;21
commencing: 1;19
Comment: 9;4

COMMISSIONER: 1;16, 2;15, 4;4, 10;20
compliance: 2;1
correct: 10;11
Cottle: 6;6, 6;10, 7;1, 7;4, 7;19, 8;5, 9;1
counsel: 1;14, 2;6, 2;8, 5;6, 10;15
COUNTY: 10;4
COURT: 1;1, 2;2, 5;1
curb: 8;6

<D>
date: 5;3
day: 1;18
Deborah: 1;15, 4;3, 5;1
DEFENDANT: 1;9, 4;14
DELIA: 1;15, 5;9, 5;13
DEPONENT: 9;20
deposition: 1;14, 1;22, 1;23, 2;11, 2;14, 5;23, 10;7
depositions: 2;3
different: 7;22
DISTRICT: 1;1, 1;2
DIVISION: 1;3
Donald: 4;10
done: 7;19
down: 8;5, 10;7
drafted: 6;1
duly: 5;14
during: 6;20, 7;16
duty: 8;8, 8;9

<E>
early: 7;2
EASTERN: 1;3
effect: 1;23
ENCLOSED: 9;21
end: 8;5
Esquire: 4;7, 4;10
evidence: 2;11
EXAMINATION: 3;3, 5;10, 5;17
examined: 5;14
except: 2;7

Exhibit 1: 5;23
EXHIBIT: 9;21
EXHIBITS: 3;7

<F>
Fall: 6;14, 6;16
Federal: 4;12
felt: 9;2
few: 8;20
filing: 2;14
firm: 4;11
first: 5;14, 7;3
flagpole: 8;4
following: 5;11
follows: 5;15
force: 1;23
foregoing: 5;5, 10;7, 10;10
form: 2;7
front: 8;3, 8;9
full: 2;1

<G>
Gilham: 1;17, 5;7
given: 10;12
grounds: 2;9

<H>
Handley: 1;17, 5;7
harassing: 6;11
harassment: 9;8, 9;10
HARMON: 1;15, 5;9, 5;13, 5;18, 9;16
heard: 6;12, 6;14
hearing: 6;4
hereby: 10;6

<I>
idea: 6;12
inappropriate: 7;20, 9;2
INDEX: 3;7
interested: 10;16

<J>
JEFFERSON: 10;4
Jr: 4;10
June 2007,: 1;19

<K>
kin: 10;15

<L>
L.L.P.: 4;12
Large: 5;3
laws: 2;2
lawsuit: 5;20
leading: 2;7
leave: 7;9
lot: 8;22

<M>
Marcum: 4;16
mark: 5;23
MIDDLE: 1;2, 1;17, 5;7
minutes: 8;20
morning: 5;18, 7;2, 7;6
Morris: 4;7
Ms: 5;18, 5;19, 6;5, 6;19, 7;18, 8;3, 8;14, 8;21, 9;13, 9;16

<N>
name: 5;18
necessary: 2;5
neither: 10;14
nice: 9;17
nor: 10;15
North: 4;13
Notary: 1;16, 5;2
notice: 2;14

<O>
objections: 2;6, 2;9
occasion: 10;13

remember: 6;4, 7;11
report: 9;10
reporter: 5;2
represent: 5;19
represents: 10;11
respective: 1;14
result: 10;17
resume: 6;1
Road: 1;18, 5;8
ROANOKE: 1;8, 1;18, 5;8
Rose: 4;11
Rule: 5;4
Rules: 2;2, 5;4

<S>
SAITH: 9;20
Schaffer: 1;16, 4;3, 5;1
School: 1;17, 5;7, 7;2, 7;3, 7;8, 8;17
seems: 7;14
sexual: 9;8, 9;10
sexually: 6;10
shall: 2;5
show: 5;22
signature: 1;21
sitting: 7;16
sorts: 6;1
stand: 7;7, 8;12, 8;20
standing: 7;5, 7;9, 8;16
started: 7;16
STATE: 5;2, 10;3
STATES: 1;1
stenotype: 10;8
STIPULATED: 1;12, 1;20, 2;4, 2;13
stipulation: 5;6
stopped: 7;15
Suite: 4;8
supervision: 10;10
SWEENEY: 4;10, 9;16
sworn: 5;14

offered: 2;11
often: 6;19, 6;22
Okay: 6;4, 6;22, 7;22, 9;14
One: 4;12
ones: 7;3
open: 7;8
opened: 8;18
oral: 5;10

<P>
PAGE: 3;3
park: 7;22, 8;5
parked: 8;2, 8;3, 8;4, 8;14
part: 7;14
parties: 1;13, 2;8, 10;15
Place: 4;12
places: 7;23
PLAINTIFF: 1;6, 4;9
point: 6;5, 6;23, 7;15, 8;19, 8;22
policy: 9;8
PORTER: 3;4, 4;7, 5;17, 5;19, 9;14
present: 4;15
PRICE: 1;5, 4;15, 5;19, 6;5, 6;19, 7;18, 8;3, 8;14, 8;21
principal: 9;13
prior: 2;11
Procedure: 5;5
proceedings: 5;11
provided: 5;4
Public: 1;17, 5;2
Pudles: 1;16, 4;3, 5;1
PX-1: 3;8

<Q>
questions: 2;7, 2;8, 10;8

<R>
reading: 1;21
really: 8;22
reduced: 10;9
relating: 2;2

<T>
talked: 8;23
testified: 5;15
testimony: 10;12
thereto: 2;12, 10;9
toward: 7;20
transcript: 10;11
trial: 2;10
truck: 8;12
true: 10;11
two: 7;9

<U>
understanding: 6;8, 9;7
UNITED: 1;1
until: 7;7, 8;17

<V>
vehicle: 8;15

<W>
waived: 1;22, 2;15
walk: 7;6, 8;16
whereupon: 5;10
White: 4;11
whole: 8;22
witness: 1;22, 5;9, 10;12
writing: 10;9

<Y>
y'all: 8;10, 8;17
year: 6;15, 7;11
years: 7;12

# EXHIBIT 19

**1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE MIDDLE DISTRICT OF ALABAMA,
 3                EASTERN DIVISION
 4
 5   ANGELA PRICE,          )
 6          PLAINTIFF,      )
 7   V                      )   CIVIL ACTION NO.
 8   ROANOKE CITY BOARD OF )    3:06-CV-742-VPM
 9   EDUCATION,             )
10          DEFENDANT.      )
11
12          S T I P U L A T I O N
13        IT IS STIPULATED AND AGREED, by
14   and between the parties, through their
15   MARILYN POLLARD, may be taken before Deborah
16   Pudles Schaffer, Commissioner and Notary
17   Public, at Handley Middle School, 251 Gilham
18   Road, Roanoke, Alabama, on the 22nd day of
19   June, 2007, commencing at 10:30 a.m.
20        IT IS FURTHER STIPULATED AND AGREED
21   that the signature to and reading of the
22   deposition by the witness is waived, the
23   deposition to have the same force and effect
```

**2**

```
 1   as if full compliance had been had with all
 2   laws and rules of Court relating to the
 3   taking of depositions.
 4        IT IS FURTHER STIPULATED AND AGREED
 5   that it shall not be necessary for any
 6   objections to be made by counsel to any
 7   questions, except as to form or leading
 8   questions, and that counsel for the parties
 9   may make objections and assign grounds at
10   the time of trial or at the time said
11   deposition is offered in evidence, or prior
12   thereto.
13        IT IS FURTHER STIPULATED AND AGREED
14   that notice of filing of the deposition by
15   the Commissioner is waived.
16
17
18
19
20
21
22
23
```

**3**

```
 1
 2                I N D E X
 3   EXAMINATION BY              PAGE NO.
 4   Mr. Porter                   5 - 13
 5
 6
 7              INDEX OF EXHIBITS
 8   PX-1                           5
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

**4**

```
 1
 2   BEFORE:
 3          Deborah Pudles Schaffer,
 4   Commissioner.
 5
 6   APPEARANCES:
 7          Adam M. Porter, Esquire, 2301 Morris
 8   Avenue, Suite 102, Birmingham, Alabama,
 9   35203, appearing on behalf of the Plaintiff
10          Donald B. Sweeney, Jr., Esquire, of
11   the firm Bradly, Arant, Rose & White,
12   L.L.P., One Federal Place, 1819 5th Avenue
13   North, Birmingham, Alabama, 35203, appearing
14   on behalf of the Defendant.
15          Also present:  Angela Price
16                         Chuck Marcum
17
18
19
20
21
22
23
```

5

1        I, Deborah Pudles Schaffer, a court
2    reporter acting as Notary Public, State of
3    Alabama at Large, certify that on this date,
4    as provided by Rule 30 of the Alabama Rules
5    of Civil Procedure, and the foregoing
6    stipulation of counsel, there came before
7    me at Handley Middle School, 251 Gilham
8    Road, Roanoke, Alabama, beginning at 10:30
9    a.m., MARILYN POLLARD, witness in the above
10   cause, for oral examination, whereupon the
11   following proceedings were had:
12
13               MARILYN POLLARD,
14   being first duly sworn, was examined and
15   testified as follows:
16
17   EXAMINATION BY MR. PORTER:
18   Q      Good morning, Ms. Pollard.  I'm Adam
19   Porter.  I represent Ms. Price in her
20   lawsuit against the board.  I appreciate you
21   coming in.  Let me show you what I'm marking
22   as Exhibit 1 to your deposition.
23        Is this a brief resume that you've

6

1    made up for us?
2    A      Yes, sir, it is.
3    Q      Do you remember being interviewed by
4    Mr. Marcum back about a year ago about some
5    claims that Ms. Price had made against Mr.
6    Cottle?
7    A      Yes, sir, I do.
8    Q      Okay.  Are you aware of the
9    allegations that she makes?
10   A      Yes, sir, I am.
11   Q      What is your understanding of that?
12   A      That she is suing Roanoke City
13   Schools for sexual harassment against Mr.
14   Cottle and she states that Roanoke City
15   Schools were aware of it and did nothing
16   about it.
17   Q      Who told you that?
18   A      It was in the EEOC complaint.
19   Q      The EEOC charge?
20   A      Yes, sir.
21   Q      You read that?
22   A      Yes, sir.
23   Q      Did Ms. Price ever say anything to

7

1    you about any inappropriate behavior from
2    Mr. Cottle?
3    A      Not directly.  She may have mentioned
4    something about a, him asking her to go to
5    Florida or something about going to Florida,
6    maybe driving for him.  He was going on
7    maybe some kind of health issue.  Something
8    about a Florida trip, that's all I remember.
9    Q      She, did Ms. Price tell you about a
10   health issue with Mr. Cottle?
11   A      I'm thinking there was a, the best
12   that I can remember something about a health
13   issue was mentioned, seeing a doctor or
14   something to that effect.
15   Q      Did she seem happy about that?
16   A      Happy -- rephrase the question.  I
17   don't -- happy about --
18   Q      Did she seem happy about him asking
19   her to go to Florida?
20   A      Not necessarily happy, but she didn't
21   necessarily seem upset.
22   Q      She didn't seem to be concerned about
23   it at all?

8

1    A      Well, she didn't, she wasn't crying
2    or upset or anything like that.  No more
3    upset than --
4    Q      She didn't seem the slightest bit
5    upset about it?
6    A      Explain what you're talking about
7    upset.  Are you saying --
8    Q      Just in, just in your definition,
9    however you mean it.
10   A      Maybe aggravated kind of maybe.
11   Q      Let me show you what was marked as
12   Exhibit 6 to Mr. Marcum's deposition and --
13   is there a stapler in here?
14               (Whereupon, an off-the-
15               record discussion was had.)
16   Q      (BY MR. PORTER:)  Marked as Exhibit 6
17   to Mr. Marcum's deposition.  Flip through
18   that, there is, I think near the back there
19   is a page of a note regarding an interview
20   with you.  Second to the last.
21   A      Okay.  Now, repeat the question.
22   Q      Have you read that whole page?
23   A      Yes, sir.

9

```
 1   Q     Do you see the passage down there
 2   where you state that Mr. Cottle said or Ms.
 3   Price said that Mr. Cottle had said
 4   something about wanting her to go to
 5   Florida.  Do you see that?
 6   A     Yes, sir.
 7   Q     And down below that Mr. Marcum asks
 8   you did she seem upset and you said kind
 9   of.  I mean, do you stand by that statement?
10   A     Aggravated more than upset, say maybe
11   aggravated kind of, yes.
12   Q     So when you said she was kind of
13   upset was that accurate?
14   A     Yes, sir.
15   Q     Okay.  Who was present when she said
16   this?
17   A     I don't remember.
18   Q     You said that she was just talking in
19   general in front of people in front of the
20   office?
21   A     In the lobby of the office.
22   Q     You don't remember who, who would
23   have been there?
```

10

```
 1   A     No, sir.  There could have been a lot
 2   of people come and go, I don't remember
 3   specifics.
 4   Q     And did she ever say anything else to
 5   to you about Mr. Cottle?
 6   A     No, sir, not that I remember.
 7   Q     Did you ever see them talking out in
 8   front of the school?
 9   A     Yes, sir.
10   Q     Where would they usually be talking?
11   A     Well, sometimes they were talking at
12   her car and sometimes they were talking at
13   his truck.
14   Q     Okay.  Anywhere else?
15   A     No, sir, not that I remember.
16   Q     Do you ever recall an occasion where
17   Ms. Price was in the office and she said
18   that she was staying in there waiting for
19   Mr. Cottle to leave?
20   A     No, sir, I don't remember, but a lot
21   of people would wait for Mr. Cottle to leave
22   because of the fact that when he left at
23   two-thirty, the traffic -- at that point in
```

11

```
 1   time traffic came, was one way coming in and
 2   now it's changed going out the other way, so
 3   a lot of people would wait for him to leave.
 4   Q     Because he wasn't stopping traffic
 5   anymore?
 6   A     Right.  Right.  Because once he left
 7   at two-thirty the traffic would change.
 8   Q     Two-way?
 9   A     Right, and you could go that way so a
10   lot of people waited for him to leave
11   because traffic changed.
12   Q     Okay.  Did they usually wait in the
13   office?
14   A     Sometimes.
15   Q     Who did that?
16   A     Different teachers, no one in
17   specific.
18   Q     Okay.  Are you familiar with the
19   board's sexual harassment policy?
20   A     Yes, sir, I am.
21   Q     And who are you supposed to report
22   sexual harassment to?
23   A     Who would I report it to?
```

12

```
 1   Q     Is there a policy that says who
 2   you're supposed to report it to?
 3   A     Well, I would start with my lead
 4   teacher, then I would go to my assistant
 5   principal, the principal, then Donna Hodges
 6   which is over my specific area and then Mr.
 7   Marcum, but if you didn't follow chain of
 8   command, I would go to the principal.
 9   Q     What is your position?
10   A     I'm a special education teacher's
11   aide.
12   Q     You're a teacher's aide?
13   A     A teacher's aide.
14   Q     So you would first go to your
15   teacher?
16   A     I would go to my special education
17   teacher that was over me.
18   Q     Are you aware of the policies
19   telling you who to go to, do you know
20   anything about that?
21   A     We have had sexual harassment
22   classes.
23   Q     Okay.  And you were told to go to
```

PRESS OF ROANOKE CITY BD. OF ED.    MARILYN POLLARD

13

```
 1    your supervisor?
 2    A       Yes, sir.
 3              MR. PORTER:   Okay.  That's all I
 4    have.  Thank you.
 5              MR. SWEENEY:   Thank you so much, Ms.
 6    Pollard.  Nice to see you.
 7
 8              FURTHER THE DEPONENT SAITH NOT.
 9              (EXHIBIT ATTACHED AND ENCLOSED.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

14

```
 1              C E R T I F I C A T E
 2
 3    STATE OF ALABAMA )
 4    JEFFERSON COUNTY )
 5
 6         I hereby certify that the above and
 7    foregoing deposition was taken down by me in
 8    stenotype and the questions and answers
 9    thereto were reduced to writing under my
10    supervision, and that the foregoing
11    represents a true and correct transcript of
12    the testimony given by said witness on said
13    occasion.
14         I further certify that I am neither
15    of counsel nor of kin to the parties to the
16    action, not am I in anywise interested in
17    the result of said cause.
18
19         _____
20              COMMISSIONER
21
22
23
```

<1>
10:30 a.m.: 1;19, 5;8
102: 4;8
13: 3;4
1819: 4;12

<2>
22nd: 1;18
2301: 4;7
251: 1;17, 5;7

<3>
3:06-CV-742-VPM: 1;8
30: 5;4
35203: 4;9, 4;13

<5>
5: 3;4, 3;8
5th: 4;12

<A>
above: 5;9, 14;6
accurate: 9;13
acting: 5;2
ACTION: 1;7, 14;16
Adam: 4;7, 5;18
Aggravated: 8;10, 9;10, 9;11
ago: 6;4
AGREED: 1;13, 1;20, 2;4, 2;13
aide: 12;11, 12;12, 12;13
ALABAMA: 1;2, 1;18, 4;8, 4;13, 5;3, 5;4, 5;8, 14;3
allegations: 6;9
ANGELA: 1;5, 4;15
answers: 14;8
anywise: 14;16
APPEARANCES: 4;6
appearing: 4;9, 4;13
appreciate: 5;20
Arant: 4;11

compliance: 2;1
concerned: 7;22
correct: 14;11
Cottle: 6;6, 6;14, 7;2, 7;10, 9;2, 9;3, 10;5, 10;19, 10;21
counsel: 2;6, 2;8, 5;6, 14;15
COUNTY: 14;4
COURT: 1;1, 2;2, 5;1
crying: 8;1

<D>
date: 5;3
day: 1;18
Deborah: 1;15, 4;3, 5;1
DEFENDANT: 1;10, 4;14
definition: 8;8
DEPONENT: 13;8
deposition: 1;22, 1;23, 2;11, 2;14, 5;22, 8;12, 8;17, 14;7
depositions: 2;3
Different: 11;16
directly: 7;3
discussion: 8;15
DISTRICT: 1;1, 1;2
DIVISION: 1;3
doctor: 7;13
Donald: 4;10
Donna: 12;5
down: 9;1, 9;7, 14;7
driving: 7;6
duly: 5;14

<E>
EASTERN: 1;3
EDUCATION: 1;9, 12;10, 12;16
EEOC: 6;18, 6;19
effect: 1;23, 7;14
ENCLOSED: 13;9
Esquire: 4;7, 4;10
evidence: 2;11
EXAMINATION: 3;3, 5;10, 5;17
examined: 5;14

area: 12;6
asks: 9;7
assign: 2;9
assistant: 12;4
ATTACHED: 13;9
Avenue: 4;8, 4;12
aware: 6;8, 6;15, 12;18

<B>
back: 6;4, 8;18
beginning: 5;8
behalf: 4;9, 4;14
behavior: 7;1
below: 9;7
best: 7;11
Birmingham: 4;8, 4;13
bit: 8;4
BOARD: 1;8, 5;20
board's: 11;19
Bradly: 4;11
brief: 5;23

<C>
car: 10;12
cause: 5;10, 14;17
certify: 5;3, 14;6, 14;14
chain: 12;7
change: 11;7
changed: 11;2, 11;11
charge: 6;19
Chuck: 4;16
CITY: 1;8, 6;12, 6;14
CIVIL: 1;7, 5;5
claims: 6;5
classes: 12;22
coming: 5;21, 11;1
command: 12;8
commencing: 1;19
COMMISSIONER: 1;16, 2;15, 4;4, 14;20
complaint: 6;18

except: 2;7
Exhibit 1: 5;22
Exhibit 6: 8;12, 8;16
EXHIBIT: 13;9
EXHIBITS: 3;7
Explain: 8;6

<F>
fact: 10;22
familiar: 11;18
Federal: 4;12
filing: 2;14
firm: 4;11
first: 5;14, 12;14
Flip: 8;17
Florida: 7;5, 7;5, 7;8, 7;19, 9;5
follow: 12;7
following: 5;11
follows: 5;15
force: 1;23
foregoing: 5;5, 14;7, 14;10
form: 2;7
front: 9;19, 9;19, 10;8
full: 2;1

<G>
general: 9;19
Gilham: 1;17, 5;7
given: 14;12
grounds: 2;9

<H>
Handley: 1;17, 5;7
Happy: 7;15, 7;16, 7;17, 7;18, 7;20
harassment: 6;13, 11;19, 11;22, 12;21
health: 7;7, 7;10, 7;12
hereby: 14;6
Hodges: 12;5

<I>

inappropriate: 7;1
INDEX: 3;7
interested: 14;16
interview: 8;19
interviewed: 6;3
issue: 7;7, 7;10, 7;13

<J>
JEFFERSON: 14;4
Jr.: 4;10
June 2007,: 1;19

<K>
kin: 14;15
kind: 7;7, 8;10, 9;8, 9;11, 9;12

<L>
L.L.P.: 4;12
Large: 5;3
last: 8;20
laws: 2;2
lawsuit: 5;20
lead: 12;3
leading: 2;7
leave: 10;19, 10;21, 11;3, 11;10
left: 10;22, 11;6
lobby: 9;21
lot: 10;1, 10;20, 11;3, 11;10

<M>
Marcum: 4;16, 6;4, 9;7, 12;7
Marcum's: 8;12, 8;17
MARILYN: 1;15, 5;9, 5;13
Marked: 8;11, 8;16
marking: 5;21
mean: 8;9, 9;9
mentioned: 7;3, 7;13
MIDDLE: 1;2, 1;17, 5;7
morning: 5;18
Morris: 4;7

Ms: 5;18, 5;19, 6;5, 6;23, 7;9, 9;2, 10;17, 13;5

<N>
near: 8;18
necessarily: 7;20, 7;21
necessary: 2;5
neither: 14;14
Nice: 13;6
nor: 14;15
North: 4;13
Notary: 1;16, 5;2
note: 8;19
nothing: 6;15
notice: 2;14

<O>
objections: 2;6, 2;9
occasion: 10;16, 14;13
off-the: 8;14
offered: 2;11
office: 9;20, 9;21, 10;17, 11;13
Okay: 6;8, 8;21, 9;15, 10;14, 11;12, 11;18, 12;23, 13;3
once: 11;6
One: 4;12, 11;1, 11;16
oral: 5;10

<P>
PAGE: 3;3, 8;19, 8;22
parties: 1;14, 2;8, 14;15
passage: 9;1
people: 9;19, 10;2, 10;21, 11;3, 11;10
Place: 4;12
PLAINTIFF: 1;6, 4;9
point: 10;23
policies: 12;18
policy: 11;19, 12;1
POLLARD: 1;15, 5;9, 5;13, 5;18, 13;6
PORTER: 3;4, 4;7, 5;17, 5;19, 8;16, 13;3
position: 12;9
present: 4;15, 9;15

PRICE: 1;5, 4;15, 5;19, 6;5, 6;23, 7;9, 9;3, 10;17
principal: 12;5, 12;5, 12;8
prior: 2;11
Procedure: 5;5
proceedings: 5;11
provided: 5;4
Public: 1;17, 5;2
Pudtes: 1;16, 4;3, 5;1
PX-1: 3;8

<Q>
question: 7;16, 8;21
questions: 2;7, 2;8, 14;8

<R>
read: 6;21, 8;22
reading: 1;21
recall: 10;16
record: 8;15
reduced: 14;9
regarding: 8;19
relating: 2;2
remember: 6;3, 7;8, 7;12, 9;17, 9;22, 10;2, 10;6, 10;15, 10;20
repeat: 8;21
rephrase: 7;16
report: 11;21, 11;23, 12;2
reporter: 5;2
represent: 5;19
represents: 14;11
result: 14;17
resume: 5;23
Road: 1;18, 5;8
ROANOKE: 1;8, 1;18, 5;8, 6;12, 6;14
Rose: 4;11
Rule: 5;4
Rules: 2;2, 5;4

<S>
SAITH: 13;8
saying: 8;7

says: 12;1
Schaffer: 1;16, 4;3, 5;1
School: 1;17, 5;7, 10;8
Schools: 6;13, 6;15
Second: 8;20
seeing: 7;13
seem: 7;15, 7;18, 7;21, 7;22, 8;4, 9;8
sexual: 6;13, 11;19, 11;22, 12;21
shall: 2;5
show: 5;21, 8;11
signature: 1;21
sir: 6;2, 6;7, 6;10, 6;20, 6;22, 8;23, 9;6, 9;14, 10;1, 10;6, 10;9, 10;15, 10;20, 11;20, 13;2
slightest: 8;4
Sometimes: 10;11, 10;12, 11;14
special: 12;10, 12;16
specific: 11;17, 12;6
specifics: 10;3
stand: 9;9
stapler: 8;13
start: 12;3
STATE: 5;2, 9;2, 14;3
statement: 9;9
STATES: 1;1, 6;14
staying: 10;18
stenotype: 14;8
STIPULATED: 1;13, 1;20, 2;4, 2;13
stipulation: 5;6
stopping: 11;4
suing: 6;12
Suite: 4;8
supervision: 14;10
supervisor: 13;1
supposed: 11;21, 12;2
SWEENEY: 4;10, 13;5
sworn: 5;14

<T>
teacher: 12;4, 12;15, 12;17
teacher's: 12;10, 12;12, 12;13

teachers: 11;16
testified: 5;15
testimony: 14;12
thereto: 2;12, 14;9
thinking: 7;11
traffic: 10;23, 11;1, 11;4, 11;7, 11;11
transcript: 14;11
trial: 2;10
trip: 7;8
truck: 10;13
true: 14;11
two-thirty: 10;23, 11;7
Two-way: 11;8

<U>
understanding: 6;11
UNITED: 1;1
upset: 7;21, 8;2, 8;3, 8;5, 8;7, 9;8, 9;10, 9;13

<W>
wait: 10;21, 11;3, 11;12
waited: 11;10
waiting: 10;18
waived: 1;22, 2;15
wanting: 9;4
Whereupon: 5;10, 8;14
White: 4;11
whole: 8;22
witness: 1;22, 5;9, 14;12
writing: 14;9

<Y>
year: 6;4

EXHIBIT 20

1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2       FOR THE MIDDLE DISTRICT OF ALABAMA
 3              EASTERN DIVISION
 4
 5   ANGELA PRICE,          )
 6          PLAINTIFF,      )
 7   V                      )    CIVIL ACTION NO.
 8   ROANOKE CITY BOARD OF )     3:06-CV-742-VPM
 9   EDUCATION,             )
10          DEFENDANT.      )
11
12          S T I P U L A T I O N
13       IT IS STIPULATED AND AGREED, by
14   and between the parties, through their
15   respective counsel, that the deposition of
16   SHERRY YARBROUGH, may be taken before
17   Deborah Pudles Schaffer, Commissioner and
18   Notary Public, at Handley Middle School, 251
19   Gilham Road, Roanoke, Alabama, on the 21st
20   day of June, 2007, commencing at 1:30 p.m.
21       IT IS FURTHER STIPULATED AND AGREED
22   that the signature to and reading of the
23   deposition by the witness is waived, the
```

3

```
                  I N D E X
 2
 3   EXAMINATION BY              PAGE NO.
 4   Mr. Porter                   5 - 15
 5
 6
 7              INDEX OF EXHIBITS
 8   PX-1                          5
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

2

```
 1   deposition to have the same force and effect
 2   as if full compliance had been had with all
 3   laws and rules of Court relating to the
 4   taking of depositions.
 5       IT IS FURTHER STIPULATED AND AGREED
 6   that it shall not be necessary for any
 7   objections to be made by counsel to any
 8   questions, except as to form or leading
 9   questions, and that counsel for the parties
10   may make objections and assign grounds at
11   the time of trial or at the time said
12   deposition is offered in evidence, or prior
13   thereto.
14       IT IS FURTHER STIPULATED AND AGREED
15   that notice of filing of the deposition by
16   the Commissioner is waived.
17
18
19
20
21
22
23
```

4

```
 1
 2   BEFORE:
 3          Deborah Pudles Schaffer,
 4   Commissioner.
 5
 6   APPEARANCES:
 7          Adam M. Porter, Esquire, 2301 Morris
 8   Avenue, Suite 102, Birmingham, Alabama,
 9   35203, appearing on behalf of the Plaintiff.
10          Donald B. Sweeney, Jr., Esquire, of
11   the firm Bradley, Arant, Rose & White,
12   L.L.P., One Federal Place, 1819 5th Avenue
13   North, Birmingham, Alabama, 35203, appearing
14   on behalf of the Defendant.
15          Also present:  Angela Price
16                         Chuck Marcum
17
18
19
20
21
22
23
```

5

1     I, Deborah Pudles Schaffer, a court
2   reporter acting as Notary Public, State of
3   Alabama at Large, certify that on this date,
4   as provided by Rule 30 of the Alabama Rules
5   of Civil Procedure, and the foregoing
6   stipulation of counsel, there came before
7   me at Handley Middle School, 251 Gilham
8   Road, Roanoke, Alabama, beginning at 1:30
9   p.m., SHERRY YARBROUGH, witness in the above
10  cause, for oral examination, whereupon the
11  following proceedings were had:
12
13                SHERRY YARBROUGH,
14  being first duly sworn, was examined and
15  testified as follows:
16
17  EXAMINATION BY MR. PORTER:
18  Q     Good afternoon, Ms. Yarbrough.  I am
19  Adam Porter.  I represent Ms. Price in her
20  lawsuit against the board.
21        Let me show you what I marked as
22  Plaintiff's Exhibit 1 to your deposition.
23  Is that a resume of sorts that you have

7

1   A     Yes.
2   Q     I don't know, there may have been
3   somebody else present.  Let me ask you to
4   take a look at that page, that has your name
5   at the top.  Let me know when you've read
6   it.
7   A     Uh-huh.
8   Q     Do you remember meeting with Mr.
9   Marcum?
10  A     Yes, I do.
11  Q     And do these notes accurately reflect
12  what you said in that meeting?
13  A     Yes.
14  Q     Do you recall saying anything else
15  that's not in these notes?
16  A     No, sir.
17  Q     Okay.  It looks like you say in the
18  notes that what she said was that he had
19  flirted with her that that was in the prior
20  year; is that right?
21  A     Yes.
22  Q     Okay.  Would that be the school year
23  of '04 and '05?  The meeting was October of

6

1   prepared?
2   A     Yes, sir, it is.
3   Q     And is the information on there
4   accurate?
5   A     Yes, sir.
6   Q     How long, how long have you worked
7   here?
8   A     Nineteen years.
9   Q     And, and do you ever recall hearing
10  anything from Ms. Price about any
11  inappropriate behavior from Mr. Cottle?
12  A     Yes.
13  Q     Tell me as best you can remember
14  where you first heard something like that.
15  A     She came in one day and said he was
16  flirting with her, and I can't recall the
17  month or anything like that, but she said he
18  was flirting with her.
19  Q     Did -- well, let me -- let me show
20  you what we have marked as Exhibit 4 to Mr.
21  Marcum's decision.
22        Do you remember a meeting with Mr.
23  Marcum and talking with him about that?

8

1   '05.
2   A     '05.  It would have had to have been
3   the previous year before that.
4   Q     Are you talking about calendar year
5   or school year?
6   A     School year.
7   Q     Okay.  Sometime in the '04, '05 year?
8   A     Yes, sir.
9   Q     And you say, in there it says, "About
10  a year ago she said that he had asked her if
11  she wanted to go to Florida."
12        Would that have been sometime in
13  October of '04 you think when Ms. Price told
14  you that he said that?
15  A     I can't really recall the, this all
16  was in a one-year time frame --
17  Q     Okay.
18  A     -- that I recall.
19  Q     But she did tell you that he had
20  asked her to go to Florida?
21  A     Yes.
22  Q     Did she seem excited about that?
23  Happy about that?

9

```
1    A    Not really.
2    Q    Did she seem disturbed about it?
3    A    Not overly concerned -- I mean, not
4    overly disturbed.
5    Q    Well, did it strike you that she
6    didn't want to go?
7    A    Well, I couldn't really, she just
8    said that he had asked her to go.
9    Q    What, what about when she told you
10   that he was flirting with her, did she seem
11   happy about that?
12   A    No, sir.
13   Q    Did she seem troubled by it to any
14   degree?
15   A    Just more or less sharing
16   information, I mean, that's what he had told
17   her or asked her.
18   Q    You didn't consider it to be like a
19   complaint about that?
20   A    It possibly could have been.  It was
21   just, you know, we were just general
22   conversation up front.
23   Q    Okay.  And you're a secretary in the
```

10

```
1    office out there?
2    A    I'm the receptionist, secretary up
3    front.
4    Q    Where is the board policy manual
5    kept?
6    A    In the library and also Mr. Foster
7    has a copy of it.
8    Q    Have you ever looked at it?
9    A    Yes, sir.
10   Q    Okay.  Did Ms. Price say anything
11   else to you about anything that she felt was
12   offensive or inappropriate from Mr. Cottle?
13   A    I do not remember.  These two
14   incidents are the only ones --
15   Q    Okay.
16   A    -- that I can recall.
17   Q    Okay.  Look down on those notes, you
18   see the third section from the bottom and
19   you say, "I do remember seeing her going to
20   where he was talking to him after she had
21   complained about him in the office, she went
22   to his post."
23        What occasion was it where you refer
```

11

```
1    that she had complained about him in the
2    office?
3    A    Well, that would be these instances
4    that --
5    Q    Okay.  So you did consider those to
6    be complaints?
7    A    Yes.
8    Q    All right.  What's the importance of
9    your mentioning that she walked over to
10   where he was?
11   A    Well, he always parked right out here
12   at the end of the parking lot and she was
13   down here -- so.
14   Q    Wait, that's not clear on the record.
15   A    Oh.
16   Q    He would park on the side of the
17   building?
18   A    He parked all the way out toward the
19   street.
20   Q    Okay.
21   A    At the end of the parking lot.
22   Q    Okay.  And she parked somewhere else?
23   A    I recall her parking more down on
```

12

```
1    this end toward the flagpole.
2    Q    The front of the building?
3    A    Yes.
4    Q    Would she usually do that every day?
5    A    Just about every day as far as I can
6    recall.
7    Q    And Mr. Cottle usually parked over
8    there on the side of the building like you
9    said about every day?
10   A    Well, not on the side of the
11   building.  It was out at the, toward, at the
12   very end of the parking lot toward the
13   street.
14   Q    Okay.  Would he usually park in that
15   place every day?
16   A    Yes, sir.
17   Q    Okay.  So you say there was one
18   occasion where you saw her walk over to his
19   car?
20   A    No, sir, I did not see her walk over
21   to his car -- his truck.  I saw her out at
22   his truck.
23   Q    All right.  And in these notes it
```

13

1  says, "I do remember seeing her going to
2  where he was talking to him after she had
3  complained."
4        So you just saw him -- saw her at the
5  truck?
6  A     Yes, sir.
7  Q     You don't know how she got there?
8  A     No, sir.
9  Q     And then what's the, what's the
10  importance of that?
11  A     Well, just that she was out there
12  after she had been in the office.
13  Q     That seemed contradictory to you?
14  A     Yes, sir.
15  Q     Do you know whether or not she was
16  talking about something work-related?
17  A     No, sir.
18  Q     If she had to talk to him about
19  something work related she would have had to
20  have gone over to where he was; isn't that
21  right?
22  A     I would assume, yes, sir.
23  Q     All right.  Are you familiar with the

15

1  Q     Were they on separate occasions?
2  A     Yes, sir.
3  Q     What did you say back to her when she
4  made the comment about him asking her to go
5  to Florida?
6  A     I do not remember any comment that I
7  made.
8  Q     Okay.  Was anybody else present then?
9  A     I do not even remember that.
10  Q     Okay.  Do you remember if you said
11  anything to her in response to her statement
12  that he was flirting with her?
13  A     No, sir, I really don't.
14  Q     Did you tell anybody else about it?
15  A     No, sir.
16  Q     Did you tell anybody else about the
17  comment about going to Florida with him?
18  A     No, sir.
19       MR. PORTER:  Okay.  That's all I
20  have.  Thank you, Ms. Yarbrough.
21       MR. SWEENEY:  Thank you, Ms.
22  Yarbrough.
23       FURTHER THE DEPONENT SAITH NOT.

14

1  school, the board's policy on sexual
2  harassment?
3  A     Yes, sir.
4  Q     Where is that policy located?
5  A     In the library.
6  Q     Okay.
7  A     And also Mr. Foster has it.
8  Q     What is your understanding of the
9  reporting procedure for that?
10  A     If you are being harassed, you are to
11  go to your supervisor --
12  Q     Okay.
13  A     -- and report it.
14  Q     Have you ever heard any person other
15  than Ms. Price say that Mr. Cottle had said
16  something sexually inappropriate or done
17  something sexually inappropriate?
18  A     No, sir.
19  Q     And these two comments that you've
20  gotten in the notes are the only two things
21  that you heard from Ms. Price?
22  A     Yes, those are the only two I
23  remember.

16

1       (EXHIBIT ATTACHED AND ENCLOSED.)
2            C E R T I F I C A T E
3
4  STATE OF ALABAMA )
5  JEFFERSON COUNTY )
6
7       I hereby certify that the above and
8  foregoing deposition was taken down by me in
9  stenotype and the questions and answers
10  thereto were reduced to writing under my
11  supervision, and that the foregoing
12  represents a true and correct transcript of
13  the testimony given by said witness on said
14  occasion.
15       I further certify that I am neither
16  of counsel nor of kin to the parties to the
17  action, not am I in anywise interested in
18  the result of said cause.
19
20
21                        _____
                          COMMISSIONER
22
23

<>
'04: 7;23, 8;7, 8;13
'05: 7;23, 8;1, 8;2, 8;7

<1>
1:30 p.m.: 1;20, 5;8
102: 4;8
15: 3;4
1819: 4;12

<2>
21st: 1;19
2301: 4;7
251: 1;18, 5;7

<3>
3:06-CV-742-VPM: 1;8
30: 5;4
35203: 4;9, 4;13

<5>
5: 3;4, 3;8
5th: 4;12

<A>
above: 5;9, 16;7
accurate: 6;4
accurately: 7;11
acting: 5;2
ACTION: 1;7, 16;17
Adam: 4;7, 5;19
afternoon: 5;18
ago: 8;10
AGREED: 1;13, 1;21, 2;5, 2;14
ALABAMA: 1;2, 1;19, 4;8, 4;13, 5;3, 5;4, 5;8, 16;4
ANGELA: 1;5, 4;15
answers: 16;9
anybody: 15;8, 15;14, 15;16
anywise: 16;17

contradictory: 13;13
conversation: 9;22
copy: 10;7
correct: 16;12
Cottle: 6;11, 10;12, 12;7, 14;15
counsel: 1;15, 2;7, 2;9, 5;6, 16;16
COUNTY: 16;5
COURT: 1;1, 2;3, 5;1

<D>
date: 5;3
day: 1;20, 6;15, 12;4, 12;5, 12;9, 12;15
Deborah: 1;17, 4;3, 5;1
decision: 6;21
DEFENDANT: 1;10, 4;14
degree: 9;14
DEPONENT: 15;23
deposition: 1;15, 1;23, 2;1, 2;12, 2;15, 5;22, 16;8
depositions: 2;4
DISTRICT: 1;1, 1;2
disturbed: 9;2, 9;4
DIVISION: 1;3
Donald: 4;10
done: 14;16
down: 10;17, 11;13, 11;23, 16;8
duly: 5;14

<E>
EASTERN: 1;3
EDUCATION: 1;9
effect: 2;1
ENCLOSED: 16;1
end: 11;12, 11;21, 12;1, 12;12
Esquire: 4;7, 4;10
evidence: 2;12
EXAMINATION: 3;3, 5;10, 5;17
examined: 5;14
except: 2;8
excited: 8;22
Exhibit 1: 5;22

APPEARANCES: 4;6
appearing: 4;9, 4;13
Arant: 4;11
assign: 2;10
assume: 13;22
ATTACHED: 16;1
Avenue: 4;8, 4;12

<B>
back: 15;3
beginning: 5;8
behalf: 4;9, 4;14
behavior: 6;11
best: 6;13
Birmingham: 4;8, 4;13
BOARD: 1;8, 5;20, 10;4
board's: 14;1
bottom: 10;18
Bradley: 4;11
building: 11;17, 12;2, 12;8, 12;11

<C>
calendar: 8;4
car: 12;19, 12;21
cause: 5;10, 16;18
certify: 5;3, 16;7, 16;15
Chuck: 4;16
CITY: 1;8
CIVIL: 1;7, 5;5
clear: 11;14
commencing: 1;20
comment: 15;4, 15;6, 15;17
comments: 14;19
COMMISSIONER: 1;17, 2;16, 4;4, 16;21
complained: 10;21, 11;1, 13;3
complaint: 9;19
complaints: 11;6
compliance: 2;2
concerned: 9;3
consider: 9;18, 11;5

Exhibit 4: 6;20
EXHIBIT: 16;1
EXHIBITS: 3;7

<F>
familiar: 13;23
far: 12;5
Federal: 4;12
felt: 10;11
filing: 2;15
firm: 4;11
first: 5;14, 6;14
flagpole: 12;1
flirted: 7;19
flirting: 6;16, 6;18, 9;10, 15;12
Florida: 8;11, 8;20, 15;5, 15;17
following: 5;11
follows: 5;15
force: 2;1
foregoing: 5;5, 16;8, 16;11
form: 2;8
Foster: 10;6, 14;7
frame: 8;16
front: 9;22, 10;3, 12;2
full: 2;2

<G>
general: 9;21
Gilham: 1;19, 5;7
given: 16;13
gotten: 14;20
grounds: 2;10

<H>
Handley: 1;18, 5;7
Happy: 8;23, 9;11
harassed: 14;10
harassment: 14;2
heard: 6;14, 14;14, 14;21
hearing: 6;9

hereby: 16;7

<I>
importance: 11;8, 13;10
inappropriate: 6;11, 10;12, 14;16, 14;17
incidents: 10;14
INDEX: 3;7
information: 6;3, 9;16
instances: 11;3
interested: 16;17

<J>
JEFFERSON: 16;5
Jr: 4;10
June 2007,: 1;20

<K>
kept: 10;5
kin: 16;16

<L>
L.L.P.: 4;12
Large: 5;3
laws: 2;3
lawsuit: 5;20
leading: 2;8
less: 9;15
library: 10;6, 14;5
located: 14;4
long: 6;6, 6;6
Look: 7;4, 10;17
looked: 10;8
looks: 7;17
lot: 11;12, 11;21, 12;12

<M>
manual: 10;4
Marcum: 4;16, 6;23, 7;9
Marcum's: 6;21
marked: 5;21, 6;20

parties: 1;14, 2;9, 16;16
person: 14;14
Place: 4;12, 12;15
PLAINTIFF: 1;6, 4;9
Plaintiff's 5;22
policy: 10;4, 14;1, 14;4
PORTER: 3;4, 4;7, 5;17, 5;19, 15;19
possibly: 9;20
post: 10;22
prepared: 6;1
present: 4;15, 7;3, 15;8
previous: 8;3
PRICE: 1;5, 4;15, 5;19, 6;10, 8;13, 10;10, 14;15, 14;21
prior: 2;12, 7;19
Procedure: 5;5, 14;9
proceedings: 5;11
provided: 5;4
Public: 1;18, 5;2
Pudles: 1;17, 4;3, 5;1
PX-1: 3;8

<Q>
questions: 2;8, 2;9, 16;9

<R>
read: 7;5
reading: 1;22
really: 8;15, 9;1, 9;7, 15;13
recall: 6;9, 6;16, 7;14, 8;15, 8;18, 10;16, 11;23, 12;6
receptionist: 10;2
record: 11;14
reduced: 16;10
refer: 10;23
reflect: 7;11
related: 13;19
relating: 2;3
remember: 6;13, 6;22, 7;8, 10;13, 10;19, 13;1, 14;23, 15;6, 15;9, 15;10
report: 14;13
reporter: 5;2

mean: 9;3, 9;16
meeting: 6;22, 7;8, 7;12, 7;23
mentioning: 11;9
MIDDLE: 1;2, 1;18, 5;7
month: 6;17
Morris: 4;7
Ms: 5;18, 5;19, 6;10, 8;13, 10;10, 14;15, 14;21, 15;20, 15;21

<N>
name: 7;4
necessary: 2;6
neither: 16;15
Nineteen: 6;8
nor: 16;16
North: 4;13
Notary: 1;18, 5;2
notes: 7;11, 7;15, 7;18, 10;17, 12;23, 14;20
notice: 2;15

<O>
objections: 2;7, 2;10
occasion: 10;23, 12;18, 16;14
occasions: 15;1
October: 7;23, 8;13
offensive: 10;12
offered: 2;12
office: 10;1, 10;21, 11;2, 13;12
Okay: 7;17, 7;22, 8;7, 8;17, 9;23, 10;10, 10;15, 10;17, 11;5, 11;20, 11;22, 12;14, 12;17, 14;6, 14;12, 15;8, 15;10, 15;19
One: 4;12, 6;15, 12;17
one-year: 8;16
ones: 10;14
oral: 5;10
overly: 9;3, 9;4

<P>
PAGE: 3;3, 7;4
park: 11;16, 12;14
parked: 11;11, 11;18, 11;22, 12;7
parking: 11;12, 11;21, 11;23, 12;12

reporting: 14;9
represent: 5;19
represents: 16;12
respective: 1;15
response: 15;11
result: 16;18
resume: 5;23
Road: 1;19, 5;8
ROANOKE: 1;8, 1;19, 5;8
Rose: 4;11
Rule: 5;4
Rules: 2;3, 5;4

<S>
SAITH: 15;23
saw: 12;18, 12;21, 13;4, 13;4
saying: 7;14
says: 8;9, 13;1
Schaffer: 1;17, 4;3, 5;1
School: 1;18, 5;7, 7;22, 8;5, 8;6, 14;1
secretary: 9;23, 10;2
section: 10;18
seeing: 10;19, 13;1
seem: 8;22, 9;2, 9;10, 9;13
seemed: 13;13
separate: 15;1
sexual: 14;1
sexually: 14;16, 14;17
shall: 2;6
sharing: 9;15
SHERRY: 1;16, 5;9, 5;13
show: 5;21, 6;19
side: 11;16, 12;8, 12;10
signature: 1;22
sir: 6;2, 6;5, 7;16, 8;8, 9;12, 10;9, 12;16, 12;20, 13;6, 13;8, 13;14, 13;17, 13;22, 14;3, 14;18, 15;2, 15;13, 15;15, 15;18
somebody: 7;3
Sometime: 8;7, 8;12
somewhere: 11;22
sorts: 5;23

STATE: 5;2, 16;4
statement: 15;11
STATES: 1;1
stenotype: 16;9
STIPULATED: 1;13, 1;21, 2;5, 2;14
stipulation: 5;6
street: 11;19, 12;13
strike: 9;5
Suite: 4;8
supervision: 16;11
supervisor: 14;11
SWEENEY: 4;10, 15;21
sworn: 5;14

<T>
testified: 5;15
testimony: 16;13
thereto: 2;13, 16;10
third: 10;18
top: 7;5
toward: 11;18, 12;1, 12;11, 12;12
transcript: 16;12
trial: 2;11
troubled: 9;13
truck: 12;21, 12;22, 13;5
true: 16;12
two: 10;13, 14;19, 14;20, 14;22

<U>
understanding: 14;8
UNITED: 1;1

<W>
Wait: 11;14
waived: 1;23, 2;16
walk: 12;18, 12;20
walked: 11;9
wanted: 8;11
whereupon: 5;10
whether: 13;15

White: 4;11
witness: 1;23, 5;9, 16;13
work: 13;19
work-related: 13;16
worked: 6;6
writing: 16;10

<Y>
YARBROUGH: 1;16, 5;9, 5;13, 5;18, 15;20, 15;22
year: 7;20, 7;22, 8;3, 8;4, 8;5, 8;6, 8;7, 8;10
years: 6;8

EXHIBIT 4

1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE MIDDLE DISTRICT OF ALABAMA,
 3                EASTERN DIVISION
 4
 5   ANGELA PRICE,        )
 6        PLAINTIFF,      )
 7   V                    )    CIVIL ACTION NO.
 8   ROANOKE CITY BOARD OF )   3:06-CV-742-VPM
 9   EDUCATION,           )
10        DEFENDANT.      )
11
12        S T I P U L A T I O N
13        IT IS STIPULATED AND AGREED, by
14   and between the parties, through their
15   respective counsel, that the deposition of
16   GREG FOSTER, may be taken before Deborah
17   Pudles Schaffer, Commissioner and Notary
18   Public, at Handley Middle School, 251 Gilham
19   Road, Roanoke, Alabama, on the 22nd day of
20   June, 2007, commencing at 10:45 a.m.
21        IT IS FURTHER STIPULATED AND AGREED
22   that the signature to and reading of the
23   deposition by the witness is waived, the
```

3

```
 1
 2              I N D E X
 3   EXAMINATION BY          PAGE NO.
 4   Mr. Porter              5 - 12
 5
 6
 7          INDEX OF EXHIBITS
 8   PX-1                   6
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

2

```
 1   deposition to have the same force and effect
 2   as if full compliance had been had with all
 3   laws and rules of Court relating to the
 4   taking of depositions.
 5        IT IS FURTHER STIPULATED AND AGREED
 6   that it shall not be necessary for any
 7   objections to be made by counsel to any
 8   questions, except as to form or leading
 9   questions, and that counsel for the parties
10   may make objections and assign grounds at
11   the time of trial or at the time said
12   deposition is offered in evidence, or prior
13   thereto.
14        IT IS FURTHER STIPULATED AND AGREED
15   that notice of filing of the deposition by
16   the Commissioner is waived.
17
18
19
20
21
22
23
```

4

```
 1
 2   BEFORE:
 3        Deborah Pudles Schaffer,
 4   Commissioner.
 5
 6   APPEARANCES:
 7        Adam M. Porter, Esquire, 2301 Morris
 8   Avenue, Suite 102, Birmingham, Alabama,
 9   35203, appearing on behalf of the Plaintiff.
10        Donald B. Sweeney, Jr., Esquire, of
11   the firm Bradley, Arant, Rose & White,
12   L.L.P., One Federal Place, 1819 5th Avenue
13   North, Birmingham, Alabama, 35203, appearing
14   on behalf of the Defendant.
15        Also present:  Angela Price
16                       Chuck Marcum
17
18
19
20
21
22
23
```

5

```
 1          I, Deborah Pudles Schaffer, a court
 2    reporter acting as Notary Public, State of
 3    Alabama at Large, certify that on this date,
 4    as provided by Rule 30 of the Alabama Rules
 5    of Civil Procedure, and the foregoing
 6    stipulation of counsel, there came before
 7    me at Handley Middle School, 251 Gilham
 8    Road, Roanoke, Alabama, beginning at 10:45
 9    a.m., GREG FOSTER, witness in the above
10    cause, for oral examination, whereupon the
11    following proceedings were had:
12
13                 GREG FOSTER,
14    being first duly sworn, was examined and
15    testified as follows:
16
17    EXAMINATION BY MR. PORTER:
18    Q      Good morning, Mr. Foster.  My name
19    is Adam Porter.  I represent Ms. Price in
20    her lawsuit against the board.
21          Can I see that paper there --
22    A      (Witness complies.)
23    Q      -- and I will mark it.  Let me show
```

6

```
 1    you what I'm marking as Exhibit 1 to your
 2    deposition.  Is this a brief resume you
 3    drafted for us?
 4    A      Yes.
 5    Q      Okay.  Is all the information there
 6    accurate?
 7    A      Yes.
 8    Q      Are you aware of the claims that Ms.
 9    Price makes in her lawsuit against the
10    board?
11    A      Yes.
12    Q      What is your understanding of those
13    claims?
14    A      That Ms. Price stated that Mr.
15    Jerrell Cottle had sexually harassed her and
16    we as a system did nothing about it.
17    Q      When did you first hear anything
18    about that claim?
19    A      The superintendent got in touch with
20    me and told me that, that he had received a
21    complaint from the EEOC that, about this
22    situation.
23    Q      Okay.  So you never heard anything
```

7

```
 1    about it before then?
 2    A      No, sir.
 3    Q      Ms. Price never said anything to you
 4    about Mr. Cottle?
 5    A      No.
 6    Q      Okay.  You never observed anything
 7    that suggested to you that any inappropriate
 8    behavior was going on?
 9    A      No.
10    Q      Did Mr. Marcum ever discuss Ms. Price
11    having an audiotape with you?
12    A      Yes, we, we talked about that.
13    Q      What did he tell you about that?
14    A      He just stated that Ms. Price had a
15    tape with some recordings on it of Mr.
16    Cottle.
17    Q      Did he say anything about giving the
18    tape to Mr. Cottle's wife?
19    A      No.  Not to me, no.
20    Q      Did he say anything about Ms. Price
21    not having followed the board's sexual
22    harassment policy in reporting the
23    harassment?
```

8

```
 1    A      Will you kind of repeat that.
 2    Q      Okay.  Let me ask you this.  Are you
 3    familiar with the board's sexual harassment
 4    policy?
 5    A      Yes.
 6    Q      Who would she have reported the
 7    sexual harassment to under that policy?
 8    A      Here I have an open door policy.  Any
 9    time any employee has a problem, they feel
10    free to come and talk with me about that
11    problem or they can talk with Ms. Benefield.
12    We have our Title IX coordinator that it can
13    be reported to as well, so any time there is
14    a problem or can come to Mr. Marcum himself.
15    Q      Do you know who the sexual harassment
16    policy designates -- well, strike that.  Do
17    you know if the sexual harassment policy
18    designates a particular person that you're
19    supposed to go to?
20    A      Title IX.
21    Q      Okay.
22    A      Yes.
23    Q      Okay.
```

9

1  A      But once again as I stated, I have an
2  open door policy --
3  Q      I understand.
4  A      -- any time an employee has a
5  problem, by me being building supervisor,
6  they can feel free to come and speak with
7  me.
8  Q      I understand that at the beginning of
9  the year you have meetings with all
10  employees of the school?
11  A      Yes.
12  Q      And does that include like kitchen
13  staff, custodians, crossing guards?
14  A      They do, some of them do attend,
15  some of them do attend when we have our very
16  first meeting.
17  Q      Some of, when you say some of them,
18  who are you referring to?
19  A      The custodians and the lunchroom
20  workers, any employee that's under this
21  building they do attend.
22  Q      Is that typically held on the first
23  day of school or before the first day of

10

1  school?
2  A      Well, it varies.
3  Q      Okay.
4  A      It varies from time to time, it
5  depends on what we have scheduled for that
6  year.
7  Q      Do you know if the crossing guards
8  attend that?
9  A      They're welcome to attend.
10  Q      Okay.  Is that when you tell the
11  employees as a group about how to report
12  problems with harassment?
13  A      Yes, we do talk about that and state
14  that they can.  It's in the student
15  handbooks about, still about open door
16  policies and so forth.  If there is any
17  problems that they can come and talk with
18  me, but that is the only time when we do
19  tell them along with faculty meetings
20  throughout the year, grade level meetings
21  and things of that nature.
22  Q      Do you remember in, in around '05
23  when there was some revisions being made to

11

1  the board's policies?
2  A      Yes.
3  Q      Did, I assume before these revisions
4  were made you had a copy of the board manual
5  in your office; is that right?
6  A      Yes.
7  Q      Did that manual ever leave your
8  office during the time the revisions were
9  being made?
10  A      I usually keep two to three copies of
11  board policy manuals in my office, so
12  therefore if one of them had left, I still
13  would have had another one, if one of them
14  was being used for a revision, so I usually
15  keep two board policies.
16  Q      The whole manual?
17  A      Yes, the entire manual, yes, sir.
18  Q      But there was not a time where they
19  were removed from your office for the
20  purposes of doing the revisions?
21  A      No, all three of them would have
22  never or two of them or however many I had
23  would never, all of them never would have

12

1  been removed.
2  Q      Okay.  In this orientation meeting as
3  I call the first day, the orientation for
4  returning employees, but what do you tell or
5  do you tell the employees anything about
6  reporting problems of harassment?
7  A      What I state to them that if they
8  have any problems that I have an open door
9  policy, that they can come and talk with me,
10  I let them know where the board's manual
11  policies are located and that's what I tell
12  them.
13        MR. PORTER:  Okay.  That's all I
14  have.  Thank you.
15        MR. SWEENEY:  Thank you, Mr.
16  Foster.
17
18        FURTHER THE DEPONENT SAITH NOT.
19        (EXHIBIT ATTACHED AND ENCLOSED.)
20
21
22
23

13

```
 1              C E R T I F I C A T E
 2
 3     STATE OF ALABAMA )
 4     JEFFERSON COUNTY )
 5
 6          I hereby certify that the above and
 7     foregoing deposition was taken down by me in
 8     stenotype and the questions and answers
 9     thereto were reduced to writing under my
10     supervision, and that the foregoing
11     represents a true and correct transcript of
12     the testimony given by said witness on said
13     occasion.
14          I further certify that I am neither
15     of counsel nor of kin to the parties to the
16     action, not am I in anywise interested in
17     the result of said cause.
18
19          _____
20               COMMISSIONER
21
22
23
```

<'>
'05: 10;22

<1>
10:45 a.m.: 1;20, 5;8
102: 4;8
12: 3;4
1819: 4;12

<2>
22nd: 1;19
2301: 4;7
251: 1;18, 5;7

<3>
3:06-CV-742-VPM: 1;8
30: 5;4
35203: 4;9, 4;13

<5>
5: 3;4
5th: 4;12

<6>
6: 3;8

<A>
above: 5;9, 13;6
accurate: 6;6
acting: 5;2
ACTION: 1;7, 13;16
Adam: 4;7, 5;19
AGREED: 1;13, 1;21, 2;5, 2;14
ALABAMA: 1;2, 1;19, 4;8, 4;13, 5;3, 5;4, 5;8, 13;3
ANGELA: 1;5, 4;15
answers: 13;8
anywise: 13;16
APPEARANCES: 4;6
appearing: 4;9, 4;13

Cottle: 6;15, 7;4, 7;16
Cottle's: 7;18
counsel: 1;15, 2;7, 2;9, 5;6, 13;15
COUNTY: 13;4
COURT: 1;1, 2;3, 5;1
crossing: 9;13, 10;7
custodians: 9;13, 9;19

<D>
date: 5;3
day: 1;19, 9;23, 9;23, 12;3
Deborah: 1;16, 4;3, 5;1
DEFENDANT: 1;10, 4;14
depends: 10;5
DEPONENT: 12;18
deposition: 1;15, 1;23, 2;1, 2;12, 2;15, 6;2, 13;7
depositions: 2;4
designates: 8;16, 8;18
discuss: 7;10
DISTRICT: 1;1, 1;2
DIVISION: 1;3
doing: 11;20
Donald: 4;10
door: 8;8, 9;2, 10;15, 12;8
down: 13;7
drafted: 6;3
duly: 5;14
during: 11;8

<E>
EASTERN: 1;3
EDUCATION: 1;9
EEOC: 6;21
effect: 2;1
employee: 8;9, 9;4, 9;20
employees: 9;10, 10;11, 12;4, 12;5
ENCLOSED: 12;19
entire: 11;17
Esquire: 4;7, 4;10
evidence: 2;12

Arant: 4;11
around: 10;22
assign: 2;10
assume: 11;3
ATTACHED: 12;19
attend: 9;14, 9;15, 9;21, 10;8, 10;9
audiotape: 7;11
Avenue: 4;8, 4;12
aware: 6;8

<B>
beginning: 5;8, 9;8
behalf: 4;9, 4;14
behavior: 7;8
Benefield: 8;11
Birmingham: 4;8, 4;13
BOARD: 1;8, 5;20, 6;10, 11;4, 11;11, 11;15
board's: 7;21, 8;3, 11;1, 12;10
Bradley: 4;11
brief: 6;2
building: 9;5, 9;21

<C>
call: 12;3
cause: 5;10, 13;17
certify: 5;3, 13;6, 13;14
Chuck: 4;16
CITY: 1;8
CIVIL: 1;7, 5;5
claim: 6;18
claims: 6;8, 6;13
commencing: 1;20
COMMISSIONER: 1;17, 2;16, 4;4, 13;20
complaint: 6;21
compliance: 2;2
complies: 5;22
coordinator: 8;12
copies: 11;10
copy: 11;4
correct: 13;11

EXAMINATION: 3;3, 5;10, 5;17
examined: 5;14
except: 2;8
Exhibit 1: 6;1
EXHIBIT: 12;19
EXHIBITS: 3;7

<F>
faculty: 10;19
familiar: 8;3
Federal: 4;12
feel: 8;9, 9;6
filing: 2;15
firm: 4;11
first: 5;14, 6;17, 9;16, 9;22, 9;23, 12;3
followed: 7;21
following: 5;11
follows: 5;15
force: 2;1
foregoing: 5;5, 13;7, 13;10
form: 2;8
forth: 10;16
FOSTER: 1;16, 5;9, 5;13, 5;18, 12;16
free: 8;10, 9;6
full: 2;2

<G>
Gilham: 1;18, 5;7
given: 13;12
giving: 7;17
grade: 10;20
GREG: 1;16, 5;9, 5;13
grounds: 2;10
group: 10;11
guards: 9;13, 10;7

<H>
handbooks: 10;15
Handley: 1;18, 5;7
harassed: 6;15

harassment: 7;22, 7;23, 8;3, 8;7, 8;15, 8;17, 10;12, 12;6
hear: 6;17
heard: 6;23
held: 9;22
hereby: 13;6

<I>
inappropriate: 7;7
include: 9;12
INDEX: 3;7
information: 6;5
interested: 13;16
IX: 8;12, 8;20

<J>
JEFFERSON: 13;4
Jerrell: 6;15
Jr: 4;10
June 2007,: 1;20

<K>
keep: 11;10, 11;15
kin: 13;15
kind: 8;1
kitchen: 9;12

<L>
L.L.P.: 4;12
Large: 5;3
laws: 2;3
lawsuit: 5;20, 6;9
leading: 2;8
leave: 11;7
left: 11;12
level: 10;20
located: 12;11
lunchroom: 9;19

<M>
manual: 11;4, 11;7, 11;16, 11;17, 12;10

manuals: 11;11
Marcum: 4;16, 7;10, 8;14
mark: 5;23
marking: 6;1
meeting: 9;16, 12;2
meetings: 9;9, 10;19, 10;20
MIDDLE: 1;2, 1;18, 5;7
morning: 5;18
Morris: 4;7
Ms: 5;19, 6;8, 6;14, 7;3, 7;10, 7;14, 7;20, 8;11

<N>
name: 5;18
nature: 10;21
necessary: 2;6
neither: 13;14
nor: 13;15
North: 4;13
Notary: 1;17, 5;2
nothing: 6;16
notice: 2;15

<O>
objections: 2;7, 2;10
observed: 7;6
occasion: 13;13
offered: 2;12
office: 11;5, 11;8, 11;11, 11;19
Okay: 6;5, 6;23, 7;6, 8;2, 8;21, 8;23, 10;3, 10;10, 12;2, 12;13
once: 9;1
One: 4;12, 11;12, 11;13, 11;13
open: 8;8, 9;2, 10;15, 12;8
oral: 5;10
orientation: 12;2, 12;3

<P>
PAGE: 3;3
paper: 5;21
particular: 8;18
parties: 1;14, 2;9, 13;15

person: 8;18
Place: 4;12
PLAINTIFF: 1;6, 4;9
policies: 10;16, 11;1, 11;15, 12;11
policy: 7;22, 8;4, 8;7, 8;8, 8;16, 8;17, 9;2, 11;11, 12;9
PORTER: 3;4, 4;7, 5;17, 5;19, 12;13
present: 4;15
PRICE: 1;5, 4;15, 5;19, 6;9, 6;14, 7;3, 7;10, 7;14, 7;20
prior: 2;12
problem: 8;9, 8;11, 8;14, 9;5
problems: 10;12, 10;17, 12;6, 12;8
Procedure: 5;5
proceedings: 5;11
provided: 5;4
Public: 1;18, 5;2
Pudles: 1;17, 4;3, 5;1
purposes: 11;20
PX-1: 3;8

<Q>
questions: 2;8, 2;9, 13;8

<R>
reading: 1;22
received: 6;20
recordings: 7;15
reduced: 13;9
referring: 9;18
relating: 2;3
remember: 10;22
removed: 11;19, 12;1
repeat: 8;1
report: 10;11
reported: 8;6, 8;13
reporter: 5;2
reporting: 7;22, 12;6
represent: 1;15
represents: 13;11
respective: 1;15
result: 13;17

resume: 6;2
returning: 12;4
revision: 11;14
revisions: 10;23, 11;3, 11;8, 11;20
Road: 1;19, 5;8
ROANOKE: 1;8, 1;19, 5;8
Rose: 4;11
Rule: 5;4
Rules: 2;3, 5;4

<S>
SAITH: 12;18
Schaffer: 1;17, 4;3, 5;1
scheduled: 10;5
School: 1;18, 5;7, 9;10, 9;23, 10;1
sexual: 7;21, 8;3, 8;7, 8;15, 8;17
sexually: 6;15
shall: 2;6
show: 5;23
signature: 1;22
sir: 7;2, 11;17
situation: 6;22
staff: 9;13
STATE: 5;2, 10;13, 12;7, 13;3
stated: 6;14, 7;14, 9;1
STATES: 1;1
stenotype: 13;8
STIPULATED: 1;13, 1;21, 2;5, 2;14
stipulation: 5;6
strike: 8;16
student: 10;14
suggested: 7;7
Suite: 4;8
superintendent: 6;19
supervision: 13;10
supervisor: 9;5
supposed: 8;19
SWEENEY: 4;10, 12;15
sworn: 5;14
system: 6;16

PRICE V ROANOKE CITY BO. OF ED.          GREG FOSTER

&lt;T&gt;
talked: 7;12
tape: 7;15, 7;18
testified: 5;15
testimony: 13;12
thereto: 2;13, 13;9
three: 11;10, 11;21
throughout: 10;20
Title: 8;12, 8;20
touch: 6;19
transcript: 13;11
trial: 2;11
true: 13;11
two: 11;10, 11;15, 11;22
typically: 9;22

&lt;U&gt;
understand: 9;3, 9;8
understanding: 6;12
UNITED: 1;1

&lt;V&gt;
varies: 10;2, 10;4

&lt;W&gt;
waived: 1;23, 2;16
welcome: 10;9
whereupon: 5;10
White: 4;11
whole: 11;16
wife: 7;18
Will: 5;23, 8;1
Witness: 1;23, 5;9, 5;22, 13;12
workers: 9;20
writing: 13;9

&lt;Y&gt;
year: 9;9, 10;6, 10;20