IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| ANGELA PRICE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No. |
| vs. | ) |
| | ) 3:06-cv-742-MEF |
| ROANOKE CITY BOARD OF EDUCATION, | ) |
| | |
| Defendant. | |

_____

**PLAINTIFF'S EVIDENCE SUBMITTED IN OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff submits the following evidence in opposition to defendant's motion for summary judgment:

1. Declaration of Angela Price

Plaintiff also relies on the depositions and exhibits previously filed by defendant.

                Respectfully submitted,
                s/ Adam M. Porter
                Adam M. Porter
                Attorney for Plaintiff
                2301 Morris Avenue, Suite 102
                Birmingham, Alabama 35203
                (205) 322-8999

**CERTIFICATE OF SERVICE**

I hereby certify that on August 22, 2007 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, who will electronically provide a copy of the foregoing to Donald B. Sweeney, Jr., Esq Bradley Arant Rose & White LLP One Federal Place 1819 Fifth Avenue North Birmingham, AL 35203-2104 and that there are no non-CM/ECF participants in this case to whom hard copies should be mailed.

                /s Adam M. Porter
                Counsel for Plaintiff

DECLARATION OF ANGELA PRICE

My name is Angela Price, I am over the age of twenty-one, and the following facts are personally known to me.

1. Beginning with the start of the school year of 2003-2004, I was subjected to what I considered sexual harassment by co-worker Jerrell Cottle, as described below. He had made sexual comments to me in the 2002-2003 school year, but they were only made once a week or so during that time. In the fall semester of 2003, his comments became more frequent and personal, and I began to feel uncomfortable and concerned about them. His comments occurred all through the 2003-2004 school year, the 2004-2005 school year, and into the fall semester of 2005 until October, approximately one month after I filed an EEOC charge. During the 2003-2004 and 2004-2005 school years, Mr. Cottle made remarks to me about my appearance, such as telling me that I was pretty, that I had pretty legs, or ask me to show him my "pretty green eyes." He told me he wished he had met me before my husband. He asked me many times to go places with him- to Florida, to a football game, to Cheaha, to just go riding in the car, or to tell everyone that we had a school board meeting that night and go to LaGrange, Georgia. He would put his hands on my cheeks on cold mornings. Beginning in the fall semester of 2005 (August), he continued to make these comments but also did things that were worse. On one occasion in August of 2005, he told me, "You look good enough to eat this morning." In August or September of 2005, he touched me on the cheek, shoulder and hands and told me he was going to "plant one" there.

2. The frequency of Mr. Cottle's behavior as described above was as follows: in the 2003-2004 school year, he made the comments and actions described above about four times a week. In the 2004-2005 school year, he also made the comments and actions described above about four times a week, but they were more personal: there were still the comments about my appearance, but there was more of the "let's go out" type comments and more directness and insistency in his comments. From August to October of 2005, his comments

and actions got worse and were on a daily basis. They continued to include the previous type comments, but now they included the comments about kissing me and "eat[ing]" me.

3. Mr. Cottle's behavior toward me was very distressing and distracting to me. Throughout the entire time, I told him many times to stop with his comments. When he would touch me, I would push his hands away and tell him to stop. Sometimes he would say, "You don't like me saying that, do you?" I would tell him no, I did not. It got to where I did not want to come to work. Mr. Cottle and I had separate posts we attended during work hours. I had in the past been coming to work about fifteen minutes before my scheduled work time. I would sometimes talk to him before we went to our posts. However, after Mr. Cottle's behavior became a problem, I started coming in just before my scheduled start time to try to avoid any possible conversation with him. This caused me to have to time my arrival every day to get there just at start time and I often had to rush to be at my post on time. In the afternoons, after I was done with work, Mr. Cottle would wave me down to try to talk and I would go inside the school to get away from him and would wait there until he left. Sometimes I would go into the women's room and hide until he left. I did not tell my husband about the situation until the fall of 2005, right before I decided to pursue legal action. It caused me great anguish to keep that from my husband, because I felt I was keeping something from him plus I could not lean on him for support. However, I was afraid that he might do something to Mr. Cottle. Our son attended Handley Middle School. We lived outside the county and he was only allowed to go to school there because I worked there. I considered Handley a better school than the one my son would have attended in our county, and I wanted him to stay there. I did not want to lose my job over what was happening with Mr. Cottle or what my husband might have done had I told him.

4. When I had previously worked as a custodian at the school, I knew who my supervisor was: the maintenance supervisor. However, when I was crossing guard, I was never told who my supervisor was. I was never given any document that showed me who my supervisor was. I considered the school secretary, Rosemarie Marshall, to be the person

to report things to. I did not think she was my supervisor in the sense that she could discipline or terminate me, but I did consider her to be the person that I was to report things to. When I was sick or had some other attendance problem, I would report it to Ms. Marshall. I reported all other problems to her. Once, there was a problem with parents dropping children off in the teachers' parking lot. I reported this to her. To address this, a chain was then installed across the teachers' parking lot. It had to be put up by the custodian in the morning after the teachers arrived. I later reported to Ms. Marshall occasions where the chain was not put up. Also, whenever I had a problem with my work hours not being accurately stated on my paycheck, which happened every once in a while, I reported that to Ms. Marshall. The only time I would report anything to anyone beside Ms. Marshall was when I could not reach her, and that only involved attendance. When I could not reach Ms. Marshall, I would report absences to Ms. Benefield, but only regarding attendance. Neither Ms. Marshall nor anyone else told me I was not supposed to be reporting these things to her. When I made complaints to her about Mr. Cottle, I was not just "venting." I meant the reports as a complaint to someone I thought would cause them to be acted on, and I thought I was also reporting the problem to the right person. She never told me to report the problem to anyone else.

5. I first reported Cottle's comments to Ms. Marshall in the fall of 2003. I assumed that when I told Ms. Marshall that she would have acted on the complaint to see that something was done about it, like she had when I had problems with my pay check. I continued to tell Ms. Marshall about my problems with Mr. Cottle through that school year, the 2004-2005 school year, and into the fall semester of 2005.

6. I was never given a copy of any sexual harassment policy. I never saw one posted anywhere, and I was never informed that there was one available anywhere to me. I have learned since I filed this lawsuit from reading the defendant's documents that I was supposed to have reported sexual harassment to the board's Title IX coordinator. I never knew this. I had never even heard of this position until after I filed this lawsuit. Until I received

documents in this lawsuit, I never knew how I was supposed to have reported sexual harassment.

7. After Cottle's comments had gotten so bad in August of 2005, I decided I could not rely on what I thought was my chain of commend by reporting problems to Ms. Marshall. I did not know how to report sexual harassment but wanted to report it to the right person. I went to the school library where I worked and asked the librarian for a copy of the school board policy. The librarian told me that the school's copy of the policy was packed up, and she told me to contact the high school. I called the high school and was told that its copy of the policy could not be located because the school had been undergoing renovations and its copy was also packed up. I then called the board central office and spoke to Ms. Martin there. She told me that its copy of the policy was torn apart due to the fact that it was being revised. She told me that there was no way for me to get it because it had to be put back together. She did not tell me anything about my school having a copy or to go to back to my school for a copy, and she did not tell me to come back if I had any problem in finding the policies. No one ever told me I could get a copy at the principal's office of my school.

8. Since I was a crossing guard, I never attended the beginning of the year meetings that Principal Foster and Superintendent Marcum refer to in their testimony. Crossing guards were not required to attend these meetings, and I did not attend them.

9. When I filed my EEOC charge, I asserted that assistant principal Benefield had heard me complain about Cottle's sexual harassment. I based this on the following: Ms. Benefield was six to eight feet from me when I made a complaint in the office in the spring of 2005 about Mr. Cottle's sexual comments, and I did not speak softly. I thought, and still think, that she had to have heard me. I made the statement in my charge to that effect on that observation. Consequently, my statement in my charge at that time that she did hear me is not false. When I saw documents produced later where she had denied hearing what I said, I had no absolute proof that she did hear me. So, I testified in my deposition that I could not

say for sure that she had heard me. But, as I said, she was six to eight feet from me when I said it, and I did not speak softly.

I declare under penalty of perjury that the foregoing is true and correct.

Executed: August 27, 2007

*Angela Price*
Angela Price