IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| ANGELA PRICE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. |
| vs. | ) | |
| | ) | 3:06-cv-742-MEF |
| ROANOKE CITY BOARD OF EDUCATION, | ) | |
| | | |
| Defendant. | | |

---

## PLAINTIFF'S BRIEF IN OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Herein, plaintiff Angela Price ("Price") will first provide an overview of the claims in the case and the grounds for the motion for summary judgment filed by defendant Roanoke Board of Education ("Roanoke"), follow with a statement of facts, and conclude with legal argument.

## INTRODUCTION

Price claims that Roanoke violated her rights under Title VII to the Civil Rights Act of 1964 and 42 U.S.C. §1983 (Equal Protection) by subjecting her to sexual harassment from co-worker Jerrell Cottle.

In its motion for summary judgment, Roanoke raises two arguments: (1) Price cannot establish that Cottle's alleged conduct was severe or pervasive, and (2) Price failed to report the alleged conduct pursuant to its set policy.

## STATEMENT OF FACTS

Price will first respond to Roanoke's statement of facts, followed by Price's statement of additional facts.

## I. RESPONSE TO ROANOKE'S STATEMENT OF FACTS

Responses are broken down into the numbered paragraphs set forth by Roanoke. Admitted facts are admitted for summary judgment only.

1. Admitted.

2. Disputed. Roanoke fails to identify who Price's supervisor was supposed to have been. Price was never told who her supervisor was when she worked as a crossing guard. (Price Depo. 15: 1-9; Price Aff. ¶4, at Ex. 1 to Plaintiff's Evidence) She considered the school secretary, Rosemarie Marshall, perhaps not as her supervisor in the sense that she could discipline or terminate her, but as the person that she was to report things to. (Price Depo. 30:3-9; Price Aff. ¶4, 5) Price reported all problems and issues she had on the job to Marshall. (Price. Depo.15: 1-9); Price Aff. ¶4, 5) Price reported Cottle's sexual comments to Marshall numerous times, beginning in the fall of 2003. (Price Depo. 30:3-22, 96:21-97:1; Price Aff. ¶4, 5) Marshall did not tell Price to report the problem to the principal or assistant principal. (Price Depo. 30:23-31: 2)

3. Admitted in part, disputed in part. At the time she filed her EEOC charge, Price felt that assistant principal Benefield had to have heard her complaint because Benefield was only six to eight feet from her when she voiced it. (Price Aff. ¶9) After reviewing the EEOC file, Price learned that Benefield denied having heard the remark. *Id.* Price had no proof, other than Benefield's proximity, that she heard the remark and could not therefore say without doubt that she had heard it. So, it is admitted that Price cannot now prove without doubt that Benefield heard the comment but it is disputed that Price falsely stated she had in her EEOC charge.

4. Admitted in part, disputed in part. It is admitted that Price knew how to report harassment when she worked as a custodian, which is the time frame the cited passage refers to. (Price Aff. ¶4)

2

It is disputed that she knew how to report sexual harassment when she worked as a crossing guard other than to Ms. Marshall, as set forth above. (See citations there)[1]

5. Admitted not irrelevant: the policy in effect at that time was different from the revised one that was in effect during the relevant events. (Marcum Depo. 76:22, 77:14, 94: 11-16; Ex. 7 to Marcum Depo. (last 2 pages)) The former policy provided that sexual harassment be reported to the supervisor, whereas the later policy provided that it be reported to Roanoke's Title IX coordinator. (old policy- Ex. 7 to Marcum Depo. (last 2 pages); new policy- Ex. 7 to Marcum Depo. (first 2 pages))

6. Admitted but irrelevant.

7. Admitted.

8. Admitted.

9. Disputed. As stated above, Price's understanding was that she was to report problems to Marshall, which she did. (See citations above) Price first reported Cottle's sexual harassment to Marshall in 2003 and he did not stop after that. (See citations above; Price Aff. ¶¶1, 2)

10. Price admits that this is an accurate excerpt of Price's deposition testimony, but is not entirely clear as to exactly what Roanoke is advancing it for. It appears that the inference sought to be made is that the harassment stopped when it came to the attention of the superintendent, principal, and assistant principal (after Price filed an EEOC charge), and that these were the persons to whom she should have made the report in the first place. This is disputed. As stated above, Price may not have directly asked Marshall to do something, but she understood that Marshall was the one to whom

---

[1]The asserted fact regards reporting sexual harassment to one's "supervisor." As will be addressed below, Roanoke's sexual harassment policy provides that such harassment is to be reported to Roanoke's Title IX coordinator rather than the supervisor.

she should make such reports, and she expected Marshall to act on them.  (Price Depo. 30:3-9; Price

Aff.  ¶¶4, 5)

11. Admitted.

12. Admitted.

13. Admitted that this was Marshall's perception.

14. Admitted.

15. Admitted that this is an accurate statement of the deposition excerpt.

16. Admitted, but Marshall's professed opinion is irrelevant.

17.  It is disputed that Price always was smiling when she would report Cottle's comments

to Marshall or others. Price told Marshall in August of 2005 that Cottle's comments were "getting

worse" and that she did not know how much more of it that she could take. (Price Depo. 97: 21-98:

2)  Marilyn Pollard testified that Price seemed "aggravated" and "upset" by her report of Cottle's

comments.  (Pollard Depo. 7:3-8: 10, 9:14)

18. Admitted.

19.  Admitted but irrelevant.

20. Admitted.

21. Admitted.

22. Admitted but irrelevant.  Price would point out that Cottle only started using a walker in

June of 2007.  He used a walking cane before that, beginning in January 2006.  (Cottle Depo. 25:3-

14)

23.  It is admitted that that is what the policy provides for.

4

24. It is admitted that the policy is in the manual, but it is undisputed that the policy is in the student handbook.   The policy applicable to students is different from the one applicable to employees.  (Marcum Depo. 77:6-8; Ex. 7 to Marcum Depo)

25. It is disputed to the extent that it is implied that Price, as a crossing guard, attended any such meetings. (Price Depo. 24: 17-25: 1;  Price Aff. ¶8; *cf.* Foster Depo. 9:11-10:9 (Crossing guards are "welcome" to attend the meetings))  Crossing guards did not attend such meetings.  It is further disputed that reporting sexual harassment to one's supervisor is consistent with Roanoke's sexual harassment policy.  As stated above, that policy provides that such harassment is to be reported to the Title IX coordinator.   Consequently, reporting harassment to one's supervisor would be contradictory to this policy.  (Marcum Depo. 84:14-85: 3, 89:15-90:16)

26. Admitted.

27. Admitted.

28. Admitted.

29. Admitted.

30. Admitted.

31.  Admitted with caveat that these recorded events are not the only instances of sexual harassment as reflected herein.

32. Admitted.

33. Admitted.

34. Admitted.

35.  Admitted.

36. Disputed.  Price testified that there were other instances of harassment that were "just general comments of that nature."  (Price Depo. 109:11-12) She further stated that Cottle made "constant" comments in the 2003-2004 school year about wanting Price to go to Florida with him, that she looked good, asking her to let him see her "pretty green eyes," and "that type of stuff." (Price Depo. 109:3-17)

37. Admitted in part, disputed in part.  First, it is admitted Cottle made all these remarks.  However, the passages cited do not give any reference as to when these comments were made. It is admitted that Cottle made the "looks good enough to eat" comment and told Price that he wanted to kiss her on her cheek, shoulder, and the back of her hand in August and September of 2005. (Price Aff. ¶1)  It is admitted that Cottle made the other remarks set forth in this time period. However, it is disputed that he did not also make these others remarks before this time period.  (Price Depo. 109:3-17; Price Aff. ¶1)

38.  Admitted, with caveat that there were additional instances of sexual harassment that occurred during this time period that are not set forth.  Price would add that Cottle would put his hands on her cheeks.  (Price Aff. ¶1;Price Depo. 114:5-9)

39. Admitted.

40. Admitted.

41. Admitted.

42. Admitted.

43. Admitted.

44. Admitted.

45. Admitted but irrelevant.  As stated above, the policy in effect at that time was different as far as reporting sexual harassment than the policy that was in effect during the relevant events. (See response to 5 above for citations)

46.  Admitted but irrelevant.  See response to 46 above.

47. Admitted but irrelevant.  See response to 46 above.

48. Admitted.

49. Admitted.

50. Admitted.

51. Admitted with caveat that Marcum was formerly the principal at the high school, not Handley Middle School.

52.  Admitted.

53. Admitted.

54. Admitted.

55.  Admitted with caveat that Price expected Marshall to act on her complaints. (See responses to items 2 and 9 above for citations.)

56.  Admitted.

57.  Admitted with caveat that Price knew who her supervisor was when she was custodian, the maintenance supervisor rather than Marshall.  When she was crossing guard, Price was never told who her supervisor was.  Price understood that, while Marshall may not have been her supervisor, she was the person to whom Price was to report problems.  (See responses to items 2 and 9 above for citations.)

58. Disputed to the extent that Price only stated that she felt uncomfortable around Cottle. She told Teresa Hunter and Tina Clarke that she was trying to ignore him in hopes that he would "just stop." (Price Depo. 104:15-21) Further, in the 2004-2005 school year, Hunter observed that Price seemed to be trying to ignore Cottle. (Hunter Depo. 20:5-21:18)

59. Admitted.

60. Disputed. As stated above, Price told Clarke that she was trying to ignore Cottle in hopes that he would "just stop." (Price Depo. 104:15-21)

61. Admitted that Price cannot identify her supervisor because she was never told who her supervisor was. Further admitted that Roanoke has failed to identify Price's supervisor. That said, as stated above, Price felt that Marshall was the person to whom she should report problems. (See responses to 2 and 9 above for citations)

62. Admitted.

63. Admitted.

64. Admitted.

65. Admitted with caveat that Price was never told there was a copy in the principal's office. (Price Aff. ¶8)

66. Admitted with caveat, as stated above, that Price understood that Marshall was the person to whom she should report problems. (See responses to 2 and 9 above for citations)

67. Admitted but irrelevant.

68. Admitted but irrelevant, if not tacky.

69. Disputed. This assertion appears to be limited to the experiences of Marshall only. Further, as stated above, Price told Marshall in August of 2005 that Cottle's comments were "getting

worse" and that she did not know how much more of it that she could take. (Price Depo. 97: 21-98: 2)

70. Admitted.

71. Based on the evidentiary citation, it is assumed that this assertion is limited to Price's asking Foster for the manual. To this extent, it is admitted. As set forth below, it is denied that Price did not try to find a manual from other sources.

72. Admitted with caveat that Price was never told there was a copy in the principal's office. (Price Aff. ¶8)

73. Admitted with caveat that Roanoke's sexual harassment policy does not provide for reporting harassment to the principal; it is to be reported to the Title IX coordinator. (Ex. 7 to Marcum Depo. (first 2 pages) In fact, reporting harassment to one's supervisor would be contradictory to this policy. (Marcum Depo. 84:14-85: 3, 89:15-90:16)

74. Disputed. Foster tells the employees in the start of year meetings that he has an open door policy and that they can come and talk with him, and he tells them where the board's policies are kept at the school. (Foster Depo. 12: 7-12) Price would add that she did not attend such meetings. (Price Depo. 24: 17-25: 1; Price Aff. ¶8; *cf.* Foster Depo. 9:11-10:9 (Crossing guards are "welcome" to attend the meetings))

75. Admitted.

76. Admitted except to his being friendly to and well-liked by Price.

77. Admitted that Cottle is married. Disputed that he is devoted to his wife given his sexual harassment of Price.

78. Admitted except as to the comment Price made six to eight feet from Benefield which she assumed Benefield heard. (Price Aff. ¶8)

79. Admitted except as to the comment Price made six to eight feet from Benefield which she assumed Benefield heard. (Price Aff. ¶8)

80. Admitted except as to the comment made in her presence, which Price concededly cannot prove given Benefield's denial.

81. Admitted.

82. Given the evidentiary citation, it is assumed that this factual assertion is limited to Benefield. To that extent, it is admitted with exception to the remark made in her presence as set forth above.

83. Admitted.

84. Admitted in part, disputed in part. Price would only contact Benefield regarding attendance problems if she were unable to reach Marshall. (Price Aff. ¶4)

85. Admitted, given the fact that Benefield, an assistant principal, was unaware of the fact that the sexual harassment policy provided that such conduct be reported only to the Title IX coordinator. (Benefield Depo. 8:15-17)

86. Admitted.

87. Price objects to this assertion and as hypothetical and self-serving.

88. Admitted.

89. Admitted.

90. Admitted with caveat regarding the remark made in her presence as set forth above.

91. Admitted.

10

92. Disputed.  Once again, Roanoke has failed to identify who was Price's supervisor.  As stated above, Price understood that she was to report such problems to Marshall.  Price did report the harassment to her.  (See responses to 2 and 9 above for citations)

93. Admitted.

94. Disputed.  See responses to 2, 9, and 92 above.

95. Admitted.

96. Admitted.

97.  It is admitted that Marcum claimed that he was unable to substantiate Price's claim.  It is disputed that he did not receive information supportive of her claim.  The notes Roanoke cites indicate several persons stating that Price related that she was uncomfortable around Cottle and avoided him.  Moreover, Marshall stated that Price in fact told her that Cottle was subjecting her to sexual harassment.  (See notes cited by Roanoke; Marshall Depo. 9: 13-10:15)

98. Admitted.

99. Price objects to the assertion of Marcum's beliefs as irrelevant and self-serving.

100. It is admitted that Roanoke has a sexual harassment policy, but it is disputed that all employees attend such meetings.  As stated above, Price did not attend them as a crossing guard. (Price Depo. 24: 17-25: 1;  Price Aff. ¶8; *cf.* Foster Depo. 9:11-10:9 (Crossing guards are "welcome" to attend the meetings))

101. Admitted but irrelevant.  As stated above, the policy in effect was different with regard to reporting sexual harassment in the policy in effect during the events of this case.  (See response to 5 above for citations)

102. Admitted but irrelevant.  Once again, the policies were different.

11

103. Admitted.

104. Disputed. As stated above, Price was never told who her supervisor was. Moreover, as also stated above, she thought that she was reporting the sexual harassment to the person she was supposed to be reporting such things. (See responses to 2 and 9 above for citations)

105. Admitted that Price seeks monetary damages for her emotional distress. It is disputed that she failed to give Roanoke a "fair chance" to remedy the problem. Roanoke never gave Price a copy of the policy to report the sexual harassment so she could find out to whom to report it. (See ¶6 of Price's affidavit regarding her unsuccessful efforts in trying to get a copy of the sexual harassment policy.) Further, as set forth above, Roanoke never told Price who her supervisor was. Finally, as set forth above, Price repeatedly reported the problem to the person she understood she was to report such problems. (See responses to 2 and 9 above for citations)

106. Admitted.

107. Disputed. As set forth above, Roanoke's sexual harassment policy provides for reporting harassment to its Title IX coordinator. (Ex. 7 to Marcum Depo. (first 2 pages) In fact, reporting harassment otherwise is contradictory to this policy. (Marcum Depo. 84:14-85: 3, 89:15-90:16)

108. Admitted but irrelevant.

109. Price objects to Cottle's apology as irrelevant and self-serving. Price further disputes that he "did not mean to." When Price would tell him to leave her alone, he would tell her, "You don't like me saying that, do you? " (Price Depo. 74:20-22) Price would tell him no, she did not. (Price Depo. 74:22) This contradicts his "mea culpa" that he did not know what he was doing.

110. Admitted only to the extent that Cottle "said" this.

111. Admitted.

112. Admitted but irrelevant.  Price would further point out, as stated above, Cottle only began using the walker after the relevant events in this case had taken place. (Cottle Depo. 25:3-14)

113. Admitted but irrelevant and self-serving.

114. Admitted.

115. Admitted.

116. Admitted.

117. Disputed that Martin (or anyone) told Price that a copy was available in the principal's office.  (Price Aff. ¶7) Price would add that she had already unsuccessfully tried to get a copy of the policy at her school library. (Price Depo. 45:4-13)

118. Disputed.  (Price Aff. ¶7)

119. Admitted.

120. Admitted with caveat that the sexual harassment policy is in the manual.

121. Admitted.

122. Based on the evidentiary source, it is assumed that this factual assertion is limited to Martin.  To that extent, it is admitted.

123. Disputed.  To begin with, it is highly questionable that Martin would have personal knowledge that "all" employees have attended these meetings.  In event, as stated above, Price did not attend these meetings as crossing guard.  (Price Depo. 24: 17-25: 1; Price Aff. ¶8; *cf.* Foster Depo. 9:11-10:9 (Crossing guards are "welcome" to attend the meetings))

124.  Admitted.

125.  Admitted with caveat as to the remark made in her presence, as set forth above.

126. Admitted.

127. Admitted.

128. Admitted.

129. Admitted; as set forth above, Price thought that Marshall was the person to whom she should report such problems.  (See 2 and 9 above for citations)

130. Admitted.

131. Admitted.

132. Admitted.

133. Admitted.

134. Admitted.

135. Admitted.

136. Admitted.

137. Admitted.

138. Admitted that she never asked for the sexual harassment policy in particular, but denied that she did not actively search for the manual, which included the policy.  (See Price Aff. ¶7)

139. Admitted.

140. Admitted.

141. Admitted.

142. Admitted.

143. Admitted that she represented this to EEOC.  Disputed that it was false.  (See response to 3 above)

144. Admitted.

145.  Disputed.  Price told Clarke and Teresa Hunter more than once that she was uncomfortable around Cottle, that she was going into the school to wait for him to leave, and that she was trying to ignore him in hopes that he would "just stop." (Price Depo. 104:15-21)

146.  Disputed.  See response to 145 above.

147.  Admitted.

148.  Disputed.  As set forth above, Roanoke's sexual harassment policy provides for reporting harassment to its Title IX coordinator. (Ex. 7 to Marcum Depo. (first 2 pages) In fact, reporting harassment to the supervisor is contradictory to this policy.  (Marcum Depo. 84:14-85: 3, 89:15-90:16)

149.  Disputed.  See response to 148 above.

150.  Admitted, but denied that anyone told Price this.  (Price Aff. ¶7)

151.  Admitted without context of time or what was being said.

152.  Disputed.  As stated above, Price told Hunter and Clarke more than once that she was uncomfortable around Cottle, that she was going into the school to wait for him to leave, and that she was trying to ignore him in hopes that he would "just stop." (Price Depo. 36:15-37:8, 104:15-21)

153.  Disputed.  See response to 148 above.

154.  Admitted.

155.  Admitted, though, as set forth above, Harmon would not have been following Roanoke's policy in doing so.

156.  Admitted.

157. Admitted without reference to time.  Price never went anywhere near Cottle was parked beginning in December of 2004 except passing by there when she would be leaving the school. (Price Depo. 56:6-9)

158. Disputed that Pollard is familiar with the policy.  As stated above, such complaints are to be made to the Title IX coordinator.  (Marcum Depo. 84:14-85: 3, 89:15-90:16;  Ex. 7 to Marcum Depo. (first 2 pages)

159.  Admitted that that was her perception.

160. Disputed.  Price reported Cottle's comments to Yarbrough on several occasions and told her that she had come into the building after work in the afternoon to wait for Cottle to leave. (Price Depo. 98: 23-99: 5, 42: 18-43: 16, 44:17) Moreover, Yarbrough considered Price's reports to be "complaints."   (Yarbrough Depo. 11: 7)

161. Admitted without reference to time.  Price never went anywhere near Cottle was parked beginning in December of 2004 except passing by there when she would be leaving the school. (Price Depo. 56:6-9)

162. Admitted, though disputed that anyone told Price this. (Price Aff. ¶7)

163. Disputed.  As stated above, such complaints are to be made to the Title IX coordinator. (Marcum Depo. 84:14-85: 3, 89:15-90:16;  Ex. 7 to Marcum Depo. (first 2 pages)

164. To the extent that this means no one other than Price, this is admitted.

## II.  PRICE'S ADDITIONAL FACTS

### A.  Additional Undisputed Facts

Price will now set forth additional facts that are not anticipated to be disputed by Roanoke.[2]

1.  Copies of Roanoke's policy manual are not distributed to the employees. (Marcum Depo. 66:4-6)

2.  Of eight Handley Middle School Employees deposed in this case– teachers, office workers, and even the assistant principal–  none of them knew the proper person to report sexual harassment to under Roanoke's policy.  (Clark Depo. 10:1-4;  Cottle Depo.  12: 18-20;  Yarbrough Depo.  14:10-11; Marshall Depo.  18:17-18; Hunter Depo.  24:2-6; Harmon Depo.  9:-12-13; Pollard Depo. 12:3-13:2; Benefield Depo. 8:15-17)

3.  The only one deposed who knew the proper person was Principal Foster. (Foster Depo. 8:8-14)

### B.  Additional Disputed Facts

Price will now present her additional facts that are anticipated to be disputed by Roanoke.

4.  During the 2003-2004 and 2004-2005 school years, Cottle made the remarks to Price:

• About her appearance, such as telling her she was pretty, that she had pretty legs, or ask her to show him her "pretty green eyes."  (Price Aff. ¶1; Price Depo. 113:6-7)

• Telling her he wished he had met her before her husband.  (Price Aff. ¶1; (Price Depo. 73:4-5)

---

[2]References to deposition testimony are to page and line separated by colon.  For example, reference to "Price Depo. 13:2-5" would be page 13 of that deposition from line two through line five.  Reference to "Price Depo. 13:2-14:5" would be page 13 of that deposition from line two to page 14 through line five.

• Asking her many times to go places with him- to Florida, to a football game, to Cheaha, to just go riding in the car, or to tell everyone that they had a school board meeting that night and go to LaGrange, Georgia. (Price Aff. ¶1; Price Depo. 71: 21-72: 2, 113:14-20)

5.  Also during this time, he would put his hands on her cheeks on cold mornings. (Price Aff. ¶1; Price Depo. 114:5-9)

6.  Cottle made the comments and actions described above about four times a week in the 2003-2004 school year. (Price Aff. ¶2)

7.  In the 2004-2005 school year, he also made the comments and actions described above about four times a week, but they were more personal: there were still the comments about Price's appearance, but there was more of the "let's go out" type comments and more directness and insistency in his comments. (Price Aff. ¶2)

8.  From August to October of 2005, Cottle's comments and actions got worse and were on a daily basis. (Price Aff. ¶2) They continued to include the previous type comments, but now they included the comments referenced in Roanoke's brief about his kissing Price's check, shoulder and hand, and "eat[ing]" her. (Price Aff. ¶2)

9.  Cottle's behavior toward Price was very distressing and distracting to her. (Price Aff. ¶3)

10.  Throughout the entire time, Price told him many times to stop with his comments. (Price Aff. ¶3; (Price Depo. 72: 5-6, 75:1-2)

11.  When Cottle would touch Price, she would push his hands away and tell him to stop. (Price Aff. ¶3; Price Depo. 114:12-15)

12.  It got to where Price did not want to come to work. (Price Aff. ¶3) (Price Depo. 127:20-128:1)

13.  In the mornings, Price would come in just before her scheduled start time to try to avoid any possible conversation with Cottle.  (Price Aff. ¶3)

14.  This caused her to have to time her arrival every day to get there just at start time and she often had to rush to be at her post on time.  (Price Aff. ¶3)

15.  In the afternoons, after she was done with work, she would go inside the school, sometimes hiding in the women's room, to get away from Cottle and would wait there until he left. (Price Aff. ¶3; Price Depo. 38: 8-15)

16.  Price did not tell her husband about the situation until the fall of 2005, right before she decided to pursue legal action.  (Price Aff. ¶3)

17.  This caused her great anguish, because she felt she was keeping something from him plus she could not lean on him for support.  (Price Aff. ¶3)

18.  However, Price was afraid that he might do something to Cottle.  (Price Aff. ¶3)

19.  Their son attended Handley Middle School, though Price did not live in the county. (Price Aff. ¶3)

20.  Their son was only allowed to go to school there because Price worked there.  (Price Aff. ¶3)

21.  Price did not want to lose her job over what was happening with Cottle or what her husband might have done had she told him. (Price Aff. ¶3)

22.  Price needed to keep her job at the school because she wanted her son to attend school there, as she thought it superior to the one in her county.  (Price Aff. ¶3; Price Depo. 123:3-6)

23.  Price was never given a copy of any sexual harassment policy. (Price Aff. 6)

19

24. She never saw one posted anywhere, and she was never informed that there was one available anywhere to her. (Price Aff. 6)

25. Price had never heard of the position of Title IX coordinator until after she filed this lawsuit, and she did not know she was supposed to have reported sexual harassment to that person. (Price Aff. 6)

26. After Cottle's comments had gotten so bad in August of 2005, Price decided she could not rely on what she understood to be her chain of command by reporting problems to Marshall. (Price Aff. 6)

27. Price did not know how to report sexual harassment but wanted to find the applicable policy to report it to the right person. (Price Aff. 6; Price Depo. 46:4-7, 61:1-9)

28. Price did not go to the principal or assistant principal to complain about Cottle because she was not sure to whom she should report the problem. (Price Depo. 40:1-2)

29. Price went to the school library looking for the policy, where the librarian told her that the school's copy of the policy was packed up due to renovations and directed her to the high school. (Price Aff. 6; Price Depo. 45:4-13; Marcum Depo. 68:16-18)

30. Price called the high school and was also told that its copy of the policy was packed up. (Price Aff. 6; Price Depo. 45:9-13)

31. Price then called the board central office and spoke to Martin there, who told her that its copy of the policy was unavailable because it was torn apart due to the fact that it was being revised. (Price Depo. 47:4-13; Marcum Depo. 69:22-70:2)

## ARGUMENT

Roanoke raises two arguments: (1) Price cannot establish that Cottle's alleged conduct was severe or pervasive, and (2) Price failed to report the alleged conduct pursuant to its set policy.

## I. THE CONDUCT WAS SEVERE OR PERVASIVE

In assessing whether harassment is objectively severe and pervasive, courts typically look to: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct was physically threatening and humiliating or just a mere utterance; and (4) whether the conduct unreasonably interferes with the employee's work performance. In considering these factors, we employ a totality of the circumstances approach, instead of requiring proof of each factor individually.

*Hulsey v. Pride Restaurants, LLC*, 367 F.3d 1238, 1247-1248 (11th Cir. 2004) (citations omitted)

With regard to frequency, there is no "magic" number of incidents required. *Miller v. Kenworth of Dothan,* 277 F.3d 1269, 1276 (11th Cir. 2002). On the one hand, "sporadic use of abusive language" is not enough. *Faragher, supra,* 524 U.S. at 788. On the other, "it is repeated incidents of verbal harassment that continue despite the employee's objections that are indicative of a hostile work environment." *Miller, supra* (internal quotes and brackets and citation omitted). In *Miller*, three to four daily incidents of racial or ethnic remarks over a period of one month was enough. In *Hulsey, supra,* eighteen events over two to two and a half weeks was sufficient. In *Johnson v. Booker T. Washington Broad. Serv.*, 234 F.3d 501, 509 (11th Cir. 2000), fifteen incidents over the course of four months was sufficient.

21

In Price's case, there were incidents occurring on average of four times per week in the 2003-2004 and 2004-2005 school years and on a daily basis from August to October of 2005.[3]  In light of the above cited case law, that is a sufficient number of incidents, particularly considering the length of time they occurred in.

As for the severity of the conduct, which is Roanoke's primary argument, it first argues that Cottle's conduct was not sufficiently sexual in nature for Price to be objectively offended.  This is contrary to the evidence.  How can it be argued that Cottle's regular comments about Price's appearance, legs, and eyes, were not of a sexual origin, especially considering the numerous times that he put his hands on her and asked her to go out with him?  If there could be any doubt about the sexual nature of the actions, it was removed with Cottle's attempt to kiss Price and telling her that she looked "good enough to eat."  What woman would not be offended by that?  In sum, Cottle's frequent comments and actions made over a long period of time were clearly of a sexual nature and were sufficiently pervasive.  *Meritor Savings Bank, FSB* v. *Vinson,* 477 U.S. 57, 67 (1986) ("For sexual harassment to be actionable, it must be sufficiently severe or pervasive") (underlining added); *Hulsey, supra,* at 1244 (same).

---

[3]With regard to the claim under Title VII, Price filed her EEOC charge in October of 2005, which would timely bring in the events of that semester as well as the 2004-2005 school year, that school year ending less than 180 days from when the charge was filed.  *National Railroad Passenger Corporation v. Morgan,* 536 U.S. 101, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002) (harassment charge brings in entire period of harassment if filed within 180 days of its ending); *Shields v. Fort James Corp.,* 305 F.3d 1280 (11th Cir. 2002)*; Watson v. Blue Circle, Inc.* 324 F.3d 1252 (11th Cir. 2003).  As to the 2003-2004 school year, Roanoke makes no statute of limitations argument under Title VII, so it is presumed there is no contention of a limitations problem.  As for the §1983 claim, there is no argument on this claim either.

Roanoke next argues that Price did not feel threatened or humiliated by Cottle's conduct, nor did it interfere with her work. Nothing could be further from the truth. In addition to not wanting to come to work at all because of Cottle, Price has testified that, in the mornings, she would delay her arrival at work so that she would not have to interact with him.[4] This often caused her to have to rush to get to her post on time. In the afternoons, when she was done with work, Price would flee inside the building, sometimes hiding in the women's room, to get away from him. This clearly demonstrates that Price had a strong aversion to Cottle's conduct, *i.e.*, that she was humiliated by it. It further demonstrates that his conduct most definitely interfered with her work. Cottle had to have known that his conduct was offensive to Price because he would tell her, "You don't like that, do you?" when he would make his comments. Moreover, Price was unable to tell her husband about the harassment for almost two years for fear that he would react "negatively" and jeopardize their son's ability to attend a school, which caused Price great anguish. In sum, Cottle's conduct interfered with Price's work and caused her significant emotional trauma.

The cases cited by Roanoke– *Gupta v. Florida Board of Regents*, 212 F.3d 571, 583 (11th Cir. 2000) and *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1247 (11th Cir. 1999)– are inapposite because they clearly do not have sexual harassment of the frequency and duration that is present in this case. To conclude on this issue, Price has presented evidence from which a reasonable person could find that Cottle's sexual harassment of her was sufficiently severe or pervasive.

---

[4]Despite Roanoke's contention to the contrary, Price regularly told Cottle to leave her alone.

## II.  PRICE DID NOT FAIL TO REPORT THE HARASSMENT

Price agrees with Roanoke's statement of the law that it will be responsible for the sexual harassment of a coworker where it knew (actual notice) or should have known (constructive notice) of the harassment and failed to take immediate and appropriate corrective action. *Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1259 (11th Cir. 2003).  Price bases her claim primarily on constructive notice.  With regard to cases where the employer claims to have had an effective anti-discrimination policy disseminated to its employees, "where there is an ineffective or incomplete policy, the employer remains liable for conduct that is so severe and pervasive as to confer constructive knowledge." *Id.* at 1260.

Roanoke claims that Price has no valid cause of action because she failed to follow its sexual harassment policy in reporting the harassment.  In order for Roanoke to use its policy as a shield from constructive notice, it must prove (1) that it disseminated an effective policy and reporting procedure regarding harassment; and (2) plaintiff unreasonably failed to follow it.  *Frederick v. Sprint/United Management Co.*,  246 F.3d 1305, 1313 (11th Cir. 2001); *Watson, supra*, at 1260. Roanoke bears the burden of proving both elements.  *Frederick, supra.*

As to dissemination, Price never received the policy.  Roanoke discusses at length a meeting in 1998 that Price attended that regarded, among other things, reporting sexual harassment.  This argument is irrelevant because the policy that was in place at that time was different from the policy that was in place during the events of this case with regard to the critical component of to whom the harassment should be reported.  Under the old policy, complaints were made to an employee's supervisor; under the policy in place during the events of this case, complaints were made to Roanoke's Title IX coordinator.  Consequently, Roanoke's argument on this subject is moot.

24

With regard to the policy that was in place during the events of this case, it is undisputed that it was not disseminated to Price. Moreover, Price was never told where to find it. She made a valiant effort in trying to locate it by going to her school's library, the high school's library, and the central office looking for a copy. However, she was unsuccessful, and no one had told her that a copy was available in the principal's office. Consequently, Price did not know who she should report the harassment to, despite her efforts.[5] Roanoke's policy therefore was not effectively disseminated. Even if it were, Price's diligent albeit unsuccessful efforts in trying to locate the policy to find whom she should report the harassment to preclude a finding that she was unreasonable in following the policy.[6]

Based on the foregoing, Roanoke's policy does not shield it from constructive notice of Cottle's harassment of Price.

The Eleventh Circuit holds "the following factors to be germane to the issue of constructive notice of harassment: (1) the remoteness of the location of the harassment as compared to the location of management; (2) whether the harassment occurs intermittently over a long period of time; (3) whether the victims were employed on a part-time or full-time basis; and (4) whether there were

---

[5]Interestingly, of the nine employees at the school who were deposed, only the principal was aware of what the policy actually provides for as for reporting harassment. This includes the assistant principal, whom Roanoke touts as someone to whom complaints of harassment should be made. How can a policy be effective if a person supposedly in charge of receiving complaints regarding it does not even know its provisions? *Accord Miller, supra*, at 1279 (management's lack of familiarity with policy undercut assertion that policy was effective).

[6]With regard to the period of harassment occurring prior to Price's attempts to locate the policy, Roanoke's defense on the policy is unfounded because it failed to disseminate the policy to her by, at the least, telling her where she could find it.

only a few, discrete instances of harassment." *Miller, supra,* at 1278 -1279 (internal citations omitted).

Applying these factors to this case, it is clear that constructive notice should apply. Before addressing the factors, it must be reiterated that Roanoke never told Price who her supervisor was. Rather, she reported all problems to Marshall, and she was never told not to do this.[7] As for the first factor, the harassment took place right outside the building. Moreover, Price would frequently come inside the building to not only get away from Cottle, but also to tell the employees in the office about the harassment. Additionally, at least one employee (Hunter) admitted to observing that Price was trying to ignore Cottle. Consequently, the harassment was not something so far removed from the workplace that constructive notice should not be applied. As for whether the harassment occurred intermittently over a long period of time, no it did not. It did occur over a long period of time, but not intermittently; rather, it occurred on a regular basis. As for the third factor, both Price and Cottle were part-time, which normally would reduce the inference of constructive notice. However, given the fact that the harassment occurred over two years, it is asserted that this length of time negates the part-time issue. With regard to the final factor, the frequency and number of events, as stated they were regular and occurred over two years. Price would add that over this period, she was coming into the school and complaining about harassment in the office, and hiding from Cottle inside the building. Several employees in the office were notified of the harassment, observed Price ignoring Cottle, and were told that Price was trying to stay away from him. There is ample evidence from which a reasonable person could conclude that Roanoke should have known of the harassment. The

---

[7]Price would argue that actual notice should be found given that (1) Roanoke failed to tell Price who her supervisor was, (2) Price was allowed to report all problems to Marshall, and (3) Price did report the sexual harassment to Marshall.

fact that it failed to notify Price of who her supervisor was to report such harassment or inform her how to find its harassment reporting policy further supports this conclusion.

## CONCLUSION

Based on the foregoing, Roanoke's motion for summary judgment is due to be denied.

Respectfully submitted,

/s Adam M. Porter
Adam M. Porter
Attorney for Plaintiff
2301 Morris Avenue, Suite 102
Birmingham, Alabama 35203
(205) 322-8999

## CERTIFICATE OF SERVICE

I hereby certify that on August 22, 2007 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, who will electronically provide a copy of the foregoing to Donald B. Sweeney, Jr., Esq Bradley Arant Rose & White LLP One Federal Place 1819 Fifth Avenue North Birmingham, AL 35203-2104 and that there are no non-CM/ECF participants in this case to whom hard copies should be mailed.

/s Adam M. Porter
Counsel for Plaintiff